**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JIA TIAN and DAVID FEIGELMAN, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | Case No. 1:23-cv-04279-MKB-JRC |
| PELOTON INTERACTIVE, INC., JOHN FOLEY, BARRY MCCARTHY, JILL WOODWORTH, ELIZABETH F. CODDINGTON, THOMAS CORTESE, HISAO KUSHI, and TAMMY ALBARRÁN, | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

**AMENDED CLASS ACTION COMPLAINT**
**<u>FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>**

## TABLE OF CONTENTS

NATURE OF THE ACTION ................................................................................................. 1

JURISDICTION AND VENUE .......................................................................................... 5

PARTIES ............................................................................................................................. 6

THE CONFIDENTIAL WITNESSES ............................................................................... 7

SUBSTANTIVE ALLEGATIONS ..................................................................................... 8

    A.   Relevant Background ......................................................................................... 8

        1.   Overview of the Company and Its Business ......................................... 8

        2.   May 2021 Recall and Scandal Involving Peloton's Tread Products ...................... 11

    B.   Design and Construction of Peloton's Bike and Bike+ Products.................................. 15

    C.   The Bike Seat Post Safety Defect Known to Defendants .............................................. 18

        1.   Peloton's Systems for Tracking and Analyzing the Member Experience.............. 18

        2.   Peloton Received a Steady Stream of Reports About a Catastrophic Safety Failure of the Seat Post on Its Most Widely-Used Bike Product ........................... 21

    D.   Executives Devise "Project Tinman" to Cover Up a Known Bike Flaw ...................... 32

MATERIALLY FALSE AND MISLEADING STATEMENTS................................................. 34

THE TRUTH EMERGES IN A SERIES OF PARTIAL DISCLOSURES ............................... 59

    A.   Concerned Employees Inform the Media About Project Tinman But Peloton Continues to Deceive the Market By Denying Any Issue ........................................... 59

    B.   Peloton Announces a Recall of All Bikes Sold Between 2018 and 2023 ..................... 61

    C.   Peloton's CEO Backpedals on the Nature and Scope of the Recall.............................. 64

    D.   Peloton Reveals a Sharp Increase in Subscription Losses Due to the Recall ............... 65

ADDITIONAL FACTS PROBATIVE OF SCIENTER................................................................ 67

    A.   Defendants Had An Affirmative Duty to Investigate Bike Safety Issues ..................... 68

    B.   Bike-Related Reports Were Escalated Up The Chain to Peloton's Executives............ 71

    C.   The "Project Tinman" Coverup Supports an Inference of Scienter ............................. 73

    D.   Peloton's Change to Its Procedures for Handling Complaints About Signs of Bike Rust Is Strong Evidence of Scienter ........................................................................... 74

    E.   Defendants Were On Notice of the Likelihood and Extent of a Bike Recall................ 75

    F.   Numerous Government Investigations Support the Inference of Scienter..................... 77

    G.   Peloton's Settlement With the CPSC Supports An Inference of Scienter .................... 78

    H.   Defendants' Denials Support An Inference of Scienter ............................................... 79

    I.   Defendants Foley and Cortese Pledged Their Stock As Collateral At the Peak of Peloton's Stock Price And Faced Margin Calls As the Stock Declined ....................... 80

    J.   Defendant Coddington Enriched Herself Through the Sale of Inflated Stock.............. 82

i

K.    The Peloton Bike And Product Safety Are At The Core Of Peloton's Business ........... 83

L.    Foley and Woodworth Were Hands-On Managers ....................................... 84

M.    *Resondeat Superior* and Agency Principles Apply ....................................... 84

LOSS CAUSATION ............................................................................................... 85

PRESUMPTION OF RELIANCE ........................................................................... 87

NO SAFE HARBOR ............................................................................................... 89

CLASS ACTION ALLEGATIONS ........................................................................ 90

COUNT I ................................................................................................................ 92

COUNT II ............................................................................................................... 94

PRAYER FOR RELIEF ......................................................................................... 95

DEMAND FOR TRIAL JURY .............................................................................. 96

Court-appointed lead plaintiffs Jia Tian and David Feigelman ("Lead Plaintiffs") and additional plaintiff Sam Solomon (collectively, with Lead Plaintiffs, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, as for their First Amended Class Action Complaint against defendants Peloton Interactive, Inc. ("Peloton" or the "Company"), John Foley, Barry McCarthy, Jill Woodworth, Elizabeth F. Coddington, Thomas Cortese, Hisao Kushi, and Tammy Albarrán (collectively, with Peloton, "Defendants"), allege the following on personal knowledge as to their own acts and on information and belief as to all else based upon the investigation by counsel, which has included, among other things, a review and analysis of regulatory filings made with the U.S. Securities and Exchange Commission ("SEC"), securities analyst research reports, press releases, news reports, and other publicly available information issued by, or about, Peloton or the industry in which it operates, interviews with former employees of Peloton, and expert consultation.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action that asserts claims against the Company and certain of its top officials for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Peloton securities between May 6, 2021 and August 22, 2023, both dates inclusive (the "Class Period"), and were damaged thereby (the "Class").

2.      Peloton operates an interactive fitness platform in North America and internationally.  The Company manufactures, markets, and sells personal fitness equipment, including its flagship Peloton Bike, through which it offers a subscription to streaming live and

on-demand fitness classes.  In addition to the Bike, the Company sold the following "Connected Fitness Products" during the Class Period:  a premium version of the Bike known as the Bike+, a treadmill marketed as the Tread and a premium version of the Tread known as the Tread+.

3.     The Company produces revenue through two means:  sales of its Connected Fitness Products, like its Bike, and sales of month-to-month subscriptions to its digital library of live and on-demand fitness classes.  By the start of the Class Period, the Bike was Peloton's top-selling SKU, accounting for the "significant majority" of its overall sales, and almost 75% of Peloton's subscription revenues were associated with Connected Fitness Products, including the Bike.  Thus, Peloton's two revenue sources are largely interconnected:  a defect with a Connected Fitness Product (including the ever-popular Bike) which renders the device inoperable simultaneously damages Peloton's subscription revenues, particularly with respect to the Bike.

4.     Furthermore, the investing community was keenly focused on Peloton's subscription revenues, as the only source of revenue from a customer after an initial product purchase was often through his or her monthly subscription.  As such, the rate of subscription cancellations, referred to as "churn," was an extremely important metric for investors and analysts. Prior to the Class Period, Peloton boasted an unprecedented churn rate of less than 1%.

5.     The Class Period commences in May 2021, when Peloton was suffering a financial and reputational crisis.  The U.S. Consumer Product Safety Commission ("CPSC") had recently issued an urgent warning to stop using the Company's Tread+ after learning that a child died and other children and small pets were severely injured by being trapped under the rear of the tread while the unit was engaged.  At first, Peloton vigorously denied the CPSC's claims and refused to recall the product, but ultimately issued a recall after receiving staunch criticism from industry

experts, academics, and consumer advocacy groups.  As a result of these missteps, the Company

was scandalized and suffered significant product and subscription losses.

6.     In an effort to regain the public's trust and repair its damaged brand and reputation,

Defendants assured investors, consumers, and the public that the Company was prioritizing

consumer safety.  However, at the same time, Pelton was receiving a cascade of complaints that

the seat post on the Bike was detaching *while in use*, posing an alarming safety risk to the millions

of customers who used the popular device.  In an apparent effort to evade further public scrutiny

and losses in the wake of the Tread+ scandal, throughout the Class Period, Defendants concealed

this recurring issue from customers and regulators alike and continued to laud the quality of its

remaining products, including the Bike, and its commitment to safety.  Thus, unbeknownst to

investors, the Company's widely-used Bike suffered from a hidden safety defect that posed a

significant threat to Peloton and its business.

7.     Defendants were well aware of the safety-related complaints about the Bike's seat

post.  Throughout the Class Period, Peloton received a steady stream of reports about the seat post

defect through its customer service resources, social media pages that the Company admittedly

(and verifiably) monitored, and even directly from the CPSC.  Indeed, Peloton contacted several

of these customers to ask them to provide it with the detached seat.  Not only did Defendants have

a known duty to monitor such complaints in the wake of the Tread+ recall, these complaints were

circulated to management as a matter of practice and reviewed by executive-level safety

committees.  In addition, when the Company became aware that Bikes at its warehouses had a

build-up of visible rust on the interior of the seat frame, the Company's senior-most executives

issued a set of company-wide directives code-named "Project Tinman" to cover up the rust with a

sealing agent and send the Bikes to customers at full price.  Even worse, at around the same time,

Peloton was receiving photographic evidence of detached seats with severe rust along the inner edge of the break. By May 2023, Peloton received 35 reports of the seat post detaching from the bike during use, 13 of which involved serious injuries such as a fractured wrist and lacerations—far in excess of levels which prompted recalls for similar products by the CPSC.

8.     Unfortunately, Peloton's customers were not the only individuals harmed by Defendants' actions. Plaintiffs and the other Class members experienced significant losses as investors in a market that was propped up by false and misleading statements that failed to disclose the ongoing safety issues associated with the Bike.

9.     It was not until February 2022 that investors began to learn the truth about these significant defects and their impact on the Company. In February 2022, the *Financial Times* exposed the details on Project Tinman. Former employees were so troubled by the covert operation that they brought the story to the publication and provided it with internal documents memorializing the plan. On this news, Peloton's stock fell approximately 14% in the aggregate.

10.    In the Company's quarterly report filed with the SEC on May 4, 2023, Peloton disclosed that it accrued a modest $8.4 million to remedy a problem with the seat post on its Bikes, but assured that it did not expect the amount to grow by a material amount. Investors were thus jolted a week later when Peloton announced a purportedly voluntary recall of *2.2 million* Peloton Bikes sold from 2018 to 2023 (the "Recall")—the vast majority of all Bikes it sold—stating that "[t]he bike's seat post assembly can break during use, posing fall and injury hazards to the user." The CPSC told consumers to cease use immediately until repaired by Peloton. On this news, Peloton's stock price fell 8.9% to close at $6.86 per share on May 11, 2023.

11.    Just over two weeks later, on May 24, 2023, Peloton's CEO, Barry McCarthy participated in a conference during which he admitted that the scope and cost of the Recall would

be more extensive than the Company previously reported on May 4, 2023, and that the Recall was "mandated" by the CPSC.  The Company's stock price tumbled over 5% in response to this news.

12.     On August 23, 2023 Peloton belatedly admitted that the May recall's price tag "substantially exceeded" expectations "leading to an additional accrual of $40 million this quarter for actual costs incurred as well as anticipated future recall-related expenses."  This was a nearly 600% escalation, substantially increasing reported losses.  The Company also reported a significant increase in lost and suspended subscriptions as customers waited to receive a replacement post for their Bike in connection with the Recall, leading to a decrease in the overall number of subscriptions for the first time since the Company went public in 2019.  On this news, Peloton's stock price fell 22.6% to close at $5.41 per share on August 23, 2023.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, codified at 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations duly promulgated thereunder, including SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27(a) of the Exchange Act, codified at 15 U.S.C. § 78aa(a) because Defendants transact business in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.  Among other things, Peloton maintains a warehouse facility in Syosset, New York, and the Official Peloton Member Page on Facebook indicates that there are hundreds if not thousands of active Peloton members located throughout this judicial district.  Peloton also maintained retail showrooms at Roosevelt Field in

Garden City, New York, and The Gate in Manhasset, New York, during the Class Period, and previously operated warehouse facilities in Farmingdale, New York, and Port Jefferson, New York during the Class Period.  In addition, the transfer agent for Peloton's Class A common stock is American Stock Transfer & Trust Company, LLC, located in Brooklyn, New York.

16.     In connection with the acts and omissions alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

17.     Plaintiffs acquired Peloton securities at artificially inflated prices during the Class Period, as set forth in the Certifications previously filed with the Court (ECF Nos. 1, 11-1, 15-6) and attached hereto, and were damaged thereby, as set forth herein.

18.     Defendant Peloton is a Delaware corporation with principal executive offices located at 441 Ninth Avenue, Sixth Floor, New York, New York 10001.  Peloton's Class A common stock trades on the Nasdaq Stock Market ("NASDAQ") under the ticker symbol PTON.

19.     Defendant John Foley ("Foley") is a co-founder of Peloton and served as its CEO and Chairman of Peloton's Board of Directors (the "Board") from before the start of the Class Period until February 9, 2022.  He served as Executive Chairman of the Board from February 9, 2022 until September 12, 2022.

20.     Defendant Barry McCarthy ("McCarthy") has served as CEO and President of Peloton, and as a member on its Board, since February 9, 2022.

21.     Defendant Jill Woodworth ("Woodworth") served as Peloton's CFO from before the start of the Class Period until June 13, 2022.  She served as a consultant to Peloton from June 13, 2022 until September 13, 2023.

6

22.     Defendant Elizabeth F. Coddington ("Coddington") has served as Peloton's CFO since June 13, 2022.

23.     Defendant Thomas Cortese ("Cortese") served as Peloton's Chief Operating Officer from before the start of the Class Period until August 2021.  He served as Chief Product Officer from August 2021 until November 1, 2023.

24.     Defendant Hisao Kushi ("Kushi") served as Peloton's Secretary and Chief Legal Officer from before the start of the Class Period until October 3, 2022.

25.     Defendant Tammy Albarrán ("Albarrán") has served as Peloton's Chief Legal Officer and Corporate Secretary since October 3, 2022.

26.     Defendants Foley, McCarty, Woodworth, Coddington, Cortese, Kushi, and Albarrán and are referred to herein as the "Individual Defendants."

## THE CONFIDENTIAL WITNESSES

27.     CW1 worked for Peloton from April 2021 until February 2022.  CW1 was a Product Manager for the Supply Chain and was based in New York City but also spent time at Peloton's assembly facilities in Carteret, New Jersey, Los Angeles, and San Francisco.  CW1 reported to Senior Director of Business Operations Taylor Thornton, who reported to former Senior Vice President of Global Operations and Supply Chain, Jennifer McKeehan.  McKeehan, in turn, reported to Chief Supply Chain Officer, Jon Adee.  CW1 was responsible for working on the manufacturing execution system, which involved monitoring and tracking of the manufacturing process to pull in more data.

28.     CW2 worked at Peloton from July 2021 to September 2023.  CW2 worked as a Member Support Supervisor from July 2021 to October 2022, based in Tempe, Arizona, and as a Senior Partner Analyst from October 2022 to September 2023, in Atlanta, Georgia.  CW2 reported to Director of Global Member Support Operations, Tera Rogers.  As a Member Support

Supervisor, CW2 oversaw 30 team members who fielded calls from members seeking customer support.   As a Senior Partner Analyst, CW2 was responsible for supervising the third-party answering service that Peloton used.

29.     CW3 worked for Peloton from August 2020 to February 2022.   CW3 served as an Assembly Technician from January 2021 to November 2021 and as Quality Control Inspector from November 2021 until February 2022.   CW3's supervisor was Juan Rodriguez, who reported to Senior Manufacturing Manager, Juan Ramos.   As an Assembly Technician, CW3 calibrated the Bikes, and as a Quality Control Inspector, CW3 inspected incoming Bike+ shipments.

30.     CW4 worked for Peloton from January 2021 to February 2022 as a Quality Control Inspector in its Carteret, New Jersey warehouse.   CW4 also reported to Juan Perez, who reported to Senior Manufacturing Manager, Juan Rodriguez.   As a Quality Control Inspector, CW4 was responsible for testing Bikes and Bike parts that arrived at the plant to make sure they were mechanically sound.   In late 2021, CW4 was directed to inspect Bike parts for rust in connection with Project Tinman.

## SUBSTANTIVE ALLEGATIONS

### A.     Relevant Background

#### 1.     Overview of the Company and Its Business

31.     Peloton is a technology-enabled fitness company that sells home fitness machines and operates a subscription-based digital library of interactive exercise classes.   The Company's exercise machines are equipped with a large touchscreen video display which provide direct access to Peloton's course catalog and, as such, are referred to as its "Connected Fitness Products."   By the start of the Class Period, Peloton's Connected Fitness Products included a stationary spin bike known as the Bike and a treadmill known as the Tread.   Peloton's digital platform is also accessible to those who do not have a Connected Fitness Product through Peloton Digital, an app available

on most smart phones, tablets, and computers.  Peloton offers classes across multiple disciplines, including cycling, running, yoga, Pilates, strength training, meditation, and floor cardio.  Each member has a unique individual profile and can, among other things, interact with other members and track their fitness goals.

32.     Founded in 2012 by Defendants Foley and Cortese and three others, Peloton began by selling its novel touchscreen Bike as a more convenient home alternative to the in-person fitness classes that dominated the industry at the time.  The concept soon gained traction with consumers and its subscriber base and sales steadily grew.  Its annual revenues more than doubled nearly every year.  By June 30, 2018, the Company accumulated almost 250,000 active subscribers, and generated over $435 million in revenues.

33.     In late 2018, Peloton introduced its second Connected Fitness Product, the Tread, at the premium price of $4,295.  Unlike most traditional treadmills, which use a continuous nylon belt, the running area on the Tread was made of 59 horizontal slats coated in rubber that roll on a system of ball bearings.  To accommodate this system, the Tread featured a very large, sturdy frame which brought its total weight to over 450 pounds.  As designed, the area of the slat belt which wraps around to the underside of the unit was fully exposed, without any type of cover or guard to prevent items or people from being pulled under by the belt while the unit is in use.

