**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

JIA TIAN and DAVID FEIGELMAN,
individually and on behalf of all others
similarly situated,

Plaintiffs,

v.

Case No. 1:23-cv-04279-MKB-JRC

PELOTON INTERACTIVE, INC., JOHN
FOLEY, BARRY MCCARTHY, JILL
WOODWORTH, ELIZABETH F.
CODDINGTON, THOMAS CORTESE and
TAMMY ALBARRÁN,

Defendants.

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

Dated: April 2, 2024

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (SH-1887)
Gregory M. Potrepka (GP-5999)
Rachel A. Berger
Amanda D. Foley
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
rberger@zlk.com
afoley@zlk.com

*Counsel for Co-Lead Plaintiff Jia
Tian and Co-Lead Counsel for the
Class*

**POMERANTZ LLP**
Jeremy A. Lieberman
Emma Gilmore
Justin D. D'Aloia
Villi Shteyn
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com
jdaloia@pomlaw.com
vshteyn@pomlaw.com

*Counsel for Co-Lead Plaintiff David
Feigelman and Additional Named Plaintiff
Sam Solomon and Co-Lead Counsel for the
Class*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ..................................................................................................... 3

    A.   Peloton Sells Premium Connected Fitness Products Including the Bike ........................ 3

    B.   The Tread+ Scandal Spurs Investor Concern About CFP Safety, Brand Reputation, and Cooperation with Regulators .......................................................................... 3

    C.   Defendants Actively Conceal a Dangerous Defect with the Bike Seat Post ................... 5

    D.   The Truth Is Revealed in a Series of Partial Disclosures ................................. 6

ARGUMENT ........................................................................................................ 7

    A.   The Amended Complaint Alleges Material Misstatements ............................. 7

        1.   Material Misrepresentations Regarding Bike Safety ................................. 8

            i.   Misrepresentations Regarding Safety of Peloton Members ................... 8

            ii.   Misrepresentations Regarding Product Quality ................................. 13

            iii.   Misrepresentations Denying Project Tinman Safety Concern ............. 14

        2.   Material Misrepresentations on Churn Rates and Subscription Growth ........ 15

        3.   Defendants' Risk Warnings Were Misleading and Offer No Protection ........ 16

        4.   Material Misrepresentations Regarding the Voluntary Nature of Recall ....... 18

        5.   Materially False and Misleading Loss Accruals .................................. 19

    B.   The Amended Complaint Alleges a Strong Inference of Scienter ..................... 21

        1.   Defendants' Knowledge and Recklessness ....................................... 22

        2.   Motive and Opportunity to Commit Fraud ....................................... 28

        3.   Plaintiffs' Theory of Scienter is More Compelling than Defendants' ......... 30

CONCLUSION ..................................................................................................... 30

**Cases**

*Abramson v. Newlink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020) ..................................................................................... 9

*Akerman v. Arotech Corp.*,
   608 F. Supp. 2d 372 (E.D.N.Y. 2009) ..................................................................... 21

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
   19 F.4th 145 (2d Cir. 2021) ...................................................................................... 7

*Bd. of Trs. of Ft. Lauderdale Gen. Emples. Ret. Sys. v. Mechel OAO*,
   811 F. Supp. 2d 853 (S.D.N.Y. 2011) ............................................................... 25, 30

*C.D.T.S. v. UBS AG*,
   2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ........................................................ 21

*Campo v. Sears Holdings Corp.*,
   371 F. App'x 212 (2d Cir. 2010) ............................................................................ 27

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   56 F. Supp. 3d 549 (S.D.N.Y. 2014) ...................................................................... 29

*Chapman v. Mueller Water Prod., Inc.*,
   466 F. Supp. 3d 382 (S.D.N.Y. 2020) ..................................................................... 19

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*,
   2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ........................................................... 24

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F. Supp. 3d 379 (S.D.N.Y. 2020) ..................................................................... 28

*City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp.*,
   679 F.3d 64 (2d Cir. 2012) ....................................................................................... 9

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
   752 F.3d 173 (2d Cir. 2014) .................................................................................... 12

*City of Providence v. Aeropostale, Inc.*,
   2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ........................................................ 23

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
   587 F. Supp. 3d 56 (S.D.N.Y. 2022) ...................................................................... 10

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
   412 F. Supp. 3d 206 (E.D.N.Y. 2019) ..................................................................... 12

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
    70 F.4th 668 (3d Cir. 2023) ................................................. 20

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
    477 F. Supp. 3d 123 (S.D.N.Y. 2020) ......................... 12, 19, 21

*Coronel v. Quanta Cap. Holdings Ltd.*,
    2009 WL 174656 (S.D.N.Y. Jan. 26, 2009) ........................... 21

*Cresci v. Mohawk Valley Cmty. College*,
    693 Fed. Appx. 21 (2nd Cir. 2017) ...................................... 30

*Desyatnikov v. Credit Suisse Grp.*,
    2012 WL 1019990 (E.D.N.Y. Mar. 26, 2012) ........................ 22

*Detroit Gen. Ret. Sys. v. Medtronic, Inc.*,
    621 F.3d 800 (8th Cir. 2010) .............................................. 24

*DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*,
    323 F. Supp. 3d 393 (S.D.N.Y. 2018) ..................................... 7

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ............................................... 12

*Fait v. Regions Fin. Corp.*,
    655 F.3d 105 (2d Cir. 2011) ............................................... 20

*Freudenberg v. E*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ................................. 17

*Galestan v. Onemain Holdings, Inc.*,
    348 F. Supp. 3d 282 (S.D.N.Y. 2018) ................................. 23

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) .......................................... 13, 30

*Gauquie v. Albany Molecular Rsch., Inc.*,
    2016 WL 4007591 (E.D.N.Y. July 26, 2016) ........................ 27

*Guozhang Wang v. Cloopen Grp. Holding Ltd.*,
    661 F. Supp. 3d 208 (S.D.N.Y. 2023) .............................. 21, 26

*Hall v. Children's Place Retail Stores, Inc.*,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008) ................................. 30

*In re 3M Co. Sec. Litig.*,
    2021 WL 4482987 (D. Minn. Sept. 30, 2021) ....................... 20

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ........................................................................ 16

*In re Aegon N.V. Sec. Litig.*,
  2004 WL 1415973 (S.D.N.Y. June 23, 2004) ....................................................................... 21

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
  2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023) ...................................................................... 16

*In re Allergan PLC Sec. Litig.*,
  2019 WL 4686445 (S.D.N.Y. Sept. 20, 2019) ..................................................................... 17

*In re Aphria Sec. Litig.*,
  2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020) ....................................................................... 8

*In re Barclays PLC Sec. Litig.*,
  2024 WL 757385 (S.D.N.Y. Feb. 23, 2024) ......................................................................... 10

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017) ............................................................................... 9, 12

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005) ................................................................................. 29

*In re Carlotz Inc.  Sec. Litig.*,
  2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) ...................................................................... 23

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) ...................................................................... 16

*In re CIT Grp., Inc. Sec. Litig.*,
  349 F. Supp. 2d 685 (S.D.N.Y. 2004) ................................................................................. 20

*In re Citigroup Inc. Sec. Litig.*,
  753 F. Supp. 2d 206 (S.D.N.Y. 2010) ................................................................................. 26

*In re Delcath Sys., Inc. Sec. Litig.*,
  36 F. Supp. 3d 320 (S.D.N.Y. 2014) ................................................................................... 13

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  665 F. Supp. 3d 255 (E.D.N.Y. 2023) ......................................................................... passim

*In Re Didi Global Inc.*,
  2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) ................................................................ 26, 29

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017) ................................................................................. 25

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006).......................................................... 29

*In re FBR Inc. Sec. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008).......................................................... 17

*In re Gen. Elec. Co. Sec. Litig.*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012).......................................................... 13

*In re Gentiva Sec. Litig.*,
971 F. Supp. 2d 305 (E.D.N.Y. 2013).......................................................... 29

*In re Hain Celestial Group, Inc*
2023 WL 6360345 (E.D.N.Y. Sept. 29, 2023)............................................. 27

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
20 F.4th 131 (2d Cir. 2021).......................................................................... 28

*In re Henry Schein, Inc. Sec. Litig.*,
2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019)...................................... 11, 22

*In re Hi-Crush Partners L.P. Sec. Litig.*,
2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013)............................................... 28

*In re Inv. Tech. Grp., Inc. Sec. Litig.*,
251 F. Supp. 3d 596 (S.D.N.Y. 2017).......................................................... 14

*In re ITT Educ. Servs. Inc. Sec. Litig.*,
34 F. Supp. 3d 298 (S.D.N.Y. 2014)............................................................ 30

*In re Keyspan Corp. Sec. Litig.*,
383 F. Supp. 2d 358 (E.D.N.Y. 2003).......................................................... 22

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)........................................... 24, 26, 27, 29

*In re Marsh & Mclennan Companies, Inc. Sec. Litig.*,
501 F. Supp. 2d 452 (S.D.N.Y. 2006).......................................................... 28

*In re Mylan N.V. Sec. Litig.*,
2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)............................................. 23

*In re Nielsen Holdings PLC Sec. Litig.*,
510 F. Supp. 3d 217 (S.D.N.Y 2021)........................................................... 27

*In re NovaGold Res. Inc. Sec. Litig.*,
629 F. Supp. 2d 272 (S.D.N.Y. 2009) ............................................... 16, 20, 24

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015) ........................................................................ 12

*In re Pretium Res. Inc. Sec. Litig.*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017) ........................................................................ 28

*In re Rockwell Med., Inc. Sec. Litig.*,
    2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ............................................................ 28

*In re Rsrv. Fund Sec. & Derivative Litig.*,
    732 F. Supp. 2d 310 (S.D.N.Y. 2010) ...................................................................... 29

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .................................................... 26, 28

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ................................................................................ 8, 29

*In re Signet Jewelers Ltd. Sec. Litig.*,
    389 F. Supp. 3d (S.D.N.Y. 2019) ............................................................................ 13

*In re Synchrony Fin. Sec. Litig.*,
    988 F.3d 157 (2d Cir. 2021) .................................................................................... 14

*In re Tenaris S.A. Sec. Litig.*,
    493 F. Supp. 3d 143 (E.D.N.Y. 2020) ................................................................ 11, 17

*In re Vale S.A. Sec. Litig.*,
    2020 WL 2610979 (E.D.N.Y. May 20, 2020) ................................................... passim

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) ..................................................................... 10, 18, 21

*In re Weight Watchers Sec. Litig.*,
    504 F. Supp. 3d 224 (S.D.N.Y. 2020) ...................................................................... 27

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y. 2003) ...................................................................... 28

*In re XL Fleet Corp. Sec. Litig.*,
    2022 WL 493629 (S.D.N.Y. Feb. 17, 2022) ............................................................... 8

*In re Yukos Oil Co. Sec. Litig.*,
    2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ............................................................ 22

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016) ...................................................................................... 14

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020) ................................................................................. 22

*Johnson v. NYFIX, Inc.*,
  399 F. Supp. 2d 105 (D. Conn. 2005) ................................................................. 30

*Karimi v. Deutsche Bank Aktiengesellschaft*,
  607 F. Supp. 3d 381 (S.D.N.Y. 2022) ........................................................... 23, 28

