**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

JIA TIAN and DAVID
FEIGELMAN, individually and on
behalf of all others similarly situated,

        Plaintiffs,

     v.

PELOTON INTERACTIVE, INC., JOHN
FOLEY, BARRY MCCARTHY, JILL
WOODWORTH, ELIZABETH F.
CODDINGTON, THOMAS CORTESE, HISAO
KUSHI, and TAMMY ALBARRÁN,

        Defendants.

Case No. 1:23-cv-04279-MKB-JRC

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

COVINGTON & BURLING LLP
Mark P. Gimbel
Robert C. Gianchetti
Jordan S. Joachim
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
mgimbel@cov.com
rgianchetti@cov.com
jjoachim@cov.com

*Attorneys for Defendants*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ......................................................................................................................... 2

I.  PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISSTATEMENT. ..................... 2

    A.  Peloton's Class Period Risk Disclosures Were Not False or Misleading. .............. 2

    B.  Peloton's May 2023 Seat Post Loss Accrual Was Not False or Misleading. ......... 3

    C.  Describing the Seat Post Recall as "Voluntary" Was Not False or
        Misleading. ......................................................................................................... 4

    D.  The Challenged Statements on Member Safety and Product Quality Were
        Not False or Misleading. ..................................................................................... 5

    E.  Peloton's Statements About "Project Tinman" Were Not False or
        Misleading. ......................................................................................................... 6

    F.  The Challenged Statements on Alleged Churn Were Not False or
        Misleading. ......................................................................................................... 6

II. THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF
    SCIENTER. ................................................................................................................ 7

    A.  Plaintiffs Cannot Demonstrate a Strong Inference of Conscious
        Misbehavior or Recklessness Because There Are No Allegations That Any
        Defendant Had Information Contradicting the Challenged Statements. ................ 8

    B.  Plaintiffs' Motive and Opportunity Allegations Fail. ......................................... 11

CONCLUSION.................................................................................................................... 12

## TABLE OF AUTHORITIES

**Cases**

*In re Adient plc Sec. Litig.*,
   2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)..................................................................11

*In re Aegon N.V. Sec. Litig.*,
   2004 WL 1415973 (S.D.N.Y. June 23, 2004) ..........................................................4

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
   28 F.4th 343 (2d Cir. 2022) ..................................................................................12

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
   980 F. Supp. 2d 564 (S.D.N.Y. 2013)....................................................................3

*In re BHP Billiton Ltd. Sec. Litig.*,
   276 F. Supp. 3d 65 (S.D.N.Y. 2017)......................................................................5

*C.D.T.S. v. UBS AG*,
   2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) .....................................................10

*In re Citigroup Sec. Litig.*,
   2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .......................................................2

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen.*
   *Holdings Corp.*,
   2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) .........................................................11

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
   70 F.4th 668 (3d Cir. 2023) ....................................................................................3

*In re Didi Global Inc. Sec. Litig.*,
   2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) ......................................................11

*In re Dentsply Sirona, Inc. Sec. Litig.*,
   665 F. Supp. 3d 255 (E.D.N.Y. 2023) .................................................................5, 9

*In re Dynagas LNG Partners LP Sec. Litig.*,
   504 F. Supp. 3d 289 (S.D.N.Y. 2020)....................................................................7

*Galestan v. OneMain Holdings, Inc.*,
   348 F. Supp. 3d 282 (S.D.N.Y. 2018).....................................................................9

*Gauquie v. Albany Molecular Research, Inc.*,
   2016 WL 4007591 (E.D.N.Y. July 26, 2016)........................................................11

*Hall v. Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008)...................................................................12

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
   818 F.3d 85 (2d Cir. 2016)..................................................................5

*Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*,
   445 F. App'x 368 (2d Cir. 2011) .......................................................8

*Johnson v. NYFIX, Inc.*,
   399 F. Supp. 2d 105 (D. Conn. 2005)................................................12

*In re Kindred Healthcare, Inc. Sec. Litig.*,
   299 F. Supp. 2d 724 (W.D. Ky. 2004)................................................3

*Lematta v. Casper Sleep, Inc.*,
   2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) ............................2, 5, 9

*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014).............................................11, 12

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024)..........................................................................6

*In re Marsh & Mclennan Cos., Inc. Sec. Litig.*,
   501 F. Supp. 2d 452 (S.D.N.Y. 2006)...............................................11

*Meyer v. Concordia Int'l Corp.*,
   2017 WL 4083603 (S.D.N.Y. July 28, 2017) ...................................12

*Meyer v. Organogenesis Holdings Inc.*,
   2024 WL 1346432 (E.D.N.Y. Mar. 29, 2024)...................................10

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
   80 F.4th 158 (2d Cir. 2023) ..............................................................3

*In re Nielsen Holdings PLC Sec. Litig.*,
   510 F. Supp. 3d 217 (S.D.N.Y. 2021)...............................................11

