UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------

JIA TIAN and DAVID FEIGELMAN, *individually and on behalf of all others similarly situated*,

                          Plaintiffs,

        v.

PELOTON INTERACTIVE, INC., JOHN FOLEY, BARRY MCCARTHY, JILL WOODWORTH, ELIZABETH F. CODDINGTON, THOMAS CORTESE, HISAO KUSHI, AND TAMMY ALBARRÁN

                          Defendants.

---------------------------------------------------------------

**MEMORANDUM & ORDER**
23-CV-4279 (MKB)

MARGO K. BRODIE, United States District Judge:

On June 9, 2023, Sam Solomon commenced this securities class action on behalf of himself and other similarly situated investors who purchased or otherwise acquired Peloton Interactive, Inc. ("Peloton") securities between May 10, 2022 and May 10, 2023 (the "Class Period"), against Defendants Peloton, Barry McCarthy, Jill Woodworth, and Elizabeth F. Coddington. (Compl. ¶¶ 1, 13–16, Docket Entry No. 1.) Solomon alleged that Defendants violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). (*Id.* ¶ 1.) On November 6, 2023, Jia Tian and David Feigelman, as lead Plaintiffs,[1] filed an Amended Complaint and added Defendants John Foley, Thomas Cortese, Hisao Kushi, and Tammy Albarrán (collectively with Barry McCarthy, Jill Woodworth, and Elizabeth F.

---

[1] On August 22, 2023, Tian and Feigelman filed a joint motion for appointment as lead plaintiffs. (*See* Consent Mot. to Appoint Co-Lead Pls. and Co-Lead Counsel, Docket Entry No. 16.) On September 7, 2023, Magistrate Judge James R. Cho granted the joint motion without objection and directed Tian and Feigelman to file an amended complaint. (Order granting Consent Mot. to Appoint Co-Lead Pls. and Co-Lead Counsel, Docket Entry No. 17.)

Coddington, the "Individual Defendants").  (Am. Compl. ¶¶ 19, 23–25, Docket Entry No. 23.)

The Amended Complaint also identifies the Class Period as May 6, 2021 to August 22, 2023.[2]

(*Id.* ¶ 1.)

Defendants move to dismiss the Amended Complaint for failure to state a claim pursuant

to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Plaintiff opposes the motion.[3]  For

the reasons explained below, the Court grants Defendants' motion.

## I.  Background

The Court assumes the truth of the factual allegations in the Amended Complaint for the

purpose of deciding Defendants' motion.

Peloton is a Delaware corporation with principal executive offices in New York, New

York.  (*Id.* ¶ 18.)  Individual Defendants were senior officers or board members of Peloton

during the Class Period.  (*See id.* ¶ 274.)  Barry McCarthy ("CEO McCarthy") has been the CEO

and President of Peloton and a board member since February 9, 2022.  (*Id.* ¶ 20.)  Jill

Woodworth ("CFO Woodworth") was Peloton's CFO from before the Class Period to June 13,

2022, and a consultant to Peloton from June 13, 2022 until September 13, 2023.  (*Id.* ¶ 21.)

Elizabeth F. Coddington ("CFO Coddington") has been Peloton's CFO since June 13, 2022.  (*Id.*

¶ 22.)  John Foley ("CEO Foley") is Peloton's co-founder and was its CEO and Chairman of the

Board from before the start of the Class Period until February 9, 2022, and Executive Chairman

of the Board from February 9, 2022 to September 12, 2022.  (*Id.* ¶ 19.)  Thomas Cortese ("CPO

---

[2]  The Complaint identified the Class Period as May 10, 2022 to May 10, 2023.  (Compl. ¶ 1.)

[3]  (Defs.' Mot. to Dismiss ("Defs.' Mot."), Docket Entry No. 35; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), Docket Entry No. 35-1; Pls.' Opp'n to Defs.' Mot. ("Pls.' Opp'n"), Docket Entry No. 36; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 35.)

Cortese") was Peloton's COO from before the start of the Class Period until August of 2021, and Chief Product Officer ("CPO") from August of 2021 to November 1, 2023.  (*Id.* ¶ 23.)  Hisao Kushi ("CLO Kushi") was Peloton's Secretary and Chief Legal Officer ("CLO") from before the start of the Class Period until October 3, 2022.  (*Id.* ¶ 24.)  Tammy Albarrán ("CLO Albarrán") has served as CLO and Corporate Secretary since October 3, 2022.  (*Id.* ¶ 25.)

### a.  Peloton's business model

Peloton manufactures personal fitness equipment and sells subscriptions to live and on-demand fitness classes.  (Am. Compl. ¶¶ 2, 32.)  Peloton's "exercise machines are equipped with a large touchscreen video display which provide[s] direct access to Peloton's course catalog, and, as such, are referred to as its 'Connected Fitness Products.'"  (*Id.* ¶ 31.)  During the Class Period, Peloton's Connected Fitness Products included the Peloton Bike, which is its flagship stationary spin bike (the "Bike"); the Bike+, a premium version of the Bike; the Tread, a treadmill; and the Tread+, a premium version of the Tread.  (*Id.* ¶¶ 2, 31.)  Peloton's primary revenue sources are its Connected Fitness Products and the "month-to-month subscriptions" of Peloton's "digital library" of its fitness classes.  (*Id.* ¶ 3.)  By the start of the Class Period, the Bike accounted for a "significant majority" of Peloton's annual $4.02 billion in sales, and "almost 75% of Peloton's subscription revenues were associated with Connected Fitness Products."  (*See id.* ¶¶ 3, 37.)  Because "the only source of revenue from a customer after an initial product purchase was often through his or her monthly subscription," Peloton and investors were focused on the "rate of subscription cancellations, referred to as 'churn.'"  (*Id.* ¶ 4.)  "Prior to the Class Period, Peloton boasted an unprecedented churn rate of less than 1%."  (*Id.*)

"As of June 30, 2019, Peloton had more than 500,000 active subscribers, and its annual revenues reached almost $1 billion."  (*Id.* ¶ 34.)  "On September 26, 2019, Peloton commenced

an IPO in which it issued and sold over 40,000,000 shares of its Class A common stock at $29.00 per share." (*Id.*)

One of Peloton's "fundamental values" is its "Members First" philosophy, which means that Peloton "obsess[es] over every touchpoint of [their] member experience." (*Id.* ¶ 39.) Peloton regularly receives direct feedback from members through several channels. (*Id.* ¶ 58.) "First, Peloton has a dedicated Member Support Team that is responsible for working directly with Peloton members to answer questions and to resolve their issues, including safety issues or product defects." (*Id.* ¶ 59.) "Second, Peloton receives notice of any safety-related complaints about its products that are filed with the [U.S. Consumer Product Safety Commission (the "CPSC")]." (*Id.* ¶ 60.) "Third, Peloton engages with members through social media," including through Community Associates who are "tasked with monitoring all social media channels for insights by current or prospective members, and addressing support-related posts, comments, and messages." (*Id.* ¶ 61.) "Fourth, Peloton also receives a wealth of detailed behavioral data from members through their use of Connected Fitness Products and Peloton Digital." (*Id.* ¶ 62.) In a March of 2018 interview, Brad Olson, then the head of Peloton's Member Experience division, said that Peloton "capture[s] every single piece of Member feedback across all channels, and read[s] it back to the entire organization on a regular basis to identify emerging trends and areas of improvement." (*Id.* ¶¶ 61, 63 (emphasis omitted).) "In 2020, Olson confirmed that Peloton continued to 'pull all that together and share it broadly in the organization.'" (*Id.* ¶ 63.) Confidential Witness 2 ("CW2"), who worked in Peloton's Member Support department from July of 2021 to September of 2023, confirmed that the entire organization would receive monthly summaries of member feedback, including social media "verbatims" and support requests with reports of both negative and positive feedback. (*Id.*)

4

### b.  Consumer issues with Peloton's Connected Fitness Products

### i.  Complaints about the Tread and Tread+

Peloton began receiving consumer complaints about the Tread shortly after its launch in late 2018.  (*Id.* ¶ 41.)  Customers reported that "a variety of household objects were getting sucked under and entrapped by the rear of Tread's unprotected running belt while in use, often lifting the massive device off the ground."  (*Id.*)  "On March 3, 2021, Peloton received notice that a six-year-old died after being swept under the Tread's slat belt."  (*Id.*)  On March 4, 2021, Peloton reported the safety concern to the CPSC.  (*Id.* ¶ 42.)  After investigating, the CPSC asked Peloton to recall the Tread+, but Peloton refused and instead issued a press release stating that "[t]here is no reason to stop using the Tread+, as long as all warnings and safety instructions are followed."  (*Id.* ¶ 43–44.)  On May 5, 2021, CPSC and Peloton issued a joint press release announcing a voluntary recall of all Tread+ machines on the market."  (*Id.* ¶ 45.)  "At the time of this recall, Peloton had already sold approximately 125,000 Tread+ machines in the United States."  (*Id.*)  "In total, the Tread+ recall cost Peloton over $100 million in direct recall-related expenses."  (*Id.* ¶ 46.)  During a May 6, 2021 conference call Peloton executives held to discuss the quarter ending on March 31, 2021, then-CEO Foley stated that "Peloton made a mistake in our initial response to the [CSPC]'s request that we recall our Tread+ product."  (*Id.* ¶ 49.)  He also stated that Peloton has "some work to do to get back on the right side of the line with trust and safety."  (*Id.*)  In Peloton's annual SEC filing for the period ending June 30, 2021, Peloton identified the Tread+ recall as an "example" of their success depending on their "ability to maintain the value and reputation of the Peloton brand" and noted that their "products and services may be affected from time to time by design and manufacturing defects, real or perceived."  (*Id.* at 50.)