34.     As of June 30, 2019, Peloton had more than 500,000 active subscribers, and its annual revenues reached almost $1 billion.  To capitalize on its success, management decided to take Peloton public.  On September 26, 2019, Peloton commenced an IPO in which it issued and sold over 40,000,000 shares of its Class A common stock at $29.00 per share.

35.     In 2020, Peloton experienced explosive growth fueled by the COVID-19 pandemic as home gyms became increasingly popular with lockdown restrictions and social distancing

mandates in place.  In September 2020, Peloton announced that its paid subscriptions grew by 113% to over 1 million and quarterly sales grew by 172% compared to the same quarter in the previous year.  In November 2020, Peloton reported that its subscriptions and sales grew in the following quarter by 137% and 232%.  By the end of 2020, its stock price surged to more than $171 per share.  CW1 said that, by order of magnitude, Peloton went from making approximately 100 bikes a day before the COVID-19 pandemic to 2,000 to 3,000 per day in April 2021.

36.     In response to the spike in demand for its at-home products, Peloton introduced two new Connected Fitness Products at the end of 2020.  In September 2020, Peloton released a premium version of its Bike branded as the Bike+.  It also rebranded its clunky Tread as the Tread+ and, in December 2020, released a sleeker, more lightweight version branded as the new Tread.

37.     By the start of the Class Period, the Company's revenue primarily consisted of (1) sales of its Connected Fitness Products, including its flagship Bike, and (2) recurring revenue from subscriptions, including subscriptions for Connected Fitness Product ("Connected Fitness Subscriptions") and subscriptions for Peloton Digital ("Peloton Digital Subscriptions," and together with Connected Fitness Subscriptions, the "Subscriptions").  As of June 30, 2021, approximately $3.15 billion of Peloton's $4.02 billion in annual revenues derived from sales of its Connected Fitness Products and the remainder of Peloton's $4.02 billion in annual revenues derived from Subscriptions.  While Peloton did not offer a breakdown of revenues by Connected Fitness Product, it reported that a "significant majority" of its revenues derive from the sale of its Bike and, as such, "[a] decline in sales of our Bike would negatively affect our future revenue and operating results."  Indeed, Defendant Woodworth explained during a call with analysts in November 2020 that "our original Bike will be our top-selling SKU" in fiscal 2021.  In addition, approximately 73% of Peloton's Subscriptions were Connected Fitness Subscriptions.  Thus, by

the start of the Class Period, the substantial majority of the Company's revenues were associated with Connected Fitness Products, especially the Bike.

38.     The nature of Peloton's business presents a unique challenge for investors and analysts.  Once a customer buys a Connected Fitness Product, such as the Bike, it may receive no further revenue from that customer except through his or her Subscriptions.  As a result, the rate of Subscription cancellations in a reporting period, referred to by Peloton as the "churn" rate, is an extremely important metric for investors and analysts to assess the health of Peloton's business.  For fiscal years 2021, 2020, and 2019, Peloton maintained an extremely low and consistent churn rate of 0.61%, 0.62%, and 0.65%, respectively.

39.     Peloton also prides itself on maintaining a "Members First" philosophy.  In SEC filings throughout the Class Period, Peloton said that putting "Members First" was one of its "fundamental values."  According to Peloton, this means "[w]e obsess over every touchpoint of our member experience," including the member's use of Peloton products.  As Defendant Foley explained on a conference call with investors in November 2020, "[s]ince our founding, we've prided ourselves on being a 'Members First' organization."

### 2.     May 2021 Recall and Scandal Involving Peloton's Tread Products

40.     The CPSC is an independent federal agency established in 1972 by, and for the purpose of enforcing, the Consumer Product Safety Act, codified at 15 U.S.C. §§ 2051-2089 (the "CPSA").  As explained *infra* ¶ 188, companies like Peloton that distribute consumer products into interstate commerce are required to notify the CPSC "immediately" upon receiving information indicating that such a product creates an unreasonable risk of serious injury or death.  As amended, the CPSA vests the CPSC with broad power to issue product recalls for such products and to enforce violations of its requirements, including the reporting requirements described above.

11

41.     Almost as soon as Peloton started selling its Tread in late 2018, customers began reporting that a variety of household objects were getting sucked under and entrapped by the rear of Tread's unprotected running belt while in use, often lifting the massive device off the ground. Peloton received the first such report in December 2018, and continued to receive many more over the next year, including reports of children becoming trapped and seriously injured.  On March 3, 2021, Peloton received notice that a six year-old died after being swept under the Tread's slat belt.

42.     Peloton reported the safety concern to the CSPC on March 4, 2021.  The report prompted the CPSC to initiate an investigation and it issued a number of requests for information to Peloton.  By that time, there were more than 150 reports of such incidents, including 13 serious injuries, like broken bones, lacerations, abrasions, and friction burns.

43.     After reviewing the evidence, including a disturbing home video of an incident involving a small child, the CSPC asked Peloton to recall the Tread+.  Peloton refused.  On April 17, 2021, the CSPC took the unusual step of issuing a Health and Safety Notice warning consumers with children or pets to immediately stop using the Tread+.  The notice stated that there were "multiple incidents of small children and a pet being injured beneath the machines" and that "CPSC staff believes the Peloton Tread+ poses serious risks to children."

44.     In response, Peloton vigorously denied CPSC's claims and even accused the CPSC of making misleading and inaccurate statements.  It issued a press release later on April 17, 2021, attached as an exhibit to a Form 8-K filed with the SEC, in which it stated:

> The company is troubled by the Consumer Product Safety Commission's (CPSC) unilateral press release about the Peloton Tread+ because it is inaccurate and misleading.  There is no reason to stop using the Tread+, as long as all warnings and safety instructions are followed . . . .
>
> Peloton invited CPSC to make a joint announcement about the danger of not following the warnings and safety instructions provided with the Tread+, and [Peloton's CEO John] Foley asked to meet directly with CPSC.  CPSC has unfairly

12

characterized Peloton's efforts to collaborate and to correct inaccuracies in CPSC's press release as an attempt to delay.   This could not be further from the truth.

The following day, Defendant Foley issued a letter to investors in which he stated:

> You may have read news reports suggesting that CPSC believes that we should stop selling or recall the Tread+.  I want to assure you that we have no intention of doing so.  The Tread+ is safe when our warnings and safety instructions are followed . . . .

45.    Just two weeks later, on May 5, 2021, CPSC and Peloton issued a joint press release announcing a voluntary recall of all Tread+ machines on the market.  The release included a quote from Defendant Foley in which he candidly apologized for refusing to agree to an earlier recall:

> The decision to recall . . . was the right thing to do for Peloton's Members and their families.  I want to be clear, Peloton made a mistake in our initial response to the Consumer Product Safety Commission's request that we recall the Tread+. We should have engaged more productively with them from the outset. For that, I apologize.

The recall notice published by the CSPC that day revealed that, by then, Peloton formally received 72 reports of adults, children, pets, and/or other objects being pulled under the rear of the treadmill, including ***29 serious injuries to children***.  At the time of this recall, Peloton had already sold approximately 125,000 Tread+ machines in the United States.

46.    But the Company was ultimately forced to recall the treadmill products and publicly apologized for challenging the agency's warnings.   Specifically, Defendants Foley and Woodworth caused Peloton to issue a statement to investors claiming that "[w]e have a desire and a responsibility to be an industry leader in product safety."  In total, the Tread+ recall cost Peloton over $100 million in direct recall-related expenses.

47.    The market voiced understandable concern in response to this news on the day that the recall was announced.   Bloomberg commentator Tara Lachapelle said that Peloton "blew it," and observed that its response "threatens to damage its brand and dent sales and profits."  Similarly, Justin Post, an analyst with Bank of America, decreased his recommendation for Peloton,

explaining "[w]e think tread overhang will impact the Street's long-term subscriber growth outlook and, therefore, the stock's multiple."

48.     Experts in the field of product recalls agreed.  Kaitlin Wowak, assistant professor of business operations at the University of Notre Dame's Mendoza College of Business, who specializes in product recalls, told *Business Insider* that Peloton's refusal to initially agree to a recall was troubling because "[w]hen federal agencies request that a company recall their product" they usually "do so."  Carl Tobias, Williams Chair in Law and a professor at the University of Richmond School of Law, said that in addition to endangering its customers and their families, the delay in issuing a recall may have lasting damage to Peloton's reputation.

49.     Even Peloton senior management recognized that this episode tarnished its reputation and image with customers.  On May 6, 2021, Peloton held a conference call to discuss its results for the quarter ended March 31, 2021.  On the call, Defendant Foley reiterated that "Peloton made a mistake in our initial response to the [CPSC]'s request that we recall our Tread+ product."  In response to a question from an analyst about "brand health" following the "Tread" debacle, Foley confessed that "we have some work to do to get back on the right side of the line with trust and safety" and stated that "yesterday [the recall] was a big day in mending trust."

50.     Indeed, Peloton revised the risk disclosure included in its SEC filings to reflect as much.  Before the Tread+ recall, Peloton warned in its periodic SEC filings that "[o]our success depends on our ability to maintain the value and reputation of the Peloton brand."  In its annual report for the period ended June 30, 2021, Peloton updated the narrative accompanying that warning to call out the Tread+ recall as one such "example."  Peloton also made a similar update to another warning in that same filing advising that "[o]ur products and services may be affected from time to time by design and manufacturing defects, real or perceived."

14

51.     As explained *infra* ¶¶ 214-216, Peloton ultimately agreed to pay a civil penalty of $19.2 million in response to charges by the CPSC that it failed to report that the Tread+ created an unreasonable risk of serious injury or death under the CPSA until long after it knew that it did.

**B.     Design and Construction of Peloton's Bike and Bike+ Products**

52.     The Bike, model number PL-01, is Peloton's flagship Connected Fitness Product, originally introduced in 2014.  It is a stationary bike made of a welded carbon steel frame that uses a belt drive and magnetic resistance to simulate the feel of riding on varied terrain.  Like other stationary bikes, it features an adjustable seat and handlebars.  Fully assembled, it measures approximately 59 inches long, 53 inches high, 23 inches wide, weights approximately 135 pounds, and has a footprint of approximately 24 by 48 inches.  It also features a 21.5 inch touchscreen display with built-in speakers.  A picture of the Bike is included below for reference:



53.     Notably, the Bike uses "Delta-compatible" pedals.  These pedals require cycling shoes with specialized cleats affixed to the bottom that "lock" the shoe into place unless the cyclist physically snaps out using the proper motion.  Peloton provides such shoes with each Bike order:

 

The Bike's clip-in system presents an obvious hazard relative to a standard bike pedal should the cyclist fall off the Bike for any reason, including or example, if a load bearing component of the Bike were to break off:  the cyclist will remain attached to the pedals as they fall.

54.     The seating apparatus on the Bike also uses a unique design.  As can be seen in the product pictures below, the seat of the Bike is mounted on top of a removable post that has a vertical and horizontal segment, which are connected by a welded joint:

 

This design provides the cyclist with the ability to move the seat up and down as well as forward and backward, as indicated by the red arrows.  The user manual for the Bike directs users to "[s]et the seat height level with the top of your hip bone," leaving the cyclist elevated several feet off the ground when sedentary in the saddle.  However, this design also places inherent tension on the joint whenever weight is applied on the horizontal shaft.  Indeed, the more weight that is applied, and the further back on the horizontal segment the weight is applied, the more force the joint must sustain.  Thus, the structural integrity of the joint is critical to the design of the Bike's seat post.

55.     By the time of its IPO in September 2019, Peloton sold the Bike for $2,245, including setup and installation.

56.     As explained above, Peloton released a premium version of the Bike known as the Bike+ in September 2020 when demand for home gym equipment was at an all-time high.  The Bike+ is functionally similar to the Bike but offers a variety of upgrades.  For example, the Bike+ features a larger 23.8 inch touchscreen display which can rotate 180 degrees in either direction for members who wish to use it for non-cycling classes, like strength training or yoga.  It also uses a larger frame.  Unlike the Bike, the Bike+ is 59 inches tall fully assembled.  Given that the Bike+ was not subject to the Recall, and the public reports of seat post failures were limited to the Bike, it is reasonable to infer that Peloton used different materials, construction, or manufacturers for the seat post on the Bike+ than it did on the Bike.  Below is a picture of the Bike+ for reference:



57.     At the time the Bike+ was introduced in September 2020, Peloton reduced the price of the original Bike from $2,245 to $1,895, and offered the Bike+ for sale at $2,495.  The Company also offered Bike owners the ability to trade in their original Bike for a $700 credit toward a Bike+.

**C.      The Bike Seat Post Safety Defect Known to Defendants**

       **1.      Peloton's Systems for Tracking and Analyzing the Member Experience**

58.     Prior to, and throughout the Class Period, Peloton maintained robust processes and systems for receiving direct feedback from Peloton members and monitoring their experiences, including feedback or experiences regarding safety incidents and/or product defects.   The Company received such information through several different channels.

59.     First, Peloton has a dedicated Member Support Team that is responsible for working directly with Peloton members to answer questions and to resolve their issues, including

safety issues or product defects.  As Defendant Foley explained on November 6, 2020, shortly before the Class Period, "an important part of having a 'Members First' focus is providing superior customer service . . . . We have an ongoing service relationship that we hope will extend for many, many years."  Peloton's SEC filings during the Class Period confirm that the Member Support Team is tasked with providing help on "anything . . . our Members need," including, among other things, "Connected Fitness Product trouble-shooting and repair."  Peloton members can speak with the Member Support Team by starting a live chat in the "Peloton Assistant," calling a toll-free customer service hotline, or sending an email to the customer service email address.

60.     Second, Peloton receives notice of any safety-related complaints about its products that are filed with the CSPC and posted to the CSPC's public database for such complaints at www.SaferProducts.gov.  By law, the CSPC must send the report to the manufacturer of the product within five business days of receiving it, where practicable.  A manufacturer who receives a report from the CPSC is afforded the opportunity to submit a comment in response to the report, as Peloton has done prior to, and during, the Class Period.

61.     Third, Peloton engages with members through social media.  Brad Olson, Peloton's former Chief Business Officer until February 2022, explained that Peloton does "a lot of social listening to capture what [Peloton] members and prospective members are saying about [Peloton]." In fact, Peloton maintained a group of employees during the Class Period known as "Community Associates" tasked with monitoring all social media channels for insights by current or prospective members, and addressing support-related posts, comments, and messages.  One such Community Associate based out of Peloton's Plano, Texas support center from August 2019 to October 2020 by the name Delaney Spetnagel claimed that she "[m]onitored and moderated discussions, acknowledged feedback, and resolved on average 5,000+ queries per week across Peloton social

channels." After being promoted to Community Lead in October 2020, this employee "[a]nalyzed 160k monthly social media insights across all platforms" until leaving Peloton in May 2021. As far back as 2017, Olson recognized that Peloton should "join communities created originally by our members and help to moderate where we can," including, specifically, groups on "Facebook." Accordingly, Peloton boasted throughout the Class Period that it "collects and responds to the feedback about our platform that is on our primary Facebook group," a private community of over 450,000 members called the Official Peloton Member Page. This group is invite-only and not accessible to the public. Peloton's official Facebook account is not only a member, but also an "Admin," in this group with content moderation controls.

62.     Fourth, Peloton also receives a wealth of detailed behavioral data from members through their use of Connected Fitness Products and Peloton Digital. According to an interview Brad Olson gave in June 2017, every selection made by a member on Peloton's digital platform generates data that the Company receives. This data is so specific that Peloton can see, for example, the date and time a member exercises, the type of class selected, the duration of the workout, and even whether a member got off the machine mid-workout. Olson described this as an "embarrassment of riches" and began using it to, among other things, send personalized emails to members with no recent activity. During a 2020 interview, Olson said that Peloton was "unapologetically . . . data-driven" and volunteered that "we're monitoring every day the classes that our members are taking and the activity that they're actually conducting within each of those classes." This activity continued through the Class Period. Peloton openly admitted in its SEC filings that "[w]e use performance data to understand our Members' workout habits in order to evolve and optimize our programming," including "class type, length, music and other

20

considerations."  As in 2017, Peloton's Membership team used this data to "communicate[] with Members with no recent activity."

63.     Customer complaints collected through these channels were aggregated and shared with other divisions within Peloton, including its senior executives.  According to an interview Olson gave in March 2018, when he was head of the Member Experience division, "[w]e capture every single piece of Member feedback across all channels, and read it back to ***the entire organization*** on a regular basis to identify emerging trends and areas for improvement." (Emphasis added.)  In 2020, Olson confirmed that Peloton continued to "pull all that together and share it broadly in the organization."  Specifically, Olson explained that his group "compile[s] all that data into a monthly voice of the member report and share it with basically the entire organization," including senior executives.  These reports contained, among other things, "social verbatims" and "support requests."  CW2, who worked in Member Support from July 2021 through September 2023, confirmed that these voice of member reports continued through the Class Period, and that they contained a mix of both "negative and positive feedback."

### 2. Peloton Received a Steady Stream of Reports About a Catastrophic Safety Failure of the Seat Post on Its Most Widely-Used Bike Product

64.     Throughout the Class Period, Peloton received a steady stream of reports regarding a critical and dangerous defect relating to the structural integrity of the seat post on its most popular product, the Bike, from numerous sources, including official CPSC notifications, feedback and reports to the Member Support team, and posts made on social media tracked by the Company.