*KBC Asset Mgmt. NV v. MetLife, Inc.*,
  2022 WL 480213 (2d Cir. Feb. 17, 2022) ........................................................... 23

*Kusnier v. Virgin Galactic Holdings, Inc.*,
  639 F. Supp. 3d 350  (E.D.N.Y. 2022) ................................................................ 12

*Lea v. TAL Educ. Grp.*,
  837 F. App'x 20 (2d Cir. 2020) ............................................................................. 8

*Lematta v. Casper Sleep, Inc.*,
  2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) .............................................. passim

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*,
  724 F. Supp. 2d 447 (S.D.N.Y. 2010) ................................................................. 27

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 774 (S.D.N.Y. 2020) ................................................................. 27

*Lopez v. CTPartners Exec. Search Inc.*,
  173 F. Supp. 3d 12 (S.D.N.Y. 2016) ................................................................... 21

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) ................................................................................. 7

*Lozada v. TaskUs, Inc.*,
  2024 WL 68571 (S.D.N.Y. Jan. 5, 2024) .............................................................. 9

*Marcu v. Cheetah Mobile Inc.*,
  2020 WL 4016645 (S.D.N.Y. July 16, 2020) ...................................................... 17

*Martin v. Quartermain*,
  732 F. App'x 37 (2d Cir. 2018) ........................................................................... 28

*Meyer v. Concordia Int'l Corp.*,
  2017 WL 4083603 (S.D.N.Y. July 28, 2017) ...................................................... 30

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ................................................................................. 9

*Moab Partners, L.P. v. Macquarie Infrastructure Corp.*,
    2022 WL 17815767 (2d Cir. Dec. 20, 2022) ............................................................. 10

*New England Carpenters' Guar. Annuity & Pension Funds v. DeCarlo*,
    80 F.4th 158 (2d Cir. 2023) ........................................................................... 19, 20

*Noto v. 22nd Century Grp., Inc.*,
    35 F.4th 95 (2d Cir. 2022) ........................................................................ 8, 10, 13

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ...................................................................... 8, 24, 27

*Nurlybayev v. ZTO Express (Cayman) Inc.*,
    2021 WL 1226865 (S.D.N.Y. Mar. 31, 2021) ............................................................ 17

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
    2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) ........................................................... 18

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
    2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ......................................................... 20, 23

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) ............................................................................. 15

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
    2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ........................................................ 14, 18

*Riley v. New York City Health & Hosps. Corp.*,
    2023 WL 2118073 (S.D.N.Y. Feb. 17, 2023) ............................................................ 10

*Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*,
    665 F. Supp. 3d 522 (S.D.N.Y. 2023) ............................................................... 17, 18

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ........................................................................... 12

*Rotunno v. Wood*,
    2022 WL 14997930 (2d Cir. Oct. 27, 2022) ............................................................ 23

*Rudani v. Ideanomics, Inc.*,
    2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020) ........................................................... 16

*Schleicher v. Wendt*,
    529 F.Supp.2d 959 (S.D. Ind. 2007) ................................................................... 25

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021) ............................................................................. 17

*Setzer v. Omega Healthcare Invs., Inc.*,
   968 F.3d 204 (2d Cir. 2020) ............................................................. 26

*Skiadas v. Acer Therapeutics Inc.*,
   2020 WL 4208442 (S.D.N.Y. July 21, 2020) ................................. 19, 29

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
   2024 WL 456745 (S.D.N.Y. Feb. 5, 2024) ......................... 17, 18, 23, 26

*Steamship Trade Ass'n of Baltimore-Int'l Longshoreman's Ass'n Pension Fund v. Olo Inc.*,
   2023 WL 8287681 (S.D.N.Y. Nov. 30, 2023) ................................. 15, 27

*Steginsky v. Xcelera Inc.*,
   741 F.3d 365 (2d Cir. 2014) ................................................................. 7

*Stevelman v. Alias Rsch. Inc.*,
   174 F.3d 79 (2d Cir. 1999) ................................................................ 29

*Strougo v. Barclays PLC*,
   105 F. Supp. 3d 330 (S.D.N.Y. 2015) ................................................ 11

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008) .............................................................. 24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ............................................................. 21, 28, 30

*Thomas v. Shiloh Indus., Inc.*,
   2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) ..................................... 28

*Turner v. MagicJack VocalTec, Ltd.*,
   2014 WL 406917 (S.D.N.Y. Feb. 3, 2014) .......................................... 30

*Valentini v. Citigroup, Inc.*,
   837 F. Supp. 2d 304 (S.D.N.Y. 2011) ............................................... 22

*Van Dongen v. CNinsure Inc.*,
   951 F. Supp. 2d 457 (S.D.N.Y. 2013) ............................................... 29

*Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*,
   2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016) ..................................... 20

*Woolgar v. Kingstone Companies, Inc.*,
   477 F. Supp. 3d 193 (S.D.N.Y. 2020)…………………………………..20

## **Statutes**

15 U.S. Code § 78j ................................................................... 7, 30

15 U.S. Code § 78t .................................................................................................... 30

**Regulations**

17 C.F.R. § 229.105(a) ............................................................................................. 12

17 C.F.R. § 240.10b-5 ................................................................................................ 7

17 CFR § 240.10b5-1 ............................................................................................... 29

**Rules**

Fed. R. Civ. P. 9(b) ..................................................................................................... 7

Fed. R. Civ. P. 12(b)(6) .............................................................................................. 7

## TABLE OF ABBREVIATIONS

| Term | Definition |
|---|---|
| ¶ | Paragraphs in the Amended Class Action Complaint |
| **AC** | Plaintiffs' Amended Class Action Complaint filed on November 6, 2023 (ECF No. 23) |
| **Albarrán** | Defendant Tammy Albarrán, Peloton's Chief Legal Officer and Corporate Secretary since October 3, 2022 |
| **Bike** | Peloton's flagship Connected Fitness Product, a stationary exercise bike originally introduced in 2014 |
| **Bike+** | Peloton's premium version of the Bike, introduced in September 2020 |
| **Board** | Peloton's Board of Directors |
| **CEO** | Chief Executive Officer |
| **CFO** | Chief Financial Officer |
| **CFP** | Peloton's Connected Fitness Products, such as the Bike and the Tread |
| **Class Period** | May 6, 2021 to August 22, 2023, inclusive |
| **Coddington** | Defendant Elizabeth F. Coddington, Peloton's CFO since June 13, 2022 |
| **COO** | Chief Operating Officer |
| **Cortese** | Defendant Thomas Cortese, Peloton's Chief Operating Officer from before the start of the Class Period until August 2021. Cortese served as Chief Product Officer from August 2021 until November 1, 2023 |
| **CPSA** | Consumer Product Safety Act codified at 15 U.S.C. §§ 2051-2089 |
| **CPSC** | The United States Consumer Protection Safety Commission |
| **CW(s)** | Confidential Witness(es) |
| **DB** | Defendants' Memorandum of Law in Support of Motion to Dismiss |
| **Defendants** | Peloton, Foley, McCarty, Woodworth, Coddington, Cortese, Kushi, and Albarrán, collectively |
| **DHS** | United States Department of Homeland Security |
| **DOJ** | United States Department of Justice |
| **Exhibit 1** | Accounting Standard Codification ("ASC") 450-20-50-1, which was in effect during the Class Period, attached to the Declaration of Gregory M. Potrepka in Support of Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint |
| **Foley** | Defendant John Foley, co-founder of Peloton and CEO and Chairman of Peloton's Board of Directors from before the start of the Class Period until February 9, 2022. Defendant John Foley also served as Executive Chairman of the Board from February 9, 2022 until September 12, 2022 |
| **Individual Defendants** | Foley, McCarty, Woodworth, Coddington, Cortese, Kushi, and Albarrán |
| **IPO** | Peloton's Initial Public Offering in September 2019 |
| **Kushi** | Defendant Hisao Kushi, Peloton's Secretary and Chief Legal Officer from before the start of the Class Period until October 3, 2022 |
| **McCarthy** | Defendant Barry McCarthy, CEO, President, and Member of the Board of Peloton since February 9, 2022 |

| | |
|---|---|
| **Motion** | Defendants' Notice of Motion to Dismiss and Defendants' Memorandum of Law in Support of Motion to Dismiss |
| **Peloton** | Peloton Interactive, Inc. |
| **Plaintiffs** | Court-appointed lead plaintiffs Jia Tian and David Feigelman and additional plaintiff Sam Solomon |
| **Post** | Peloton's Bike's seat post, which was the subject of the Recall |
| **Project Tinman** | Peloton's company-wide, covert protocol to conceal corrosion on Bike Posts that was orchestrated by Peloton executive officers beginning in September 2021 |
| **Recall** | The May 11, 2023 recall of 2.2 million Peloton Bikes sold from 2018 to 2023 |
| **SEC** | United States Securities and Exchange Commission |
| **Settlement** | December 8, 2022 settlement between Peloton and the CPSC where Peloton agreed to pay a $19 million civil penalty, roll out an enhanced compliance program with procedures for reviewing reports of safety concerns, and implement corrective and preventative actions, and which charged Peloton's senior management with CPSA compliance |
| **Subscriptions** | Recurring revenue from subscriptions, including subscriptions from both Connected Fitness Products and the Peloton Digital App |
| **Tread** | Peloton's second CFP product, a treadmill, which was introduced in late 2018 |
| **Tread+** | Peloton's premium version of the Tread which was introduced in September 2020 |
| **Tread+ recall** | May 5, 2021, recall of all Tread+ machines |
| **Woodworth** | Defendant Jill Woodworth, Peloton's CFO from before the start of the Class Period until June 13, 2022. Woodworth served as a consultant to Peloton from June 13, 2022 until September 13, 2023 |

The AC alleges Defendants' fraud with exacting particularity. Throughout the Class Period, Defendants knew of and *actively concealed* a dangerous defect in Peloton's flagship Bike—endangering customer safety at a time when Peloton investors were anxious about even "perceived" safety risks—to avoid another costly product recall and maximize personal, financial gain. When the truth leaked out, Peloton stock deflated causing significant losses to the Class.

Peloton is a premium home-fitness company that sells CFPs, including its flagship Bike and a treadmill known as the Tread, which offer Subscription-based access to a proprietary catalogue of CFP-geared workout classes through an interactive video display. Bike sales and reputation were critical to Peloton. By Defendants' admission, a decline in Bike sales would "negatively affect [] future revenue and operating results," and Peloton's success depended on "maintain[ing] the value and reputation of the Peloton brand."

Just prior to the Class Period, a high-profile CFP recall scandalized Peloton. After two years of reports of an alarming defect in Peloton's Tread+ treadmill, a child got trapped under a Tread+ and died. Despite this, Peloton flouted safety warnings issued by the CPSC and refused to recall the product. Facing intense public scrutiny, Peloton eventually reversed course and recalled the Tread+, costing the Company over $100 million. But Peloton's reputation was tarnished, and investors were vigilant of further threat to Peloton's brand. Defendants admitted that they needed to "get back on the right side of the line with trust and safety" and repeated throughout the Class Period that, after the Tread+ recall, even a "perceived" safety risk posed a material threat.

To quell investor concern, Defendants repeatedly touted product safety, devotion to Peloton members (*i.e.*, customers), and product quality. But Defendants knew that these

---

[1] Emphasis is added and citations are omitted unless otherwise indicated.