*Noto v. 22nd Century Grp.*,
   35 F.4th 95 (2d Cir. 2022) ................................................................5

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..............................................................8

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)..........................................................................4

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   89 F.4th 408 (2d Cir. 2023) ..............................................................5

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
   2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016) ........................................................................3

*Schleicher v. Wendt*,
   529 F. Supp. 2d 959 (S.D. Ind. 2007) ...............................................................................11

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994) ................................................................................................3

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008) ..............................................................................................10

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   625 F. Supp. 3d 164 (S.D.N.Y. 2022) .................................................................................7

*Valdes v. Kandi Techs. Grp., Inc.*,
   2024 WL 1348697 (E.D.N.Y. Mar. 29, 2024) ..................................................................11

*In re Vale S.A. Sec. Litig.*,
   2020 WL 2610979 (E.D.N.Y. May 20, 2020) ..........................................................5, 8, 9, 11

*In re Wachovia Equity Sec. Litig.*,
   753 F. Supp. 2d 326 (S.D.N.Y. 2011) .............................................................................3, 4

*Wang v. Cloopen Grp. Holding Ltd.*,
   661 F. Supp. 3d 208 (S.D.N.Y. 2023) ...............................................................................10

*Wilchfort v. Knight*,
   307 F. Supp. 3d 64 (E.D.N.Y. 2018) ...................................................................................9

*Woodley v. Wood*,
   2022 WL 103563 (S.D.N.Y. Jan. 11, 2022) ......................................................................10

**GLOSSARY**

| | |
|---|---|
| <u>Appendix</u> or <u>App.</u>: | Appendix attached to this reply brief excerpting all CW allegations in the Complaint relating to Project Tinman or rust |
| <u>Brief</u> or <u>Br.</u>: | Defendants' Memorandum of Law in Support of Motion to Dismiss, ECF No. 35-1 |
| <u>Complaint</u> or <u>Compl.</u>: | Amended Class Action Complaint, filed November 6, 2023, ECF No. 23 |
| <u>Class Period</u>: | May 6, 2021 through and including August 22, 2023 |
| <u>Company</u>: | Peloton Interactive, Inc. |
| <u>CPSC</u>: | U.S. Consumer Product Safety Commission |
| <u>CPSA</u>: | Consumer Product Safety Act, 15 U.S.C. § 2051, *et seq.* |
| <u>CW(s)</u>: | Confidential Witness(es), as identifed in the Complaint |
| <u>Defendants</u>: | The Individual Defendants and the Company |
| <u>EPSC</u>: | Peloton's Executive Product Safety Committee |
| <u>Exhibit(s)</u> or <u>Ex.</u>: | Exhibits attached to the Declaration of Mark P. Gimbel, dated February 2, 2024, ECF No. 35-2, all of which are public filings and statements and are incorporated into the Complaint and/or subject to judicial notice |
| <u>Individual Defendants</u>: | John Foley, Barry McCarthy, Jill Woodworth, Elizabeth Coddington, Thomas Cortese, Hisao Kushi, and Tammy Albarrán |
| <u>Member(s)</u>: | Active users and subscribers of Peloton's fitness platform |
| <u>Opposition</u> or <u>Opp.</u>: | Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiffs' Amended Class Action Complaint, ECF No. 36 |
| <u>Peloton</u>: | Peloton Interactive, Inc. |
| <u>Plaintiffs</u>: | Lead Plaintiffs Jia Tian and David Feigelman |
| <u>PSLRA</u>: | Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77k, 77l, 77z–1, 77z–2, 78a, 78j–1, 78t, 78u, 78u–4, 78u–5 |
| <u>SEC</u>: | U.S. Securities and Exchange Commission |

## PRELIMINARY STATEMENT

Plaintiffs boast that they have alleged securities fraud with "exacting particularity," Opp. 1, but the reality is the opposite: the Complaint fails to plead a single, actionable false statement, and its allegations of fraudulent intent rely on empty generalizations and red herrings.

As explained below, none of the allegations Plaintiffs point to in their Opposition demonstrate that the Company's risk disclosures were inaccurate, that its loss accrual was misleading, that it failed to accurately describe the voluntary seat post recall, or that Defendants made any other misleading statement. In addition, much of the Complaint relies on categories of statements that are not actionable as a matter of law.