By May 7, 2021, "the CPSC notified Peloton that it had opened an investigation into the [c]ompany's compliance with its reporting obligations under the [Consumer Product Safety Act (the "CPSA")] in connection with the Tread+ safety issue it first reported to the CPSC in March 2021." (*Id.* ¶ 210.)  The U.S. Department of Justice and U.S. Department of Homeland Security also "opened investigations into Peloton's reporting of injuries associated with its products generally." (*Id.*)  In August of 2022, "the CPSC informed Peloton that its staff believes that it knowingly failed to satisfy its reporting obligation under the [CPSA]" and "that by the time Peloton made its first report to the CPSC about the Tread+ safety issue in March 2021, it had already received more than 150 previous reports from as far back as December 2018" about the Tread+'s slat belt. (*Id.* ¶ 211.)  Peloton reported the CPSC's findings in the 2022 Form 10-K it filed with the SEC on September 7, 2022, and entered a settlement agreement with the CPSC in December of 2022. (*Id.* ¶¶ 212, 214.)  Peloton agreed to pay a civil penalty of more than $19 million and pledged to maintain an "enhanced compliance program design to ensure compliance with the CPSA with respect to any consumer product . . . distributed or sold by Peloton." (*Id.* ¶¶ 215–16 (emphasis omitted).)

### ii.   Complaints about the Bike

Around the same time, Peloton "was receiving a cascade of complaints that the seat post on the Bike was detaching *while in use*." (*Id.* ¶ 6.)  "[T]he seat of the Bike is mounted on top of a removable post that has a vertical and horizontal segment, which are connected by a welded joint." (*Id.* ¶ 54.)  The design allows the user to move the seat up and down and forward and backward, placing "inherent tension on the joint whenever weight is applied on the horizontal shaft." (*Id.*)  The structural integrity of the joint between the vertical and horizontal segments is "critical to the design of the Bike's seat post." (*Id.*)  The complaints included reports that a Bike

seat post had split along the seam of the joint, (*id.* ¶ 67), that the Bike seat post "broke off along the 'weld' of the post joint," (*id.* ¶ 69), and that a user's "seat post snapp[ed] during a ride causing [the user] to fall backwards off the bike," (*id.* ¶ 71). Plaintiffs contend that "[t]hroughout the Class Period, Peloton received a steady stream of reports about the [Bike] seat post defect through its customer service resources, social media pages that the [c]ompany admittedly (and verifiably) monitored, and even directly from the CPSC." (*Id.* ¶¶ 7, 64–82.) "[A]s of April 30, 2023, Peloton had formally received at least [thirty-five] reports of the seat post breaking 'during use,' according to an internal memorandum sent to employees by Peloton's Executive Product Safety Committee on or around May 4, 2023." (*Id.* ¶ 83.)

### iii.  Project Tinman

In addition, Plaintiffs allege that, under the code name "Project Tinman," Defendants began covering up visible rust build-up on the Bike seat frames at Peloton's warehouses and selling the Bikes to customers at full price. (*Id.* ¶ 7.) Plaintiffs contend that Peloton senior executives issued a series of protocols to direct "staff assembling or inspecting the Bikes in the United States to apply a chemical solution called a 'rust converter,' []which concealed the corrosion by reacting with the rust to form a 'black layer' like the color of the frame." (*Id.* ¶ 87.) Several former Peloton employees supported Plaintiffs' description of Project Tinman. (Pls.' Opp'n 6; Am. Compl. ¶ 88.) Confidential Witness 1 ("CW1") and Confidential Witness 3 ("CW3"), both of whom worked in operations and inspection for Peloton, attributed the rust issue, at least in part, to humid conditions during shipping the bike parts from Taiwan to the United States. (*Id.* ¶ 90.) Confidential Witness 4 ("CW4"), who was assigned to Project Tinman in 2021, stated that employees "had to take a heavy-duty flashlight and shine it into the inside of the bike to check the severity of the rust," and if there was a lot of rust, the rust "would get

scraped out and then sprayed down on the inside" to cover-up the rust. (*Id.* ¶ 89.) "Prior to Tinman, a Bike frame with *any* rust was automatically disqualified from being sold." (*Id.* ¶ 88.)

On February 16, 2022, the *Financial Times* reported on Project Tinman with supporting details from former Peloton employees and internal documentation. (*Id.* ¶¶ 9, 161.) In a follow-up article on February 22, 2022, the *Financial Times* published another article "featur[ing] rich detail on Project Tinman sourced from eight current and former employees and internal materials they provided which documented the program . . . and . . . a company-wide national effort to use chemical solution to change the color of the rust." (*Id.* ¶ 162.) "On this news, Peloton's stock fell approximately 14% in the aggregate." (*Id.* ¶ 9.) In response to the *Financial Times* reporting, Peloton released a statement claiming that its "internal testing, based on industry standards, confirmed the cosmetic oxidation issue would have no impact on [the Peloton] Bike's performance, quality, durability, reliability, or the overall Member experience." (*Id.* ¶ 127.) CW2 stated that after the *Financial Times* article, Peloton changed its internal guidelines for handling customer complaints about rust. (*Id.* ¶ 204.) While previously any reports about rust were referred to Peloton's "Escalation Team," after the *Financial Times* article Peloton changed its guidelines so that only reports of rust within a joint or a connection point were sent to the Escalation Team. (*Id.*)

According to Plaintiffs, Peloton's executives orchestrated Project Tinman, demonstrating "a conscious attempt to *hide* the rust and pass them off to customers at full price." (*Id.* ¶ 201.)

### c. Peloton's alleged misrepresentations and omissions about the Bike and Peloton's business model

"Despite the deluge of safety defects reported to or otherwise known by [Defendants] during the Class Period, Defendants made numerous false and misleading statements in the wake of the Tread recall." (*Id.* ¶ 92.) Plaintiffs allege that "Defendants concealed [the] recurring

[Bike seat] issue from customers and regulators alike and continued to laud the quality of [Defendants'] products, including the Bike, and [Defendants'] commitment to safety." (*Id.* ¶ 6.)

Plaintiffs allege that Peloton and each of the individual Defendants made misleading statements about the quality and safety of the Peloton Bike throughout the Class Period. For example, then-CEO Foley stated on a May 6, 2021 earnings call that Peloton is as "members-first organization" and "the safety of our member community comes first." (*Id.* ¶ 94.) He also publicly stated in interviews and earnings calls in 2021 that Peloton has "an incredible responsibility and obligation to the safety of people who bring Peloton in their home," that Peloton is "100% committed to the safety and well-being" of its members, and that "[e]verything we do at Peloton is designed to keep our members engaged and our churn rate low." (*Id.* ¶¶ 98, 102.) Reflecting on the Tread+ recall, then-CEO Foley also said that "the learning looking back was more quickly getting in lockstep with the regulators." (*Id.* ¶ 114.)

In Peloton's May 7, 2021 Form 10-Q filing, Peloton stated:

> Our products and services may be affected from time to time by design and manufacturing defects, real or perceived, that could adversely affect our business and result in harm to our reputation. We offer complex hardware and software products and services that can be affected by design and manufacturing defects. . . . Defects may also exist in components and products that we source from third parties. Any defects could make our products and services unsafe and create a risk of environmental or property damage and/or personal injury. . . . [T]he occurrence of real or perceived defects in any of our products, now or in the future, could result in additional negative publicity, regulatory investigations, or lawsuits filed against us, particularly if Members or others who use or purchase our Connected Fitness Products are injured.