65.     An Instagram user, responding to a post about the post recall in May 2023 by Pelo Buddy, a popular member community for Peloton news with over 100,000 followers, revealed that a friend reported the same exact issue to Peloton ***in 2020***, *i.e.,* before the start of the Class Period:



**jmshimek** My friend's broke in 2020…
seems like they've known about this for a
while

24w   Reply

66.     On Facebook, another user responding to a Pelo Buddy post about the seat post recall, said on May 22, 2023 that her seat broke "a couple years ago" and that she received a replacement after reporting the issue to the Company.  Thus, the Company received notice of this event multiple years before May 22, 2023, or, at the very latest, May 2021.



67.     On July 10, 2021, a 51 year-old man contacted Peloton to report that the post for his seat on his Bike split along the seam of its joint.  After Peloton informed him that a replacement would cost $65 and displayed "[n]o concern" for the alarming defect, he decided to report the issue to the CPSC.  The CPSC, in turn, reported the issue to Peloton on or around August 18, 2021. Peloton provided a response to the report in which it stated "[w]e . . . encourage Members to contact us about any issue or incident with our products by calling us" rather than reporting the issue to the CPSC.  The user provided the following photograph in the report made to the CPSC:



68.     On October 11, 2021, a Bike rider posted a related complaint about the Peloton Bike on X.com (formerly Twitter.com):



**Brooks** ✨
@brooks_koenig

i broke the peloton seat, taking it as a sign i am now THICC

5:11 PM · Oct 11, 2021

69.     On March 29, 2022, a customer posted about a similar experience on the popular social media site, Reddit, to the r/pelotoncycle subreddit.  The member fell off the Bike when the seat post broke off along the "weld" of the post joint.  The user reported this issue to Peloton customer service.



The picture below, provided by the user to Peloton customer service, shows what appears to be severe rust on the inside the seat post along the area where the break occurred:



Indeed, one Reddit user by the name mdbryan84 commented in response "that looks like internal rust to me." Several other responses were quick to draw a connection to Project Tinman and provided hyperlinks to the news stories about Project Tinman in response to the post.

70.    Another Reddit user replied to this post on May 22, 2022, and stated that the exact same incident happened to a friend's daughter who was pinned on the floor by the bike.



71.    On the Official Peloton Member Page on Facebook, a user posted on November 11, 2022 about a similar incident which involved his seat post snapping during a ride causing him to fall backwards off the bike and into the sliding glass door behind him. He contacted Peloton customer service to report the issue and was told he would have to pay for a replacement seat post. The post is shown below:



This member included the following photograph with his post, which again appears to show signs of corrosion on the inside of the post along the edge of the break:



72.     Responding to this same post on the Official Peloton Member Page, another Peloton user said the same thing previously happened with her Bike and that she also contacted the Company to the report the issue.  She was told it was a "manufacturing issue" and had to pay for a replacement but was contacted by a Peloton representative weeks later to ask that she ship the detached section back to the Company:



73.    The post generated over 700 comments, many of which pointed out what was obvious to any Bike user by then:  the failure of the weld was a serious safety defect that should be reported to the CPSC and evaluated internally for a potential recall.   A sampling of those responses is included below:



27



74.     On or around January 1, 2023, a 39 year-old woman contacted Peloton to report that the post for her seat split at the joint for the vertical and horizontal sections.

75.     Another Peloton user who had his seat post break during a ride posted pictures of his broken seat post to the Official Peloton Member Page on Facebook on January 17, 2023:



Commenting was almost immediately turned off, and, consistent with the practice of engaging with members on social media, the official Peloton account responded to the post with a message asking Eric to "send us a direct message with the email associated with your account."



76.    As Eric explained in a later interview with Pelo Buddy, "I was lucky enough to have fallen straight backwards away from the bike onto a plush carpeted area." Even though he later experienced "a stiff/tight/sore lower back," the incident would have been much worse if he "attempt[ed] to grapple the handlebars when the seat stem gave away" as he remained clipped into the pedals throughout this incident. Notably, the article continued as follows:

> One key takeaway of his [Eric's] experience was that there was no visible signs of damage or defect to the outside of his seat post prior to it breaking. The weld on his seat post snapped *from the inside*—so unless you happened to have rust developing directly on the weld, you wouldn't have any visible sign of the defect.

Eric stated that he notified Peloton about the incident through its online support chat and sent pictures of the fractured seat post. In response, Peloton sent him a replacement post.

77.    In a repost of Eric's incident where comments were allowed to proliferate, another user reported that the same thing happened to him in December 2020, and a fellow rider encouraged him to report the incident to the CPSC:



78.     Again, it was obvious to many Bike riders who commented in response to Eric's

post that an incident of this type should be immediately reported to the CPSC and prompt a recall:



79.     On or around May 11, 2023, an Instagram user stated in response to a post by Pelo

Buddy about the Bike recall that she had her seat post break and had it replaced after notifying the

Company. Thus, prior to the recall, Peloton was aware of this incident as well.



80.     Several others commented on the buildup of rust on their Bikes:



81.     On May 12, 2023, a Peloton user responded to a post about the recall on the Official

Peloton Member Page in which she said she reported the same problem to Peloton previously:



82.     A Peloton user responded on May 16, 2023 to a post about the recall from the

official "@onepeloton" account on Twitter.com (now X.com) and stated that he informed the

Company about his seat breaking and causing him severe injury months before the recall:



83.     Thus, Defendants were well-aware of the dangerous seat post defect and the associated risks it posed to members whose seat post had not yet failed.  Indeed, as of April 30, 2023, Peloton had formally received at least 35 reports of the seat post breaking "during use," according to an internal memorandum sent to employees by Peloton's Executive Product Safety Committee on or around May 4, 2023.  The memorandum also revealed that at least twelve of those incidents resulted in serious injuries, including a wrist fracture.  The figure cited therein does not even account for the many incidents Peloton knew about from scouring social media posts.

### D.     Executives Devise "Project Tinman" to Cover Up a Known Bike Flaw

84.     Before July 2022, Peloton relied on several businesses in Asia to manufacture the hardware for its Connected Fitness Products, including Tonic Fitness Technology, Inc. ("Tonic") and Rexon Industrial Corp. ("Rexon") in Taiwan.  Peloton began working with Tonic on the Bike in 2013.  In October 2019, shortly after its IPO, Peloton acquired Tonic for $47.4 million, and thereby brought its operations in house.  At the time, a Company spokesperson confirmed that Tonic was one of Peloton's two major manufacturing partners.  Senior management subsequently confirmed that the other manufacturing partner was Rexon.  For example, on August 26, 2021, Defendant Foley identified Tonic and Rexon by name when describing Peloton's manufacturing capacity for the components of its Connected Fitness Products other than the touchscreen tablet.

85.     Once manufactured, the parts for the Bike were assembled or otherwise inspected at Peloton facilities in the United States.  As explained by CW1, who oversaw supply chain operations for the Bike, Pelton would "buy" the parts from vendors in Asia, "ship them over to the US, and do a basic assembly process" at a regional Peloton facility.  CW3, who worked at a regional Peloton warehouse, similarly confirmed that "[we] had to assemble the Bikes once they arrived at the plant."  CW3 specified that this was the process for "the original Bike," not the

Bike+.  In addition, Peloton has confirmed that it has performed a pre-delivery inspection of every unit since 2016.

86.     By September 2021, Peloton's stock had taken a beating.  From an all-time high of $171 at the end of 2020, Peloton's stock price tumbled to $96.48 by September 7, 2021.

87.     At around the same time, staff at Peloton facilities noticed that Bike frames were arriving from Taiwan with a build-up of rust on the ***inside of the frame***.  But rather than return the Bikes to the manufacturer, senior management decided to paint over the issue.  According to internal documents reviewed by the *Financial Times* in February 2022, the discovery of this issue just months after emerging from the Tread+ recall prompted Peloton senior executives to issue a nationwide set of procedures code-named "Project Tinman" to conceal the corrosion with a chemical agent and send the Bikes to customers as such.  These protocols directed staff assembling or inspecting the Bikes in the United States to apply a chemical solution called a "rust converter," pelotwhich concealed the corrosion by reacting with the rust to form a "black layer" like the color of the frame, and set forth criteria for determining what level of rust was "acceptable."  One such document stated:  "It is acceptable if you see some rust through the black layer as the severity of the rust is reduced using the rust converter."  The scheme was called Tinman to avoid terms like "rust," which were out of step with Peloton's image as a high-quality brand.

88.     The nationwide, executive-level cover up was verified by eight Peloton employees in four different states interviewed by the *Financial Times*, including several "warehouse workers," a "team lead" and others who supplied internal documents to the publication memorializing the protocols associated with the operation.  According to these sources, Bikes with visible rust on the ***inside of the frame*** were knowingly sent to customers as a direct result of the Tinman protocols.  Prior to Tinman, a Bike frame with ***any*** rust was automatically disqualified

from being sold.  Another employee provided a photograph to the *Financial Times* showing that Peloton was still receiving Bike frames with such rust as of February 2022.

89.     Project Tinman is also corroborated by first-hand accounts from CW4, who was assigned to Project Tinman in late 2021.  According to CW4, "we had to take a heavy-duty flashlight and shine it into the inside of the bike to check the severity of the rust."  As CW4, "if there was a lot of rust then . . . they would get scraped out and then sprayed down on the inside." CW4 did not recall the name of the product used to disguise the rust but noted that "[i]t looked like Elmer's Glue."

90.     CW3 confirmed that warehouse personnel were told by Company "executives" that corroded Bike frames were stuck in shipping containers at the Los Angeles port for months in late 2020 and early 2021, and that the rust was "from the humidity" in that environment.  This is consistent with CW1, who said it was common knowledge that the rust issue on some of the bikes was caused, at least in part, from conditions during transit from Taiwan to the United States.

91.     As explained *infra* (¶¶ 161-163), Project Tinman was exposed by the *Financial Times* in February 2022.  On July 12, 2022, Peloton announced that it decided to cease all in-house manufacturing and, thus, was suspending operations at Tonic moving forward.  However, Peloton would continue to rely on, and indeed expand its relationship with, Rexon to fulfill its manufacturing needs.  The release stated that "Rexon will become the primary manufacturer of the hardware for Peloton's iconic Bike and Tread product lines."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

92.     Despite the deluge of safety defects reported to or otherwise known by the Company during the Class Period, Defendants made numerous false and misleading statements in the wake of the Tread recall.  Plaintiffs assert that all statements set forth below that are bolded

34

and italicized are materially false and misleading for the reasons set forth therein.  Non-bolded statements are included for context.

93.    The Class Period begins on May 6, 2021, when Peloton filed a current report on Form 8-K signed by Defendant Woodworth attaching a letter addressed to its stockholders announcing the Company's financial results for its third fiscal quarter of 2021, ended March 31, 2021 (the "3Q 2021 Shareholder Letter").  The 3Q 2021 Shareholder Letter represented that "[a]s a Members-first company, *we are committed to improving all aspects of our Member experience*."

94.    Later that day, Peloton held an earnings call with analysts to discuss its results for the quarter ended March 31, 2021.  During the call, Defendant Foley stated:

> I want to start by giving you an update on recent events regarding our treadmill products.  As a company, we believe strongly in the future of at-home connected fitness, and we know we have a responsibility to be an industry leader in product safety.  *We are a members-first organization* and that means for all of us at Peloton *the safety of our member community comes first*.
>
> ***
>
> In closing, *I'd like to reiterate that the safety of our member community is our first priority*.  And through working with the CPSC and others, *our aim is to have the safest products on the market* . . . .

95.    On May 7, 2021, Peloton filed a quarterly report on Form 10-Q for the quarter ended March 31, 2022, signed by Defendants Foley and Woodworth (the "3Q 2021 Form 10-Q").  The 3Q 2021 Form 10-Q stated that there are certain risks and uncertainties which "could" materially impact Peloton's financial condition and results of operation "[i]f" they occur, including the following:

> *Our products and services may be affected from time to time by design and manufacturing defects, real or perceived, that could adversely affect our business and result in harm to our reputation.*

*We offer complex hardware and software products and services that can be affected by design and manufacturing defects. . . . Defects may also exist in components and products that we source from third parties. Any defects could make our products and services unsafe and create a risk of environmental or property damage and/or personal injury. . . .* For example, we have received reports of injuries associated with our Tread+ product, one of which led to the death of a child. As a result of the aforementioned injuries associated with these reported Tread+ incidents, in April 2021, CPSC unilaterally issued a warning to consumers about the safety hazards associated with the Tread+ and is continuing to investigate the matter. While we do not agree with all of the assertions in CPSC's warning, we announced on May 5, 2021 that we will initiate a voluntary recall of our Tread+ product in collaboration with the CPSC. The recall, the possibility that the CPSC could assess penalties or fines against us, and the risk that the CPSC or we could determine to recall any other product now or in the future, may adversely impact our operating results, brand reputation, and business. . . . Furthermore, *the occurrence of real or perceived defects in any of our products, now or in the future, could result in additional negative publicity, regulatory investigations, or lawsuits filed against us, particularly if Members or others who use or purchase our Connected Fitness Products are injured.*

96.     The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) the seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn; and, accordingly, (iv) the risks posed by a design or manufacturing defect were not merely hypothetical and Defendants did not prioritize the safety of Peloton Bike users.

97.     On May 7, 2021, Defendant Foley also appeared on ABC's television show Good Morning America to speak about the Tread+ recall. To begin his interview, Foley stated: "Thanks for having me Michael. I have to say, *by far, the most important thing to us at Peloton is the*

36

*safety of our members*.  It always has been."  Asked why Peloton did not immediately recall the

Tread+ after receiving the report of a child's death in March 2021, Foley responded as follows:

> Right away, when I found out about a child's death—we've had one child's death,
> and it was tragic and horrible and our heart went out to that family—right away, I
> emailed every one of our Tread members personally and said, listen, treadmills in
> the home need to be used safely.  And so we've been trying to be communicative
> and transparent with our members.  We've been—always have—about everything.
> That's the way we operate at Peloton. *We care deeply about our members, about
> our members safety*.

98.     In response to further questioning, Defendant Foley emphasized "again, we just

care so deeply about everyone in our family—in our extended family—and we treat our members

like our own family, and that, so this, *their safety is the highest priority for us*."  He added:

> *We have an incredible responsibility and obligation to the safety of people who
> bring Peloton in their home, and we aren't shirking from that responsibility.  We
> are 100% committed to the safety and well-being [of members]*—I mean, we are
> a health and wellness company.  We are all about your health and happiness.  When
> we wake up in the morning—we have thousands of people around the world that
> wake up in the morning thinking about our members' health and wellness.  *And
> safety is number one in that list of what we think about.*

99.     The statements in the preceding paragraphs were materially false and misleading

when made, or omitted to state material facts necessary to make the statements not misleading

because, as explained above, Defendants actively concealed and failed to disclose that: (i) the seat

posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe

for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike

and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent

experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a

comprehensive remedy and, as a direct result, experience a large amount of Subscription churn;

and, accordingly, (iv) Defendants did not prioritize the safety of Peloton Bike users.

100.     On June 8, 2021, Jill Woodworth participated in the Bank of America Securities Global Technology Conference hosted by analyst Justin Post.  In response to a question about "Peloton's sustainable competitive advantages," Woodworth responded as follows:

> Well, I think we were the pioneer in the category.  So I do think we have a first mover advantage. . . .  So, we are incredibly excited about our first mover advantage but we do not rest on our laurels, and obviously *we're always continuously working harder to make that—make our products and make our software and content better and better and better*.

101.     The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; and (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn.

102.     On August 26 2021, Peloton held an earnings call with analysts to discuss its results for the quarter ended June 30, 2021.  During the call, Defendant Foley represented as follows:

> [C]hurn remains a very important metric to us, and we will continue to report our actual results each quarter.  *Everything we do at Peloton is designed to keep our members engaged and our churn rate low*.  And over time, we expect our churn and retention rates to remain relatively consistent.

103.     Foley ended the call by stating as follows:

> By definition, powerful brands are recognized for their extraordinary product and service experiences.  By *always putting members first and obsessing over their experience*, we're building the most powerful brand in fitness and potentially one of the most powerful brands in any category.

104.    Foley also said the following about Peloton's strategy: "Our strategy remains constant. . . . *We will continue to prioritize subscription growth over near-term profitability* as it's still very early days in the consumer migration to Connected Fitness in the home.

105.    The next day, on August 27, 2021, Peloton filed its annual report on Form 10-K signed by Defendants Foley and Woodworth, reporting the Company's financial and operational results for the Company's fourth fiscal quarter and full year ended June 30, 2021  (the "2021 Form 10-K").  The 2021 Form 10-K boasted that it offered the best equipment in the industry:

> We are an innovation company at the nexus of fitness, technology, and media. We have disrupted the fitness industry by developing a first-of-its-kind subscription platform that seamlessly combines the *best equipment*, proprietary networked software, and world-class streaming digital fitness and wellness content, creating a product that our Members love.

106.    The 2021 Form 10-K represented that putting members first was one of its four core values:

> Our dynamic culture expresses our expansive vision and passion for community and collaboration, and is shaped by the following fundamental values:
>
> 1. *Put Members First: We obsess over every touchpoint of our Member experience.  We have a Member-centered mindset that prioritizes a positive product and brand experience.*  We are proud to be pioneers and innovators of a global, product-oriented, fitness-centered community.

107.    Similarly, the 2021 Form 10-K represented that Peloton is driven by a members-first mindset and offers a best-in-class experience:  "*Driven by our Members-first mindset, we built a vertically integrated platform that ensures a best-in-class, end-to-end experience*."