1

representations were misleading. Throughout the Class Period, Peloton received a cascade of disconcerting reports that the Bike's seat Post was breaking off *while in use*, causing falls and related injuries. These reports were made directly to Peloton customer support, via social media the Company monitored, and to Peloton from the CPSC. The AC's non-exhaustive sampling of incident reports plausibly reflects hundreds of Post breaks. All were summarized in monthly reports circulated to Defendants and analyzed by an Executive Product Safety Committee that reported to them. But Defendants knew that if the Post defect was disclosed, Peloton would need to recall the Bike. Thus, rather than disclose the looming safety issue, Defendants hid the problem. Indeed, when Defendants learned that Posts were arriving at Peloton's distribution centers with visible internal corrosion in 2021, they designed a nationwide effort to literally paint over it with rust converters, which they covertly named "Project Tinman."

To be sure, Defendants had strong motive to avoid another major recall, and further damage to Peloton's reputation, on the heels of the Tread+ affair. Defendants also had significant financial motive to defraud: Foley and McCarthy pledged huge amounts of Peloton stock as collateral and stood much to lose if Peloton stock deflated, and Coddington, whose stock awards vested in June 2023, promptly sold them at a profit before the full truth came out.

Even when Defendants were forced to reveal the possibility of a safety defect, they continued to mislead by minimizing the scope and nature of the safety issue. As the true extent of the problem came to light, Peloton's stock price declined, harming the Class.

Defendants cannot rebut these facts. Instead, they rip their Class Period misrepresentations concerning Bike safety and quality out of context, ignoring that Defendants repeated these misstatements ad nauseum to allay existing investor concern, and baldly distort their Class Period risk disclosures to imply they warned only of a product recall, when the disclosures expressly

referred to then-rampant safety and quality issues as hypothetical risks. Further, Defendants improperly urge this Court to conclude at the pleading stage that there was no connection—not even one to be "perceived"—between Posts regularly corroding and breaking at the same time. Elsewhere, Defendants simply rewrite the AC, insinuating that the AC's sampling of reports constitutes the full universe of reports made during the Class Period, recasting the regular reports of product damage and injury as "raw data," and ignoring that, by their own admission, they *deliberately concealed* a Post issue in Project Tinman. These tactics cannot be credited, certainly not on a motion to dismiss. The motion should be denied.

## BACKGROUND

### A. Peloton Sells Premium Connected Fitness Products Including the Bike

Founded by Foley and Cortese, Peloton sells CFPs, including its flagship Bike, which, at "over 2 million" sold was Peloton's "top-selling SKU" and provided a "significant majority" of its revenues. ¶¶31, 37, 167. During the Class Period, Peloton also sold another bike (the Bike+), treadmills (the Tread and Tread+), and Subscriptions to its digital class catalogue. ¶¶31, 37. Peloton aims to be a "premium" home-fitness brand, and Defendants admit that its success depends on "maintain[ing] the value and reputation of the Peloton brand." ¶¶50, 116. Peloton's Subscription rates were important because Subscriptions were often the only recurring source of revenue from customers after a CFP purchase. ¶38. Thus, the rate of Subscription cancellations, known as "churn," was a key metric for investors. *Id.* Before the Class Period, Peloton's churn rate was less than 1%. *Id.* Significantly, almost 75% of Subscriptions are associated with a CFP. ¶¶3, 37. Thus, CFP defects, real or perceived, both decrease CFP sales and increase Subscription churn, as customers wait for replacement parts. ¶¶37-38, 177.

### B. The Tread+ Scandal Spurs Investor Concern About CFP Safety, Brand Reputation, and Cooperation with Regulators

Peloton introduced the Tread+ in 2018 and immediately received reports of people, pets, and

objects caught in its running belt. ¶41. Peloton was required to report these incidents to the CPSC immediately but did not. ¶¶40, 188. On March 3, 2021, Peloton learned that a child was killed by a Tread+ and belatedly reported the incident to the CPSC, whose investigation showed Peloton already received 150 incident reports. ¶¶41-42. Defendants initially refused to recall the Tread+ and accused the CPSC of being misleading when it publicly warned consumers to stop using the machine. ¶¶43-44.

After heavy criticism from experts, academics, and consumer advocates, Peloton finally recalled all Tread+ machines on May 5, 2021. ¶45. But its reputation, particularly for safety and regulatory compliance, was tarnished. ¶¶47-49. Analysts downgraded Peloton stock. ¶47. *Bloomberg* said Peloton "blew it," and Foley told an analyst worried about "brand health" that "we have some work to do to get back on the right side of the line with trust and safety." ¶¶47, 49. Defendants also admitted in Peloton's periodic SEC filings that "design and manufacturing defects, *real or perceived*," could materially impact Peloton and noted the Tread+ recall as an "example" impacting "ability to maintain the value and reputation of the Peloton brand." ¶50. In total, the Tread+ recall cost Peloton over $100 million. ¶46.

These events also prompted multiple government investigations, including a CPSC investigation into Peloton's regulatory reporting, DOJ and DHS investigations into Peloton's reporting of product-related injuries (not limited to the Tread+), and an SEC investigation into Peloton's public disclosures on these matters, all of which remained ongoing during the Class Period. ¶210. On December 8, 2022, Peloton agreed to settle charges brought by the CPSC. In the Settlement Agreement, Peloton agreed to pay $19 million, roll out an "enhanced compliance program" concerning "any consumer product" sold by Peloton that required "procedures for reviewing claims and reports for safety concerns and for implementing corrective and preventative actions," and charged "Peloton's *senior management*" with CPSA compliance. ¶¶214-16. McCarthy signed the Settlement Agreement. ¶214.

## C.     Defendants Actively Conceal a Dangerous Defect with the Bike Seat Post

Prior to and during the Class Period, Peloton received repeated reports that Bike Posts were detaching at the joint *while in use*, resulting in, *inter alia*: neck and back injuries, torn ligaments, and broken bones. ¶¶64-83. These reports were made between 2020 and April 2023 and lodged directly with Peloton customer support, sent to it by the CPSC, or made on social media platforms which Peloton monitored for customer feedback. *Id.* Many included evidence that there was heavy rust along the inside of the Post at the site of the break. ¶¶69, 71, 76. By April 30, 2023, Peloton received at least 35 *formal* reports of such incidents. ¶83. That figure disregards informal reports that Peloton observed on social media. ¶75. The AC's non-exhaustive sampling plausibly reflects that there were likely hundreds more.[2]

Peloton was plainly aware of these reports because it often told customers to pay for replacement Posts, asked them to mail back defective ones, or otherwise responded to the reports. ¶¶61, 66-67, 69, 71-72, 76, 81. Indeed, Peloton was "Admin" in the Facebook group where many reports were made. ¶61. One such post in November 2022 generated over 700 replies, including reports of similar incidents. ¶¶71-73. When another user made a similar post, Peloton immediately shut down commenting. ¶75.

At all times, Defendants knew that the Company was required by law to analyze all available information bearing on product safety and, accordingly, had several systems in place to stay informed. ¶¶187-89. Former employees, including Peloton's former Chief Business Officer, confirm that "every single piece of Member feedback across all [reporting] channels" was compiled into a monthly report and shared with "the entire organization," including senior executives. ¶¶63, 195. In addition, Defendants received regular reports from a management-level "Executive Product Safety Committee" formed after the Tread+

---

[2] Each example *expressly* concerns a Post break: ¶66 ("Mine broke a couple years ago"); ¶67 ("seat post had broken…"); ¶68 ("I broke the Peloton seat…"); ¶69 ("the seat post weld snapped"); ¶70 ("the exact same incident happened to my friend's daughter…"); ¶71 ("the bike seat post snapped while sitting on it"); ¶72 ("This happened to our bike…"); ¶74 ("the post for her seat split at the joint…"); ¶75 ("…seat snaps off"); ¶77 ("I had that happen..."); ¶79 ("the seat post broke"); ¶81 ("the same thing happened with my seat."); ¶82 ("my seat broke several months ago causing torn ligaments in my knee"). Arguing "it is not even clear" that they all involved the Post, DB5, is groundless.

recall and tasked with conducting "regular reviews of safety-related data," including member feedback. ¶197.

Defendants' contemporaneous awareness of these reports is inescapable. In September 2021, after learning Bikes were imported with built-up rust inside the Post, Peloton "senior executives" designed a protocol code-named "Project Tinman," directing employees to paint over the rust using a chemical "converter." ¶¶87-88, 201. Eight Peloton employees in four states and CW4 corroborated the coverup, noting Peloton knowingly sold Bikes with rust. ¶¶88-89. Further, members who reported Post breaks were contacted by Peloton associates *acting on behalf of the Company's executives*. ¶198.

Defendants knew the Bike defect would result in a massive recall and could reasonably estimate its scope and cost because Foley and Woodworth directly participated in the Tread+ recall (affecting ***all*** 125,000 machines) and its fallout, and other bikes were recalled after just a few incidents and no injuries. ¶¶167, 206-08. Yet, Defendants remained silent about the issue both to regulators and investors.

### D.     The Truth Is Revealed in a Series of Partial Disclosures

The truth about the Post defect was revealed through a series of partial disclosures. On February 16, 2022, the *Financial Times* broke the story on Project Tinman, and Peloton stock fell 4.7% to $30.59 at next close. ¶161. On February 22, 2022, the *Financial Times* published a full-length exposé detailing the scope of Project Tinman with corroboration from eight former employees, and Peloton stock dropped $2.63 per share, 9.3%, to $27.00 at next close. ¶162.

On May 11, 2023, Peloton announced the Recall of all ~2.2 million Bikes sold from January 2018 to May 2023, almost all Bikes sold, the CPSC instructed members to "immediately stop using" affected Bikes, and Peloton's stock price fell 8.9%. ¶¶166-70, 243. The Recall was widely covered by media outlets like the *Wall Street Journal*, *Forbes*, and the *New York Times*, with several recalling the Tread+ affair. ¶168. Evercore ISI stated that "[g]iven the prior hardware-related [Tread] recalls, another recall announcement is a blow to the Brand's credibility related to user safety." ¶169. On May 24, 2023,

McCarthy revealed the CPSC had "mandated" the Recall (correcting Defendants' representations that it was voluntary), and estimated Recall expenses at $10-20 million (correcting Peloton's previous $8.4 million loss accrual); Peloton stock dropped over 5%. ¶¶174-75, 244.

Finally, on August 23, 2023, Peloton revealed a dramatic 64% increase in churn, in direct contrast to Coddington's statement that "we don't expect any significant changes to our current churn levels aside from [] small seasonal variations from quarter-to-quarter" just six months prior. ¶¶147, 179. Analyst Justin Post, who once saw "value in the connected fitness subscriber base . . . given low churn" cut Peloton from "Buy" to "Neutral," citing "high churn." ¶¶181-83. Simultaneously, Peloton revealed that Recall expense "substantially exceeded" the $8.4 million loss accrual *by $40 million*. ¶178. On the news, Peloton's share price fell *22.6*% that day to $5.41. ¶180.