The scienter allegations are equally lacking. Plaintiffs' core scienter theory is that Defendants had knowledge of a seat post defect during the Class Period, but none of Plaintiffs' allegations establish this. Instead, Plaintiffs rely on 11 customer accounts of seat-related issues that appeared in different contexts such as Reddit, Twitter, and Facebook over a three-year period during which millions of Bikes were sold. But there are no allegations establishing that any of these accounts were conveyed to any Individual Defendant or any other person whose intent might be imputed to Peloton, much less that anyone concluded that they demonstrated a material product safety issue. Plaintiffs attempt to establish knowledge of the reports through generalized allegations that unnamed "senior executives" received unspecified "monthly reports" containing unspecified "Member feedback," without identifying any specific report, its content, or who received it. But this is precisely the type of vague pleading that is insufficient to raise a "strong inference" of scienter under the PSLRA. Recognizing the insufficiency of these allegations, Plaintiffs invent new ones, claiming that the 11 accounts of Bike seat issues identified in the

1

Complaint are a "non-exhaustive sampling" of "hundreds" of reports. *Id.* at 2. The Complaint pleads no such thing, and Plaintiffs may not amend their allegations in an opposition brief.

Plaintiffs also attempt to manufacture scienter from allegations about the recall of the Tread+ treadmill and claims about Project Tinman, a program for addressing cosmetic rust publicized more than a year before the seat post recall. But a treadmill is an entirely different product than a bike; an issue with one does not imply an issue with the other. And the Complaint offers no basis for connecting the cosmetic rust at issue in Project Tinman to the Bike seat post recall beyond unfounded speculation on Reddit. Neither the Company's nor the CPSC's notice of the Bike seat post recall mentions rust. *See* Ex. 6. The CWs do not claim a relationship between rust and the seat post recall. No factual allegations establish such a relationship.

For the foregoing reasons and those set forth below, the Complaint should be dismissed.

## ARGUMENT

### I.    PLAINTIFFS FAIL TO PLEAD AN ACTIONABLE MISSTATEMENT.

#### A.    Peloton's Class Period Risk Disclosures Were Not False or Misleading.

Plaintiffs argue that risk disclosures from May 7, 2021 to November 3, 2022 that warned of "real or perceived" "design and manufacturing defects" "misrepresented the Bike's already-known safety defect . . . as theoretical." Opp. 16–17. But the Complaint does not demonstrate that a defect was "already known" or had materialized at the time these disclosures were issued. It identifies only five accounts of seat post issues before November 2022—and only one that was allegedly communicated to anyone at Peloton. Br. 6. Nowhere do Plaintiffs allege that anyone concluded from this isolated report that there was a material "safety defect"—real or perceived. *See In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *19 (S.D.N.Y. Mar. 24, 2023) ("increase in a risk does not mean the risk has already come to pass, such that a disclosure that simply identifies

the risk would be misleading"); *Lematta v. Casper Sleep, Inc.*, 2022 WL 4637795, at *11 (E.D.N.Y. Sept. 30, 2022) (no claim when disclosure identified "risk that later materialized").

### B.    Peloton's May 2023 Seat Post Loss Accrual Was Not False or Misleading.

Plaintiffs argue that Peloton's initial loss accrual was misleading because the accrual later increased, but this is classic fraud by hindsight, which is not actionable.  Opp. 19–21.  Plaintiffs also ignore that Peloton warned that it could incur additional expenses in amounts it was unable to estimate that "could be material."  Br. 7–8, 13–14.  Analyst reports confirm the market understood this.  Compl. ¶ 171 ("entirely possible that this dollar amount could rise").  Having disclosed the risk that the accrual could increase—and that the amount of any increase could not be estimated— Peloton was not required to do more.  *See In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 584 (S.D.N.Y. 2013) (disclosure not required where loss not reasonably estimable).[1]

Plaintiffs insist that the "magnitude" of subsequent increases and their "proximity" to the initial accrual support falsity.  Opp. 19–20.  But in the absence of allegations that Peloton estimated losses exceeding its publicly disclosed reserves, subsequent increases "provide no basis to conclude that [Peloton] recklessly misstated previous reserve levels."  *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 362 (S.D.N.Y. 2011) (multi-billion increase in reserves insufficient to show scienter); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1126–27, 1129 (2d Cir. 1994) ("significant addition" two months after initial reserve "does not support an inference of fraud").[2]

---

[1] *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158 (2d Cir. 2023), does not support Plaintiffs' arguments; it involved failure to accrue a probable *and estimable* expense.  *Id.* at 175.

[2] *City of Warren* and *Pirnik* are of no help to Plaintiffs.  In *City of Warren*, one of the country's largest life insurance companies concealed that its death benefit reserve would need to increase by hundreds of millions of dollars because its policies were experiencing negative mortality development, while stating to investors that the mortality rate was in the normal range at the time of the accrual.  *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 676 (3d Cir. 2023).  Here, by contrast, Peloton warned at the time of its accrual that the amount could materially increase in the future.  In *Pirnik*, the court <u>dismissed</u> the plaintiffs' securities fraud claim relating to reserve estimates. *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 2016 WL 5818590, at *8–9, 10 (S.D.N.Y. Oct. 5, 2016).