(*Id.* ¶ 95 (emphasis omitted).) Peloton submitted additional Form 10-Ks and Form 10-Qs to regulators in 2021 and 2022 containing similar language about the company's risks and uncertainties. (*Id.* ¶¶ 108, 118, 125, 131, 135, 145.) Peloton's 2021 Form 10-K and Proxy

Statement also identified "Put[ing] Members First" as one of its core values, elaborating that Peloton "obsess[es] over every touchpoint of our Member experience." (*Id.* ¶¶ 106, 111.) Peloton's website also stated that "the Member experience [is] at the core of everything we do" and "[f]rom product design to manufacturing and from delivery to the entire Member experience — our team continuously evaluates the safety of our products." (*Id.* ¶ 120.)

At a June 8, 2021 industry conference, then-CFO Woodworth stated that Peloton is "always continuously working hard to . . . make our products and make our software and content better and better and better." (*Id.* ¶ 100.)   At an October 21, 2021 industry conference, then-CPO Cortese stated, in response to a question about the Tread+ recall, that Peloton "is energized that we can now take . . . this charge and become" the "far, far ahead runner in everything safety-related . . . for innovation in fitness." (*Id.* ¶ 110.)   At a September 12, 2022 industry conference, CEO McCarthy stated that Peloton's "hardware is significantly better than anybody else's hardware and the content is uniquely different and better than is otherwise available in the marketplace." (*Id.* ¶ 137.)   In a 2022 letter to stockholders, CEO McCarthy stated that Peloton was "beating" its own timeline for "sustained growth and scale" by growing its subscriber base and continuing to have low churn rates. (*Id.* ¶ 143.)   On a February 1, 2023 earnings call, CFO Coddington stated that Peloton did not "expect any significant changes to our current churn levels." (*Id.* ¶ 147.)

In its 2023 regulatory filings, Peloton emphasized that they "continue[d] to work cooperatively with the CPSC to further enhance the safety of our products" following the "separate, voluntary recalls" of Tread and Tread+. (*Id.* ¶¶ 149, 151.)   In Peloton's third quarter 2023 Form 10-Q, Peloton disclosed that it accrued "$8.4 million of estimated contingent loss expense related to a voluntary corrective action plan ("CAP") involving certain seat posts" in the

Bike  (*Id.* ¶ 152.)  Peloton notified the CPSC of the issue.  (*Id.*)  The $8.4 contingent liability

accrual "was based on an amount that was deemed probable and estimable." (*Id.*)  However,

Peloton also noted that it was "reasonably possible that any additional accruals for contingent

losses related to this matter could be material to the financial statements" but Peloton was

"unable to estimate the amount of such additional losses at this time."  (*Id.*)  In the same Form

10-Q, Peloton stated that they "determined that there is a potential product safety issue involving

the seat post in the original model Peloton Bike (not Peloton Bike+) and have voluntarily

notified the CPSC."  (*Id.* ¶ 153.)  As a result, Peloton noted that they may:

> incur incremental expenses or face other challenges in connection
> with the implementation of the CAP beyond what we have currently
> estimated to be probable and reasonably estimable, including if the
> number of reported incidents materially increases, which may
> adversely impact our operating results, brand reputation, demand for
> our products, and business, although we do not currently anticipate
> that the total expenses related to implementation of the CAP will be
> material to our financial position.

(*Id.* ¶ 153.)  On May 11, 2023, Peloton submitted a Form 8-K stating that Peloton announced a

"voluntary recall of original Peloton model Bikes" sold between January of 2018 to May of

2023.  (*Id.* ¶ 156.)

Plaintiffs allege that the statements made by CEO Foley, CFO Woodworth, CEO

McCarthy, CFO Coddington, and CPO Cortese, and Peloton were "materially false and

misleading when made, or omitted to state material facts necessary to make the statements not

misleading because" Defendants actively concealed and failed to disclose that: (i) the seat posts

on Peloton Bikes were prone to break or otherwise detach during use, rendering them unsafe for

users; (ii) Peloton did not remedy the seat post defect or suspend sales of its Bike and, thus,

continued selling Bikes to customers with a recurring safety defect in spite of its recent

experience with the Tread+ recall; (iii) Peloton would need to recall millions of Bikes pending a

comprehensive remedy and, as a direct result, experience a large amount of Subscription churn; and, accordingly, (iv) the risks posed by a design or manufacturing defect were not merely hypothetical and Defendants did not prioritize the safety of Peloton Bike users; (v) Peloton failed to immediately report the seat post safety defect to its regulators, including the CPSC; (vi) there was a company-wide effort to cover up visible signs of rust and/or corrosion on the inner frame of new Bikes before selling them to customers at full price; (vii) the risks posed by a design or manufacturing defect were not merely hypothetical; (viii) understated reserves for future product recall expenses by at least $40 million and the indirect impact a large-scale recall of Bikes would have on its Subscription revenue; and (ix) failed to disclose that the CPSC mandated the Bike recall. (*Id.* ¶¶ 96, 115, 119, 150, 154, 156.) Plaintiffs contend these statements also violated Items 303 and 105 of SEC Regulation S-K, 17 C.F.R. §§ 229.303 and 229.105 by failing to disclose material risks and expenses related to the seat post defects and potential recall of Peloton Bikes.[4] (*Id*. ¶¶ 157–60.)

### d. Peloton recalls Bikes sold between 2018 and 2023

On May 11, 2023, Peloton announced a voluntary recall of all Bikes sold between January of 2018 and May of 2023. (*Id.* ¶ 166.) After announcing news of the recall, Peloton's stock price fell approximately 9.3%. (*Id.* ¶ 170.) "Nevertheless, the financial community remained upbeat that the impact of the [r]ecall would be short-lived based on [Peloton's] misleading estimate that the CAP would cost it $8.4 million." (*Id.* ¶ 171.) "[S]everal outlets pointed out how Peloton's 'voluntary' approach stood in stark contrast to its defiant response to

---

[4] Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, required that Peloton disclose any known trends or uncertainties that had or were reasonably like to have a material impact on net sales. (Am. Compl. ¶ 159.) Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, required that Peloton discuss "the material factors that make [the securities] speculative or risky." (*Id*. ¶ 157.)

the Tread+ safety issue," with one commentator noting that "Peloton may be learning from its past recalls by being more collaborative with the [CPSC]."  (*Id.* ¶ 172.)

However, CEO McCarthy "began to reveal the true extent" of the recall at a May 24, 2023 industry conference, where he "unwittingly admitted that the CPSC 'mandated a recall of the seat posts.'"  (*Id.* ¶ 174.)  CEO McCarthy also shared that Peloton had already received more than 500,000 requests for a replacement seat post, which was more than they were expecting, and he estimated that the seat post replacement cost would total "somewhere in the neighborhood of" $10 million to $20 million.  (*Id.* ¶ 175.)  Peloton's stock price decreased approximately 5.1% over the next three days.  (*Id.* ¶ 176.)  In Peloton's August 23, 2023 quarterly letter to shareholders, Peloton stated that the recall "substantially exceeded" their initial estimate, "leading to an additional accrual of $40 million this quart for actual costs incurred as well as anticipated future recall-related expenses."  (*Id.* ¶ 178.)  The letter stated that Peloton had received approximately 750,000 requests for replacement posts, and that Peloton lost 29,000 subscriptions from the previous quarter and at least an additional 25,000 Peloton users paused their subscription that quarter in comparison to the three previous quarters.  (*Id.* ¶¶ 178–79.)  Prior to the recall news, Peloton's subscriptions consistently grew quarter-over-quarter since going public in 2019.  (*Id.* ¶ 179.)  Including subscription losses, Peloton's churn rate grew from 1.1% in the three preceding quarters to 1.8%.  (*Id.*)  Peloton's stock price fell by 22.6% on August 23, 2023.  (*Id.* ¶ 180.)  Plaintiffs allege that Defendants made a series of misleading statements and failed to disclose material facts related to recurring Bike defects, leading to "the precipitous decline in the market value" of Peloton's stock price from $32.05 on February 16, 2022, the date of the first *Financial Times* article on Project Tinman, to $5.41 on August 23, 2023.  (*Id.* ¶¶ 241–46.)

## II.  Discussion

### a.  Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must construe [the Complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor."  *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)); *see also Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024) (quoting *Matson*, 631 F.3d at 63); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions."  *Iqbal*, 556 U.S. at 678; *Roe*, 91 F.4th at 651 ("Although all factual allegations contained in the complaint are assumed to be true, this rule does not extend 'to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" (quoting *Iqbal*, 556 U.S. at 678)).