108.    Like the 3Q 2021 Form 10-Q, the 2021 Form 10-K stated that there are certain risks and uncertainties which "could" materially impact Peloton's financial condition and results of operation "[i]f" they occur, including the following:

> *Our products and services may be affected from time to time by design and manufacturing defects, real or perceived, that could adversely affect our business and result in harm to our reputation.*

39

*We offer complex hardware and software products and services that can be affected by design and manufacturing defects. . . . Defects may also exist in components and products that we source from third parties. Any defects could make our products and services unsafe and create a risk of environmental or property damage and/or personal injury. . . .* For example, we have received reports of injuries associated with our Tread+ product, one of which led to the death of a child. As a result of the aforementioned injuries associated with these reported Tread+ incidents, in April 2021, CPSC unilaterally issued a warning to consumers about the safety hazards associated with the Tread+ and is continuing to investigate the matter. While we do not agree with all of the assertions in CPSC's warning, we announced on May 5, 2021 that we will initiate a voluntary recall of our Tread+ product in collaboration with the CPSC. The recall, the possibility that the CPSC or other regulators could assess penalties or fines against us, and the risk that the CPSC or we could determine to recall any other product now or in the future, may adversely impact our operating results, brand reputation, and business. . . . Furthermore*, the occurrence of real or perceived defects in any of our products, now or in the future, could result in additional negative publicity, regulatory investigations, or lawsuits filed against us, particularly if Members or others who use or purchase our Connected Fitness Products are injured.*

109. The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn; (iv) there was a company-wide effort to cover up visible signs of rust and/or corrosion on the inner frame of new Bikes before selling them to customers at full price; and, accordingly, (v) the risks posed by a design or manufacturing defect were not merely hypothetical.

110. On October 21, 2021, Defendant Cortese participated in the CNBC Disrupter 50 Summit and spoke with CNBC's Julia Boorstin. During the interview, in response to a prompt about the Tread+ recall, Defendant Cortese stated:

40

And, um, but, you know, we've responded, we've responded really swiftly.  Um, we now have the, um, all new Peloton tread out in market and, you know, we've, we've baked in, um, a number of features that we believe make us the out in front innovator now in safety for, uh, for treads.  And our team is energized, uh, by the notion that, you know, with all of these aspects of the fitness industry where we've been the out in front innovator, *our team is energized that we can now take, take this charge and become, um, you know, the, the far, far ahead runner in everything safety-related, um, for innovation in fitness.*

111.    On October 25, 2021, Peloton filed a definitive proxy statement on Schedule 14A (the "2021 Proxy Statement") signed by Defendant Kushi.  The 2021 Proxy Statement represented that putting members first was one of Peloton's five core values:

Our culture is shaped by our five core values, described below:

1. ***Put Members First: We obsess over every touchpoint of our Member experience — always remembering that when our Members win, we win.  We root everything we do and all product and feature development in Member needs and never assume we know what is best.***  We believe in building connections based on trust, respect, and inclusion, and are proud that our Member community embodies these qualities.

112.    Also in the 2021 Proxy Statement, Peloton claimed that it made "meaningful strides" towards achieving excellence in environmental, social, and governance leadership by "creating a product safety committee, comprised of senior leaders, charged with overseeing our product design, development, marketing, and support processes *so that we are always keeping safety top of mind*."

113.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a

41

comprehensive remedy and, as a direct result, experience a large amount of Subscription churn; and (iv) there was a company-wide effort to cover up visible signs of rust and/or corrosion on the inner frame of new Bikes before selling them to customers at full price.

114.    Defendant Foley appeared on an audio podcast called Masters of Scale on an episode titled "Rapid Response: How Peloton keeps pushing through resistance, w/CEO John Foley," released on November 4, 2021.  During the interview, in response to a question about the CPSC related issues with the treadmill recall, Defendant Foley stated:

> Yeah, when we first learned of a tragic incident involving a child with the Tread+, it was a real wake-up call.  It's a horrible situation.  We were incredibly empathetic and sympathetic.   And what happened in those days, Bob, is we realized collectively, that Peloton is an innovator in all things fitness.  ***Since we brought the first bike into market, we had shot to meet the bar of safety in the category***.  And certainly, our Tread+ did.  It met every safety standard that the category had.  And at the moment when this instant happened, we said, "Wow, we need to be better than the industry.  We are better than this.  We can innovate on safety as well as experiences."

***

> Well, certainly: work directly with the government agencies is something that's critical. We, I don't want to say tried to go it alone, but we're a direct-to-consumer business, as you know Bob, so I have a direct relationship with our members.  And so I wanted to solve it myself with the community and with my team.  And, for a couple weeks, we got on the wrong side of the line with the CPSC because our instinct was to just fix the situation.  ***And I think the learning looking back was more quickly getting in lockstep with the regulators***.  But it was a rocky couple of weeks.  As soon as I heard about this incident, within hours, we sent an email to the entire community saying it had happened.   And that's the type of action, engagement, and transparency that we have with our community.  This one was just a little bit trickier.

115.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike

42

and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton failed to immediately report the aforementioned safety defect to its regulators, including the CPSC; and (iv) there was a company-wide effort to cover up visible signs of rust and/or corrosion on the inner frame of new Bikes before selling them to customers at full price.

116.    On November 4, 2021, Peloton held an earnings call with analysts to discuss its results for the quarter ended September 30, 2021.  On the call, Defendant Foley stated that Peloton made various investments in the quarter to maintain an existing premium member experience:  "To *maintain a premium end-to-end member experience*, we made significant investments over the past year to scale manufacturing, logistics, and operations."

117.    On that same call, Foley stated:

> But please note that *the entire Peloton management team is focused on making the best decisions for the long-term health of our business* despite the challenges we are currently facing . . . .  *We make the best, most immersive and interactive home fitness products available*, and we have more on the way in the coming weeks and months.

Later on the same call, he also said:  "*Our formula for growth that we've been able to hone on the Bike* and then as we roll our internationally, it starts with the product experience.  *We deliver the best product experience in Connected Fitness* . . . ."

118.    On November 5, 2021, Peloton filed a quarterly report on Form 10-Q for the quarter ended September 30, 2022, signed by Defendants Foley and Woodworth (the "1Q 2022 Form 10-Q").  The 1Q 2022 Form 10-Q stated that there are certain risks and uncertainties which "could" materially impact Peloton's financial condition and results of operation "[i]f" they occur, including the following:

> *Our products and services may be affected from time to time by design and manufacturing defects, real or perceived, that could adversely affect our business and result in harm to our reputation.*

43

*We offer complex hardware and software products and services that can be affected by design and manufacturing defects. . . . Defects may also exist in components and products that we source from third parties. Any defects could make our products and services unsafe and create a risk of environmental or property damage and/or personal injury. . . .* For example, we have received reports of injuries associated with our Tread+ product, one of which led to the death of a child. As a result of the aforementioned injuries associated with these reported Tread+ incidents, in April 2021, CPSC unilaterally issued a warning to consumers about the safety hazards associated with the Tread+ and is continuing to investigate the matter. While we do not agree with all of the assertions in CPSC's warning, we announced on May 5, 2021 that we will initiate a voluntary recall of our Tread+ product in collaboration with the CPSC. The recall, the possibility that the CPSC could assess penalties or fines against us, and the risk that the CPSC or we could determine to recall any other product now or in the future, may adversely impact our operating results, brand reputation, and business. . . . Furthermore, *the occurrence of real or perceived defects in any of our products, now or in the future, could result in additional negative publicity, regulatory investigations, or lawsuits filed against us, particularly if Members or others who use or purchase our Connected Fitness Products are injured.*

119. The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) the seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn; (iv) there was a company-wide effort to cover up visible signs of rust and/or corrosion on the inner frame of new Bikes before selling them to customers at full price; and, accordingly, (v) the risks posed by a design or manufacturing defect were not merely hypothetical.

120. On or about November 12, 2021, Peloton made the following representations about product safety on its website:

Product safety At Peloton.  At Peloton, *we place the Member experience at the core of everything we do*, and *product safety is a top priority*. . . .

Peloton has a dedicated team of product safety professionals to drive processes and help ensure all our products, parts and services undergo safety reviews. *From product design to manufacturing and from delivery to the entire Member experience – our team continuously evaluates the safety of our products* with the aim of providing the best fitness experience for our community.

121.   The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) the seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) there was a company-wide effort to cover up visible signs of rust and/or corrosion on the inner frame of new Bikes before selling them to customers at full price; and, accordingly, (iv) Defendants did not prioritize the safety of Peloton Bike users.

122.   On December 7, 2021, Defendant Foley spoke at Peloton's 2021 annual meeting of stockholders.  At the meeting, he told stockholders that Peloton offered the best stationary bikes in the world:

It is very clear to us and it's very clear to me that the universe of customers who want fitness in their lives is a large one. *We have the best Bikes* and the best Treadmill *in the world*.  And we plan to grow those franchises as part of our immediate opportunities that is right in front of us.

123.   The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) the seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike

45

and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn; and (iv) there was a company-wide effort to cover up visible signs of rust and/or corrosion on the inner frame of new Bikes before selling them to customers at full price.

124.    On February 8, 2022, Peloton filed a Form 8-K signed by Defendant Woodworth attaching a letter addressed to stockholders announcing the Company's financial results for its second fiscal quarter of 2022, ended December 31, 2021 (the "2Q 2022 Shareholder Letter").  In the 2Q 2022 Shareholder letter, Defendant Foley discussed a recently-announced restructuring plan and stated:  "As we adjust our operations, *our commitment to putting our members first and to increasing the accessibility of our platform remains unchanged*."

125.    Later on February 8, 2022, Peloton filed a quarterly report on Form 10-Q for the quarter ended December 31, 2021, signed by Defendants Foley and Woodworth  (the "2Q 2022 Form 10-Q").  The 2Q 2022 Form 10-Q stated that there are certain risks and uncertainties which "could" materially impact Peloton's financial condition and results of operation "[i]f" they occur, including the following:

> *Our products and services may be affected from time to time by design and manufacturing defects, real or perceived, that could adversely affect our business and result in harm to our reputation.*
>
> *We offer complex hardware and software products and services that can be affected by design and manufacturing defects. . . .  Defects may also exist in components and products that we source from third parties, or may arise from upgrades or changes to hardware that we or our third party manufacturing partners may make in the ordinary course of a product's lifecycle.  Actual or perceived defects may not be identified until after a product is in market.  Any defects could impact or customer experience, tarnish our brand reputation or make our products and services unsafe and create a risk of environmental or property damage and/or personal injury. . . .*  For example, we have received reports of injuries associated with our Tread+ product, one of which led to the death of a child.  As a result of the aforementioned injuries associated with these reported

46

Tread+ incidents, in April 2021, the CPSC unilaterally issued a warning to consumers about the safety hazards associated with the Tread+ and is continuing to investigate the matter.  While we do not agree with all of the assertions in the CPSC's warning, we initiated a voluntary recall of our Tread+ product in collaboration with the CPSC.  The recall, the possibility that the CPSC or other regulators could assess penalties or fines against us, and the risk that the CPSC or we could determine to recall any other product now or in the future, may adversely impact our operating results, brand reputation, and business. . . .  Furthermore, ***the occurrence of real or perceived defects in any of our products, now or in the future, could result in additional negative publicity, regulatory investigations, recalls, or lawsuits filed against us, particularly if Members or others who use or purchase our Connected Fitness Products are injured.***

126.    The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) the seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn; (iv) there was a company-wide effort to cover up visible signs of rust and/or corrosion on the inner frame of new Bikes before selling them to customers at full price; and, accordingly, (v) the risks posed by a design or manufacturing defect were not merely hypothetical and Defendants did not prioritize the safety of Peloton Bike users.

127.    On February 16, 2022, and February 22, 2022, Peloton released a statement to various media outlets reporting on Project Tinman in which they stated as follows about the rust:

Our internal testing, based on industry standards, confirmed ***the cosmetic oxidation issue would have no impact on a Bike's performance, quality, durability, reliability, or the overall Member experience***. . . .  Additionally, for products in inventory, we implemented a standard rework process to address ***this cosmetic issue*** in the aforementioned non-visible parts.  ***We have not found evidence or received Member complaints that this specific issue has presented a problem.***

128.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) the seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; and (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn.

129.    On April 29, 2022, the official Twitter account "@OnePeloton" emphasized the Company's commitment to safety:

> ***Our Members' safety is our top priority.***  The Peloton Tread+ continues to be subject to a voluntary recall and sales are on hold for the foreseeable future, but you can sign up to be notified once updates are available by visiting onepeloton.com/tread-plus/sign-up.

130.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) the seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; and, accordingly, (iii) Defendants did not prioritize the safety of Peloton Bike users.

131.    On May 10, 2022, Peloton filed a quarterly report on Form 10-Q for the quarter ended March 31, 2022, signed by Defendants McCarthy and Woodworth  (the "3Q 2022 Form 10-Q").  Like the 2Q 2022 Form 10-Q, the 3Q 2022 Form 10-Q stated that there are certain risks and

48

uncertainties which "could" materially impact Peloton's financial condition and results of operation "[i]f" they occur, and expressly incorporated by reference the risks and uncertainties described in Peloton's 2Q 2022 Form 10-Q, including the statement set forth in ¶ 125.

132.    The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) the seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn; and, accordingly, (iv) the risks posed by a design or manufacturing defect were not merely hypothetical and Defendants did not prioritize the safety of Peloton Bike users.

133.    On September 7, 2022, Peloton filed its annual report on Form 10-K signed by Defendants McCarthy and Coddington, reporting the Company's financial and operational results for the Company's fourth fiscal quarter and full year ended June 30, 2022  (the "2022 Form 10-K").  The 2021 Form 10-K boasted that it offered the best equipment in the industry:

> We are an innovation company at the nexus of fitness, technology, and media. We have disrupted the fitness industry by developing a first-of-its-kind subscription platform that seamlessly combines the ***best equipment***, proprietary networked software, and world-class streaming digital fitness and wellness content, creating a product that our Members love.

134.    The 2022 Form 10-K represented that putting members first was one of its five core values:

> Our dynamic culture expresses our expansive vision and passion for community and collaboration, and is shaped by the following fundamental values:

49

2. ***Put Members First: We obsess over every touchpoint of our Member experience - always remembering that when our Members win, we win. We root everything we do and all product and feature development in Member needs and never assume we know what is best.*** We believe in building connections based on trust, respect, and inclusion, and are proud that our Member community embodies these qualities.

135.    Like the 2021 Form 10-K, the 2021 Form 10-K stated that there are certain risks and uncertainties which "could" materially impact Peloton's financial condition and results of operation "[i]f" they occur, including the following:

***Our products and services may be affected from time to time by design and manufacturing defects, real or perceived, that could adversely affect our business and result in harm to our reputation.***

***We offer complex hardware and software products and services that can be affected by design and manufacturing defects. . . . Defects may also exist in components and products that we source from third parties, or may arise from upgrades or changes to hardware that we or our third-party manufacturing partners may make in the ordinary course of a product's lifecycle. Actual or perceived defects may not be identified until after a product is in market. Any defects could impact our customer experience, tarnish our brand reputation or make our products and services unsafe and create a risk of environmental or property damage and/or personal injury. . . .*** For example, we have received reports of injuries associated with our Tread+ product, one of which led to the death of a child. As a result of the aforementioned injuries associated with these reported Tread+ incidents, in April 2021, the CPSC unilaterally issued a warning to consumers about the safety hazards associated with the Tread+. While we do not agree with all of the assertions in the CPSC's warning, in May 2021 we initiated a voluntary recall of our Tread+ product in collaboration with the CPSC. The CPSC is currently investigating the matter and in August 2022 we were notified by the CPSC that the agency staff believes we failed to meet our statutory obligations under the Consumer Product Safety Act and intends to recommend that the CPSC impose civil monetary penalties. The recall, the possibility that the CPSC or other regulators could assess penalties or fines against us, and the risk that the CPSC or we could determine to recall any other product now or in the future, may adversely impact our operating results, brand reputation, and business. . . . Furthermore, ***the occurrence of real or perceived defects in any of our products, now or in the future, could result in additional negative publicity, regulatory investigations, recalls, or lawsuits filed against us, particularly if Members or others who use or purchase our Connected Fitness Products are injured.***

136.    The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading

because, as explained above, Defendants actively concealed and failed to disclose that: (i) seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn; and, accordingly, (iv) the risks posed by a design or manufacturing defect were not merely hypothetical.

137.    On September 12, 2022, Defendant McCarthy participated in the Goldman Sachs Communacopia + Technology Conference hosted by Goldman Sachs analyst Eric Sheridan.  In response to a question from Sheridan about "how to think about how important price is versus quality of the product" relative to Peloton's pricing strategy, Defendant McCarthy responded by pointing out that "*[t]he hardware is significantly better than anybody else's hardware* and the content is uniquely different and better than is otherwise available in the marketplace"

138.    The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn.

139.    On October 25, 2022, Peloton filed a definitive proxy statement on Schedule 14A (the "2022 Proxy Statement") signed by Defendant Tammy Albarrán.  The 2022 Proxy Statement represented that putting members first was one of Peloton's five core values:

> Central to how we deliver on our ambitious, and underpinning our culture, are our five core values:
>
> 1. ***Put Members First***
> 2. Operate with a bias for action
> 3. Empower teams of smart creatives
> 4. Together we go far
> 5. Be the best place to work

140.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn.