## ARGUMENT

On a Rule 12(b)(6) motion, courts accept plaintiffs' factual allegations as true and "draw[] all reasonable inferences in the plaintiff's favor." *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014). Under Rule 9(b), an "alleged fraud need only be *plausible*," not "more likely than" alternatives. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original). "[D]ismissal is appropriate only where [plaintiff] can prove no set of facts consistent with the complaint that would entitle them to relief." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021). §10(b) and Rule 10b-5 require: (1) a material misrepresentation or omission; (2) scienter; (3) a connected transaction; (4) reliance; and (5) causation and injury. *Lematta v. Casper Sleep, Inc.*, 2022 WL 4637795, at *7 (E.D.N.Y. Sept. 30, 2022) (Brodie, J.) ("*Casper*"). Defendants advance only falsity and scienter arguments, waiving all others. *DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 450 (S.D.N.Y. 2018).

### A.  The Amended Complaint Alleges Material Misstatements

Once a company chooses to speak on a topic, the federal securities laws obligate speakers

to be "both accurate and complete." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 105 n. 49 (2d Cir. 2022). Thus, alleged misrepresentations must be considered "in context," and even "[l]iterally true statements" are actionable if they "create a materially misleading impression" by virtue of what they omit to disclose. *Casper*, 2022 WL 4637795 at *8. Allegations of false or misleading statements suffice where, as here, they: "(1) specify the statements that plaintiffs contend[] were fraudulent, (2) identify the speaker[s], (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 22 (2d Cir. 2020). The AC need not plead "detailed evidentiary matter[.]" *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). Facts sufficient "to support a reasonable belief" that statements were misleading are adequate. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000).[3]

The Class Period follows the Tread+ recall which caused Peloton enormous expense and reputational harm from undisclosed safety issues, regulatory obstruction, and recall-related costs—the exact topics of the alleged fraud. ¶¶40-51. Because these topics were critical to investors, *particularly* in the context of Peloton's history, the AC alleges material misrepresentation.

### 1. Material Misrepresentations Regarding Bike Safety

### i. Misrepresentations Regarding Safety of Peloton Members

Throughout the Class Period, Defendants repeatedly misrepresented the Bike's safety, falsely assuring investors that safety was their priority but failing to disclose a known Post safety defect. ¶¶93-94, 97-98,102-03, 106-07, 110-114, 116-17, 120, 124, 127, 129, 133-34, 137-39, 141. Thus, on May 6, 2021, Foley stated that "***the safety of our member community comes first***,…***I'd like to reiterate that the safety of our member community is our first priority***," and in the 2021 Proxy Statement,

---

[3] If securities fraud is "sufficiently alleged" as to at least one misstatement, this "warrants denial of the motion to dismiss" and the Court need not review other alleged misstatements. *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, *3 (S.D.N.Y. Feb. 17, 2022); *In re Aphria Sec. Litig.*, 2020 WL 5819548, *9 (S.D.N.Y. Sept. 30, 2020) (same).

Defendants stated "*we are always keeping safety top of mind*," ¶¶94, 112. This commitment purportedly meant that "*From product design to manufacturing and from delivery to the entire member experience—[the Peloton] team continuously evaluates the safety of [] products*," and made Peloton the "*far, far ahead runner in everything safety-related*." ¶¶110, 120. Defendants also repeatedly emphasized their commitment to maintaining reputation by prioritizing "*members*" and the "*member experience*." ¶¶93-94, 97, 102, 106-07, 111, 116, 120, 124, 134, 139. Thus, Peloton's October 25, 2021 Proxy statement listed "*Put Members First*" as the first of five core values. ¶111. Defendants, themselves, explained that "member experience" meant member safety. *See* ¶94 ("We are a members-first organization and *that means* for all of us at Peloton the safety of our member community comes first"); ¶97 ("We care deeply about our members, our members' safety.").

These statements were false and misleading when made because Defendants received regular reports of breaking Posts (¶¶64-83, 168) and actively concealed Post rust (¶¶84-91), but continued sales while relentlessly touting safety as their priority. *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *13 (E.D.N.Y. May 20, 2020) (touting commitment to safety misleading given repeated red flags about dam stability); *see also In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79-80 (S.D.N.Y. 2017) (same for statements touting "relentless focus" and "overriding commitment" to safety).[4] Defendants' statement that a team "*continuously evaluates the safety of [Peloton] products*," (¶120) was further misleading because it "lull[ed]" investors into a "false sense of security" about Peloton's safety protocols. *Vale*, 2020 WL 2610979, at *15; *see also Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) (describing safety measures gave investors false "comfort"). Similarly, Foley's statement that "*Since we brought the first

---

[4] Defendants waive arguments that these statements are inactionable opinions. *Lozada v. TaskUs, Inc.*, 2024 WL 68571, *12 and n. 17 (S.D.N.Y. Jan. 5, 2024) (argument not meaningfully briefed is waived). Thus, *City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp.* (DB17), which involved statements of opinion (as Defendants acknowledge) is inapposite. 679 F.3d 64 (2d Cir. 2012). Even if opinions, the statements are actionable because "without providing critical context," (that Defendants knew of Post breaks and concealed rust), the statements "implied facts that can be proven false," (that Defendants were not aware of safety defect). *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020).

***bike into market, we had shot to meet the bar of safety in the category***," (¶114) was false and misleading because Defendants concealed safety defects rather than address them. *See City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 91 (S.D.N.Y. 2022) ("Since we've launched each of our products, each product has been designed with the intent of being a lower potential for abuse" actionable because company alleged to make product to capture market share, not mitigate safety).

Further, by touting product safety, Defendants incurred a duty to tell the "whole truth," including that Posts were rusting, breaking, and causing injury.[5] *Noto*, 35 F.4th at 105; *see also In re Barclays PLC Sec. Litig.*, 2024 WL 757385, at *13 (S.D.N.Y. Feb. 23, 2024) (touting internal control measures triggered duty to disclose that issuer had no system for tracking issuance of unregistered securities); *Casper*, 2022 WL 4637795 at *9 (similar). Defendants' attempt to trivialize the defect as "cosmetic" or as remote as being "hit by lightning" (¶¶218-20) is irrelevant because breaking and rusting Posts would, at the least, be *perceived* as a safety risk and a threat to reputation (particularly for a "premium" brand after the Tread+ affair), and Defendants admitted that even "*perceived*" safety issues would materially impact Peloton. ¶¶50, 95, 108, 118, 125, 131, 135, 145. Reaction to the *Financial Times*' Tinman coverage and the Recall announcement proves that is exactly how investors perceived the issue. ¶69.

Defendants cannot negate this conclusion by claiming credit for the Recall after three years of concealed reports and complaints. DB17. "[A] statement materially false when made does not become acceptable" retroactively. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 262 (2d Cir. 2016). Regardless, the Recall was *mandated by the CPSC* (¶¶11, 174), as Defendants tacitly concede by arguing the Recall was "voluntary" only in a technical, legal sense (DB16), belying the idea that safety was important to Defendants.

---

[5] Peloton's periodic SEC filings also violated a legal duty to disclose because Defendants knowingly omitted that Posts were breaking and rusting, which Defendants knew was likely to have a materially unfavorable impact on sales, revenue, and income from continuing operations, and thus should have been disclosed and "analy[zed]" pursuant to Items 105 and 303 of Regulation S-K. The Supreme Court's grant of certiorari in *Moab Partners, L.P. v. Macquarie Infrastructure Corp.*, 2022 WL 17815767 (2d Cir. Dec. 20, 2022) (cited at DB21) "do[es] not change" Second Circuit precedent. *Riley v. New York City Health & Hosps. Corp.*, 2023 WL 2118073, at *3 n.5 (S.D.N.Y. Feb. 17, 2023).

Defendants' remaining effort to minimize these assurances as inactionable puffery is meritless. DB17. As a concept rooted in materiality, and as this Court has recognized, whether a statement qualifies as puffery turns on the "context" in which it is made. *In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *12 (E.D.N.Y. Sept. 27, 2019) (Brodie, J.); *see also In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 284 (E.D.N.Y. 2023) (same). In other words, a statement inactionable "in some contexts," may be "a material misrepresentation in others." *Vale*, 2020 WL 2610979, at *10.[6]

The Motion steadfastly ignores that safety issues ("real or perceived") were critical to investors after the Tread+ scandal, given Peloton's need to restore customer confidence in its reputation. ¶¶45-50. Indeed, on May 1, 2021, Foley responded to an analyst question about brand health acknowledging "we have some work to do to get back on the right side of the line with trust and safety." ¶49. This context undermines Defendants' puffery challenge. *See Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 349 (S.D.N.Y. 2015) (statements "touting [trading platform] safety" not immaterial as a matter of law in context of bank's "past scandals" and "efforts to restore its reputation"); *see also Dentsply Sirona*, 665 F. Supp. 3d at 284 (statements about "strong" relationship with distributors not puffery given "context" that they recently terminated exclusivity); *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 159-60 (E.D.N.Y. 2020) (same for policy statement prohibiting bribery after company's entry into SEC deferred prosecution agreement for bribing foreign officials).

*Vale*, 2020 WL 2610979, is instructive. Like the Class Period, which directly follows the Tread+ safety scandal, the *Vale* class period directly followed a safety debacle involving a dam collapse. *Id.* at *2. Shortly after the collapse, the *Vale* defendants learned of safety issues in another dam (as Peloton did in another product), yet declined to address the problem and touted its commitment to "safety and

---

[6] Representations are immaterial if they are "so obviously unimportant to a reasonable investor" that reasonable minds could not disagree, and whether a fact would have "'assumed actual significance' in a reasonable investor's deliberations is a question that will be best determined on a more developed factual record." *Dentsply Sirona*, 665 F. Supp. 3d at 293.

sustainability," and its "robust safety and risk management policies and practices." *Id.* at *12-13 & n.15. Noting the "context" in which they were made, the court found the representations were not immaterial to investors and determined they were actionable. *Id.* at *10-13. Defendants' substantially identical statements, made in the context of the Tread+ scandal, are similarly actionable.

Further, Defendants' "extensive, frequent, and prominent" statements on their "commitment to safety" shows safety was a "major concern" to investors, "such that [a court] cannot say that, as a matter of law, investors would not find these representations material." *BHP Billiton*, 276 F. Supp. 3d at 80; *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 375 (E.D.N.Y. 2022) ("repeated emphasis on safety" shows it is material to investors); *Vale*, 2020 WL 2610979, at *12 (same).

Lest there be any doubt, Peloton *highlighted* design defects and safety issues as a consideration in the "Risk Factor" section of its SEC filings. ¶¶95, 108, 118, 125, 131, 135, 145. This is notable because that section requires Peloton to discuss "the *material* factors that make an investment . . . speculative or risky." 17 C.F.R. § 229.105(a). This too negates a finding that the statements are puffery. *BHP Billiton*, 276 F. Supp. 3d at 80 (materiality shown by raising safety as a topic in risk factors).[7]

Defendants fail to rebut materiality by insinuating "just 35 complaints" were insufficient. DB17.[8] By any count, the reports greatly exceeded those triggering other CPSC bike recalls and were clearly material or Defendants would not have recalled a whopping *2.2 million* Bikes or tried to conceal

---

[7] Defendants' cases are inapposite. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (unlike here, statements were not made repeatedly to reassure investors, as courts have reasoned in declining to extend *UBS*) (*see In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015)); *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) (optimistic statements on progress grew more guarded as time progressed, unlike Defendants' statements, which they repeated unqualifiedly); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (no facts supported particular importance of integrity to the specific bank); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 221 (E.D.N.Y. 2019) (without more, investors would not rely upon touting of "strong leadership position," whereas here, context and repetition would induce reliance).