3

The accrual also is not actionable under the bespeaks caution doctrine. Br. 14–15. As a prediction of future liabilities, the accrual was forward-looking. *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 738 (W.D. Ky. 2004) (amount kept in reserve to cover liability is "a prediction about . . . future claims").[3] And it identified factors that could cause results to differ: the accrual was "estimated"; it could increase; Peloton was unable to estimate additional losses; and more information on risks could be found in Peloton's risk factors. Br. 7–8, 14.

### C. Describing the Seat Post Recall as "Voluntary" Was Not False or Misleading.

Plaintiffs do not dispute that the recall was voluntary as a matter of law, Br. 15–16, and thus cannot establish that statements describing it as such were false. Plaintiffs argue that recall regulations are "technical, legal jargon" disregarded by "ordinary investors," Opp. 19, but even if so, it would not make Peloton's accurate description of the recall false. Br. 15–16. Moreover, Plaintiffs' assumption that investors do not understand regulatory context is incorrect; investors are presumed to "take[] into account the customs and practices of the relevant industry." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).

Plaintiffs also fail to establish that Peloton's statements about working "cooperatively" with the CPSC were false. Although Plaintiffs argue that the statements were misleading because Peloton allegedly failed to report a known "safety defect" to the CPSC, Opp. 18, there are no allegations supporting this claim. The Complaint identifies only a small number of seat post issues that were reported during the Class Period, and even fewer that were allegedly brought to Peloton's attention. Br. 6. There are no allegations establishing that Peloton concluded that these isolated reports demonstrated a material "safety defect" or failed to report a purportedly "known" defect.

---

[3] *See also Wachovia*, 753 F. Supp. 2d at 361 ("reserves reflect management's opinion as to the likelihood of future loan losses and their magnitude"); *In re Aegon N.V. Sec. Litig.*, 2004 WL 1415973, at *12 (S.D.N.Y. June 23, 2004) ("statements whose truth cannot be ascertained until some time after the time they are made are forward-looking").

**D.    The Challenged Statements on Member Safety and Product Quality Were Not False or Misleading.**

Plaintiffs cannot bring a claim based on statements concerning Peloton's commitment to "Member safety" and "product quality," Opp. 8–14, because such statements are "too general to cause a reasonable investor to rely upon them" and are therefore not actionable. *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417–18 (2d Cir. 2023); Br. 17 (collecting cases). None of Plaintiffs' cited cases holds otherwise. In *BHP* and *Vale*, the courts held that general, aspirational statements similar to those challenged here were inactionable puffery and dismissed claims based on such statements; the few statements found actionable were "not mere generalities" but "specific representations or guarantees of some concrete fact or outcome"—a factor not present here. *In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79–80 (S.D.N.Y. 2017); *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *11–13 (E.D.N.Y. May 20, 2020). Likewise, in *Dentsply*, the court found that statements about the strength of a company's relationship with two distributors were not puffery because they were not generalized and were intended to "soften the significant financial impact" of the loss of exclusivity with the distributors. *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 284 (E.D.N.Y. 2023). Here, the challenged statements are far more general and were not made to "reassure investors" about the seat post. *Id.*[4]

Moreover, even if any of the statements Plaintiffs challenge could, in theory, be actionable, the Complaint fails to demonstrate that they were false. As discussed above, Plaintiffs' allegations do not support their premise that Peloton was aware of and concealed "a known Post safety defect,"

---

[4] Plaintiffs' other cases are equally inapposite because they either involved statements that were deemed too general to be actionable or are distinguishable as involving specific affirmative representations or guarantees that were alleged to be false. *See Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 97 (2d Cir. 2016) (dismissing claims about "high ethical standards, integrity, operational excellence, and customer satisfaction" and reputation as too general to be actionable); *Noto v. 22nd Century Grp.*, 35 F.4th 95, 105 (2d Cir. 2022) (failure to disclose ongoing investigation actionable when defendants "stated that they had solved the issue"); *Lematta*, 2022 WL 4637795, at *9 (defendant made statements highlighting continuing profitability while failing to disclose company was actually suffering accelerating losses).

Opp. 8, when it made the challenged statements concerning Member safety and product quality.[5] Nor does the Complaint plead any other facts suggesting that Peloton was not committed to Member safety and product quality; if anything, the allegations of the Complaint demonstrate the opposite, by acknowledging that Peloton decided to announce a voluntary recall after receiving only 35 reports related to the seat post out of *over 2 million* Bikes sold.  Compl. ¶ 166.