> **b.    Plaintiffs fail to plead that Defendants made materially misleading statements or omissions**

Defendants argue that Plaintiffs' claims under the Exchange Act must be dismissed because they failed to plead any materially misleading statements or omissions, and also failed to plead any facts establishing that Defendants acted with fraudulent intent.  (Defs.' Mem. 1.)  First, Defendants contend that Plaintiffs did not allege "any actionable misrepresentation or omission." (*Id*. at 2.)  In support, Defendants claim that Plaintiffs rely on statements that were either (1) "accurate at the time they were made" or (2) "are otherwise inactionable."  (*Id*. at 2.)  Second, Defendants argue "Plaintiffs fail to raise any inference of scienter, let alone the 'strong inference' of fraudulent intent required by the" Private Securities Litigation Reform Act (the "PSLRA").  (*Id*. at 3.)  Defendants assert that (1) "[v]irtually all of the Complaint's scienter allegations consist of generalized allegations about what Defendants purportedly must have known as a collective group, which is prohibited by the PSLRA" and (2) Plaintiffs' claim that Peloton "actively concealed" the seat post issue is "meritless, as not a single fact . . . establishes that Peloton was aware of the need for a recall, or of a significant safety issue requiring disclosure" before May of 2023.  (*Id.*)

Plaintiffs argue that they adequately allege material misrepresentations by Defendants and a strong inference that Defendants acted with scienter.  (Pls.' Opp'n 7, 21.)  In support, Plaintiffs argue first, that they allege Defendants' fraud "with exacting particularity."  (*Id.* at 1.) Second, that they allege facts supporting each Individual Defendant's scienter and that "[s]cienter is imputed to Peloton from the Individual Defendants and" other members of Peloton's senior leadership.  (*Id.* at 21–22.)  Plaintiffs also argue that they have pled a strong inference of scienter based on the allegations that employees performed their duties in a

"consciously wrongful or reckless manner [by painting over rust]."  (*Id.* at 22 (alteration in original).)

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ."  15 U.S.C. § 78j(b); *see also VR Glob. Partners, L.P. v. Petroleos de Venezuela, S.A.*, No. 24-1176, 2024 WL 4891271, at *3 (2d. Cir. Nov. 26, 2024) (same); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021) (same); *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018) (same).  To state a claim for securities fraud under section 10(b) or Rule 10b–5 of the Exchange Act, "a plaintiff must allege that the defendant: (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."[5]  *Nandkumar v. AstraZeneca PLC*, No. 22-2704, 2023 WL 3477164, at *1 (2d Cir. May 16, 2023) (quoting *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 463 (2d Cir. 2019)); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 167 (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015)); *see also Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (same); *Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) (same).  A plaintiff must make a threshold showing that the material misrepresentation was made by the defendant.  *See* 17 C.F.R. § 240.10b–5 ("It shall be unlawful for any person, directly or indirectly . . . [t]o *make any untrue statement* of a material fact or to omit to state a material fact necessary . . . ." (emphasis added)); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) ("Section 10(b) of the

---

[5]  Defendants only allege that Plaintiffs failed to plead an actionable misstatement and failed to plead a strong inference of scienter, (*see generally* Defs.' Mem; Defs.' Reply), and thus the Court does not address the remaining factors.

Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b–5 prohibit *making any material misstatement or omission* in connection with the purchase or sale of any security." (emphasis added)).  In addition, a claim of securities fraud under section 10(b) of the Exchange Act is "subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ('PSLRA') . . . ."  *Wyche v. Adv. Drainage Sys., Inc.*, 710 F. App'x 471, 473 (2d Cir. 2017) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)); *see also Hassan v. Bos. Beer Co.*, No. 23-8, 2023 WL 8110940, at *1 (2d Cir. Nov. 22, 2023) (same) (quoting *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004)); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (same).

Under Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under [the Exchange Act and its regulations] shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . ."  15 U.S.C. § 78t(a); *see also Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) ("To state a claim under § 20(a), a plaintiff must demonstrate . . . a primary violation by the controlled person."); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 429 (S.D.N.Y. 2020) ("In order to establish a prima facie case of liability under § 20(a), a plaintiff must show a primary violation of the Exchange Act.").

### i.    Material misstatements and omissions

Defendants argue that Plaintiffs fail to adequately plead a material misstatement or omission that (1) Peloton's risk disclosures were false or misleading; (2) the loss accrual was false or misleading; (3) the description of the Bike seat post recall as "voluntary" was false or

misleading; (4) certain statements about member safety and product quality were false or misleading; (5) certain statements that Peloton was working "cooperatively" with the CSPC were false or misleading; (6) statements concerning Project Tinman were false or misleading; and (7) statements concerning Peloton's subscriptions were false or misleading. (Defs.' Mem. 10–20.)

Plaintiffs contend that they have adequately pled material misstatements and omissions regarding (1) Defendants' "risk warnings," (Pls.' Opp'n 16–18); (2) loss accrual, (*id.* at 19–21); (3) the "voluntary" nature of the Bike+ recall, (*id.* at 18–19); (4) statements regarding product safety and quality, (*id.* at 8–14); (5) statements denying safety concerns related to Project Tinman, (*id.* at 14–15); and (6) statements regarding churn rates and subscription growth, (*id.* at 15–16).

Claims under section 10(b) of the Exchange Act require "(1) the existence of either a misstatement or an unlawful omission; and (2) materiality." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). "However, because the materiality element presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss . . . ." *Id.* (citation omitted); *see In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 170 ("The materiality of an item of information is a mixed question of law and fact." (citation omitted)).

"A statement is materially misleading when 'the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 151 (2d Cir. 2021) (quoting *Rombach*, 355 F.3d at 172 n.7); *see also Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, No. 21-2698, 2022 WL 17587853, at *3 (2d Cir. Dec. 13, 2022) (noting that the definition of materiality under section 10(b) is "whether the defendants' representations, taken together and in context, would have misled a reasonable investor"); *Singh*, 918 F.3d at 63 (explaining that allegedly misleading

18

statements are "evaluated not only by literal truth, but by context and manner of presentation" (internal quotation marks omitted)). "A statement or omission is material if 'a reasonable investor would have considered it significant in making investment decisions.'" *Altayyar v. Etsy, Inc.*, 731 F. App'x 35, 37 (2d Cir. 2018) (alteration omitted) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161–62 (2d Cir. 2000)); *see also Steamfitters Loc. 449 Pension Plan*, 2022 WL 17587853, at *2 ("A statement or omission is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (alteration in original))); *Singh*, 918 F.3d at 63 ("An alleged misrepresentation is material if 'there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock.'" (quoting *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010))); *see also United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) ("A misstatement in a securities transaction is material so long as there is a substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision." (alteration and internal quotation marks omitted)).

When a company does not have an obligation to speak but does so anyway, it assumes "a duty to be both accurate and complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002); *see also Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 214 n. 15 (2d Cir. 2020) ("[E]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth." (quoting *Meyer v. Jinksolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014))); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366 (explaining that once a corporation makes "a disclosure about a particular

topic, whether voluntary or required, the representation must be complete and accurate" (internal quotation marks omitted)).  "[L]iterally true statements" are actionable if they "create a materially misleading impression . . . ."  *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013).  "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context."  *In re Morgan Stanley Info. Fund Sec. Litig*., 592 F.3d at 366 (internal quotation marks omitted).  Thus, plaintiffs "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud."  *In re Synchrony Fin. Sec. Litig*., 988 F.3d at 171.

### 1.  Peloton's risk disclosures

Defendants argue that Peloton's "risk disclosures issued between May 2021 and November 2022 warning investors of risks relating to product defects and recalls" were "accurate at the time they were made" and that Peloton had "no obligation to speculate about seat post recall risks that had not yet materialized."  (Defs.' Mem. 10–11.)  Defendants argue that Plaintiffs do not allege that any risk related to the Bike seat post had emerged at the time Peloton issued the risk disclosures Plaintiffs challenge.  (*Id.* at 10–12; Defs.' Reply 2–3.)  In addition, Defendants contend that they "cannot be held liable for failing to predict" the Bike recall after issuing the Class Period risk disclosures, and that Peloton did not have a duty to disclose an increased product risk after making the initial disclosure about potential recalls.  (Defs.' Mem. 12.)

Plaintiffs argue that Defendants' risk disclosures misrepresented the known seat post defect.  (Pls.' Opp'n 16–17.)  In support, Plaintiffs argue that Defendants had already regularly

received reports of the seat post issue at the time of the risk disclosures, (*id.*), and that understating a recall risk is material where the safety issue is already known, (*id.*).