141.    On November 1, 2022, Peloton published its annual Environmental, Social, and Governance (ESG) Report (the "2022 ESG Report").  In the 2022 Proxy Statement, Peloton said that its forthcoming 2022 ESG Report will "outlin[e] our continued efforts across key areas of importance to our business and stakeholders" during the Company's most recent fiscal year.  The 2022 ESG Report said the following about product safety at Peloton:

> At Peloton, product safety is a top priority, and ***we strive to retain the trust of our Members who use our products***.
>
> . . . .

We continually monitor Members safety feedback and experiences with our products *and incorporate these learnings as part of our continuous improvement efforts. We apply these learnings in voluntary standards development activities to enhance product safety outcomes for all consumers*.

142.    The statements in the preceding paragraph were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn.

143.    On November 3, 2022, Peloton filed a Form 8-K signed by Defendant Coddington attaching a letter addressed to stockholders announcing the Company's financial results for its first fiscal quarter of 2023, ended September 30, 2022 (the "1Q23 Shareholder Letter").  In the letter, Defendant McCarthy stated as follows:

> *For the last nine months my goal has been to turn around Peloton and position it for sustained growth and scale.  I thought it would take a year.  We are beating that timeline.*
>
> . . .
>
> *"Turnaround" means* a stable underlying business with the green shoots of growth beginning to emerge.  It means a financially sustainable business, which means breakeven or better free cash flow ("FCF," defined as cash from operations less capital expenditures and capitalized software).  It means engaged Members with high net promoter scores.  It means *a growing subscriber base, continued low churn*, and improved customer acquisition costs.
>
> . . .
>
> Peloton's turnaround remains a work-in-progress.

144.     The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn.

145.     Later on November 3, 2022, Peloton filed a quarterly report on Form 10-Q for the quarter ended September 30, 2022, signed by Defendants McCarthy and Coddington (the "1Q 2023 Form 10-Q").  The 1Q 2023 Form 10-Q stated that there are certain risks and uncertainties which "could" materially impact Peloton's financial condition and results of operation "[i]f" they occur, but advised that "[t]here have been no material changes to our risk factors since the [2022] Form 10-K," including the statement referenced in ¶ 135.

146.     The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn;

and, accordingly, (iv) the risks posed by a design or manufacturing defect were not merely hypothetical.

147.   On February 1, 2023, Peloton hosted an earnings call with analysts to discuss the second fiscal quarter ended December 31, 2022.  Asked by Citigroup analyst Ronald Josey if the "this 1.1% churn is, call it, the new normal," Defendant Coddington stated "***we don't expect any significant changes to our current churn levels*** aside from the fact that we do have small seasonal variations from quarter-to-quarter."

148.   The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; and (iii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn.

149.   Later on February 1, 2023, Peloton filed a quarterly report on Form 10-Q for the quarter ended December 31, 2022, signed by Defendants McCarthy and Coddington (the "2Q 2023 Form 10-Q").  The 2Q 2023 Form 10-Q stated, in the context of remediation of the problems that gave rise to the prior recall as follows:

> On May 5, 2021, we announced separate, voluntary recalls of each of our Tread+ and Tread products in collaboration with the Consumer Product Safety Commission (the "CPSC") and halted sales of these products to work on product enhancements. Members were notified that they could return their Tread or Tread+ for a full refund, or wait until a solution is available.  Tread+ owners were also given the option to have Peloton move their Tread+ to a different location within their home. We announced a repair for the Tread in August 2021, shortly before resuming sales. We continue to work on potential hardware enhancements for Tread+, which

remains recalled.  In August 2022, the CPSC notified us that the agency staff believes we failed to meet our statutory obligations under the Consumer Product Safety Act (the "CPSA"), and, in January 2023, the CPSC announced a settlement involving civil monetary penalties. To continue our cooperation with the CPSC, we agreed to pay the $19.1 million civil penalty, resolving the CPSC's charges that we knowingly failed to immediately report hazards associated with the Tread+, and ***we continue to work cooperatively with the CPSC to further enhance the safety of our products.***

150.    The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants actively concealed and failed to disclose that: (i) seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) the Company did not remedy the aforementioned defect or suspend sales of its Bike and, thus, continued selling Bikes to customers with a recurring safety defect in spite of its recent experience with the Tread+ recall; and (iii) Peloton failed to immediately report the aforementioned safety defect to its regulators, including the CPSC.

151.    On May 4, 2023, Peloton filed a quarterly report on Form 10-Q for the quarter ended March 31, 2023, signed by Defendants McCarthy and Coddington (the "3Q 2023 Form 10-Q").  Like the 2Q 2023 Form 10-Q, the 3Q 2023 Form 10-Q also reiterated, in the context of touting remediation of the problems that gave rise to the prior recall as follows:

On May 5, 2021, we announced separate, voluntary recalls of each of our Tread+ and Tread products in collaboration with the Consumer Product Safety Commission (the "CPSC") and halted sales of these products to work on product enhancements. Members were notified that they could return their Tread or Tread+ for a full refund, or wait until a solution is available.  Tread+ owners were also given the option to have Peloton move their Tread+ to a different location within their home. We announced a repair for the Tread in August 2021, shortly before resuming sales. We continue to work on potential hardware enhancements for Tread+, which remains recalled.  In August 2022, the CPSC notified us that the agency staff believes we failed to meet our statutory obligations under the Consumer Product Safety Act (the "CPSA"), and, in January 2023, the CPSC announced a settlement involving civil monetary penalties.  To continue our cooperation with the CPSC, we agreed to pay the $19.1 million civil penalty, resolving the CPSC's charges that we knowingly failed to immediately report hazards associated with the Tread+, and

*we continue to work cooperatively with the CPSC to further enhance the safety of our products.*

152.     Notably, the 3Q 2023 Form 10-Q also disclosed the accrual of immaterial expenses

associated with safety issue involving the seat post in Peloton's original Bike:

> During the three months ended March 31, 2023, *we accrued $8.4 million of estimated contingent loss expense related to a voluntary corrective action plan ("CAP") involving certain seat posts in our original model Peloton Bike* (not Peloton Bike+). *We have voluntarily notified the U.S. Consumer Product Safety Commission ("CPSC") regarding this issue* and are cooperating with the CPSC to finalize a voluntary CAP. *The contingent liability accrual was based on an amount that was deemed probable and estimable. It is reasonably possible that any additional accruals for contingent losses related to this matter could be material to the financial statements, however, we are unable to estimate the amount of such additional losses at this time.*

\* \* \*

153.     Importantly, the 3Q 2023 Form 10-Q reported that Peloton did not expect that CAP

for the safety issue involving the Bike seat post to be material:

> In addition, *we have determined that there is a potential product safety issue involving the seat post in the original model Peloton Bike (not Peloton Bike+) and have voluntarily notified the CPSC*. During the three months ended March 31, 2023, we determined that a corrective action plan ("CAP") is warranted and are cooperating with the CPSC to finalize the proposed CAP. As of April 30, 2023, the Company has identified 35 reports, out of over 2.4 million units sold in the U.S. and Canada, in which the seat post has broken during use. Of these reports, 12 have included reports of injuries, including one wrist fracture. Once finalized, we would make available the approved remedy to original model Bike owners. During the three months ended March 31, 2023, we accrued expenses in connection with implementation of the proposed CAP, which were not material to the current period financial performance. *We may incur incremental expenses or face other challenges in connection with the implementation of the CAP beyond what we have currently estimated to be probable and reasonably estimable, including if the number of reported incidents materially increases, which may adversely impact our operating results, brand reputation, demand for our products, and business, although we do not currently anticipate that the total expenses related to implementation of the CAP will be material to our financial position.*

154.     The statements in the preceding paragraphs were materially false and misleading

when made, or omitted to state material facts necessary to make the statements not misleading

because, as explained above, Defendants actively concealed and failed to disclose that: (i) seat posts on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for users; (ii) Peloton would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of Subscription churn; and, accordingly, (iii) understated reserves for future product recall expenses by at least $40 million and the indirect impact a large-scale recall of Bikes would have on its Subscription revenue.

155.    On May 11, 2023, Pelton filed a current report on Form 8-K signed by Defendant Albarrán (the "May 11, 2023 Form 8-K"). The May 11, 2023 Form 8-K stated that the Company decided to issue a purported "voluntary" recall of certain Bikes sold in the United States: "Peloton Interactive, Inc. (the 'Company') announced a *voluntary recall of original Peloton model Bikes* (not Bike+) *sold rom January 2018 to May 2023 in the U.S.*

156.    The statements in the preceding paragraphs were materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading because, as explained above, Defendants failed to disclose that the CPSC mandated the recall.

157.    Peloton's annual and quarterly reports filed with the SEC were subject to the disclosure requirements of Item 105 of Regulation S-K, 17 C.F.R. §229.105, which governs disclosure of risk factors and requires, among other things, that an issuer "provide under the caption 'Risk Factors' a discussion of the material factors that make [the securities] speculative or risky."

158.    Defendants violated their disclosure duties imposed by Item 105 of Regulation S-K, 17 C.F.R. §229.105 by failing to disclose the material risk that the Company's touted safety efforts and priorities were not being fulfilled and that the seat posts defects could result in an impending recall of millions of Peloton Bikes and cost the Company substantial product recall expenses and

the loss of a large amount of subscriptions resulting in harm to the Company in negatively impacted financial results, as well as reputational harm and negative publicity.

159.    Peloton's annual and quarterly reports filed with the SEC were also subject to the disclosure requirements of Item 303 of Regulation S-K, among other things, that requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   17 C.F.R.  §  229.303(b)(2)(ii).   Companies must also disclose events that the registrant knows will "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected."  17 C.F.R. § 229.303(b)(2)(i)-(ii).

160.    In violation of Item 303, Peloton's periodic reports during the Class Period failed to disclose the known uncertainties associated with the seat post defects and potential recall of millions of Peloton Bikes, and how that would impact recall expenses and subscribership. As a result, these were circumstances presenting known uncertainties that were reasonably likely to— and, when they came to fruition, did—adversely affect Peloton's financial condition and results. The omission of this information violated the disclosure obligation imposed by Item 303.

## THE TRUTH EMERGES IN A SERIES OF PARTIAL DISCLOSURES

### A.    Concerned Employees Inform the Media About Project Tinman But Peloton Continues to Deceive the Market By Denying Any Issue

161.    On February 16, 2022, the *Financial Times* released a story on Peloton's fall from grace over the previous year.  In the article, the *Financial Times* reported that it was provided with internal documents from concerned employees memorializing a covert operation to cover up rust on Bikes arriving from Taiwan dubbed "Project Tinman."  A Peloton spokesperson responded to

the accusation that the Tinman project was an "isolated issue" that it addressed in due course. On this news, Peloton's stock price fell from $32.05 on February 16, 2022, to close at $30.59 on February 17, 2022, representing a decline of approximately 4.7%.

162. Seemingly in response to the comment Peloton provided on Project Tinman in its previous story, the *Financial Times* published a full-length exposé on Project Tinman on February 22, 2022, titled "Inside 'Project Tinman': Peloton's Plan to Conceal Rust in Its Exercise Bikes." The article featured rich detail on Project Tinman sourced from eight current and former employees and internal materials they provided which documented the program, including that it was hatched by Peloton's "executives," began in September 2021, continued through the date of the article, and involved a company-wide national effort to use a chemical solution to change the color of the rust. The exposé was widely reported among news outlets and aggregators, appearing on multiple highly-viewed sources, such as Ars Technica, Markets Insider, TheStreet, Entrepreneur, and Slashdot, as well as internationally, at Cycling Magazine and the DailyMail, among others. Research staff at the *Investor Place* said Project Tinman is "potentially another huge crack in Peloton's already-precarious foundation." On this news, Peloton's stock price dropped $2.63 per share, or approximately 9.3%, to a close at $27.00 on February 23, 2022.

163. In response to these stories, Peloton continued to mislead the market. Unable to deny the multiple sources corroborating this internal cover up, a Peloton spokesperson provided a statement to news outlets in which it claimed that the corrosion was "cosmetic" and had "no impact on a Bike's performance, quality, durability, reliability, or the overall Member experience." In doing so, Peloton admitted that it observed the rust on the ***inner frame of the seat*** and handlebars. A spokesperson also falsely represented to the *New York Post* that Peloton has "not found evidence

or received Member complaints that this specific issue has presented a problem," even though it had received numerous reports of the seat breaking off mid-ride by this time.

**B.      Peloton Announces a Recall of All Bikes Sold Between 2018 and 2023**

164.     On May 4, 2023, as was its standard practice, before the market opened, Peloton published a letter to its stockholders announcing its financial results for the quarter ended March 31, 2023, and held a corresponding conference call.  It made no mention of any issue with the Bike seat post in either of those two communications.  Instead, it revealed in its corresponding quarterly report on Form 10-Q (the "3Q 2023 Form 10-Q"), which was not published until after the market closed that day, that "we have determined there is a potential product safety issue involving the seat post in the original model Peloton Bike" in which "the seat post has broken during use." According to the 3Q 2023 Form 10-Q, Peloton "voluntarily notified" the CPSC about the issue.

165.     Nevertheless, the Company continued to mislead the market by downplaying the risks associated with the stated defect.  The 3Q 2023 Form 10-Q advised that, during the quarter ended March 31, 2023, the Company accrued a mere $8.4 million in contingent loss expenses in connection with the CAP, which it highlighted was "not material" to the results reported therein. It also claimed that the Company did not expect any future expenses associated with the CAP to be "material" to its operating results.  Accordingly, the stock price did not decline in response this news.  Certainly, no reasonable investor would anticipate a massive recall in the immediate future.

166.     Just one week later, on May 11, 2023, Peloton shocked the market by announcing the purportedly "voluntary" Recall of ***all Bikes sold from January 2018 to May 2023***, including all Bikes sold during the buying frenzy at the start of the COVID-19 pandemic, further to which it would provide a replacement seat post to such Members free of charge.  In a corresponding Recall notice issued by the CPSC, the government body advised that the Recall impacted "[a]bout ***2.2 million units***"—a figure that the CPSC could have only received from the Company—and advised

that "[c]onsumers should immediately stop using the recalled exercise bikes" until installing the replacement post.  That announcement also underscored the serious nature of the defect, noting that it presents "fall and injury hazards to the user."  Indeed, Peloton had received 35 reports of the seat post detaching from the bike during use, 13 of which involved serious injuries such as a "fractured wrist, lacerations and bruises."

167.    To put the scope of the Recall into perspective, former Director and President of Peloton, William Lynch, pointed out during the Company's annual meeting on December 7, 2021 that Peloton sold "over 2 million bikes" by that time.  While the Company has not provided a more recent breakdown of Bike unit sales since then, the Recall of 2.2 million bikes is clearly the lion's share of the total bikes Peloton has ever sold.  The prior Tread+ recall discussed above was far smaller comparison, impacting only approximately 125,000 units.

168.    The Recall was widely covered by the media on May 11, 2023.  *The Wall Street Journal* published an article with the headline "Peloton Recalls 2.2 Million Bikes, Customers Told to Immediately Stop Using Them."  *Forbes* also reported that "Peloton Interactive recalled 2.2 million bikes Thursday morning over a safety issue with the bikes' seat."  The story was broadcast across the United States on a number of television shows.  Many stories highlighted Peloton's recent experience with the Tread+ recall.  For example, *The New York Times* ran a story titled "Peloton Shares Slide After It Recalls Two Million Exercise Bikes" which pointed out that "the company recalled its Tread+ and Tread treadmills after initially resisting the safety commissions warning that the death of a child and dozens of injuries had been linked to the equipment" in 2021.  Similarly, *CBS News* observed that "[t]he recall is by no means the first for the company."

169.    Financial analysts offered further insight on the damage caused by the Recall.  For example, BMO Capital Markets published a note on May 11, 2023, in which it observed "PTON's

recalling ~2.2mn Bikes immediately pressured shares given size of recall and memories of Tread+." Similarly, Evercore ISI released a report titled "Our Thoughts on the Bike Recall" the following day in which it stated, "[g]iven the prior hardware-related [Tread] recalls, another recall announcement is a blow to the Brand's credibility related to user safety."

170.   On the news of the Recall, Peloton's stock price fell $0.67 per share, or approximately 9.3%, from a close of $7.53 on May 10, 2023, to close at $6.86 on May 11, 2023.

171.   Nevertheless, the financial community remained upbeat that the impact of the Recall would be short-lived based on the Company's misleading estimate that the CAP would cost it $8.4 million. For example, the Evercore ISI report mentioned above stated as follows in direct response to the $8.4 million loss accrual reported in the 3Q 2023 Form 10-Q: "While it is entirely possible that this dollar amount could rise, based on consumer response to seat post repairs, we do not believe it will rise to the tens of millions dollar range." The BMO Capital Markets note expressed a similar view, explaining "while it is fair to say that not every Bike owner will act on the recall, we cannot yet know if the ~$8.4mn estimated contingent loss will prove the final number, but if close, it's a helpful order of magnitude to keep in mind." As such, the note continued, it was unlikely the Recall would result in any "churn."

172.   Similarly, several outlets pointed out how Peloton's "voluntary" approach stood in stark contrast to its defiant response to the Tread+ safety issue. For example, Pelo Buddy wrote soon after the announcement that "[t]his approach contrasts with Peloton's response when the safety of the Tread+ was first called into question in 2021." Similarly, *CBS News* published a report with commentary from Notre Dame professor Katlin Wowak, who stated: "It appears that Peloton may be learning from its past recalls by being more collaborative with the U.S. Consumer

Product Safety Commission and responding faster than it had with the previous products safety issues, such as its treadmill recall."