[8] Defendants' argument that the reports totaled only 11 or 35 (DB5-6, 17, 23) simply distorts the pleadings. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 130 (S.D.N.Y. 2020) (allegations must be accepted as true and construed in plaintiffs' favor). But even if the number of impacted Bikes did not pose a meaningful safety or recall risk (and it did), Defendants were nevertheless obligated to disclose the reports because "real *or perceived*" defects were admittedly material. ¶¶95, 108, 118, 125, 131, 135, 145.

the defect with rust converters. ¶¶64-82, 207, 243; *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 (2d Cir. 2000) (magnitude of correction supports materiality); *Noto*, 35 F.4th at 106 (unless material, "[c]ompany would not have tried to hide" problem). Even the AC's "sampling" of reports plausibly reflects hundreds of examples, far more than required at the pleading stage. *See In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 332 (S.D.N.Y. 2014) (isolated reports sufficient on motion to dismiss).

### ii. Misrepresentations Regarding Product Quality

Defendants also misleadingly touted product quality, repeatedly stating Peloton products were the ***"best."*** ¶¶100, 105, 106-07, 116, 122, 133, 137. Peloton's 2021 and 2022 Forms 10-K boasted it had the "***best equipment***" (¶¶105, 133) and a "***best-in-class, end-to-end experience***." ¶107. On November 4, 2021, Foley touted a "***premium end-to-end member experience***" and the "***best, most immersive and interactive home fitness products***," (¶¶116-17), and, on December 7, 2021, he stated "***We have the best Bikes. . .in the world***" (¶122). By touting product quality, Defendants incurred a duty to tell the "whole truth;" yet, they misleadingly omitted the Post defect. *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 387 (S.D.N.Y. 2012) (touting "high quality" creates duty to disclose product issues); *see also Casper*, 2022 WL 4637795 at *9 (similar).

Defendants' quality statements were not inactionable puffery. DB19-20. Peloton was a premium brand selling at premium prices (the Bike cost $2,245 at IPO and the Tread sold for $4,295). ¶¶33, 55, 57. Peloton's product quality and brand reputation were extremely important to investors, particularly since the Tread+ affair, as Defendants admitted by updating the risk disclosures in Peloton's periodic filings to reflect the risk of reputational harm (and maintaining the updated language throughout the Class Period). ¶¶49-50, 95, 108, 118, 125, 131, 135, 145. "[A] company's specific statements that emphasize its reputation [] as central to its financial condition or that are clearly designed to distinguish the company" from competitors are not puffery. *In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d, at *230-31 (S.D.N.Y. 2019) (quoting *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 98 (2d Cir.

2016)); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *10 (S.D.N.Y. Apr. 14, 2020) (reputation statements actionable where company touts brand as a "source of its success"); *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596 (S.D.N.Y. 2017) (same).

### iii.    Misrepresentations Denying Project Tinman Safety Concern

In February 2022, in response to the *Financial Times*' reporting, Defendants represented that Post rust "**would have no impact on a Bike's performance, quality, durability, reliability, or the overall Member experience**" and was purely a "**cosmetic issue**," and that Defendants had "**not found evidence or received Member complaints that this specific issue has presented a problem**." ¶127. This statement was false; Defendants had received many "member" complaints of Posts—one of the Bike parts impacted by the rust (¶163)—breaking and causing injury. ¶¶64-83, 128.

Defendants nowhere dispute the AC's Project Tinman allegations, which are corroborated by a *Financial Times* investigation and multiple former employees. ¶¶88-91, 127. Defendants challenge only the strength of the link between the Post rust and Post breaks. DB18-19. But the link is not, as Defendants suggest, based on the "speculation" of an anonymous user on Reddit. It is based on the fact that numerous seats which detached showed visible corrosion at the site of the break. The comment on Reddit simply confirmed that there was a link perceived by investors. In addition, the *Financial Times* confirmed that the objective of Project Tinman was to avoid another *safety* recall (¶87). *See In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 169 (2d Cir. 2021) at 164, 169 (*Wall Street Journal* corroborated misstatement allegations). Indeed, Defendants *concede* they modified procedures out of concern that Bike rust posed a danger.  DB27. The Court may infer at the pleadings stage that a reasonable investor would draw the same, highly plausible connection, "real or perceived," between 6,000+ rusted Posts and ongoing reports of detaching Posts. *See Casper*, 2022 WL 4637795 at *9 (construing allegations in plaintiff's favor); *see also Steamship Trade Ass'n of Baltimore-Int'l*

*Longshoreman's Ass'n Pension Fund v. Olo Inc.*, 2023 WL 8287681, at *10 (S.D.N.Y. Nov. 30, 2023) (the Court must "draw[] all reasonable inferences in favor of the plaintiff").

### 2. Material Misrepresentations on Churn Rates and Subscription Growth

Defendants also misrepresented Peloton's subscriber churn and growth. On August 26, 2021, Defendants represented that "***Everything we do at Peloton is designed to keep our members engaged and our churn rate low***," and "***We will continue to prioritize subscription growth over near-term profitability***." ¶¶102, 104. On November 3, 2022, an SEC filing by Peloton stated that it was "***beating [its Turnaround] timeline***," which meant "***a growing subscriber base***" and "***continued low churn***." ¶143. On February 1, 2023, in response to a *direct analyst question* on churn rates, Coddington stated, "***we don't expect any significant changes to our current churn levels***." ¶147. These statements misleadingly omitted the Post defect (¶¶64-83, 163), which made a large-scale Bike recall likely, given the recalls of Tread+ and other defective bikes. ¶207-08. A recall would (and did) impact churn by causing subscription pauses and cancellations pending new Posts (¶179) and reputational harm (¶¶95, 108, 118, 125, 131, 135, 145), as Defendants knew recalls do (¶209). Thus, Defendants did not "keep… churn rate low" or commit to "continued low churn," and did expect "significant changes to [] churn." ¶¶102, 143, 147.

In context, Defendants' August 26, 2021 statements were not merely "aspirational" (DB19) because they include "specific [false] representations about [] ***then-existing*** practices," ("Everything ***we do*** at Peloton is designed to keep our members engaged and our churn rate low," and "We will ***continue to*** prioritize subscription growth") and thus "may just as easily be called lie[s]." *Vale*, 2020 WL 2610979, at *11.[9] Similarly, the November 3, 2022 statement was not corporate optimism or an inactionable opinion (DB19), because it discusses "continued" (*i.e.*, present) low churn and affirms that

---

[9] *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103 (2d Cir. 2021) alleged only a generic commitment to comply with the law which, "almost every… bank makes" and investors would not have relied upon (DB19), whereas Foley's statement discussed company-specific issues of particular concern to investors, including churn.

"we are beat*ing* that [1-year] [growth] timeline." *Id.* at \*16 (present-tense language actionable); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at \*8 (S.D.N.Y. May 24, 2018) (statement that company's progress "continue[d]" was not inactionable puffery or opinion because it had present-tense elements and conflicted with what a reasonable investor would understand).[10]

Finally, Coddington's February 1, 2023 statement disavowing "any significant changes to our current churn levels" (¶147) is not an inactionable statement of "expectations." DB20. To the extent this qualifies as an opinion, it nonetheless contradicted facts in Coddington's possession (*i.e.*, that an existing defect would likely require a recall and further damage Peloton's reputation). *See In re Alibaba Grp. Holding Ltd. Sec. Litig.*, 2023 WL 2601472, at \*11 (S.D.N.Y. Mar. 22, 2023) (opinion statements omitting critical context that defendants were not in compliance with signed pledge were actionable). Nor is it a protected forward-looking statement. First, even Defendants cannot identify cautionary language beyond the generic "actual results may differ materially." DB19; *Dentsply Sirona*, 665 F. Supp. 3d at 293 (forecasts not protected by boilerplate cautionary language). Second, the statement did not align with then-present expectations. *In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 298 n.16 (S.D.N.Y. 2009) (duty to speak truthfully about present facts applies to forecasts). Third, it omitted expected churn increases, and courts consistently hold that omissions are not protected by the safe harbor. *Rudani v. Ideanomics, Inc.*, 2020 WL 5770356, at \*6 (S.D.N.Y. Sept. 25, 2020).

### 3. Defendants' Risk Warnings Were Misleading and Offer No Protection

Peloton's Class Period SEC filings contained the misleading risk warnings that, hypothetically, "***products and services <u>may be affected</u> from time to time by <u>design and manufacturing defects</u>, <u>real or perceived</u>, that could adversely affect our business and result in harm to our reputation***," and "***the***

---

[10] *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at \*19 n. 14 (S.D.N.Y. Apr. 2, 2020) is inapt because it discusses amorphous language that a project was "on track," which could mean little if the project did not need to be very far along at that time. Here, Foley stated Peloton was "beating that timeline," indicating it surpassed specific milestones.

**_occurrence of real or perceived defects in any of our products_**, now or in the future, **_could_** result in

additional negative publicity, regulatory investigations, or lawsuits filed against us, particularly if

**_Members... are injured_**." ¶¶95, 108, 118, 125, 131, 135, 145. These disclosures were misleading because

they misrepresented the Bike's already-known safety defect (real or perceived) as theoretical. *See*

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *2 (S.D.N.Y. Feb. 5, 2024) (warning

about future "risk" misleading if it "has already happened or is then happening"); *Tenaris*, 493 F. Supp.

3d at 161 (warning employee could fail to comply with a law misleading where employee *already* broke

the law); *see also Set Cap. LLC v. Credit Suisse Grp. AG,* 996 F.3d 64, 85 (2d Cir. 2021) (noting "critical

distinction between disclosing the risk a future event *might* occur" and that it "*will* occur"). Further,

Defendants received reports of safety defects regularly, not merely "from time to time." ¶¶64-83.

Defendants argue the AC alleges "fraud by hindsight" because the Recall occurred after the

statements were made. DB12. This is wrong and misses the point. Peloton's most important product

was *already affected* by a defect at the time of these warnings. ¶¶96, 109, 119, 126, 136. Moreover, as

Defendants' own authority supports (DB11), understating recall risk is misleading where, as here, issues

are already-known internally (¶¶206-09). *See In re Allergan PLC Sec. Litig.*, 2019 WL 4686445, at

**24-25 (S.D.N.Y. Sept. 20, 2019) (generic warnings that gave "false impression" about recall risk were

actionable because of facts suggesting a safety issue); *see also Freudenberg v. E*Trade Fin. Corp.*, 712

F. Supp. 2d 171, 191 (S.D.N.Y. 2010) (present knowledge defeats fraud by hindsight).[11] Also, because

the stated risks had already materialized, Peloton's warnings cannot immunize other misrepresentations.