**E.    Peloton's Statements About "Project Tinman" Were Not False or Misleading.**

Plaintiffs challenge February 2022 statements in the *Financial Times* in which Peloton allegedly said that its internal testing confirmed that a "cosmetic oxidation" issue affecting certain containers of Bikes had "no impact on a bike's performance, quality, durability, reliability, or the overall member experience."  Compl. ¶ 127; Ex. 5.  But Plaintiffs fail to explain how any of these statements were false.  For example, Plaintiffs do not allege facts showing that Peloton's internal testing reached a different conclusion or that Peloton identified contrary evidence.  Tellingly, the Complaint alleges only three accounts of seat-related issues before the article was published in February 2022, and none were linked to rust or Project Tinman.  Br. 6; Compl. ¶¶ 66–68.[6]

**F.    The Challenged Statements on Alleged Churn Were Not False or Misleading.**

Plaintiffs argue that former CEOs Foley and McCarthy's statements in the period from August 26, 2021 to November 3, 2022 concerning "churn rates" and "subscription growth" were misleading because they omitted that the alleged "Post defect" would impact Peloton's ability to avoid churn and achieve growth.  Opp. 15–16.  The argument fails because Plaintiffs plead no facts

---

[5] Plaintiffs' argument that Defendants were required to disclose the seat post issue under Item 303 fails in light of the Supreme Court's holding in *Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257 (2024).

[6] The Complaint includes two photographs, allegedly of broken seat posts, that were posted on the internet in March and November 2022—one purportedly showing "rust" and the other purportedly showing "signs of corrosion." Compl. ¶¶ 69, 71.  The only basis Plaintiffs have for linking these photographs and Project Tinman is the speculation of Reddit users, *id.* ¶ 69, and even if such speculation could be credited, it would not establish that Peloton's earlier, February 2022 statements about Project Tinman were misleading *at the time they were made*.

establishing that Foley and McCarthy were aware of a seat post defect that would affect churn rates or subscription growth at the time. To the contrary, the Complaint identifies only five accounts of seat-related issues before the latest of these statements on November 3, 2022—only one of which was allegedly reported to Peloton. Br. 6. The Complaint pleads no facts suggesting that anyone at Peloton—least of all Foley or McCarthy—concluded from this single isolated report that there would be a material impact on churn rates or subscriber growth.

Coddington's statement on her "expect[ations]" of "churn levels," Opp. 15, is not actionable because it is a forward-looking statement protected by the PSLRA safe harbor and the bespeaks caution doctrine. Plaintiffs cannot avoid this result by arguing that the statement was accompanied only by "generic" cautionary language because Peloton's earnings call materials directed investors to detailed risk factors in Peloton's SEC filings. *See* Ex. 8 at 4 (referencing SEC filings); Ex. 4 at 14–43 (2022 Form 10-K risk factors); Br. 4–5; *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289, 319 (S.D.N.Y. 2020) ("references to SEC filings that expound more fully on the risks suffice to adequately convey the risks"). And the safe harbor would apply regardless because Plaintiffs have failed to plead facts establishing Coddington had actual knowledge that the statement was false (and it was not). *Dynagas*, 504 F. Supp. 3d at 319. Plaintiffs also may not avoid the safe harbor by "recharacteriz[ing] their false-statement claims as material-omission claims" because their claim is based on Coddington's affirmative statement. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 217 n.17 (S.D.N.Y. 2022).

## II.    THE COMPLAINT FAILS TO PLEAD A STRONG INFERENCE OF SCIENTER.

Plaintiffs do not dispute that, to survive dismissal, the Complaint must plead particularized facts giving rise to a "strong inference" that each Defendant acted with scienter. Br. 21–22. Plaintiffs' Opposition fails to demonstrate that they have met this stringent burden.

**A.** **Plaintiffs Cannot Demonstrate a Strong Inference of Conscious Misbehavior or Recklessness Because There Are No Allegations That Any Defendant Had Information Contradicting the Challenged Statements.**

Plaintiffs' primary scienter theory is that Defendants "received numerous reports throughout the Class Period indicating a serious safety defect in the Post." Opp. 22. But Plaintiffs failed to identify <u>any</u> such report that was conveyed to <u>any</u> Individual Defendant or <u>any</u> other person whose intent could be imputed to Peloton. Instead, Plaintiffs ask the Court to infer that the 11 accounts of seat-related issues identified in the Complaint—comments that allegedly appeared in sources like Reddit, Twitter, and Facebook—were relayed to the Individual Defendants simply because Peloton allegedly had a general practice of compiling "Voice of the Member" reports summarizing Member "feedback"; escalating "sensitive customer issues" to senior management; and performing reviews of "safety-related data." *Id.* at 22–24. The argument fails because generalized reporting or monitoring practices cannot establish scienter. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *Inter-Local Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (same).[7]

Plaintiffs argue that *Vale* is "directly on point," Opp. 24, but *Vale* only reinforces why the Complaint should be dismissed. In *Vale*, the plaintiffs pleaded scienter as to statements concerning the stability and safety of Vale's dams by making "specific allegations" that Vale's officers possessed contradictory information at the time the statements were made, including "warnings from auditors, low factor of safety assessments, problematic dam behavior, risk curves showing multiple dams with unacceptable failure probabilities, and alarming . . . findings as to Dam 1's

---

[7] Even if Defendants had received these or other accounts of Bike seat post issues, Peloton did not have a duty to disclose non-material product risks, and there are no facts establishing Defendants concluded there was a *material* issue requiring earlier disclosure to Peloton's investors. *See* Br. 23–25.