Peloton's risk disclosures are not materially misleading because they explicitly warned investors that their products "may be affected from time to time by design and manufacturing defects" that could "adversely affect our business and result in harm to our reputation." (Am. Compl. ¶ 95.) As a general matter, "[w]hen a registration statement warns of the exact risk that later materialized, a [securities fraud] claim will not lie as a matter of law." *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2012) (alteration in original); *see also Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008) ("An accurate statement coupled with the precise disclosure of a risk later realized cannot adequately form the basis for a securities claim."), *aff'd*, 347 F. App'x 617 (2d Cir. 2009). Although Plaintiffs note that Defendants had been informed about some issues with the Bike seat post, (Pls.' Opp'n 17), Plaintiffs do not allege that Peloton knew, at the time of the risk disclosures, that approximately five customer complaints about the Bike seat posts, (Defs.' Mem. 6; Defs.' Reply 2), would later lead to a recall of every Bike Peloton sold between 2018 and 2023. *Cf. In re Chembio Diagnostics, Inc. Sec. Litig.*, 616 F. Supp. 3d 192, 198 (E.D.N.Y. 2022) (holding that plaintiffs had not alleged securities fraud where they only claimed defendants were aware of an increased risk of a future event, not that defendants knew the event "was certain or even likely" to occur); *Okla. L. Enf't Ret. Sys v. Papa John's Int'l, Inc.*, 517 F. Supp. 3d 196, 211 (S.D.N.Y. 2021) (dismissing claims because "[a]n increase in a risk does not mean the risk has already come to pass, such that a[n SEC] disclosure that simply identifies the risk would be misleading" (alteration in original) (quoting *Const. Laborers Pension Tr. v. CBS Corp.*, 433 F. Supp. 3d 515, 537–38 (S.D.N.Y. 2020))). Plaintiffs do not sufficiently allege that the risk disclosures' failure

21

to identify either the seat post issue or predict the Bike recall were materially misleading.  *See Nurlybayev v. ZTO Express (Cayman) Inc.*, No. 17-CV-6130, 2021 WL 1226865, at *7 (S.D.N.Y. Mar. 31, 2021) (concluding that plaintiffs were not "materially misled by the purported warning about events that had already occurred" because the company had not yet experienced any "adverse effects" and thus no risk had materialized); *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 130 (E.D.N.Y. 2020) ("Plaintiffs' failure to plead facts supporting the inference that defendants knew of additional material risks at the time of the [Form] 10-K is an additional reason that the alleged omission is not actionable.").

In addition, because Plaintiffs do not allege that Defendants knew a seat post recall would happen when they made the risk disclosures, Plaintiffs' claims also fail because Defendants cannot be held liable for statements that are only false in hindsight.  "[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."  *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *Diabat v. Credit Suisse Grp. AG*, No. 23-CV-5874, 2024 WL 4252502, at *46 (S.D.N.Y. Sept. 19, 2024) (holding that plaintiff impermissibly pled "fraud by hindsight" where plaintiff failed to allege that defendants were aware of a fact that would eventually transpire at the time of their disclosures, "or that disclosing this fact was necessary to render any statements that were made not misleading"); *In re Shanda Games Ltd. Sec. Litig.*, No. 18-CV-2463, 2019 WL 11027710, at *5 (S.D.N.Y. Sept. 30, 2019) (holding that "fraud-by-hindsight cannot support a 10(b) claim), *adhered to on reconsideration sub nom.*, *In re Shanda Ltd. Sec. Litig.*, No. 18-CV-2463, 2020 WL 5813769 (S.D.N.Y. Sept. 30, 2020).

22

## 2.    Statements about the Bike recall

Defendants argue that their statements about the Bike recall were not material misrepresentations.  First, Defendants argue that Plaintiffs fail to allege facts establishing that the $8.4 million loss accrual was false and misleading because the accrual subsequently increased. (Defs.' Mem. 13.)  In support, they argue that (1) Plaintiffs do not allege the statement about the $8.4 million loss accrual was false or misleading when it was made; (2) Peloton's statements about future losses are protected by the bespeaks caution doctrine; and (3) Peloton's loss estimate is an inactionable opinion.  (*Id.* at 13–15, 28; Defs.' Reply 3–4.)  Second, Defendants argue that their statement that the Bike recall was "voluntary" was not false or misleading because the recall was not mandatory under the CPSA or CPSC regulations.  (Defs.' Mem. 15– 16; Defs.' Reply 4.)  Third, Defendants argue that Plaintiffs do not allege facts establishing that Peloton delayed reporting the seat post issue to the CPSC or otherwise failed to "cooperate" with the CPSC regarding the seat post defect.  (Defs.' Mem. 17–18; Defs.' Reply 4.)

Plaintiffs argue that Defendants made material misrepresentations in their statements regarding the Bike recall.  First, Plaintiffs argue that the loss accrual was not "unexpected to Defendants" because the CPSC announced that individuals should stop using the Bike "immediately" pending a replacement seat post on the same day that Defendants announced they would take an $8.4 million loss accrual.  (Pls.' Opp'n 19–21.)  Second, they argue that Defendants misstated that the Bike CAP was "voluntary," when it was initiated by the CPSC, not Peloton.  (*Id.* at 18–19.)  Third, Plaintiffs argue that Defendants failed to work "cooperatively" with the CPSC by failing to report seat post incidents.  (*Id.* at 18.)

Peloton's statements about the Bike recall were not false or misleading because (1) statements about the loss accrual were forward-looking statements that are not actionable under

the bespeaks-caution doctrine and (2) a reasonable investor would have understood that the Bike recall was "voluntary" rather than "mandatory."

### A. Statements about loss accrual are not actionable under the bespeaks caution doctrine

Peloton's statements about the loss accrual were forward-looking statements that are not actionable under the bespeaks-caution doctrine.

"A forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading . . . . In such circumstances, it cannot be supposed by a reasonable investor that the future is settled, or unattended by contingency." *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010); *see also Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (explaining that a defendant is not liable for a forward-looking statement that "is identified and accompanied by meaningful cautionary language"). A forward-looking statement is also not actionable if it is immaterial or if the plaintiff "fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016) (alteration in original) (quoting *Slayton*, 604 F.3d at 766). "Because '[t]he safe harbor is written in the disjunctive,' a forward-looking statement is protected under the safe harbor if any of the three prongs applies." *Id.* at 245–46 (quoting *Slayton*, 604 F.3d at 766).

The challenged statements in Defendants' SEC filings stated that the $8.4 million loss was an "estimated contingent loss" and that, while that "contingent liability accrual was based on an amount that was deemed probable and estimable," it was also "reasonably possible that any additional accruals for contingent losses related to [the Bike seat post recall] could be material to the financial statements" but Peloton was "unable to estimate the amount of such additional

losses at this time." (Am. Compl. ¶ 152.) In the same SEC filing, Peloton stated that they may

"incur incremental expenses or face other challenges" in connection with implementing the Bike

seat post CAP, including if "the number of reported incidents materially increases, . . . although

we do not currently anticipate that the total expenses related to implementation of the CAP will

be material for our financial position." (*Id.* ¶ 153.) These forward-looking statements about

Peloton's financial position are accompanied by sufficient cautionary language that expenses

related to the recall could increase. *See, e.g.*, *Gluck v. Hecla Mining Co.*, 657 F. Supp. 3d 471,

485 (S.D.N.Y. 2023) (holding that defendants' Form 10-K and 10-Q disclosures were

"sufficiently specific to insulate [d]efendants from liability" where their "warnings, when read

together, caution[ed] investors of the very risks that [p]laintiffs allege ultimately occurred,"

namely, that the "cost of operating" a new aspect of their business "would ultimately be higher

than expected"); *Robeco Cap. Growth Funds SICAV – Robeco Glob. Consumer Trends v.*

*Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 539 (S.D.N.Y. 2023) (finding that Peloton's SEC

risk disclosures were "both specific and realistic about the precise risks [sic] factors faced by

Peloton as a company" and thus shielded Peloton "from liability for their forward-looking

statements"); *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020)

(holding that defendants' forward-looking statements included sufficient cautionary language

where they discussed "company-specific factors that the [c]ompany indicated could cause its

results to be either 'materially better or worse'" than the projections). Even if Defendants'

statements about the loss accrual "falsely represented Defendants' then-*present* loss estimation,"

(Pls.' Opp'n 20), their statements about the loss accrual were accompanied by sufficient

cautionary language, which alone triggers the safe harbor. *See Slayton*, 604 F.3d at 776 ("[A]

defendant is not liable if the forward-looking statement is identified and accompanied by

meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading (emphasis in original) (citing *Southland Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 371–72 (5th Cir. 2004))); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 210 (S.D.N.Y. 2022) ("As long as the plaintiff fails to satisfy one of those elements (*e.g.*, the statement is accompanied by meaningful cautionary language or is immaterial), the presence of one of the other elements (*e.g.*, the statement was known to be false or misleading) will not subject to [sic] the defendant to liability" (quoting *Gray*, 454 F. Supp. 3d at 385–86)).

### B. Statements about the "voluntary" nature of the Bike's recall were not false or misleading

Defendants' statements that the Bike recall was "voluntary," and that Defendants worked cooperatively with the CPSC on the recall were not false or misleading.  Plaintiffs do not allege that the CPSC issued the Bike recall pursuant to the CPSC's authority to order mandatory recalls of products, *see* 16 C.F.R. § 1115.21, only that a reasonable investor would not have understood "voluntary" to mean that the recall was initiated by the CPSC, (Pls.' Opp'n 19).