### C.   Peloton's CEO Backpedals on the Nature and Scope of the Recall

173.   Peloton knew it would be unable to fulfill all expected replacement requests in a timely fashion and, accordingly, informed members shortly after the announcement of the Recall that the process of fulfilling such requests would be carried out in a staged manner.  In an email sent to members who submitted a request for a replacement post on May 19, 2023, just a week after the recall, Peloton told such members that orders would be "prioritized" in the following manner:

> 1. Members who are above 250 pounds (113 kg) and Members who are taller than 5'10" (178 cm) with unknown weight in their profile
>
> 2. Members without height and/or weight information in their profile, or in usage environments where that information may be unknown
>
> 3. All other Members requesting seat posts

The email communication further stated that members in "Group 1" should "receive their replacement seat posts no later than Friday, June 2, 2023," with the remaining groups to follow.

174.   McCarthy began to reveal the true extent of the Recall at the J.P. Morgan Global Technology, Media & Communications Conference on May 24, 2023, hosted by the J.P. Morgan analyst that follows Peloton, Doug Anmuth.  In response to a question about the Recall, and in contrast to the Company's previous disclosures that the Recall was "voluntary," McCarthy unwittingly admitted that the CPSC "***mandated*** a recall of the seat posts."

175.   In addition, McCarthy also volunteered that the Company already received more than 500,000 requests for a replacement post.  Because this was purportedly "larger than we were expecting," he explained that "our initial focus has been on shipping replacement seat posts . . . to those larger, heavier members who were most at risk" but did not provide a timeline for the

remaining members that requested replacements. Pressed on the anticipated costs in light of the 500,000 requests received to date, he admitted it was going to be "probably somewhere in the neighborhood of, I'm going to give you a broad range—don't freak—$10 million to $20 million of incremental cost."

176.    On this news, Peloton's stock price declined $0.36 over three days, or approximately 5.1%, from a close of $7.25 on May 23, 2023, to a close of $6.89 on May 26, 2023. After the end of the conference, Anmuth published a report which took specific note of McCarthy's comments about the extent of the CAP for the Recall. In particular, Anmuth specifically called out that "Peloton has received ~500k requests for V1 seat replacements" and, as such, this request rate "could drive an incremental $10M-$20M costs vs the initial $8.4M estimated contingent loss expense" reported in Peloton's 3Q 2023 Form 10-Q earlier that month.

**D.    Peloton Reveals a Sharp Increase in Subscription Losses Due to the Recall**

177.    In the email sent to members who requested a replacement seat post on May 19, 2023, Peloton informed members in the remaining two groups to visit their Peloton account on or after June 2, 2023 to view estimated delivery dates. The members who did so at that time were provided with estimated delivery dates as late as late as ***December 31, 2023 to January 14, 2024***. Thus, together with the CSPC Recall notice, these members were effectively informed that they should refrain from using their Bike for as much as ***248 days***. On July 28, 2023, almost two months later, Peloton sent an email to all members who had not yet received a requested replacement post in which it advised that it should fulfill all remaining replacement requests by "no later than September 29th." However, that is still almost ***five months*** after the announcement of the Recall.

178.    On August 23, 2023, Peloton issued its quarterly letter to shareholders discussing its financial results for the period ended June 30, 2023 (the "4Q 2023 Shareholder Letter"). The 4Q 2023 Shareholder Letter revealed that the price tag of the Recall "substantially exceeded" the

amount reported in its Q3 2023 Form 10-Q, "leading to an additional accrual of $40 million this quarter for actual costs incurred as well as anticipated future recall-related expenses." In other words, the CAP for the Recall would not be $8.4 million, as originally reported, but *$48.4 million*. As detailed therein, the Company received approximately 750,000 requests for replacement seat posts by August 23, 2023.

179. Worse still, the 4Q 2023 Shareholder Letter revealed a sharp rise in Subscription discontinuances as a direct result of the Recall and, as such, an unprecedented increase in Peloton's churn rate. The 4Q 2023 Shareholder Letter revealed that Peloton *lost 29,000 Subscriptions* from the previous quarter. This was a startling development because the total number of Subscriptions consistently grew quarter-over-quarter ever since Peloton went public in 2019. Peloton expressly attributed the loss to churn resulting from the "Bike seat post recall announcement." In addition, the number of members who elected to "pause" their Subscription in the quarter ended June 30, 2023, rose from the relatively stable level of between 50,000 to 55,000 members—as was the case in the three preceding quarters—to *80,000*. Peloton estimated that "15 to 20 thousand" of these members, *i.e.*, almost the entire increase, did so because they were "pending the receipt of a replacement seat post." Thus, the Recall was specifically linked to a loss of up to nearly 50,000 Subscriptions in the month-and-a-half period from the announcement of the Recall through June 30, 2023. Including Subscription losses, Peloton's churn rate grew to 1.8%, up from a stable level of 1.1% in the three preceding quarters, representing a dramatic 64% increase in churn.

180. On this news, Peloton's Class A common stock price fell $1.58 per share, or 22.6%, to close at $5.41 per share on August 23, 2023.

181. At the time of this disclosure, and consistent with the nature of Peloton's business model (¶ 38), its stable Subscription base was of great importance to investors. For example, on

May 4, 2023, BofA Global Research analyst Justin Post released a note on Peloton's results for the quarter ended March 31, 2023, in which it said, "we see value in the connected fitness subscriber base . . . given low churn" and noted the 1.1% churn rate was in-line with expectations and the same as the prior quarter.  On May 5, 2023, Barclays published a similar report titled "One Last Iceberg To Steer Past," and in the "positives in F3Q" section noted that "churn remained at an industry low of 1.1% for the third straight quarter."

182.    Accordingly, the press took immediate notice of the Subscription losses.  For example, *CNBC* observed later that day that Peloton reported "a quarterly drop in new subscribers that it blamed on its recall of its Bike seat post."  *Business Insider* reported that "Peloton lost 29,000 subscribers over the past quarter and burned through an extra $40 million dealing with a bike seat recall."  *CNN* ran an article in which it said the Recall "cost[] the company $40 million and about 20,000 members who paused their monthly subscriptions because they were waiting for a replacement seat post."  Similarly, *Fortune* noted that "about 15,000 to 20,000 of the 2.2 million people who were affected by the recall elected to pause their monthly subscriptions."

183.    Financial experts expressed similar concerns.  For example, on August 23, 2023, Justin P BofA Global Research cut Peloton from "Buy" to "Neutral."  In a note explaining the downgrade, Justin Post specifically called out the "high churn" of 1.8% reported by the Company.  Evercore ISI published a report that same day which said "stable to lower churn rates" could help change its outlook on the Company.

## ADDITIONAL FACTS PROBATIVE OF SCIENTER

184.    The Individual Defendants acted with scienter because at the time they issued public documents and other statements in Peloton's name, they knew, or with extreme recklessness disregarded the fact that such statements were materially false and misleading or omitted material facts.  The Individual Defendants knew such documents and statements would be issued or

disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

185.    The Individual Defendants received information reflecting the true facts regarding Peloton, their operations and business practices, had control over and/or received the companies' materially misleading misstatements, and/or their associations with the companies made them privy to confidential proprietary information concerning Peloton.  Accordingly, the Individual Defendants were active and culpable participants in the fraudulent schemes alleged herein.  The Individual Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  The ongoing fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

186.    These facts, in conjunction with the additional indicia of scienter alleged below, collectively support a strong inference that throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded that their statements were materially false and misleading.

### A.    Defendants Had An Affirmative Duty to Investigate Bike Safety Issues

187.    Throughout the Class Period, Peloton was under a known legal obligation to consider all reasonably available information regarding the safety of the Peloton Bike, including quality control and production data, independent testing, and consumer complaints, in order to evaluate if it suggests the existence of a product defect or unreasonable risk of injury.

188.    Under Section 15 of the CPSA, codified at 15 U.S.C. § 2064, a manufacturer, importer, distributor, or retailer of a consumer product that is distributed in commerce must inform the CPSC "immediately" upon the receipt of information that "reasonably supports the conclusion

that such product – . . . contains a defect which could create a substantial product hazard…; or creates an unreasonable risk of serious injury or death." 15 U.S.C. § 2064(b).  The CPSA defines a "substantial product hazard" as "a product defect" that "creates a substantial risk of injury to the public." 15 U.S.C. § 2064(a).   The CPSC instructs companies to consider "[a]ll information" available to determine "whether it suggests the existence" of a product defect or unreasonable risk. 16 C.F.R. § 1115.12(f).  Examples of such information include engineering, quality control, or production data; information about safety-related production or design changes; information from an independent testing laboratory; product liability suits and claims for personal injury or property damage; consumer complaints; information received from CPSC; and information received from other firms. *See* 16 C.F.R. § 1115.12(f).  With regards to reporting an "unreasonable risk of serious injury or death," the CPSC's regulations provide that the duty to notify the CPSC is triggered by information that reasonably supports the conclusion that such a "risk" is present.  16 C.F.R. § 1115.6(a).  Thus, the CPSC has instructed that companies "should not wait for such serious injury or death to actually occur before reporting." 16 C.F.R. § 1115.6(a).

189.  Defendants were admittedly aware of these legal obligations at all times during the Class Period.  By no later than May 7, 2021, the CPSC notified Peloton that it opened an investigation into its compliance with the reporting obligations outlined above.  In addition, Defendants Foley and Woodworth acknowledged in the Company's periodic filings with the SEC throughout their tenure with the Company that "we have reporting obligations to safety regulators in all jurisdictions where we sell Connected Fitness Products," including the United States. Defendants McCarthy and Coddington made this same statement in Peloton's annual report on Form 10-K for the fiscal year ended June 30, 2022, filed with the SEC on September 7, 2022. Indeed, as explained below (¶¶ 214-216), Defendant McCarthy signed an agreement on behalf of

Peloton on December 8, 2022, to settle charges by the CPSC that Peloton failed to comply with its reporting obligations under the CPSA with respect to the safety issue associated with the Tread+.

190.    In addition, the reports that Peloton received about the Bike seat post detaching during use (¶¶ 64-82) were reasonably available to the Company and its executive leadership, as evidenced by the fact that the internal memorandum sent to employees on or around May 4, 2023 identified the number of reports received about the defect by the time Peloton reported the issue to the CPSC.  Specifically, that memorandum stated that "there have been reports of 35 seat posts breaking during use as of April 30, 2023" and, of those, "12 involved reports of injuries, including one wrist fracture."  That memorandum was authored by Michael Del Negro, Peloton's Head of Safety, Ethics & Compliance, and Marcio Oliveira, Peloton's Head of Quality, Safety & Product PMO, in their capacity as the co-chairs of Peloton's Executive Product Safety Committee, which committee is discussed in more detail below (¶ 196).

191.    With respect to the reports received from customers by Peloton's Member Support team, specifically, Defendant McCarthy admitted during an investor call on May 10, 2022 that employees in "customer service" have access to "the entire customer history" of any member on their computer screen, including any reports made during a call to the Member Support team or a chat with the Peloton assistant.  This is consistent with the recollection of CW2, who confirmed that a summary of each customer service interaction is recorded in Peloton's internal systems and is displayed in each member's customer history therein.

192.    In addition, the reports about the Bike seat post received by the CPSC were sent to Peloton by email.  By law, the CPSC must "transmit *all information* provided in a report of harm," to the manufacturer identified in the report within five business days, where practicable, except for limited personal identifying information.  16 C.F.R. § 1102.20(a), (c).  The CPSC will provide

written notice of such reports to a manufacturer's principal place of business by U.S. mail unless the manufacturer is registered with the CPSC, in which case notice of such reports are sent to the designated contact person by email.  Peloton has been registered with the CPSC since before the start of the Class Period, as evidenced by the fact that it has left comments to reports about its products, a feature that is only available to manufacturers who are registered, since May 5, 2021.

193.    Thus, Defendants' knowledge of Peloton's reporting requirements coupled with the information reasonably available them about the Bike defect, supports the inference that Defendants either knew of the reports and feedback about the Bike seat post failing, or that Defendants knowingly failed to check information that they had a duty to monitor.

**B.      Bike-Related Reports Were Escalated Up The Chain to Peloton's Executives**

194.    Peloton has admitted that it was aware of at least 35 reports of the Bike seat post detaching mid-ride by the time it reported the issue to the CPSC in 2023.  As set forth in ¶¶ 58-62, each of these incidents were reported to Peloton's Member Support team from customers, sent to it from the CPSC, or observed by its Community Associates on social media.  As explained below, these reports were escalated up the chain to Peloton senior executives, including Defendants.

195.    Peloton senior executive Brad Olson has repeatedly confirmed that it was the Company's standard practice to "capture *every single piece of Member feedback* across all channels," including social media, and "read it back to the entire organization on a regular basis." As but one example, Olson's team assembled a monthly "voice of the member" report which is shared with "the entire organization," including senior executives, such as Defendants, which CW2 confirmed were distributed throughout Peloton during the Class Period.  *See* ¶ 63.

196.    Furthermore, Peloton maintained an Executive Escalations team within its Members Services group throughout the Class Period comprised of "Executive Escalations Specialists."  One such Executive Escalations Specialist based out of Peloton's Plano, Texas office

from August 2021 to February 2021 by the name Myah Brown-Mitchell wrote that she was responsible for handling "complex and sensitive customer issues . . . involving legal, security, and PR implications" with "senior management."

197.    In addition, safety-related product data is routinely reviewed by a cross-functional panel of senior executives known as the "Executive Product Safety Committee."  Formed between May 2021 and October 2021, the committee was established, according to its chairs, "to address, in part, the lessons we learned following the Tread+ recall" in 2021.  This body is described by Peloton as a "management level committee" that "conducts regular reviews of safety-related data for our products," including data not only generated in the development process but also from "the member experience" with its products.  The committee was initially chaired by Peloton's Head of Product Quality and Safety, but expanded to include Marcio Oliveira, Peloton's Head of Quality & Safety, as co-chair during the Class Period.  Oliveira took on that role in 2021, and has publicly stated that Peloton hired him to that position "to be the face of the company for any type of product safety issues."  In addition to its two chairs, the committee also includes senior leaders from Peloton's Legal, Technology, and Product teams.  It is tasked with advising Peloton "senior leadership," like the Individual Defendants, and its Board on "all product safety-related matters." Indeed, Peloton claimed in October 2021 soon after the committee was formed that going forward the committee "will report regularly to our board of directors on safety matters."

198.    That senior executives were regularly apprised of product safety issues, including reports about the Bike seat post failing, is evident from their actions.  For example, former Peloton Community Associate Delaney Spetnagel wrote that one of her work responsibilities included resolving "confidential inquiries on behalf of Peloton Executives and Legal Counsel."  Similarly, after Eric McPherson posted on Facebook that his seat snapped off mid-ride in January 2023, and

wrote to customer service about the incident, he began receiving calls from a member of Peloton's "Executive Support Team" asking him to return the broken stem to the Company.  After agreeing to do so, Peloton sent him a prepaid shipping label and never contacted him again despite repeated follow-up by him for updates.

### C.   The "Project Tinman" Coverup Supports an Inference of Scienter

199.   Project Tinman was an extensive effort to hide, rather than remediate, a known quality defect impacting the inner seat frame on a large portion of its backordered Bike inventory at a time when the Company was on notice that Bike seats were detaching during use.

200.   Before Project Tinman began in September 2021, Peloton had already received notice of several Bike seats breaking or detaching from the post during use, including at least one such incident sent to it in August 2021 by CPSC.

201.   According to the eight employees interviewed by the *Financial Times*, Project Tinman was a company-wide effort designed by "executives" to triage Bikes for rust and "conceal" it using a chemical solution after warehouse workers reported that a large number of Bikes were arriving from Taiwan with a build-up of rust on the inside of the frame, including the seat post. As the architects of a nationwide plan to conceal such rust, Peloton executives were therefore aware that it had or was otherwise receiving Bikes with a buildup of rust on them.  At the time, the agreements governing Peloton's relationship with is manufacturing partners provided that they must follow its established product design specifications, quality assurance programs, and manufacturing standards.  But rather than return these Bikes to the manufacturer to ensure consistency with those standards or, for that matter, filter them out of its saleable inventory pending an appropriate substitute, Peloton executives responded to the known issue with Project Tinman. Thus, Project Tinman was not an instance of merely failing to spot the rust on these Bikes but, rather, a conscious attempt to *hide* the rust and pass them off to customers at full price.

202.     Indeed, the fact that the executives to chose to name this covert operation "Project Tinman" in an apparent effort to avoid using words like "rust" is itself indicative of scienter.

### D.     Peloton's Change to Its Procedures for Handling Complaints About Signs of Bike Rust Is Strong Evidence of Scienter

203.     As noted above, Project Tinman was exposed by the *Financial Times* in February 2022.  By no later than March 29, 2022, Peloton received photographic evidence from customers who reported that their Bike seat detached during use showing that there was severe rust or corrosion on the *inside* of the frame along the edge of the break.  *See* ¶ 69.  That same day, users on Reddit who saw that photograph drew a direct connection to Project Tinman.

204.     Soon thereafter, Peloton modified the procedures for handling customer complaints about Bike rust to draw a distinction between rust on the joints of the Bike and rust on all other areas.  Rather than refer all customer complaints about Bike rust to Peloton's internal Escalation Team, as was the practice during Project Tinman,  CW2 said instructions were passed down mid-2022 that the only reports about Bike rust which should be referred to the Escalation Team were those involving rust on "areas that shouldn't be accumulating rust," including "any joints or connection points."  According to CW2, "[i]f the rust wasn't within a joint or a connection point," then it could simply be treated with "Rust-Oleum or rust converters."