---

[11] Defendants' other authorities (DB11-12) are distinguishable. *See Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 541-2 (S.D.N.Y. 2023) (risk that demand was unsustainable was disclosed, whereas here the warnings did not give investors the information "needed to make an informed decision"); *Nurlybayev v. ZTO Express (Cayman) Inc.*, 2021 WL 1226865, at *7 (S.D.N.Y. Mar. 31, 2021) (fee amount was not material, unlike the Post defect here); *Marcu v. Cheetah Mobile Inc.*, 2020 WL 4016645, at *6 (S.D.N.Y. July 16, 2020) (risk disclosures not false and misleading where, unlike here, no other misrepresentations were pled); *In re FBR Inc. Sec. Litig.*, 544 F. Supp. 2d 346, 362 (S.D.N.Y. 2008) (violations that gave rise to the risks had not transpired).

*See Stadium Cap.*, 2024 WL 456745, at *3 (misleading cautionary language "cannot be meaningful"); *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at *12 (S.D.N.Y. Sept. 27, 2020) (similar); *Plumbers & Pipefitters*, 2020 WL 1877821, at *11-12 (similar). Further, defendants undermined the warnings by falsely touting safety. *Vale*, 2020 WL 2610979, at *14-15.

### 4. Material Misrepresentations Regarding the Voluntary Nature of Recall

On November 4, 2021, Foley stated in connection with the Tread+ recall that, "***I think the learning looking back was more quickly getting in lockstep with the regulators***." ¶114. Similarly, in the 10-Qs filed on February 1, 2023 and May 4, 2023, both after Peloton entered the Settlement Agreement requiring disclosure of safety issues to the CPSC, Defendants represented that they "***continue to work cooperatively with the CPSC to further enhance the safety of our products***." ¶¶149, 151. These statements were false and misleading when made because, far from being "in lockstep" and "cooperat[ing]" with the CPSC on product safety, Defendants failed to report safety incidents involving a known, recurring safety defect in their flagship product to the CPSC for three years and hid the issue with rust converters. ¶¶64-910. Eleventh-hour cooperation on a corrective action plan (DB18)—which the AC nowhere contests—cannot render these representations "true when made." *Vivendi*, 838 F.3d at 262.

In the May 4, 2023 Form 10-Q, Defendants further misstated that they entered into a "***voluntary***" corrective action plan. ¶¶151, 153. One week later, Peloton reported a "***voluntary [Bike] recall***." ¶155. These statements were false and misleading because, as McCarthy would later admit, the Recall was "mandated" by (*i.e.*, in response to action initiated by) the CPSC. ¶174.[12] The Motion's argument that the Recall does not meet the statutory definition of a "mandatory" CPSC recall, DB15-

---

[12] Depicting the Recall as voluntary was not accurate when it was, in truth, initiated by the CPSC. *Robeco*, 665 F. Supp. 3d at 541, is of no moment. DB16. There, financial results aligned with churn rates that the *Robeco* defendants spoke about and therefore the statements were not false when made. Tellingly, the Motion does not cite *Robeco* in defending the Class Period misrepresentations about churn (DB19-20), which, as alleged in the AC, were misleading when made.

16, is a distraction. A reasonable investor would have understood "voluntary" to mean that the Recall was not initiated by the CPSC (particularly given the recent Settlement Agreement penalizing Defendants for failing to voluntarily report safety incidents). ¶¶214-15. Defendants' assertions (DB8, 15-16) that ordinary investors would have understood "voluntary" as technical, legal jargon or the absence of "a mandatory administrative recall proceeding" are implausible. *World Wrestling Ent.*, 477 F. Supp. 3d at 130 (court "must assume" statement "carries its ordinary meaning," not "a special meaning"); *see Skiadas v. Acer Therapeutics Inc.,* 2020 WL 4208442, at *3 (S.D.N.Y. July 21, 2020) (competing interpretations resolved in plaintiffs' favor on motion to dismiss). This is particularly true for the representation regarding Peloton's corrective action plan, which is in no way tied to a "recall."

### 5. Materially False and Misleading Loss Accruals

Loss accruals are actionable when greater accruals are "probable." *New England Carpenters' Guar. Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 174-76 (2d Cir. 2023). On May 4, 2023, Defendants took a mere $8.4 million accrual for the Recall, saying they did not "anticipate that the total expenses" would be "material." ¶¶152-53. Analysts thus "[did] not believe [the loss] [would] rise to the tens of millions dollar range" and saw $8.4 million as a "helpful order of magnitude to keep in mind." ¶171. But the Recall's huge scope was not unexpected to Defendants (DB8-9, 14-15). That same day, the CPSC announced to "immediately" stop using ~2.2 million Bikes pending replacement Posts (a figure the CPSC could only obtain from Peloton), which Defendants stated days later would take up to 248 days to arrive (¶¶168, 177, 243). *See DeCarlo*, 80 F.4th at 175 (understated accrual was actionable where defendants had no basis to conclude continued payments were not "probable").[13] The magnitude of the accrual corrections

---

[13] Defendants' cases (DB13) are inapt. *See Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 402 (S.D.N.Y. 2020) (involved not-yet-activated products rather than uniformly defective products, as alleged here).

(~120–240% and then 550+% of the original accruals) and their proximity to the misstatements (after 1 week and after 3 months), ¶¶176-80, also support falsity. *See City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 676 (3d Cir. 2023) (magnitude and temporal proximity support falsity); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5, 2016) (correction "only months later" supports falsity).[14]

The accruals are actionable whether assessed as fact or opinion. DB15; *DeCarlo*, 80 F.4th at 169-70 (fact/opinion distinction had little bearing) (cabining *Fait v. Regions Fin. Corp.*, 655 F.3d 105 (2d Cir. 2011) to "narrow[]" facts). Regardless, the facts going to the basis of the accrual calculation, including the number of Bikes likely to be affected and likely duration of the fix, render the accrual misleading. *DeCarlo*, 80 F.4th at 171 (accrual estimates that "contradict[]" the inputs they "purport[] to rest" on are actionable even if opinions); *Dentsply Sirona*, 665 F. Supp. 3d at 288 (sales of excess inventory and lack of demand going to the basis of goodwill calculations indicate defendants had no reasonable basis for their estimates). Nor are these protected, forward-looking statements (DB14), because the accrual falsely represented Defendants' then-***present*** loss estimation.[15] *See NovaGold*, 629 F. Supp. 2d at 301 (duty to speak truthfully about present facts applies to forecasts). Indeed, describing the accruals as "estimated" and "contingent," (DB14) merely complies with GAAP recommendations for accrual figures[16] and is not meaningful

---

[14] Defendants' authority (DB13), by contrast, involves lesser relative magnitude or attenuated proximity. *See Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 2016 WL 1261135, at *2-4 (S.D.N.Y. Mar. 30, 2016) (reserve increase a year after alleged misstatements); *In re CIT Grp., Inc. Sec. Litig.*, 349 F. Supp. 2d 685, 691 (S.D.N.Y. 2004) (noting "relative unimportance of [] charge to loss reserves" given volume of receivables. Defendants' contemporaneous instruction to cease using Bikes and their protracted timetable for replacing Posts provide additional evidence of contemporaneous knowledge, rendering *Woolgar v. Kingstone Companies, Inc.*, (cited at DB15) inapposite. 477 F. Supp. 3d 193, 225 (S.D.N.Y. 2020) (dispositive that complaint "provide[d] no additional facts from which to infer" knowledge).

[15] *In re 3M Co. Sec. Litig.*, DB14, is not to the contrary. 2021 WL 4482987, at *16 (D. Minn. Sept. 30, 2021) (no knowledge of falsity, whereas here, Defendants knew how many Bikes would be recalled and that replacement posts would be delayed).

[16] *See* Exhibit 1, ASC 450-20-50-1: "Terminology used shall be descriptive of the nature of the accrual, such as estimated liability or liability of an estimated amount."

cautionary language. *Vivendi*, 838 F.3d at 247 (cautionary language must not be "boilerplate").[17]

## B.    The Amended Complaint Alleges a Strong Inference of Scienter

Scienter is adequately pled by allegations of conscious misbehavior or recklessness, <u>or</u> motive and opportunity to defraud. *Casper*, 2022 WL 4637795 at *14. Courts "accept all factual allegations in the complaint as true," and consider "*all* of the facts alleged, taken collectively" rather than "any individual allegation, scrutinized in isolation," to determine if an inference of scienter is, like here, "cogent and at least as compelling" as the competing inference. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309–10 (2007). In other words, a "tie . . . goes to the plaintiff." *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009).

Defendants' argument that the AC engages in improper "group pleading" (DB22-23) fails. The AC alleges facts supporting each Defendant's scienter, even if certain facts support the scienter of more than one Defendant. *See Guozhang Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 235 (S.D.N.Y. 2023) ("absurd to suggest that management [collectively] was without knowledge of the matter"); *Fresno Cnty. Emps.' Ret. As'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 551 (S.D.N.Y. 2017) (inferring scienter for "each individual 10(b) defendant" from allegations of internal control deficiencies, negative "tone at the top," and extensive discussion by defendants); *see also World Wrestling Ent.*, 477 F. Supp. 3d at 136 (unnecessary to link reports to individual executive defendants where corporate defendant negotiated agreement).[18]

---

[17] By contrast, Defendants' cases (DB14-15) had tailored warnings. *Casper*, 2022 WL 4637795, at *12 (nuanced risks that could impede specific growth plans); *Coronel v. Quanta Cap. Holdings Ltd.*, 2009 WL 174656, at *17-18 (S.D.N.Y. Jan. 26, 2009) ("prominent," "express[]" and "repeated[]" warnings that hurricane impact figures were "preliminary" estimates, "inherently difficult to predict," subject to a "high level of uncertainty," and "might prove to be materially incorrect"); *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 39-40 (S.D.N.Y. 2016) (risk disclosures specifically included inability to forecast accurately on a quarterly basis); *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *13 (S.D.N.Y. June 23, 2004) (multiple, nuanced risk disclosures describing potential impact of exposure to equity markets).

[18] Defendants' cases are inapt. *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013) (complaint did not identify any known contrary information, whereas the AC alleges access to reports of Posts breaking, rusting, and causing

Scienter is imputed to Peloton from the Individual Defendants, the "management-level" Executive Product Safety Committee, and Peloton's senior management who were required to oversee CPSA compliance by the Settlement Agreement and directly handled customer issues. ¶¶112, 190, 196-98, 216; *Vale*, 2020 WL 2610979, at *17 (imputing scienter from "senior leadership"); *Henry Schein*, 2019 WL 8638851, at *22 (same for "management-level" segment executive).[19] Further, "that, on multiple occasions, employees [] are alleged to have performed their professional duties in a consciously wrongful or reckless manner [by painting over rust] establishes a strong inference of corporate scienter." *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 316-17 (S.D.N.Y. 2011).