stability" from a panel of experts.  2020 WL 2610979, at *16.  The detailed allegations that Vale's officers made assurances about dam safety while in possession of specific contradictory warnings, findings, and reports from safety auditors and experts are in stark contrast to Plaintiffs' claims here, which rely on vague social media posts that Defendants are not even alleged to have seen.[8]

Confronted with the insufficiency of the Complaint's allegations, the Opposition embellishes them, inventing new, baseless claims that appear nowhere in the Complaint and must therefore be disregarded.  *Wilchfort v. Knight*, 307 F. Supp. 3d 64, 72 n.13 (E.D.N.Y. 2018).  For example, Plaintiffs assert that the social media posts identified in the Complaint "plausibly reflect[] hundreds of Post breaks," and that these post breaks were "summarized in monthly reports circulated to Defendants" and analyzed by a committee (the EPSC) that included Defendants Kushi and Albarrán.  Opp. 2, 23.  None of this is pleaded.  The Complaint nowhere alleges that hundreds of post breaks occurred during the Class Period; that the EPSC was aware of these breaks; that the EPSC reported them to the Individual Defendants; or that Kushi or Albarrán served on the EPSC.

Unable to point to any relevant information known to Defendants during the Class Period, Plaintiffs focus on irrelevant claims about "Project Tinman."  Opp. 26.  But there are no factual allegations establishing a connection between "Project Tinman," an alleged program for addressing cosmetic rust publicized in February 2022, and the recall of the seat post that occurred over 15 months later in May 2023.  The Complaint does not plead that the CPSC found any connection between rust and the seat post recall.  The CPSC's recall announcement says nothing

---

[8] In Plaintiffs' other cases, the defendants similarly received detailed and particular information contradicting the substance of the challenged statements.  *See Dentsply*, 665 F. Supp. 3d at 269–70, 272, 291 (defendants regularly reviewed detailed reports specifically contradicting public statements and received cease-and-desist order from SEC); *Lematta*, 2022 WL 4637795, at *14 (former employees with direct contact confirmed defendants were well aware of company's unprofitability, despite contrary public statements); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 300–02 (S.D.N.Y. 2018) (defendants made positive statements about integration of two companies and financial performance despite having information about the negative effects of the integration and poor financial performance).

about rust. *See* Ex. 6. And the Complaint does not plead that anyone at Peloton found such a connection. Not even Plaintiffs' own CWs allege a link. *See* App. Nor would it matter if they did, as there is no allegation that any CW ever communicated anything to any Defendant. *Meyer v. Organogenesis Holdings Inc.*, 2024 WL 1346432, at *18 (E.D.N.Y. Mar. 29, 2024) (no scienter where CWs did not convey contradictory information to defendants). The only allegation linking "Project Tinman" and the seat post recall is the speculation of a few unidentified Reddit users, Compl. ¶ 69, and the Complaint does not plead that this speculation came to Defendants' attention.

Plaintiffs' remaining arguments are equally meritless:

- ***Continued Reliance on Improper Group Pleading.*** Plaintiffs' cases, Opp. 21, do not negate the rule that "[s]cienter must be separately pled . . . as to each defendant" and "is not amenable to group pleading." *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013). To the contrary, the decisions underline the rule because, in each case, the plaintiff alleged specific facts demonstrating scienter as to each defendant.

- ***Duty To Monitor.*** Plaintiffs' assertion that Peloton had a "duty to monitor" fails, among other reasons, because the Complaint does not "specifically identif[y] any reports or statements that would have come to light in a reasonable investigation and that would have demonstrated the falsity of the allegedly misleading statements." *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *Woodley v. Wood*, 2022 WL 103563, at *8 (S.D.N.Y. Jan. 11, 2022) ("duty to review the Company's internal controls is not a substitute for specific allegations that [defendant] was provided with information that demonstrated the inadequacy of those internal controls").

- ***Proximity of May 2023 Disclosure and Recall Announcement.*** Plaintiffs misrepresent the Company's disclosures (and Plaintiffs' own allegations) when they argue that Peloton's initial disclosure of, and accrual for, the seat post issue occurred on the "same day" that the recall was announced. Opp. 19. The initial disclosure and loss accrual occurred before the recall announcement. Compl. ¶¶ 151–53, 166. Regardless, nothing about the proximity of these events indicates scienter; the first disclosure informed investors that Peloton was in discussions with the CPSC concerning a corrective action plan—a fact that would not have been disclosed if the Company intended to conceal the risk of a recall.[9]

---

[9] In *Wang v. Cloopen Grp. Holding Ltd.*, "[a]ll of the information needed to determine" the undisclosed loss was known *before* the IPO, yet the defendants waited until "after the IPO" to disclose it. 661 F. Supp. 3d 208, 219–20, 235 (S.D.N.Y. 2023). Here, by contrast, Plaintiffs do not allege that by May 4, 2023, when Peloton was in discussions with the CPSC about a corrective action plan, the Company had all the information necessary to disclose a recall.