The CPSC issues compulsory remedial actions "to protect the public from hazards presented by consumer products" by (1) seeking an adjudicated Commission Order "after parties and interested persons have had an opportunity for a hearing"; (2) filing a motion for preliminary injunction in U.S. district court "to restrain the distribution in commerce of a product it has reason to believe presents a substantial product hazard"; (3) filing a complaint in a U.S. district court seeking a judicial termination of a product's imminent hazard; or (4) requesting that the Secretary of the Treasury refuse to admit imports of consumer products that have failed to comply with consumer product safety rules or that contain product defects.  16 C.F.R. § 1115.21(a)–(d).  The CPSC also works with companies on voluntary remedial actions, including

(1) developing corrective action plans "which set[] forth the remedial action which the firm will voluntarily undertake to protect the public, but which has no legally binding effect" or (2) executing consent agreements that include the elements of a corrective action plan but which do have legally binding effect and which are published in the Federal Register.  16 C.F.R. § 1115.20(a)–(b).

Contrary to Plaintiffs' argument, a reasonable investor would have understood the difference between a "mandatory" recall that is legally required by the CPSC, and a "voluntary" recall that a company conducts in consultation with the CPSC.  First, the vast majority of CPSC recalls are voluntary rather than mandatory.  *See, e.g.*, U.S. GOV'T ACCOUNTABILITY OFF., GAO-21-56, Consumer Product Safety Commission: Actions Needed to Improve Processes for Addressing Product Defect Cases 15 (2021) (finding that between 2016 and 2019, CPSC's investigations resulted in 131 voluntary corrective actions, while it had only brought six administrative actions for mandatory recall since 2010).  Investors are presumed to be aware of such industry practices.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) ("[T]he investor takes into account the customs and practices of the relevant industry."); *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020) ("In assessing what a reasonable investor would expect, the Supreme Court stressed the importance of context, such as 'the customs and practices of the relevant industry . . . .'" (quoting *Omnicare*, 575 U.S. at 190)).  CEO McCarthy's statement at an industry conference that the CPSC "mandated a recall of the seat posts," (Am. Compl. ¶ 174), was an "off-the-cuff judgment[] . . . that an individual might communicate in daily life," rather than a formal statement communicated to investors in an SEC filing.  *Omnicare*, 575 U.S. at 190.  Second, Defendants' description of the recall as "voluntary" aligns with the "ordinary meaning" of the word voluntary

in this context, which is that the CPSC did not require Peloton to recall the Bike pursuant to any legal authority. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 130 (S.D.N.Y. 2020) (finding that defendants' statements were not false and misleading when given their "ordinary meaning").

In addition, Defendants' statements that they worked cooperatively with the CPSC on the seat post recall are not false and misleading. Plaintiffs do not contest that Defendants voluntarily notified the CPSC of the seat post issue or that they worked with the CPSC on the voluntary corrective action plan for remedying the seat post defect. (Pls.' Opp'n 18.) They do not allege any facts rendering Defendants' statements about their cooperation with the CPSC on the seat post recall false or misleading.

### 3. Statements about Peloton's corporate values, product safety, and quality

Defendants argue that Plaintiffs fail to allege that their statements regarding Peloton's corporate values, product safety, and product quality were false or misleading. First, Defendants argue that Plaintiffs do not allege any facts showing that user "safety, product quality, and product experience were not Peloton priorities." (Defs.' Mem. 17; Defs.' Reply 5–6.) Second, Defendants argue that Plaintiffs do not allege any facts suggesting that the internal rust on the Bike was anything but "cosmetic" or that the rust affected the Bike's performance or quality. (Defs.' Mem. 18–19; Defs.' Reply 6.) Third, Defendants argue that their statements about Peloton's churn and goal of prioritizing subscription growth are inactionable because they are "general declarations" of aspirational goals or opinions, or protected by the PSLRA's safe harbor provision or the bespeaks caution doctrine. (Defs.' Mem. 19–20; Defs.' Reply 6–7.)

Plaintiffs argue that Defendants misrepresented Peloton's commitment to customer safety and their products' quality and performance. First, Plaintiffs argue that Defendants "falsely

assur[ed] investors that safety was their priority" while knowingly failing to disclose the seat

post defect. (Pls.' Opp'n. 8–13.)  In addition, Plaintiffs argue that Defendants' statements that

their products were the "best" incurred a duty to tell the "whole truth," which Defendants failed

to do by concealing the seat post defect.  (*Id.* at 13–14.)  Second, Plaintiffs argue that

Defendants' statement that the internal rust was a "cosmetic issue" was false and that "numerous

seats which detached showed visible corrosion at the site of the break."  (*Id.* at 14.)  They

contend that the Court may infer, at the pleadings stage, a connection between rust-covered seat

posts and ongoing reports of seat posts detaching while in use.  (*Id.*)  Third, Plaintiffs argue that

Defendants' statements about churn rates and subscription growth were false and misleading

because, at the time the Individual Defendants made the challenged statements, they knew that a

large-scale Bike recall was likely.  (*Id.* at 15–16.)

### A.  Statements about the Bike's quality are inactionable as corporate puffery

Peloton's statements about its corporate values and product safety and quality are not

materially misleading.  Peloton's statements about its products being the "best" on the market,

(Pls.' Opp'n 13–14), "obsess[ing] over every touchpoint of [our] member experience," (Am.

Compl. ¶ 39), and putting "Members First," (*id.*), are inactionable "general promotional language

about a product or company, statements of a company's integrity, and positive forward-looking

statements."  *Steamfitters Loc. 449 Pension Plan*, 2022 WL 17587853, at *2.  These "[g]eneric,

indefinite statements of corporate optimism typically are not actionable because reasonable

investors do not place substantial reliance on generalizations regarding a company's health or the

strength of a company's product."  *Id.* (quoting *Abramson v. Newlink Genetics Corp.*, 965 F.3d

165, 173 (2d Cir. 2020) (internal quotation marks omitted)).  Peloton's statements about its

corporate values are mere corporate puffery, which do "not give rise to securities violations"

because they are "too general to cause a reasonable investor to rely upon them." *ECA, Loc. 134 IBEW Joint Pension Tr.*, 533 F.3d at 206; *see also Steamfitters Loc. 449 Pension Plan*, 2022 WL 17587853, at *2 (affirming a district court's conclusion that statements about the integrity of the company's employees, commitments to ethical behavior, and the company's code of conduct are "plainly too generic to have been consequential"); *Diabat*, 2024 WL 4252502, at *29 (holding that statements that "touch on [a c]ompany's beliefs and expectations" are "classic examples of puffery" (quoting *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 597 (S.D.N.Y. 2010))); *In re CarLotz, Inc. Sec. Litig.*, No. 21-CV-5906, 2024 WL 1348749, at *11 (S.D.N.Y. Mar. 29, 2024) (holding that a company's description of its business model as having "best-in-class unit economics" was corporate puffery). Peloton's statements about its churn rates and subscription growth are also inactionable as corporate puffery. *See, e.g.*, *Meyer v. Organogenesis Holdings Inc.*, 727 F. Supp. 3d 368, 393–94 (holding that statements about a company's "strong execution of our growth and profitability strategy" and ability to "manage through the near-term operating environment challenges and achieve strong, long-term growth" are inactionable puffery).

### B.  Statements about Project Tinman are insufficiently alleged to be connected to Bike safety or quality issues

Plaintiffs fail to allege any facts that the internal rust on the Bike that prompted Peloton executives to launch Project Tinman are related to any issues with the Bike's safety or performance. Plaintiffs do not allege that Defendants' statement that the rust had "no impact on [the B]ike's performance, quality, durability, reliability, or the overall [m]ember experience" was false. (Am. Compl. ¶ 127.) Plaintiffs' argument that the Court should "infer at the pleadings stage that a reasonable investor" would draw a "highly plausible connection" between the rusted Bikes and the seat post issue, (Pls.' Opp'n 14), is unavailing without specific allegations that any

statements Defendants made about Project Tinman were false or contributed to customer issues with the seat post.[6]  Mere assertions that Project Tinman was "a conscious attempt to *hide* the rust and pass them off to customers at full price," (*id.* ¶ 201), are insufficient for the Court to find that Defendants' statements about the rust were false or misleading.  *See Rombach*, 355 F.3d at 174 (explaining that plaintiffs pleading securities fraud "must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so"); *Meyer*, 727 F. Supp. 3d at 393 (dismissing claims where plaintiffs did not allege defendants' actionable statements were objectively false or misleading).