205.     The fact that Peloton drew a distinction between rust on Bike joints and rust elsewhere on the Bike in the immediate aftermath of receiving reports that there was severe rust on the inner edge of a weld that broke on a Bike seat post supports that inference that Peloton and its executive leadership knew that there were Bikes in use with rust on the inner edge of the weld on the seat post, and the previous efforts to cover that rust with a rust converter in connection with Project Tinman was insufficient to ensure the structural integrity of the seat post on the Bike.

**E.      Defendants Were On Notice of the Likelihood and Extent of a Bike Recall**

206.      Defendants were no strangers to the CPSC's product recalls process and the Company's statutory obligations under the CPSA.  Defendants Foley and Woodworth personally participated in the decisions around whether or not to recall the Tread+ at the request of the CPSC in early 2021, and/or the public fallout therefrom.  In addition, Defendant McCarthy personally participated in the continued investigation by the CPSC into Peloton's alleged failure to immediately report the safety issue associated with the Tread+ under the CPSC.

207.      Thus, Defendants were deeply familiar with, and on high alert as to, the type of information that should be reported to the CPSC as well as the type of safety risks and injuries that could lead the CPSC to request a recall, particularly product defects leading to serious consumer injuries.  Notably, other bicycle companies have issued recalls where there were far fewer safety reports and injuries, such as, for example, the following recall notices from the CPSC:

- In 1981, Beacon Enterprises, Inc. announced the recall of 120,000 stationary exercise bikes after reports of injuries from the metal seat post breaking through the seat. Six injuries were reported.

- In 2008, Reebok International Ltd., announced the recall of approximately 20,000 exercise bikes due to the possibility of the alloy cranks on the exercise cycles breaking during use.  There were five reports of injuries, including lacerations and abrasions.

- In October 2011, Trek announced the recall of approximately 27,000 bicycles because the bolt that secures the seat saddle clamp to the seat post can break posing a fall hazard.  There were *four incidents* with *one injury* involving a broken tooth and lip wound.

- In May 2016, SCOTT USA Inc. announced the recall of approximately 1,400 bicycles after receiving reports of a similar hazard to that of the Peloton Bike, with *11 reports* of broken seat posts, and *no injuries*.

- In September 2016, Advanced Sports International announced the recall of approximately 3,000 bicycles for a similar hazard to that of the Peloton Bike, in which the top clamp of the bicycle's seat post cracked, posing a fall hazard to the user.  There were *no safety reports or injuries* reported.

75

- In October 2018, Pacific Cycle Inc. announced the recall of approximately 17,600 bicycles after receiving 37 reports of cracks in the bike's downtube, with just one injury, involving cuts and abrasion, reported.

- In January 2019 (announced with the CPSC in April 2019 due to government furlough), Specialized Bicycle Components, Inc. announced the recall of approximately 63,000 bicycles after receiving *two reports* involving cracking in the steerer tube collar, and *no injuries*.

- In July 2019, Faraday Bicycles Inc. announced the recall of approximately 4,450 electric bicycles after receiving reports of a similar hazard to that of the Peloton Bike, with *nine reports* of the seat post breaking, including *one minor injury*.

- In March 2020, woom bikes USA announced the recall of approximately 5,500 bicycles after receiving *two reports* of the front fork becoming loose or detaching with *no injuries*.

208.    In addition, Defendants' recent experience with the Tread+ recall put them on notice of the extent of an appropriate CAP that the CPSC would require to remediate the safety defect with the Bike, whether it amounted to a formal recall or not.  Notably, the urgent warning issued by the CPSC in April 2021 after Peloton refused to voluntarily recall the Tread+ was specifically limited to households where here are "small children or pets" because the injuries involving that product primarily involved those groups.  Nevertheless, the recall for the Tread+ told *all consumers* to immediately stop using the Tread+ until the underlying defect was remediated by Peloton.  Thus, any CAP for the Bike would more than likely cover *all* impacted models, not just those owned by a specific cohort or segment of the customer base.

209.    While the Bike defect could be remedied by replacing a single component as opposed the entire product, as in the case of the Tread+, Defendants had all information at their disposal to properly evaluate the cost of an appropriate CAP.  According to Defendants, they had detailed insight into not only the number of active Subscriptions, but the type of class they took, including classes requiring the use of a Bike, as opposed to the Tread or a standing class like yoga. *See* ¶ 62.  Indeed, on the very first day of the Class Period, Foley boasted that "there were 171

million total platform workouts during Q3" and Woodworth highlighted that "we saw particularly strong growth when it comes to our strength classes."  Further, senior management was intimately familiar with the full spectrum of expenses associated with a CAC for a product defect.  On the first investor call after the Tread+ recall, held on May 6, 2021, Defendant Woodworth highlighted that management anticipated Recall expenses associated with, among other things, a "write-down" on existing inventory until a fix is approved by the CPSC, "logistics costs" associated with the remediation program, and "expected churn" resulting from the recall.

### F.     Numerous Government Investigations Support the Inference of Scienter

210.    The manner in which Peloton handled the recall of the Tread+ in 2021 sparked a series of government investigations into its reporting and disclosure practices regarding customer injuries.  By no later than May 7, 2021, the CPSC notified Peloton that it had opened an investigation into the Company's compliance with its reporting obligations under the CPSA in connection with the Tread+ safety issue it first reported to the CPSC in March 2021.  Shortly after the Tread+ recall in May 2021, the U.S. Department of Justice and U.S. Department of Homeland Security ("DHS") opened investigations into Peloton's reporting of injuries associated with its products generally, and served a subpoena on it for the production of documents and information relating thereto.  In addition, the SEC also informed Peloton that it opened an investigation into its public disclosures concerning these matters on or before August 27, 2021.  Unlike the CPSC investigation, the investigations by the DOJ, DHS, and SEC are not limited to the Tread+.

211.    In August 2022, the CPSC informed Peloton that its staff believes that it knowingly failed to satisfy its reporting obligation under the CPSA in connection with the Tread+ safety issue and, accordingly, intends to recommend imposing civil penalties for such violations.  Based on its investigation, the CPSC staff found that by the time Peloton made its first report to the CPSC about the Tread+ safety issue in March 2021, it had already received more than 150 previous reports

from as far back as December 2018 of persons, pets and/or objects being pulled under the rear of the product while on, which reasonably supported the conclusion that the Tread+ contained a defect that could create a substantial product hazard or unreasonable risk of serious injury or death. The DOJ, DHS, and SEC investigations all remained ongoing through the end of the Class Period.

212.    Defendants were plainly aware of these investigations throughout the Class Period and, thus, at the time each misstatement was made.  Defendants Foley, Woodworth, McCarthy, and Coddington signed annual and quarterly reports filed with the SEC throughout the Class Period which acknowledged the existence of each such investigation.  In addition, Defendants McCarthy and Coddington admitted in Peloton's 2022 Form 10-K, filed with the SEC on September 7, 2022, that "[i]n August 2022, we received notice from the CPSC that the agency staff believes we failed to meet our statutory obligations under the Consumer Product Safety Act and intends to recommend that the CPSC impose civil monetary penalties" in connection with the Tread+.

213.    In addition, the CPSC's Office of Compliance and Field Operations launched yet another law enforcement investigation into Peloton relating to the Bike following the Recall, which investigation remained ongoing through the end of the Class Period.

G.    Peloton's Settlement With the CPSC Supports An Inference of Scienter

214.    On December 8, 2022, Defendant McCarthy signed a settlement agreement to resolve charges by the CPSC that Peloton knowingly failed to immediately report safety defects associated with the Tread+ and knowingly sent recalled products into commerce, both in violation of the CPSA (the "CPSC Tread+ Settlement Agreement").  The CPSC entered an Order accepting the CPSC Tread+ Settlement Agreement on December 28, 2022.  On January 9, 2023, the CPSC Tread+ Settlement Agreement was published in the *Federal Register*.  *See* 88 Fed. Reg. 1193-96 (Jan. 9, 2023).  The CPSC Tread+ Settlement Agreement became effective January 25, 2023.

78

215.    As part of the CPSC Tread+ Settlement Agreement, Peloton agreed to pay a civil penalty of more than $19 million.  The civil penalty was one of the largest collected in the history of the CPSC.  The portion of the civil penalty associated with the failure to report violation represented the maximum penalty allowed by statute.  Several Commissioners of the CPSC emphasized that the penalty was designed to deter future misconduct.  For example, Commissioner Rich Trumka Jr. stated on January 5, 2023 that the decision to accept the CPSC Tread+ Settlement Agreement "marks a lead forward in . . . deterring corporate misconduct."  Similarly, CPSC Chair Alexander D. Hoehn-Saric stated that same day that the CPSC Tread+ Settlement Agreement "sends a loud and clear warning to companies who continue to sell dangerous products that they know can cause serious injury or death."  Referencing the CPSC Tread+ Settlement Agreement, he later commented at an international symposium on February 25, 2023, that "[w]e will continue to hold companies accountable that violate the law and fail to prioritize their customers' safety."

216.    Importantly, Peloton also agreed as part of the CPSC Tread+ Settlement Agreement to maintain an "enhanced compliance program designed to ensure compliance with the CPSA with respect to *any consumer product . . . distributed or sold by Peloton*" containing a number of required elements.  Among other things, the CPSC Tread+ Settlement Agreement required the enhanced compliance program to contain:  (1) "Procedures for reviewing claims and reports for safety concerns and for implementing corrective and preventative actions when compliance deficiencies or violations are identified"; (2) "procedures requiring that information required to be disclosed by Peloton to the Commission is recorded" and "processed"; (3) and "Peloton's senior management responsibility for, and general board oversight of, CPSA compliance."

### H.    Defendants' Denials Support An Inference of Scienter

217.    Throughout the Class Period, Defendants repeatedly denied and downplayed the scope of the quality and safety issues surrounding the Bike.

218.    For example, after Project Tinman was exposed by the *Financial Times* in February 2022, Peloton denied that the rust that was the focus of the operation had any functional impact on the Bike and stated they were purely "cosmetic."  *See* ¶ 163.

219.    Similarly, in the Company's 3Q 2023 Form 10-Q filed with the SEC on May 4, 2023, the Defendants downplayed the risks of the seat post issues by stating expenses to remediate the Bike seat issue were not material.  The Company had to quickly change course and just a week later issued a large-scale recall of roughly 2.2 million Peloton Bikes that would cost the Company tens of millions in additional expenses and negatively impact its Subscriber figures.

220.    On May 24, 2023, Defendant McCarthy again downplayed the safety issues associated with the Recall during a conference hosted by J.P. Morgan.  In response to a question about the Recall from analyst Doug Anmuth of J.P. Morgan, McCarthy minimized the severity of the problem: "Now, the CPSC would like all of you, if you have a Bike, to just stop using it until you get a replacement seat post.  By the way, you're more likely to become a professional athlete or to be hit by lightning, or to injure yourself in your bath when you're showering after your workout than you are to have a broken seat post.  But they [CPSC] would like you to stop."

I.    **Defendants Foley and Cortese Pledged Their Stock As Collateral At the Peak of Peloton's Stock Price And Faced Margin Calls As the Stock Declined**

221.    As of the start of the Class Period, Defendants Foley and Cortese were two of Peloton's largest stockholders.  As of December 30, 2020, Foley owned at least 400,000 shares of Peloton's Class A common stock, 5,766,232 shares of Peloton's Class B common stock, and 11,372,928 fully vested options to purchase Peloton's Class A common stock or Class B common stock.  As of December 30, 2020, Cortese owned at least 413 shares of Peloton's Class A common stock, 1,154,922 shares of Peloton's Class B common stock, and 4,131,258 fully vested options to purchase Peloton's Class A common stock or Class B common stock.

222.    Both Foley and Cortese used their significant holdings to secure personal loans.  By no later than September 30, 2020, Defendant Foley pledged 3,500,000 shares of his Class B common stock, or approximately 20% of his holdings, to secure personal loans extended to him. By no later than September 30, 2021, Cortese pledged 900,000 shares of his Class B common stock, or approximately 20% of his holdings, to secure a personal loan extended to him as well.

223.    Borrowing against a portfolio of securities is known as a "margin loan."  But such loans carry the risk that the lender can demand, or "call," for additional collateral if the value of the securities decreases below an acceptable amount.  This risk was well-known by the time Foley and Cortese entered into their margin loans.  Sharp drops in stock prices during the dot-com bubble in the 2000s and the 2008 financial crisis prompted margin calls on loans extended to executives at several prominent companies, including, for example, Sumner Redstone, executive chairman of Viacom Inc. and CBS Corporation, who reportedly sold 20% of his stake in those companies to satisfy such debts in 2008.

224.    As of September 30, 2020, the 3,500,000 shares that Defendant Foley pledged were worth more than $351 million.  As of September 30, 2021, the 900,000 shares that Defendant Cortese pledged were worth more than $76 million.

225.    The value of Peloton's common stock deteriorated significantly in late 2021 and 2022 as lockup restrictions were eased and consumer demand for at-home fitness products waned from peak pandemic levels.  By November 10, 2021, the 3,500,000 shares that Defendant Foley pledged were worth approximately $171 million, and the 900,000 shares that Defendant Cortese pledged were worth approximately $44 million.  By January 27, 2022, the 3,500,000 shares that Defendant Foley pledged were worth approximately $84 million, and the 900,000 shares that Defendant Cortese pledged were worth approximately $21.5 million.  By July 14, 2022, the

3,500,000 shares that Defendant Foley pledged were worth approximately $29 million, and the 900,000 shares that Defendant Cortese pledged were worth approximately $7.5 million.

226.    As such, during this time, Defendant Foley faced repeated margin calls for additional collateral to prevent the pledged shares from being sold.  However, at the time, Peloton's Insider Trading Policy limited insiders like Foley and Cortese from pledging more than 40% of the number of an individual's vested and outstanding Peloton securities as collateral for a loan or in a margin account.

227.    Ultimately, Foley resigned from his remaining post on Peloton's Board on September 12, 2022, relieving him from Peloton's Insider Trading Policy.  By October 4, 2022, Foley nearly doubled the amount of pledged securities to 6,786,232 shares of his Class B common stock, or approximately 41.4% of his holdings.  Similarly, Cortese increased the amount of pledged securities to 1,300,000 shares of his Class B common stock, or 26.3% of his holdings.

228.    In October 2022, Peloton revised its Insider Trading Policy to prohibit insiders from pledging Peloton securities as collateral for a loan or in a margin account.

**J.    Defendant Coddington Enriched Herself Through the Sale of Inflated Stock**

229.    Newly-hired Peloton CFO Coddington made enormous sales in the lead-up to the massive plunge in the stock on August 23, 2023 when it was revealed that 750,000 requests were made for replacement seat posts and that the May recall's price tag "substantially exceeded" prior expectations and led to an additional accrual of $40 million as well as higher subscriber churn.

230.    On June 13, 2022, the same day she was appointed as CFO, Defendant Coddington was awarded 349,108 restricted stock units (each an "RSU").  Each RSU represents a right to receive one  share of Peloton Class A common stock for no cost.  25% of the RSUs vest one year from the grant date, on June 13, 2023, then 6.25% of the award vest in quarterly increments with

100% fully vesting on June 13, 2026.  On June 13, 2023, Coddington acquired 25% of the award, or 87,277 shares, which represented her total holdings on that date as reported to the SEC.

231.    Coddington swiftly sold 66,440 total shares on June 14, June 15, July 17, and August 15, 2023 for approximately $599,298.77, leaving just 20,837 shares as of the disclosures on August 23, 2023.  Thus, ***Coddington sold approximately 76% of her total holdings of Peloton stock right before the August 23, 2023 disclosure that led to a 22.6% drop in the stock price.*** The final three sales were made pursuant to a Rule 10b5-1 trading plan, but that plan was adopted on November 10, 2022.

### K.    The Peloton Bike And Product Safety Are At The Core Of Peloton's Business

232.    The Bike was the Company's first product launched in 2014 and is its flagship product.  It is as the very core of, and intimately associated with, Peloton's brand and likeness.  Indeed, Defendant McCarthy highlighted during a call with investors on August 25, 2022, that the unaided brand awareness of the Bike is approximately 53%, far exceeding any of Peloton's other products.  As such, Defendant Woodworth stated the "Bike business" was "core" to Peloton during a call with investors held by the Company on February 8, 2022.

233.    As noted above, the substantial majority of the Company's revenues as of the start of the Class Period (including Connected Fitness Subscriptions) derived from sales of the Peloton Bike.  *See* ¶ 37.  By the end of the Class Period, all of Peloton's revenues continued to consist exclusively of sales of Connected Fitness Products, like the Peloton Bike, or Subscriptions.  The Recall impacted all Peloton Bikes sold between January 2018 and May 2023. According to the Company's SEC filings, the Peloton's revenue on Connected Fitness Products was approximately ***$9 billion*** from June 30, 2017 until June 30, 2023, the period covering January 2018 to May 2023.

234.    Furthermore, restoring Peloton's commitment to safety after the scandal and fallout associated with the Tread+ recall in May 2021 was paramount to its continued success, as

Defendant Foley candidly admitted on the first day of the Class Period.  *See* ¶ 49.  For this reason, many of the Individual Defendants and Peloton publicly, but falsely, represented throughout the Class Period that safety is Peloton's "top priority."