## 1. Defendants' Knowledge and Recklessness

***Internal Reports***: Defendants do not deny that Peloton received numerous reports throughout the Class Period indicating a serious safety defect in the Post, including: (1) at least 35 formal complaints,[20] 13 involving serious injuries, fielded by its Member Support Team, all of which CW2 confirms were recorded in Peloton's internal system (¶¶59, 166, 190-91); (2) a steady stream of social media reports (*see* ¶¶61-83 and *supra*); (3) reports from the CPSC itself (¶¶60, 67); and (4) information from Peloton warehouse facilities that thousands of Posts arrived with heavy interior corrosion (¶87). Defendants knew of these reports because, *inter alia*:

- Brad Olson, former Chief Business Officer, repeatedly confirmed Peloton's practice was to capture "every single piece of Member feedback across all channels" in a monthly "voice of the member" report and "read it back to the ***entire organization***," including Defendants, and CW2 confirms

---

injury); *Desyatnikov v. Credit Suisse Grp.*, 2012 WL 1019990, at *7 (E.D.N.Y. Mar. 26, 2012) (conclusory allegations that defendant acted "knowingly and recklessly" insufficient, while here allegations are particularized and detailed); *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *20 (S.D.N.Y. Oct. 25, 2006) (allegations based solely on corporate position were insufficient but distinguishing cases like this one alleging specific reports (¶195) and direct contact with employees (¶¶196, 235)); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 387 (E.D.N.Y. 2003) ("mere incantation" that problems were "severe and obvious" insufficient, whereas the AC pleads specific reports and access to specific data).

[19] Defendants misconstrue *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (DB24), which regards only whether corporate scienter can be imputed from whistleblowers who were not involved in the fraud.

[20] The argument that the AC specifies only 11 or 35 complaints (DB23) would be unavailing even if proper because most documentary evidence is in Defendants' control and unavailable at the pleading stage. *See Karimi*, 607 F. Supp. 3d at 398 ("Allegations of scienter need not be supported by documentation, particularly at the pleadings stage.").

Peloton analyzed 160k social media reports *across all platforms* and created a Voice of the Member report to circulate each monthly (¶¶61, 195). *See Dentsply Sirona*, 665 F. Supp. 3d at 289-91 (monthly reports supported scienter); *Vale*, 2020 WL 2610979, at \*17 (same); *see also In re Carlotz Inc. Sec. Litig.*, 2024 WL 1348749, at \*15-16 (S.D.N.Y. Mar. 29, 2024) (ability to access regularly updated reports concerning information that, like here, defendants admittedly "paid close attention to" supported scienter inference); *Galestan v. Onemain Holdings, Inc.*, 348 F. Supp. 3d 282, 300 (S.D.N.Y. 2018) (CW accounts of regular reports supported scienter); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at \*16 (S.D.N.Y. Mar. 25, 2013) (same).

- An Executive Escalations Specialist confirmed that "sensitive customer issues" were escalated to "***senior management***" as a matter of practice (¶196) *See Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 398 (S.D.N.Y. 2022) (scienter where former employees described escalating issues to executive level). Consistent with the above, customers who reported defective Posts were contacted by Peloton associates acting on behalf of its Executives. ¶198.

- Peloton's Executive Product Safety Committee, a "management level committee" formed in mid-2021 and comprised of "senior leaders" including senior legal counsel (Kushi and Albarran), performed "regular reviews of safety-related data," *including customer complaints*, and advised "senior leadership" (the Individual Defendants) and the Board (Foley and McCarthy) on "all safety related matters." ¶¶112, 197. *Vale*, 2020 WL 2610979, at \*17 (executive safety committee reports support scienter); *Pirnik,* 2016 WL 5818590, at \*7 (new office devoted to safety headed by senior individual who reported to executives supported scienter). That this Committee had access to the reports made by customers about breaking Posts is evidenced by the statistics cited in an internal memorandum that it circulated in April 2023. ¶83, 190.

- Defendants *admitted* they have close contact with senior leaders, like those on the Executive Product Safety Committee. In June 2021, Woodworth stated that "[Foley] communicates very frequently with the senior leadership team," and "that's the way I want to lead my team as well." ¶235.

- Each Defendant was admittedly aware that there were numerous government investigations into Peloton's reporting of injuries and defects associated with its products pending during the Class Period. ¶¶210-12. *See In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at \*13 (S.D.N.Y. Mar. 28, 2018) ("existence" of government investigation into same subject at time of misstatements can bolster inference of scienter); *see also Karimi*, 607 F. Supp. 3d at 397-98 (same).[21]

Taken together, these facts support a strong inference that Defendants knew about recurring reports of defective Posts throughout the Class Period. *See Stadium Cap*., 2024 WL 456745 at \*5 (access to facts contradicting misstatements establishes scienter); *Casper*, 2022 WL4637795, at \*14 (same).

---

[21] Whereas the investigations, Settlement Agreement, and fraud all centered on product safety, the courts in Defendants' cases (DB 28) found it dispositive that no nexus connected the investigations and the frauds. *Rotunno v. Wood*, 2022 WL 14997930 (2d Cir. Oct. 27, 2022) (personal-expense investigation and a company accounting fraud); *KBC Asset Mgmt. NV v. MetLife, Inc.*, 2022 WL 480213, at \*2 (2d Cir. Feb. 17, 2022) (annuity payments investigation and death benefit fraud).

Further, the AC relies upon reports that discussed easy to understand concepts like broken Posts and injuries, not "raw" data requiring advanced analysis (DB24-25). *See NovaGold*, 629 F. Supp. 2d at 299 (contrasting cases with no showing that data was processed into reports).[22]

*Vale* is directly on point. 2020 WL 2610979. Like in *Vale*, where a safety incident catalyzed increased regulatory scrutiny and prompted the defendants to establish special departments to monitor safety and report to senior leadership, the Tread+ scandal caused increased CPSC scrutiny and the new Executive Product Safety Committee to "conduct[] regular reviews of safety-related data" and report to Peloton's senior leadership. ¶197; *Vale*, 2020 WL 2610979, at *2. And, like *Vale*, soon after the Tread+ recall, Defendants began receiving "repeated third-party warnings," about a related safety issue and had access to "reasonably available facts, or red flags." *Id.* at **13, 16-17. Thus, "safety was not a subject limited to a discrete number of company engineers," and scienter is pled. *Id.* at *17.[23]

**Duty to Monitor**: Throughout the Class Period, Defendants *admitted* in their SEC filings (signed by Foley, Woodworth, McCarthy, and Coddington) that they had reporting obligations to the CPSC, pursuant to 16 C.F.R. § 1115, *requiring* them to consider *all available information*—including the steady stream of reports about the Bike Post breaking off while in use—and to "immediately" inform the CPSC upon receipt of information reasonably supporting a "defect which could create a substantial product hazard," without waiting for "serious injury or death." ¶¶187-89; *see Dentsply Sirona*, 665 F. Supp. 3d at 290 (failure to check information subject to duty to monitor supports inference of scienter); *Novak*, 216 F.3d at 311 (same). In addition, Peloton entered the Settlement Agreement (signed by McCarthy) on

---

[22] *See* DB24-25 citing *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (access to "raw data" only), *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021) (same), *Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800, 809 (8th Cir. 2010) (same, and unlike here, ongoing investigation into reported problem was disclosed).

[23] *In re Lululemon Sec. Litig.*, (DB24) is inapposite. 14 F. Supp. 3d 553, 582 (S.D.N.Y. 2014) (no allegation that issues "were brought to the attention of any of the makers," whereas Defendants regularly received reports).

December 8, 2022 and *agreed* to maintain an *enhanced* compliance program with procedures for reviewing safety claims; that *Peloton's "senior management"* (the Individual Defendants) have "management responsibility for, and general board oversight of, CPSA compliance"; and that data be "recorded and processed," *i.e.,* reported, to the CPSC. ¶¶189, 216.

Tellingly, Defendants do not deny that they had information available to them on precisely the issues they were required to monitor indicating a Post defect that implicated safety. ¶¶58-62, 64-83. Defendants were aware of their monitoring and reporting obligations because, by May 7, 2021, the CPSC alerted Peloton of an investigation into its compliance (¶189) and by August 2022, the CPSC told Defendants Peloton had knowingly failed to satisfy reporting obligations in connection with Tread+. ¶211. Thus, Defendants knew of the defect or recklessly "failed to check information they had a duty to monitor." *Dentsply Sirona*, 665 F. Supp. 3d at 290; *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 469 (S.D.N.Y. 2017).[24] Either way, scienter is pled.

***Knowledge From Tread+ Overhang and Prior Recalls***: Foley and Woodworth directed the Tread+ recall, and experienced the (real and perceived) fallout therefrom, and were thus intimately familiar with the likelihood and expenses of a recall. ¶¶206-09. Indeed, on an investor call after the Tread+ recall in May 2021, Woodworth stated there would be recall expenses associated with a "write-down," "logistics costs," and "expected churn." ¶209. *Vale*, 2020 WL 2610979, at *17 (prior incident supported scienter); *Schleicher v. Wendt*, 529 F.Supp.2d 959, 971-72 (S.D. Ind. 2007) ("prior action alleging the same fraudulent" misconduct supports scienter). Defendants were also on notice that similar bikes were recalled for fewer incidents. ¶207 (recalls after: 2 reports, 0 injuries; 9 reports, 1 minor injury; 2 reports, 0 injuries; *etc.*). *See In Re Didi Global Inc. Sec. Litig.*, 2024 WL 1119483, at *9-10 (S.D.N.Y.

---

[24] *Bd. of Trs. of Ft. Lauderdale Gen. Emples. Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 874 (S.D.N.Y. 2011) is inapt because it involved unfamiliar, foreign law, whereas Defendants were attuned to the *U.S.* regulation given the CPSC's Tread+ investigation and the Settlement Agreement, which was *signed by Defendants* and specific to Peloton.

Mar. 14, 2024) (sanctions on other companies for similar offenses support knowledge).

**Content of Statements and Proximity to Disclosures**: The proximity of the first mention of a "potential product safety issue involving the seat post" on May 4, 2023 to the Recall also supports scienter. ¶153; *Wang*, 661 F. Supp. 3d at 235 (proximity of misrepresentation and disclosure supports scienter). Moreover, Defendants' statements touting their cooperation with the CPSC and a "voluntary" Recall, as well as their understated loss accrual, are probative of Defendants' involvement and knowledge. ¶¶149, 151-53, 155; *see Stadium Cap.*, 2024 WL 456745, at *5 (statements themselves support scienter); *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 216 (2d Cir. 2020) (under-representations indicate recklessness).

**Project Tinman Coverup**: Defendants' deliberate, code-named "Project Tinman" coverup (¶¶88, 199-201) strongly indicates conscious misbehavior. *See Dentsply Sirona*, 665 F. Supp. 3d at 291 ("affirmative steps" to further fraud support scienter); *see also In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 238 (S.D.N.Y. 2010) ("incongruity between word and deed" supports scienter). Indeed, the *Financial Times* revealed that Project Tinman was led by Peloton "executives" *to avoid another safety recall*. ¶¶87, 201. At the very least, establishing such a program shows Defendants knew that large quantities of Bikes were imported with visible rusted Post interiors. In addition, the decision to change the procedure for addressing rust in mid-2022 (¶¶203-05) supports scienter. *See In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *15 n.13 (S.D.N.Y. Apr. 22, 2016) (termination of distribution agreements supported scienter for channel stuffing fraud). Defendants' urging that the change was precautionary "even if the problem was likely to prove cosmetic" (DB27-28) *concedes* a possible safety issue and certainly one which would be perceived as such by anxious investors.[25]

---

[25] *Lululemon* (DB27-28) is distinguishable because there defendants repeatedly disclosed corrective measures, whereas Defendants deliberately hid the Post issue and Project Tinman. 14 F. Supp. 3d at 582-83.