- **Prior Recall of Entirely Different Product Category.** The Tread+ and the Bike are completely different products that were recalled due to unrelated issues. It is illogical and implausible to argue that Peloton's experience with the Tread+ somehow gave Defendants knowledge of an unrelated issue with the Bike or the scope of the ensuing Bike seat post recall. Br. 28. None of Plaintiffs' cases found scienter based on similar allegations. Opp. 25.[10]

- **Other Flawed Arguments.** The claim that Defendants' public statements support scienter depends on inapposite cases involving demonstrably false public statements. Opp. 27–28.[11] The allegation that certain Individual Defendants were "hands-on managers," *id.* at 28, is insufficient because "simply alleging that executive defendants are 'closely involved' in running their business is not enough to show that they had access to contrary information." *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021). And even assuming that the "core operations" doctrine survived the PSLRA, Opp. 28, it "does not independently establish scienter." *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *29 (S.D.N.Y. Apr. 2, 2020).

### B.    Plaintiffs' Motive and Opportunity Allegations Fail.

Plaintiffs also assert that Defendants had a motive to "conceal the Post defect and avoid another costly recall." Opp. 29. The argument fails because a "desire to avoid government scrutiny" or "maintain profitability" is a general motive shared by all manufacturers that is not sufficiently "concrete" or "personal" to support scienter. *Valdes v. Kandi Techs. Grp., Inc.*, 2024 WL 1348697, at *5 (E.D.N.Y. Mar. 29, 2024); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553,

---

[10] In *Vale*, specific facts communicated to the defendants demonstrated scienter. *See supra* p.8. The "prior incident" cited by Plaintiffs, Opp. 25, was relevant only because it was a safety-related problem that caused particular defendants to get "directly and intimately involved with dam safety," learning the facts that directly contradicted their public statements before those statements were made. 2020 WL 2610979, at *17. In *Schleicher v. Wendt*, the court's holding was based not just on a "prior action alleging the same fraudulent manipulations," but on particularized allegations of "repeated and prolonged concealment and deception," including purposefully inflating cash flows by violating GAAP. 529 F. Supp. 2d 959, 971–72, 979 (S.D. Ind. 2007). In *In re Didi Global Inc. Sec. Litig.*, the court did not rely on "sanctions on other companies" to support scienter, Opp. 26; it discussed the history of sanctions to explain why they were a risk requiring disclosure under Item 303. 2024 WL 1119483, at *9–10, 17 (S.D.N.Y. Mar. 14, 2024).

[11] *See In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 237 (S.D.N.Y. 2021) (defendants made "repeated assurances about GDPR's *de minimis* impact" on company and that it was a "non-event" despite direct and concrete information GDPR was having a significant impact on key business segments); *Gauquie v. Albany Molecular Research, Inc.*, 2016 WL 4007591, at *1 (E.D.N.Y. July 26, 2016) (defendant extolled value of acquired company and its regulatory compliance while concealing acquired company's contamination affecting nearly half of its product sale potential); *In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 486 (S.D.N.Y. 2006) (CEO and COO "knew or were reckless in not learning of" company's "fraudulent business practices" when they "personally made misstatements and aggressively supported [company's] business practices" following announcement of NYAG investigation and prior to "rapid discovery of widespread misconduct at [company] shortly thereafter").

582–83 (S.D.N.Y. 2014).  Nor is it "cogent and compelling" that "the need for quality in order to maintain its brand" would lead a company to make false statements.  *Lululemon*, 14 F. Supp. 3d at 583.  The more plausible inference is that a company would "want to rectify any quality issues as quickly as possible" because such issues would be apparent and impact sales.  *Id.* at 582.

Finally, there is nothing suspicious about the Individual Defendants' stock sales or pledges that would raise an inference of scienter.  Br. 29–30; Opp. 29–30.  Plaintiffs do not dispute that sales to cover tax liabilities or under 10b5-1 plans generally do not demonstrate scienter.  Plaintiffs argue, however, that Coddington's 10b5-1 plan was entered into during the Class Period and thus provides "no defense."  Opp. 29.  Plaintiffs are wrong.  To establish scienter based on sales pursuant to a 10b5-1 plan, Plaintiffs must allege facts showing that the "purpose of the plan was to take advantage of an inflated stock price."  *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355–56 & n.4 (2d Cir. 2022).  Here, Plaintiffs do not allege that Coddington had reason to believe Peloton's stock was inflated by failure to disclose a seat post issue on November 10, 2022 when her plan was adopted—let alone that she sought to take advantage of that fact.  The Complaint identifies only five seat-related issues from before that date, all of which predate Coddington's employment and none of which were allegedly communicated to her.  Br. 6; Opp. xi (employment commenced "June 13, 2022"); Compl. ¶ 22.  The stock pledges of Foley and Cortese likewise do not support scienter because they are "analogous to stock ownership"— not sales.  *Johnson v. NYFIX, Inc.*, 399 F. Supp. 2d 105, 114 (D. Conn. 2005); Br. 29–30.[12]

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

---

[12] In Plaintiffs' cases, the courts found a strong inference of scienter because those plaintiffs pled particularized facts showing defendants knew specific information contradicting the challenged statements—allegations that are absent here.  *Meyer v. Concordia Int'l Corp.*, 2017 WL 4083603, at *7 (S.D.N.Y. July 28, 2017); *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 232–33 (S.D.N.Y. 2008).