### ii.   Duty to disclose

Defendants argue that Plaintiffs do not allege facts establishing a violation of Items 303 and 105 of Regulation S-K.  (Defs.' Mem. 20–21.)  In support, they argue that (1) Plaintiffs fail to plead that Defendants knew of material risk or uncertainty prior to May of 2023 and fail to articulate when a duty to disclose arose under Items 105 or 303 and (2) Defendants "satisfied any disclosure obligations under Items 105 and 303 by disclosing the risk of product defects and related recalls in its risk disclosure statements."  (*Id.* at 21.)

Plaintiffs contend that Defendants violated their disclosure duties under Item 303 by failing to disclose "the known uncertainties associated with the seat post defects" and how a potential recall of the Bike could impact Peloton's financial condition.  (Am. Compl. ¶ 160.)  In addition, Plaintiffs assert that Defendants violated their disclosure duties under Item 105 by "failing to disclose the material risk that the [c]ompany's touted safety efforts and priorities were

---

[6]  Because Plaintiffs insufficiently allege any connection between the internal rust issue, Project Tinman, and the Bike's safety and quality, Plaintiffs' other arguments about Project Tinman's implications for the Bike's safety and quality also fail to support an inference of scienter.  (Defs.' Mem. 26–28.)

not being fulfilled and that the seat posts [sic] defects could result in an impending recall of

millions of Peloton Bikes" leading to "substantial product recall expenses and the loss of a large

amount of subscriptions" as well as "reputational harm and negative publicity." (*Id.* ¶¶ 158–59.)

Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303, requires that Peloton's SEC Form

10–K "[d]escribe any known trends or uncertainties that have had or that the registrant

reasonably expects will have a material favorable or unfavorable impact on net sales or revenues

or income from continuing operations." *In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 387 (2d

Cir. 2021) (alteration in original) (quoting 17 C.F.R. § 229.303(a)(3)(ii)); *Ind. Pub. Ret. Sys. v.

SAIC, Inc*., 818 F.3d 85, 94 (2d Cir. 2016) (same). According to the SEC's interpretive release

regarding Item 303, "disclosure [under Item 303] is necessary 'where a trend, demand,

commitment, event or uncertainty is both presently known to management and reasonably likely

to have material effects on the registrant's financial conditions or results of operations.'" *Ind.

Pub. Ret. Sys.*, 818 F.3d 85, 94 (alteration in original) (quoting *Stratte–McClure*, 776 F.3d at

101).

Likewise, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, "requires a disclosure

of the 'most significant risk factors' associated with the security." *Rubinstein v. Credit Suisse

Grp. AG*, 457 F. Supp. 3d 289, 300 (S.D.N.Y. 2020) (quoting 17 C.F.R. § 229.105). To state a

claim under Item 105, an issuer must know, at the time of the filing, about an undisclosed risk

factor that could seriously affect its present or future business. *See id.*

Plaintiffs have not stated a claim that Defendants violated their disclosure duties under

Items 303 or 105 because Defendants disclosed the risk of design and manufacturing defects and

recalls that "could incur significant costs and regulatory fines" throughout the Class Period.

(Am. Compl. ¶ 95, 108, 118, 125, 131, 135, 145.) Defendants therefore disclosed the exact risk

of a potential recall that Plaintiffs allege Defendants did not disclose.  *See In re Philip Morris Int'l Inc. Sec. Litig.*, No. 18-CV-8049, 2020 WL 5632901, at *5 (S.D.N.Y. Sept. 21, 2020) (holding that there were no Regulation S-K violations where the challenged risk was exactly what defendant disclosed).

### c.    Plaintiffs did not sufficiently allege scienter under section 10(b) of the Exchange Act

Defendants argue that Plaintiffs fail to allege a strong inference of scienter as required by Section 10(b) of the Exchange Act.  (Defs.' Mem. 21–30.)  First, Defendants contend Plaintiffs fail to allege conscious misbehavior or recklessness.  (*Id.* at 22–29.)  In support, Defendants argue that Plaintiffs (1) rely on impermissible group pleading, (*id.* at 22–23); (2) fail to allege scienter based on customer complaints, (*id.* at 23–25); and (3) fail to allege scienter based on any other facts, including that Defendants were aware of the possibility of recalls because of the Tread+ recall and other companies' stationary bikes recalls, (*id.* at 25–29).  Second, Defendants argue that Plaintiffs fail to allege motive or opportunity to commit fraud.  (*Id.* at 29–30.)  Third, Defendants argue that because Plaintiffs fail to plead scienter with respect to any Individual Defendant, their scienter allegations against Peloton necessarily fail.  (*Id.* at 30.)

Plaintiffs argue that they adequately plead scienter.  First, they argue that the in the Amended Complaint they "allege[] facts supporting each Defendant's scienter, even if certain facts support the scienter of more than one Defendant."  (Pls.' Opp'n 21.)  Second, they argue that the Individual Defendants had knowledge of the seat post defect, as supported by the internal reports about the defect, the content of their public statements and disclosures, and the Project Tinman "coverup."  (*Id.* at 22–28.)  In the alternative, Plaintiffs argue that if Defendants did not know about the seat post defect, they recklessly "failed to check information they had a duty to monitor."  (*Id.* at 25.)  Third, Plaintiffs argue that Defendants were motivated to conceal the seat

post defect because of the Tread+ recall and their personal financial investments in Peloton.  (*Id.* at 28–29.)

When bringing a claim under Section 10(b), a plaintiff must plead facts to support a finding of scienter.  *See* 15 U.S.C. § 78u–4(b)(2)(A); *Singh*, 918 F.3d at 62.  To survive a Rule 12(b)(6) motion under the PSLRA, a plaintiff must plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 188 (1976)); *ECA, Loc. 134 IBEW Joint Pension Tr.*, 553 F.3d at 198 (same).  When the defendant is a corporate entity, the pleaded facts must create "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc*., 531 F.3d 190, 195 (2d Cir. 2008)).

"Scienter may be established by alleging facts '(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 48 (2d Cir. 2023) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007)); *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021) ("To establish scienter, 'a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud.'" (quoting *Rombach*, 355 F.3d at 176)).  When a plaintiff seeks to establish scienter through evidence of recklessness, she may do so "through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the

34

standards of ordinary care." *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) (quoting *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012)); *see also City of Pontiac*, 752 F.3d at 184 (noting that, in this context, recklessness is defined as "a state of mind 'approximating actual intent,' which can be established by 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" (quoting *Novak*, 216 F.3d at 308, 312)). Circumstances comprising evidence of recklessness include allegations that a defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Emps.' Ret. Sys. of Gov. of the V.I.*, 794 F.3d at 306 (quoting *ECA, Loc. 134 IBEW Joint Pension Tr.*, 553 F.3d at 199). Scienter "based on conscious misbehavior . . . requires a showing of deliberate illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." *New England Carpenters*, 122 F.4th at 49 (quoting *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012)). When assessing whether scienter has been adequately pled, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc.*, 551 U.S. at 322. Thus, "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23.

### i. Plaintiffs do not sufficiently allege scienter based on misbehavior or recklessness

Plaintiffs do not adequately allege scienter based on (1) customer complaints about the Bike's seat post or (2) unrelated recalls of the Tread+ and other stationary bikes.

Plaintiffs do not allege how Defendants' knowledge of reports of approximately thirty-five seat post issues over multiple years, out of 2.2 million Bikes sold, (Am. Compl. ¶ 166), would have made any of the challenged statements or disclosures false or misleading. Even assuming Plaintiffs are correct that Defendants knew about those complaints, they do not support Plaintiffs' argument that those reports would lead to a recall of every Bike Peloton sold between 2018 and 2023. *Ret. Bd. of Policemen's Annuity and Benefit Fund ex rel. Policemen's Annuity & Benefit Fund v. FXCM Inc.*, 333 F. Supp. 3d 338, 351 (S.D.N.Y. 2018) (dismissing claims for lack of scienter where defendant was aware of the possible consequences of a risk, but did not perceive it "as a serious possibility at the time" defendant made disclosures), *aff'd*, 767 F. App'x 139 (2d Cir. 2019); *Ret. Bd. of Policemen's Annuity and Benefit Fund*, 333 F. Supp. 3d at 351 (concluding defendant "did not act with scienter when making statements about the" company's business risks because he "did not perceive a credible risk").[7]

In addition, Plaintiffs' argument that Defendants were on notice of the likelihood and extent of a Bike recall because of the Tread+ recall, the CPSC settlement, and nine voluntary recalls of other companies' stationary bicycles since 1981 do not support an inference of scienter. (Def.'s Mem. 25–29; Am. Compl. ¶¶ 206–09.) Unrelated settlements and investigations or recalls by other companies do not support an inference of scienter. *KBC Asset Mgmt. NV v. MetLife, Inc.*, No. 21-291, 2022 WL 480213, at *2 (2d Cir. Feb. 17, 2022)

---

[7] Plaintiffs' other scienter allegations largely fail because they depend on Plaintiffs' allegation that Defendants knew of or recklessly disregarded the seat post defect. For example, Plaintiffs assert that Defendants were legally required to review and inform the CPSC about any Bike defects, and that the CW statements, CEO Foley and CFO Woodworth's "hands-on" management style, and the "core operations doctrine" all establish Defendants' knowledge of the seat post issue. (Am. Compl. ¶¶ 187–93, 195, 232–33, 235–36; Defs.' Mem. 25–26, 28–29; Defs.' Reply. 10–11.) However, the Court concludes that even assuming Defendants knew of the seat post issues, Plaintiffs have not adequately alleged scienter.