### L.    Foley and Woodworth Were Hands-On Managers

235.    Defendant Woodworth appeared on an audio podcast called Scaling Up on an episode titled "Racing Through the Gears" released on June 8, 2021.  During the interview, she stated the following about Defendant Foley and herself:

> [Foley] communicates with the full team every four to six weeks.  He communicates very frequently with the senior leadership team.  And I would say that that's actually a pretty big team. It's about 90 people of senior leaders across the global organization because he's still the same person.  And that's what I love about John is he's still genuinely John and that comes across to our entire global team. And that's the way I want to lead my team as well.  I still actually personally meet every new team member on the Peloton finance team.  I take 30 minutes to meet every new hire for the week.  And he's the same way.  He does new hire introductions all the time.

236.    Thus, Defendants Foley and Woodworth were very hands-on managers and communicated throughout the organization on a regular basis, even with lower-level employees.  Thus, any key information about the Company's chief product, the Peloton Bike, would clearly be known to them.

### M.    *Resondeat Superior* and Agency Principles Apply

237.    Peloton is liable for the acts of Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all wrongful acts alleged herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so.  The scienter of Defendants and other Company officers, employees , and agents is imputed to Peloton under such principles.

## LOSS CAUSATION

238.    Defendants' wrongful conduct directly and proximately caused Plaintiffs and the Class to suffer substantial damages.

239.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Peloton securities, and operated as a fraud or deceit on Class Period purchasers of Peloton securities, by misrepresenting Peloton's business and prospects and failing to disclose the adverse facts detailed herein.  Plaintiffs and members of the Class purchased or otherwise acquired Peloton securities throughout the Class Period at prices that were inflated by the fraud described herein.  The truth regarding the fraud was revealed to the market in a series of disclosures on February 16, 2022, February 22, 2022, May 11, 2023, May 24, 2023, and August 23, 2023.  When Defendants' prior misrepresentations and omissions were disclosed to the market or the risks concealed by them materialized on each of these dates, the price of Peloton securities declined significantly as the prior inflation came out of the price of such securities.

240.    As a result of their purchase of Peloton securities during the Class Period at prices inflated by the fraud, and the subsequent decline of the price of those securities in response to the true facts or the risks concealed by the fraud, Plaintiffs and the other members of the Class suffered economic losses, *i.e.,* damages under the federal securities laws.  Such declines were a direct result of Defendants' fraudulent misrepresentations being revealed to the market, and/or the materialization of risks that Defendants downplayed or concealed from investors.

241.    After market close on February 16, 2022, the *Financial Times* published a story which revealed that Peloton used a set of protocols known as Project Tinman to hide rust on Bikes which arrived from Taiwan with visible corrosion on the inside of the frame.  On this news,

Peloton's stock price fell from $32.05 on February 16, 2022, to close at $30.59 on February 17, 2022, representing a decline of approximately 4.7%.

242.     On February 22, 2022, before market open, the *Financial Times* ran another story titled "Inside 'Project Tinman': Peloton's pan to conceal rust in its exercise bikes," which revealed new details about Project Tinman not known to the market, including that it was crafted by Peloton executives and involved a nationwide effort to inspect, remove, and/or conceal rust on Bikes since September 2021.  On this news, Peloton's stock price dropped $2.63 per share, or approximately 9.3%, from a close of $29.63 on February 18, 2023 to a close of $27.00 on February 23, 2022.

243.     On May 11, 2023, before the market opened, news broke that Peloton was announcing the Recall of all Bikes sold from January 2018 to May 2023, and that members should "immediately stop using the recalled exercise bikes" until repaired by Peloton.  On this news, Peloton's stock price fell $0.67 per share, or approximately 9.3%, from a close of $7.53 on May 10, 2023, to close at $6.86 on May 11, 2023.  Numerous media outlets attributed the drop to the announcement of the Recall.  For example, *Bloomberg* reported that before the market even opened on May 11, 2023, Peloton shares "fell about 10% in early trading Thursday after the fitness company said it was recalling about 2.2 million exercise bikes due to a safety hazard."  *BBC News* highlighted later that day that "[n]ews of the latest voluntary recall sent the company's stock plunging."  *Forbes* also reported that the announcement "sen[t] the at-home exercise company's shares plummeting to a seven-month low."  Similarly, *The New York Times* noted that the "company's shares tumbled nearly 9 percent by the market close" in response to the Recall.

244.     Before the market opened on May 24, 2023, Peloton CEO Barry McCarthy participated in a conference hosted by J.P. Morgan in which he revealed that the scope and cost of the Recall would be more extensive than the Company previously reported in its Q3 2023 Form

10-Q on May 4, 2023, and that the Recall was "mandated" by the CPSC.  On this news, Peloton's stock price declined $0.36 over three days, or approximately 5.1%, from a close of $7.25 on May 23, 2023, to a close of $6.89 on May 26, 2023.

245.    Finally, on August 23, 2023, before the market opened, Peloton announced that the Recall would cost $40 million more than previously disclosed and that it lost a significant number of Subscriptions as a result of the Recall.  On this news, Peloton's Class A common stock price fell $1.58 per share, or 22.6%, to close at $5.41 per share on August 23, 2023.  Numerous media outlets attributed the decline to the outsized Subscription losses arising from the Recall.  For example, *CNN* published an article that day with the headline "Peloton stock plunges after 20,000 members canceled subscriptions while waiting for recall."  In a *Yahoo! Finance* article published that day, it was reported that "Peloton stock crushed as seat post recall, subscriber losses hurt quarterly results."  Similarly, *Business Insider* reported that "Peloton stock plummeted on Wednesday shortly after the company reported major subscriber losses."

246.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PRESUMPTION OF RELIANCE

247.    Plaintiffs and the Class are entitled to a presumption of reliance under the fraud-on-the-market doctrine established in *Basic v. Levinson*, 485 U.S. 224 (1998), and the presumption of reliance for omissions set forth in *Affiliate Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

248.    The presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts necessary to make the statements that were made not misleading during the Class Period;

(b)     the misrepresentations and/or omissions were material;

(c)     the Company's Class A common stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's Class A common stock; and

(e)     Plaintiffs and other members of the Class purchased Peloton securities between the time Defendants misrepresented or failed to disclose material facts necessary to make the statements that were made not misleading and the time the true facts were disclosed, without knowledge of the misrepresented and/or omitted facts.

249.     At all relevant times, the market for Peloton's securities was efficient for the following reasons, among others:

(a)     Peloton's Class A common stock met the requirements for listing on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, Peloton filed periodic public reports with the SEC;

(c)     throughout the Class Period, Peloton's Class A stock was highly liquid, with an average daily trading volume over 14 million shares;

(d)     Peloton regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(e)     Peloton was followed by numerous securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain

customers of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(f)      unexpected company-specific news was reflected and incorporated into the stock price for Peloton's Class A common stock.

250.    As a result of the foregoing, the market for Peloton securities promptly digested current information regarding Peloton from publicly available sources and reflected such information in Peloton's securities prices.  Under these circumstances, all purchasers of Peloton securities during the Class Period suffered similar injury through their purchase of Peloton securities at artificially inflated prices and the presumption of reliance applies.

251.    In addition, a presumption of reliance is also appropriate under *Affiliated Ute* because the claims asserted herein are grounded in material omissions.  As this action involves Defendants' failure to disclose material adverse information regarding Peloton's business operations—information that the Defendants were obligated to disclose in light of the statements they made on these very topics and/or applicable SEC rules and regulations—positive proof of reliance is not a prerequisite to recovery.

## NO SAFE HARBOR

252.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the statements alleged to be false or misleading herein.

253.    None of the statements alleged herein to be false or misleading are forward-looking statements.  Rather, the statements alleged herein to be false or misleading all relate to facts and conditions existing at the time the statements were made.  None of the historic or present-tense statements alleged herein to be false or misleading were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance

89

when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

254.     To the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Indeed, given the then-existing facts contradicting Defendants' statements, the boilerplate and generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false and misleading statements.  In addition, the safe harbor does not apply because, at the time each purportedly "forward looking statement" was made, the speaker knew that the forward-looking statement was false or misleading when made, and/or the forward-looking statement was authorized or approved by an executive officer of Peloton who knew that the statement was materially false or misleading when made.

255.     Moreover, to the extent Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaged in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining the hypothetical nature of such disclosures.  In other words, the supposed "risks" that Defendants attempted to warn about had already materialized.

## **CLASS ACTION ALLEGATIONS**

256.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23 of the Federal Rules of Civil Procedure on behalf of the Class.  Excluded from the Class are  Defendants, members of the immediate families of the Individual Defendants, the Company's subsidiaries and affiliates, any person who is or was an officer or director of the Company or any

of the Company's subsidiaries or affiliates during the Class Period, any entity in which such excluded party has or had a controlling interest, and the legal representatives, heirs, successors, or assigns of any such excluded party.

257.    The members of the Class are so numerous and geographically dispersed that joinder is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  During the Class Period, Peloton's Class A common stock was actively trading on the NASDAQ.  As of July 31, 2023, there were approximately 338,989,862 shares of Class A stock outstanding.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in class actions arising under the federal securities laws.

258.    Plaintiffs' claims are typical of the claims of members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act, as complained of herein.

259.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have n interests antagonistic to, or in conflict with, those of the Class.

260.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class, including:

(a)    whether the acted described herein violated the Exchange Act and/or SEC rules promulgated thereunder;

(b)      whether Defendants' statements during the Class period misrepresented material facts or omitted material facts necessary in order to make the statements made, in the circumstances under which they were made, not misleading;

(c)      whether Defendants acted with the requisite level of scienter;

(d)      whether and to what extent the material misstatements and omissions alleged herein artificially inflated the market price of Peloton securities during the Class Period;

(e)      whether reliance may be presumed;

(f)      whether the Individual Defendants were controlling persons; and

(g)      whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

261.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other reasons, joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to redress the wrongs done to them individually.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

262.    Plaintiffs repeat and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

263.    This Count is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, on behalf of the Class against all Defendants.

264.     As alleged herein, throughout the Class Period, Defendants, individually and in concert, disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

265.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Peloton securities during the Class Period.

266.     As set forth above, the Individual Defendants had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and other members of the Class, or acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Peloton personnel to the investing public, including Plaintiffs and the other members of the Class.

267.     Peloton is liable for the acts of the Individual Defendants and its other employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

268.     As a result of the foregoing, the market price of Peloton securities was artificially inflated during the Class Period.  Plaintiffs and Class members relied on the integrity of the market price for Peloton securities during the Class Period and paid prices for Peloton securities that were artificially inflated as a result of the false and misleading statements described herein.  Plaintiffs and the Class members would not have purchased Peloton securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the misleading statements and/or the material adverse facts which the Defendants did not disclose.

269.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Peloton securities during the Class Period.

270.     By reason of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

<u>**COUNT II**</u>

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

271.     Plaintiffs repeat, and reallege each and every allegation in the foregoing paragraphs as if fully set forth herein.

272.     This Count is brought pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of the Class against the Individual Defendants.  During the Class Period, the Individual Defendants directed involvement in the day-to-day operations of Peloton, and conducted and participated, directly and indirectly, in the conduct of Peloton's business affairs. Because of their positions of power and control, they knew of or recklessly disregarded the adverse non-public information about Peloton's business practices.

273.     The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be

false or misleading prior to and/or shortly after those statements were made, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

274.    By virtue of their positions of control and authority as senior officers and/or directors, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Peloton, including the contents of public statements during the Class Period.

275.    The Individual Defendants, therefore, were "controlling persons" of Peloton within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged, which artificially inflated the market price of Peloton securities.

276.    By reason of such conduct, the Individual Defendants are liable to Plaintiffs and members of the Class for violations of Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Declaring that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as class representatives and Plaintiffs' counsel as lead counsel under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding Plaintiffs and the Class compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, together with pre-judgment interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including, but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

D.    Granting such other and further relief as the Court may deem just and proper.

## **DEMAND FOR TRIAL JURY**

Plaintiffs hereby demand a trial by jury of all issues so triable.


Dated:  November 6, 2023            Respectfully submitted,

                                 POMERANTZ LLP

                                 */s/ Jeremy A. Lieberman*
                                 Jeremy A. Lieberman
                                 Emma Gilmore
                                 Justin D. D'Aloia
                                 Villi Shteyn
                                 600 Third Avenue, 20th Floor
                                 New York, New York 10016
                                 Telephone: (212) 661-1100
                                 Facsimile: (917) 463-1044
                                 jalieberman@pomlaw.com
                                 egilmore@pomlaw.com
                                 jdaloia@pomlaw.com
                                 vshteyn@pomlaw.com

                                 *Counsel for Co-Lead Plaintiff David*
                                 *Feigelman and Additional Named Plaintiff*
                                 *Sam Solomon and Co-Lead Counsel for the*
                                 *Class*

                                 LEVI & KORSINSKY, LLP

                                 Shannon L. Hopkins
                                 Gregory M. Potrepka
                                 Cole von Richthofen
                                 1111 Summer Street, Suite 403
                                 Stamford, CT 06905
                                 Tel: (203) 992-4523
                                 Fax: (212) 363-7171
                                 shopkins@zlk.com
                                 gpotrepka@zlk.com
                                 cvrichthofen@zlk.com

                                 *Counsel for Co-Lead Plaintiff Jia Tian and*
                                 *Co-Lead Counsel for the Class*

DocuSign Envelope ID: 433695A7-EC21-4F25-ABDB-54ADA48A31A8

## AMENDED CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

I, Jia Tian, duly certify and say, as to the claims asserted under the federal securities laws, that:

1.     I have reviewed the Amended Class Action Complaint For Violations of the Federal Securities Laws ("Amended Complaint") and authorize its filing.

2.     I did not purchase or otherwise acquire the securities that are the subject of this action at the direction of Plaintiff's counsel, or in order to participate in this private action or any other litigation under the federal securities laws.

3.     I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     My transactions in securities of Peloton Interactive, Inc., which are the subject of this litigation, during the class period alleged in the Amended Complaint are set forth in the chart contained in the Schedule A attached hereto.

5.     Other than in this private action, within the last three (3) years I have not sought to serve, nor have I served, as a class representative in any action filed under the federal securities laws.

6.     I have not accepted and will not accept any payment for serving as a representative plaintiff on behalf of the class beyond my pro rata share of any recovery, unless ordered or approved by the Court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on    11/6/2023    .

By: _____

Jia Tian

DocuSign Envelope ID: 433695A7-EC21-4F25-ABDB-54ADA48A31A8

**AMENDED CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS**

## SCHEDULE A

| Case Name | Peloton Interactive, Inc. |
|---|---|
| Ticker | PTON |
| Class Period | 05-06-2021 to 08-22-2023 |

**Account 1**

**Client Name**

Jia Tian

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 05-05-2022 | P | 1000 | $ 16.9200 |
| 05-10-2022 | P | 500 | $ 12.7200 |
| 05-11-2022 | P | 1000 | $ 13.7400 |
| 06-09-2022 | P | 885 | $ 11.2900 |
| 08-16-2022 | P | 2000 | $ 14.0300 |
| 08-17-2022 | P | 3200 | $ 13.1600 |
| 08-19-2022 | P | 1500 | $ 11.5200 |
| 09-22-2022 | P | 2300 | $ 08.6200 |
| 09-29-2022 | P | 2791 | $ 07.1600 |
| 12-27-2022 | P | 3649 | $ 08.2300 |
| 12-30-2022 | P | 1287 | $ 07.7700 |
| 03-14-2023 | P | 1889 | $ 10.6100 |
| 05-04-2023 | P | 4000 | $ 07.6500 |
| 05-23-2023 | P | 2700 | $ 07.2600 |

**Account 2**

**Client Name**

Jia Tian

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 05-05-2022 | P | 590 | $ 16.9000 |
| 05-10-2022 | P | 400 | $ 12.6983 |
| 05-11-2022 | P | 500 | $ 13.7600 |
| 06-09-2022 | P | 885 | $ 11.2988 |
| 08-16-2022 | P | 1500 | $ 14.0684 |
| 08-19-2022 | P | 1300 | $ 11.5400 |
| 09-22-2022 | P | 1149 | $ 08.6789 |

**AMENDED CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS**

| Account 3 |
|---|
| **Client Name** |
| Jia Tian |

| Date of Transaction | Transaction Type | Quantity | Security ID | Price per Share |
|---|---|---|---|---|
| 4/11/2022 | BO | 4 | CALL PTON 01/20/23 15 | $11.35 |
| 4/11/2022 | BO | 15 | CALL PTON 01/20/23 50 | $1.33 |
| 4/20/2022 | BO | 15 | CALL PTON 01/20/23 40 | $1.95 |
| 5/5/2022 | BO | 15 | CALL PTON 01/19/24 27 | $4.75 |
| 5/9/2022 | BO | 15 | CALL PTON 01/19/24 25 | $4.25 |
| 5/11/2022 | BO | 20 | CALL PTON 01/19/24 25 | $3.49 |
| 7/26/2022 | BO | 80 | CALL PTON 01/19/24 30 | $0.96 |
| 9/29/2022 | BO | 35 | CALL PTON 01/17/25 20 | $1.51 |
| 3/14/2023 | BO | 35 | CALL  PTON 01/19/24 20 | $0.95 |
| 4/19/2023 | BO | 15 | CALL  PTON 01/17/25 20 | $1.45 |
| 5/3/2023 | BO | 13 | CALL PTON 01/17/25 20 | $1.16 |