Contrary to Defendants' argument (DB26), the CW allegations (¶¶27-30) are well pled because they support the probability that a person in the position occupied by the source would possess the information alleged, and describe each CW with sufficient particularity, including dates and locations of employment and to whom they reported. *Novak*, 216 F.3d at 314-15.[26] Media corroboration enhances the CW allegations. *Synchrony*, 988 F.3d at 169 (*Wall Street Journal* article enhanced CW allegations). The CWs need not have spoken directly with Defendants, because "it is permissible for confidential witnesses to rely on indirect knowledge[.]" *Olo*, 2023 WL 8287681, at *11.[27]

***Frequent Public Discussion***: Defendants' repeated touting of commitment to safety on earnings calls (¶¶94, 116), in SEC filings (¶¶124, 134, 149, 151), on TV shows, summits, conferences, and podcasts (¶¶97, 98, 110, 114, 137), in proxy statements and an ESG Report (¶¶112, 139, 141), and on Peloton's website and social media (¶¶120, 129) support scienter. *Vale*, 2020 WL 2610979, at *17 (public representations "suggesting familiarity"); *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 237 (S.D.N.Y 2021) (frequent discussion on topic); *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("[a]ctively communicating" on topic) (citing cases). Likewise, "public denials," like Peloton's claim that rust was "cosmetic" and had "no impact" in response to the *Financial Times* exposé (¶163) and McCarthy's statement that a "lighting" strike was more likely than a Post break in response to the CPSC's stop-use warning (¶220), are "recognized" to support

---

[26] The CW's allegations directly correspond with their roles. CW1 (Product Manager for Supply Chain, supply chain product issues ¶¶85, 90), CW2 (Member Support Supervisor/Analyst, member support requests and reports circulated to "entire organization" ¶¶63, 191, 195, 204), CW3 (Assembly Technician, Bike assembly and quality issues ¶¶85, 90), and CW4 (Quality Control Inspector, Bike quality control ¶89). As such, and given media corroboration, the CW allegations suffice. *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 246-47 (S.D.N.Y. 2020) (DB19) (CW allegations credited where CWs are described particularly OR allegations are corroborated). *Long Miao v. Fanhua, Inc.*, (DB27), is inapt. 442 F. Supp. 3d 774, 804 (S.D.N.Y. 2020) (allegations based only on error-ridden, "uncorroborated" short-seller report).

[27] Defendants' cases are inapt. (DB25-26); *Lululemon*, 14 F. Supp. 3d at 579 (former employees not involved in "discovery and disclosure," while Peloton employees spoke with the *Financial Times*, ¶¶161-163, 201); *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (CW disclaimed allegations); *In re Hain Celestial Group, Inc. Sec. Litig.*, 2023 WL 6360345, at *3 (E.D.N.Y. Sept. 29, 2023) (allegations "too conclusory," while here, detailed CW allegations are specific to Project Tinman and monthly reports); *Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) (nothing linked defendants, but CW2 confirms reports, ¶¶63, 195).

scienter. *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 486 (S.D.N.Y. 2006) ("aggressively support[ing]" practice after investigation was announced); *see also Karimi*, 607 F. Supp. 3d at 398 (public denial of news report); *comScore, Inc.*, 268 F. Supp. 3d at 552 (efforts to placate market).

***Additional Facts Probative of Knowledge and Recklessness***: Because the Bike is Peloton's top-selling SKU and accounts for the "significant majority" of its overall sales and Defendants admit Bike business is "core" to Peloton's business (¶¶37, 232), the core operations doctrine bolsters the inference of scienter. *Salix*, 2016 WL 1629341, at *16; *see In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561 at *26 (S.D.N.Y. Dec. 2, 2013) (18% of projected revenues indicated core operation); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 481 (S.D.N.Y. 2008) ("single largest component of total revenue" was core operation).[28] Foley and Woodworth were admittedly hands-on managers (¶¶235-6) and are "presumed to have knowledge" of Bike safety issues. *Hi-Crush*, 2013 WL 6233561 at *26; *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 416 (S.D.N.Y. 2003) (similar). Similarly, the magnitude of Defendants' accrual misstatements (550+%, ¶¶176-80) buttresses the scienter inference. *Dentsply Sirona*, 665 F. Supp. 3d at 291 (magnitude supports scienter); *Salix*, 2016 WL 1629341, at *16 (same).

## 2. Motive and Opportunity to Commit Fraud

Motive allegations are not necessary to establish scienter. *Casper*, 2022 WL 4637795 at *14 (plaintiff may establish scienter through evidence of recklessness alone). Nonetheless, a proper motive can bolster the inference of scienter when considered with other facts. *Tellabs*, 551 U.S. at 325; *see also, e.g.*, *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131 (2d Cir. 2021) (recklessness and motive

---

[28] Defendants' authority (DB28) concedes the "core operations" doctrine survives. *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 474 (S.D.N.Y. 2017), *aff'd sub nom. Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018) (crediting core operations); *see City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 424 (S.D.N.Y. 2020) (same, collecting cases). Defendants' other cases are inapt. DB29; *Thomas v. Shiloh Indus., Inc.*, 2017 WL 1102664, at *4 (S.D.N.Y. Mar. 23, 2017) (facility was 1 of 21, while the Recall impacted most Bikes); *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (insufficient percentage of operation, whereas Bike was top-selling SKU and Bike sales were admittedly "core" to business). ¶¶28, 166.

weighed "*together*" to support inference of scienter). The AC pleads motive for all Defendants.

Investor concern about safety and compliance after the Tread+ recall provided ample motive to conceal the Post defect and avoid another costly recall. *See In re Rsrv. Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 320-21 (S.D.N.Y. 2010) (fact that defendants had "enormous reputational stake" and sought "to avoid []financial and reputational harm" supports scienter); *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 555 (S.D.N.Y. 2014) (same for motive to "counter negative perceptions about [] borrowing costs"). Because this motive is specific to Peloton, and not "generally possessed" by all companies, it supports scienter. *See Didi*, 2024 WL 1119483, at *17 (individualized corporate financial motive supports scienter); *Skiadas,* 2020 WL 4208442, at *4-5 (similar).

Defendants also had personal financial motive.[29] *Scholastic*, 252 F.3d at 74 (motive "generally met" by insider sales). On June 13, 2023, Coddington acquired 87,277 shares (her *total holdings* as of that date) pursuant to a vesting agreement entered a year prior. ¶¶230-31. Coddington made three immediate sales and another on August 15, 2023—just a week before a disclosure and 22% drop— divesting a shocking *76%* of her holdings for profits of almost $600,000. ¶231; *see comScore, Inc.*, 268 F. Supp. 3d at 554-55 (68% sufficed); *Stevelman v. Alias Rsch. Inc.*, 174 F.3d 79, 82 (2d Cir. 1999) (40% sufficed).[30] Coddington's 10b5-1 plan (DB29) only covers her final three trades and is no defense as it was entered during the Class Period in November 2022 (¶231), by which time there were numerous reports that the Post on numerous Bikes was breaking off while in use. *In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 328 (E.D.N.Y. 2013) (10b5-1 plan "entered into during the class period" provides no

---

[29] The selling patterns of other named parties do not, as Defendants argue (DB29), negate motive. *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457 (S.D.N.Y. 2013) (that only some defendants sold "cuts ***against*** granting Defendants' motion," as understanding the difference requires discovery). *In re eSpeed, Inc. Sec. Litig.*, (DB29) is inapt. 457 F. Supp. 2d 266, 289-90 (S.D.N.Y. 2006) (no financial motive pled for others, while the AC pleads Foley and Cortese's stock pledges).

[30] Defendants' cases highlight the sufficiency of Plaintiffs' allegations. *See In re BISYS Sec. Litig.,* 397 F. Supp. 2d 430, 444–45 (S.D.N.Y. 2005) (sales, unlike here, were "not clustered" at end of class period); *Lululemon*, 14 F. Supp. 3d at 585 (minority of class period sales corresponded with disclosures).

defense); *see also comScore*, 268 F. Supp. 3d at 555 (same). Further, Foley and Cortese pledged ~41% and ~26% of their holdings, respectively, to secure personal loans (¶¶221-28), creating incentive to avoid declines that could trigger margin calls or decrease credit. *Meyer v. Concordia Int'l Corp.*, 2017 WL 4083603, at **6-7 (S.D.N.Y. July 28, 2017) (pledged shares support motive); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008) (same); *see also Ganino*, 228 F.3d at 170 (any "concrete benefits that could be realized" constitute motive).[31]

### 3. Plaintiffs' Theory of Scienter is More Compelling than Defendants'

Plaintiffs allege that Defendants knew of the Post defect and, fearing another recall, hid the truth. This inference is compelling here because Defendants actively monitored safety reports (or recklessly disregarded reports they had a duty to monitor); received regular reports of Posts breaking; and actively covered up Post defects in Project Tinman. ¶¶64-91. By contrast, Defendants proffer they knew nothing of the safety defect in their most important product despite heightened attention to safety until it warranted immediate recall of 2.2 million Bikes and a warning to immediately stop using the Bike. DB23-25. "[A] reasonable person would deem the inference of scienter cogent and at least as compelling" as Defendants' competing inference. *Tellabs, Inc.*, 551 U.S. at 324.[32]

### CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.[33]

---

[31] Defendants' authority (DB30) is inapposite. *Mechel OAO*, 811 F. Supp. 2d at 868 (shares pledged to back *company's* debt, not individual defendants'); *Turner v. MagicJack VocalTec, Ltd.*, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) (unlike here, massive stock buyback negated motive); *Johnson v. NYFIX, Inc.*, 399 F. Supp. 2d 105, 114 (D. Conn. 2005) (no additional factors supported motive, whereas Defendants had capped pledge allowances and faced repeat margin calls, ¶226; and, risk of margin loans was not widely known until 3 years after *Johnson* decision, ¶223).

[32] It is unnecessary "to identify the precise moment" a "culpable inference overtook the innocent one" where it is clear "the culpable inference eventually won out." *In re ITT Educ. Servs. Inc. Sec. Litig.*, 34 F. Supp. 3d 298, 309-10 (S.D.N.Y. 2014).

[33] Because the AC adequately states claims under §10(b), its §20(a) control liability claims should be sustained. *See Casper*, 2022 WL 4637795 at *15-16. If the Court grants any part of the Motion, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a)(2); *Cresci v. Mohawk Valley Cmty. College*, 693 Fed. Appx. 21, 25 (2nd Cir. 2017).

Dated:  April 2, 2024

Respectfully submitted,

POMERANTZ LLP

*/s/ Justin D. D'Aloia*

Jeremy A. Lieberman
Emma Gilmore
Justin D. D'Aloia
Villi Shteyn
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com
jdaloia@pomlaw.com
vshteyn@pomlaw.com

*Counsel for Co-Lead Plaintiff David*
*Feigelman and Additional Named Plaintiff*
*Sam Solomon and Co-Lead Counsel for the*
*Class*


LEVI & KORSINSKY, LLP

*/s/ Gregory M. Potrepka*

Shannon L. Hopkins
Gregory M. Potrepka
Rachel A. Berger
Amanda D. Foley
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Fax: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
rberger@zlk.com
afoley@zlk.com

*Counsel for Co-Lead Plaintiff Jia Tian and*
*Co-Lead Counsel for the Class*