New York, New York
Dated: May 17, 2024

Respectfully submitted,

COVINGTON & BURLING LLP

*/s/ Mark P. Gimbel*
Mark P. Gimbel
Robert C. Gianchetti
Jordan S. Joachim
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 841-1000
mgimbel@cov.com
rgianchetti@cov.com
jjoachim@cov.com

*Attorneys for Defendants*

13

**APPENDIX**

| PLAINTIFFS' CONFIDENTIAL WITNESS (CW) ALLEGATIONS CONCERNING PROJECT TINMAN | |
| --- | --- |
| **Complaint Paragraph** | **Allegation** |
| 27 | CW1 worked for Peloton from April 2021 until February 2022. CW1 was a Product Manager for the Supply Chain and was based in New York City but also spent time at Peloton's assembly facilities in Carteret, New Jersey, Los Angeles, and San Francisco. CW1 reported to Senior Director of Business Operations Taylor Thornton, who reported to former Senior Vice President of Global Operations and Supply Chain, Jennifer McKeehan. McKeehan, in turn, reported to Chief Supply Chain Officer, Jon Adee. CW1 was responsible for working on the manufacturing execution system, which involved monitoring and tracking of the manufacturing process to pull in more data. |
| 28 | CW2 worked at Peloton from July 2021 to September 2023. CW2 worked as a Member Support Supervisor from July 2021 to October 2022, based in Tempe, Arizona, and as a Senior Partner Analyst from October 2022 to September 2023, in Atlanta, Georgia. CW2 reported to Director of Global Member Support Operations, Tera Rogers. As a Member Support Supervisor, CW2 oversaw 30 team members who fielded calls from members seeking customer support. As a Senior Partner Analyst, CW2 was responsible for supervising the third-party answering service that Peloton used. |
| 29 | CW3 worked for Peloton from August 2020 to February 2022. CW3 served as an Assembly Technician from January 2021 to November 2021 and as Quality Control Inspector from November 2021 until February 2022. CW3's supervisor was Juan Rodriguez, who reported to Senior Manufacturing Manager, Juan Ramos. As an Assembly Technician, CW3 calibrated the Bikes, and as a Quality Control Inspector, CW3 inspected incoming Bike+ shipments. |
| 30 | CW4 worked for Peloton from January 2021 to February 2022 as a Quality Control Inspector in its Carteret, New Jersey warehouse. CW4 also reported to Juan Perez, who reported to Senior Manufacturing Manager, Juan Rodriguez. As a Quality Control Inspector, CW4 was responsible for testing Bikes and Bike parts that arrived at the plant to make sure they were mechanically sound. In late 2021, CW4 was directed to inspect Bike parts for rust in connection with Project Tinman. |

| | |
|---|---|
| 89 | Project Tinman is also corroborated by first-hand accounts from CW4, who was assigned to Project Tinman in late 2021.  According to CW4, "we had to take a heavy-duty flashlight and shine it into the inside of the bike to check the severity of the rust."  As CW4, "if there was a lot of rust then . . . they would get scraped out and then sprayed down on the inside."  CW4 did not recall the name of the product used to disguise the rust but noted that "[i]t looked like Elmer's Glue." |
| 90 | CW3 confirmed that warehouse personnel were told by Company "executives" that corroded Bike frames were stuck in shipping containers at the Los Angeles port for months in late 2020 and early 2021, and that the rust was "from the humidity" in that environment.  This is consistent with CW1, who said it was common knowledge that the rust issue on some of the bikes was caused, at least in part, from conditions during transit from Taiwan to the United States. |
| 204 | Soon thereafter, Peloton modified the procedures for handling customer complaints about Bike rust to draw a distinction between rust on the joints of the Bike and rust on all other areas.  Rather than refer all customer complaints about Bike rust to Peloton's internal Escalation Team, as was the practice during Project Tinman, CW2 said instructions were passed down mid-2022 that the only reports about Bike rust which should be referred to the Escalation Team were those involving rust on "areas that shouldn't be accumulating rust," including "any joints or connection points."  According to CW2, "[i]f the rust wasn't within a joint or a connection point," then it could simply be treated with "Rust-Oleum or rust converters." |