(concluding that defendant's previous settlement concerning a separate issue did not support an inference of scienter); *Diabat*, 2024 WL 4252502, at *159 (holding that an SEC investigation into a separate entity could not support an inference of scienter to another company).  In addition, Plaintiffs' argument that because Defendants previously recalled the Tread+, they were "intimately familiar with the likelihood and expenses of a recall," (Pls.' Opp'n 25), is insufficient to support an inference of scienter.  *See Diabat*, 2024 WL 4252502, at *164 (refusing to assume that because a defendant failed to identify issues in earlier audits, they would also fail to catch issues in subsequent audits).

### ii.    Plaintiffs do not sufficiently allege Defendants' motive or opportunity to commit fraud

Plaintiffs also do not sufficiently allege that Defendants had a motive and opportunity to fraudulently conceal the seat post defect.  First, Plaintiffs' argument that Defendants' concern about safety and compliance after the Tread+ recall to avoid another costly recall are not sufficient to support scienter.  *See S. Cherry St., LLC v. Hennessee Grp.*, 573 F.3d 98, 109 (2d Cir. 2009) (holding that a desire to "sustain the appearance of corporate profitability" was insufficient to establish scienter); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 582 (S.D.N.Y. 2014) (holding that "[a]llegations as to the importance of quality and quality control are merely allegations of what could theoretically motivate a company" and not an indicator of scienter); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 242 ("The desire to maintain the profitability of the investment and to avoid governmental and regulatory scrutiny are neither concrete nor personal to the defendants and are common to all corporate officers.").  Second, Defendants' stock sales and pledges during the Class Period do not raise a strong inference of scienter.  Plaintiffs only allege that former CEO Foley, former CPO Cortese, and CFO Coddington had personal financial motives related to Peloton's stock.  (Am. Compl. ¶¶ 221–31.)

Plaintiffs do not allege that former CEO Foley or former CPO Cortese sold Peloton stock during the Class Period, which undermines Plaintiffs' argument about Defendants' motives. *Meyer*, 727 F. Supp. 3d at 395 (holding plaintiffs did not sufficiently allege scienter where plaintiffs did not allege any executives sold any shares in the company during the class period); *Russo v. Bruce*, 777 F. Supp. 2d 505, 518 (S.D.N.Y. 2011) (holding that defendants, who were "well-placed to take advantage of the fraud they allegedly committed," but nevertheless "did not engage in any stock sales during the class period fatally undermines [plaintiff's] motive allegations . . . ."). Plaintiffs allege that former CPO Cortese and former CEO Foley pledged Peloton stock as collateral for personal loans, (Am. Compl. ¶¶ 221–28), which is insufficient to establish scienter. *See Johnson v. NYFIX, Inc.*, 399 F. Sup. 2d 105, 114 (D. Conn. 2005) (holding that an executive's pledge of company stock for a personal loan is insufficient to establish motive because "loans secured with stock are analogous to stock ownership"). In addition, although Plaintiffs allege that CFO Coddington entered into her 10b5-1 plan during the Class Period, they do not adequately allege that CFO Coddington did so "to take advantage of an inflated stock price." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355–56 n.4 (2d Cir. 2022) (holding plaintiffs did not "sufficiently allege[] that the purpose of the [10b5–1] plan was to take advantage of an inflated stock price" so plaintiffs did not "allege facts indicating that the plan was not 'given or entered into in good faith' or was 'part of a plan or scheme to evade the prohibitions' of the regulations." (first quoting *Emps.' Ret. Sys. of Gov't of the V.I.*, 794 F.3d at 309, then quoting 17 C.F.R. § 240.10b5–1(c)(1)(ii)); *Meyer*, 727 F. Supp. 3d at 395 (holding that plaintiffs had not alleged scienter because they failed to allege that the purpose of defendant's

10b5–1 plan was to take advantage of an inflated stock price) (citing *Emps.' Ret. Sys.*, 794 F.3d at 309).

Accordingly, Plaintiffs have not adequately pled scienter with respect to any Individual Defendant.

### d.  Plaintiffs do not sufficiently allege control-person claims

Defendants argue that because Plaintiffs have failed to plead a primary violation of Section 10(b), the control claim under Section 20(a) against the Individual Defendants must be dismissed.  (Defs.' Mem. 30.)   Defendants also argue that the Section 20(a) claim should be dismissed for the independent reason that Plaintiffs did not allege facts showing that any of the Individual Defendants culpably participated in the alleged fraud.  (*Id.*)

Plaintiffs allege that the Individual Defendants are liable under Section 20(a) of the Exchange Act for Peloton's Section 10(b) violations.  (Am. Compl. ¶ 275.)  Plaintiffs argue that "[b]y virtue of their positions of control and authority as senior officers and/or directors" of Peloton, the Individual Defendants "had the power to influence and control, and did influence and control, directly or indirectly . . . the contents of public statements during the Class Period" that artificially inflated the market price of Peloton securities.  (*Id.* ¶¶ 274–75.)

To state a claim under Sections 20(a), a plaintiff must show: (1) "a primary violation by the controlled person"; (2) "control of the primary violator by the defendant"; and (3) "that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *In re Shanda Games Ltd. Sec. Litig.*, --- F.4th ---, 2025 WL 365767, at *19 (2d Cir. Feb. 3, 2025) (quoting *ATSI*, 493 F.3d at 108); *In re Bernard L. Madoff Inv. Sec. LLC*, 818 F. App'x 48, 55 (2d Cir. 2020) (quoting same); *see also ECA, Loc. 134 IBEW Joint Pension Tr.*, 553 F.3d at 207 ("In order to establish a prima facie case of controlling-person liability [under sections

20(a)], a plaintiff must show a primary violation by the controlled person." (quoting *SEC v. First Jersey Sec., Inc*., 101 F.3d 1450, 1472 (2d Cir. 1996))); *Hawes v. Argo Blockhain PLC*, No. 23-CV-7305, 2024 WL 4451967, at *20 (S.D.N.Y. Oct. 9, 2024) ("To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the control person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.") (quoting *ATSI*, 493 F.3d at 108)).

As discussed above, Plaintiffs have not pled a primary violation of Section 10(b) and have failed to establish a strong inference of scienter as to the Individual Defendants. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's control claims. *See Teamsters Loc. 445 Freight Div. Pension Fund*, 531 F.3d at 195 ("When the defendant is a corporate entity," plaintiff must plead facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter. In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant."); *Meyer*, 727 F. Supp. 3d at 398 (dismissing claims against a corporation where plaintiffs failed to plead scienter as to any individual defendant).

### III.  Conclusion

For the foregoing reasons, the Court grants Defendants' motion to dismiss the Amended Complaint. The Court grants Plaintiffs leave to file a second amended complaint.[8] Any second

---

[8]  Although neither party addressed leave to amend the Amended Complaint in the event of dismissal, leave to amend should be "freely give[n] . . . when justice so requires." *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28 (2d Cir. 2016) (quoting Fed. R. Civ. P. 15(a)(2)); *see also Norman v. Experian Info. Sols., Inc.*, No. 23-CV-9245, 2024 WL 3890103, at *1 (S.D.N.Y. Aug. 20, 2024) ("In this Circuit, '[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead.'" (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d

amended complaint must be filed within thirty days from the filing of this Memorandum and

Order.  If a second amended complaint is not timely filed, the Court will direct the Clerk of

Court to enter judgment and close this case.

Dated: February 14, 2025
        Brooklyn, New York

                                        SO ORDERED:


                                        _____s/ MKB_____
                                        MARGO K. BRODIE
                                        United States District Judge

---

42, 48 (2d Cir. 1991))).  Leave to amend may be denied for good reason, including "instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party."  *Ladas*, 824 F.3d at 28 (quoting *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008)).  In addition, "it is within the sound discretion of the district court to grant or deny leave to amend . . . ."  *Broidy Cap. Mgmt. v. Benomar*, 944 F.3d 436, 447 (2d Cir. 2019).  Because leave to amend should be freely given under Rule 15 of the Federal Rules of Civil Procedure, the Court grants Plaintiffs leave to amend their Complaint a second time.