**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JIA TIAN and DAVID FEIGELMAN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PELOTON INTERACTIVE, INC., JOHN FOLEY, BARRY MCCARTHY, JILL WOODWORTH, ELIZABETH F. CODDINGTON, THOMAS CORTESE and TAMMY ALBARRÁN,<br><br>Defendants. | Case No. 1:23-cv-04279-MKB-JRC |

**PLAINTIFFS' MEMORANDUM OF LAW**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**
**PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

Dated: June 30, 2025

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (SH-1887)
Gregory M. Potrepka (GP-5999)
Morgan M. Embleton
Amanda D. Foley
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
memblemton@zlk.com
afoley@zlk.com

*Counsel for Co-Lead Plaintiff Jia Tian and Co-Lead Counsel for the Class*

**POMERANTZ LLP**
Jeremy A. Lieberman
Emma Gilmore
Justin D. D'Aloia
Villi Shteyn
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com
jdaloia@pomlaw.com
vshteyn@pomlaw.com

*Counsel for Co-Lead Plaintiff David Feigelman and Additional Named Plaintiff Sam Solomon and Co-Lead Counsel for the Class*

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ................................................................................................. 1

II.  BACKGROUND .................................................................................................................... 3

    A.   Peloton's Tread+ Scandal Spurs Investor Concern About CFP Safety, Brand Reputation, and Cooperation with Regulators ................................................................ 3

    B.   Defendants Knew that Products Were Not Built to Specifications ..................................... 4

    C.   Defendants Actively Conceal a Dangerous Defect with the Bike Seat Post ........................ 5

    D.   Executives Devise "Project Tinman" to Cover Up Bikes with Internal Rust ....................... 7

    E.   The Truth Is Revealed in a Series of Partial Disclosures ................................................... 8

III. PROCEDURAL HISTORY ................................................................................................... 9

IV.  ARGUMENT ....................................................................................................................... 9

    A.   The Amended Complaint Alleges Material Misstatements ................................................ 9

        1.   Material Misrepresentations Regarding the Bike's Safety ....................................... 9

        2.   Misrepresentations Regarding Product Quality ..................................................... 12

        3.   Defendants' Risk Warnings Were Misleading and Offer No Protection ................ 15

        4.   Material Misrepresentations on Churn Rates and Subscription Growth ................. 18

        5.   Materially False and Misleading Loss Accruals ..................................................... 20

    B.   The Amended Complaint Alleges a Strong Inference of Scienter .................................. 22

        1.   Defendants' Knowledge and Recklessness ............................................................. 22

        2.   Corporate Scienter .................................................................................................. 28

        3.   Motive and Opportunity to Commit Fraud ............................................................. 29

        4.   Plaintiffs' Theory of Scienter is More Compelling than Defendants' ................... 30

V.   CONCLUSION ................................................................................................................... 30

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*Akerman v. Arotech Corp.*,
  608 F. Supp. 2d 372 (E.D.N.Y. 2009) ................................................................ 22

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
  19 F.4th 145 (2d Cir. 2021) .............................................................................. 9

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ............................................................................. 30

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  56 F. Supp. 3d 549 (S.D.N.Y. 2014) ................................................................ 29

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ............................................................................. 11

*City of Providence v. Aeropostale, Inc.*,
  2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) ................................................. 25

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
  70 F.4th 668 (3d Cir. 2023) ............................................................................. 21

*Cozzarelli v. Inspire Pharms., Inc.*,
  549 F.3d 618 (4th Cir. 2008) ........................................................................... 27

*Diabat v. Credit Suisse Grp. AG*,
  2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024) ................................................ 28

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
  794 F.3d 297 (2d. Cir. 2015) ..................................................................... 26, 30

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017) ......................................................... 22, 27

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) .............................................................. 21

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282 (S.D.N.Y. 2018) ................................................... 20, 23, 25

*Gauquie v. Albany Molecular Rsch., Inc.*,
  2016 WL 4007591 (E.D.N.Y. July 26, 2016) .................................................. 27

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) .............................................................. 24

*Godinez v. Alere Inc.*,
  272 F. Supp. 3d 201 (D. Mass. 2017) ................................................................ 21

*Helo v. Sema4 Holdings Corp.*,
  2025 WL 1733387 (D. Conn. June 23, 2025) ........................................................ 23

*Howard v. Arconic Inc.*,
  2021 WL 2561895 (W.D. Pa. June 23, 2021) .............................................. passim

*In re Allergan PLS Secs. Litig.*,
  2019 WL 4686445 (S.D.N.Y. Sept. 20, 2019) ...................................................... 17

*In re Am. Express Co. Sec. Litig.*,
  2008 WL 4501928 (S.D.N.Y. Sept. 26, 2008) ...................................................... 24

*In re Aphria, Inc. Sec. Litig.*,
  2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020) ................................................ 10, 14

*In re Arqit Quantum Inc. Sec. Litig.*,
  2025 WL 977995 (E.D.N.Y. Mar. 28, 2025) ......................................... 13, 14, 15, 23

*In re Axsome Therapeutics, Inc. Sec. Litig.*,
  2025 WL 965265 (S.D.N.Y. Mar. 31, 2025) .......................................................... 24

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017) .................................................................... 11

*In re Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008) .................................................................. 20

*In re CarLotz, Inc. Sec. Litig.*,
  2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) .................................................. 25, 27

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) ........................................................ 24

*In re Citigroup Sec. Litig.*,
  2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ...................................................... 18

*In re Dentsply Sirona, Inc. Sec. Litig.*,
  665 F. Supp. 3d 255 (E.D.N.Y. 2023) ........................................... 11, 20, 24, 26

*In Re Didi Global Inc. Sec. Litig.*,
  2024 WL 1119483 (S.D.N.Y. Mar. 14, 2024) ...................................................... 26

*In re Emergent BioSolutions Inc. Sec. Litig.*,
  2023 WL 5671608 (D. Md. Sept. 1, 2023) ............................................................ 23

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012) ........................................................................ 12

*In re Gentiva Sec. Litig.*,
  971 F. Supp. 2d 305 (E.D.N.Y. 2013) ........................................................................ 30

*In re Henry Schein, Inc. Sec. Litig.*,
  2019 WL 8638851 (E.D.N.Y. Sept. 27, 2019) .......................................................... 11

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ............................................................. 25

*In re IMAX Sec. Litig.*,
  587 F. Supp. 2d 471 (S.D.N.Y. 2008) ....................................................................... 28

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014) ......................................................................... 30

*In re NovaGold Res. Inc. Sec. Litig.*,
  629 F. Supp. 2d 272 (S.D.N.Y. 2009) ....................................................................... 21

*In re Pall Corp.*,
  2009 WL 3111777 (E.D.N.Y. Sept. 21, 2009) .......................................................... 14

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015) ....................................................................... 11

*In re ProShares Trust Sec. Litig.*,
  728 F.3d 96 (2d. Cir. 2013) ....................................................................................... 17

*In re Rsrv. Fund Sec. & Derivative Litig.*,
  732 F. Supp. 2d 310 (S.D.N.Y. 2010) ....................................................................... 29

*In Re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ........................................................................................ 30

*In re SelectQuote, Inc. Sec. Litig.*,
  2025 WL 1001247 (S.D.N.Y. Apr. 3, 2025) ............................................................. 25

*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021) ...................................................................................... 13

*In re Teladoc Health, Inc. Sec. Litig.*,
  2025 WL 886934 (S.D.N.Y. Mar. 21, 2025) ............................................................. 29

*In re Tenaris S.A. Sec. Litig.*,
  493 F. Supp. 3d 143 (E.D.N.Y. 2020) ....................................................................... 18

iv

*In re Virtu Fin., Inc. Sec. Litig.,*
   770 F. Supp. 3d 482 (E.D.N.Y. 2025) ............................................................... 11, 17

*In re Vroom, Inc. Sec. Litig.,*
   2025 WL 862125 (S.D.N.Y. Mar. 18, 2025) ........................................................... 25

*In re WorldCom, Inc. Sec. Litig.,*
   294 F. Supp. 2d 392 (S.D.N.Y. 2003) ................................................................... 29

*Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.,*
   620 F.3d 137 (2d Cir. 2010) ............................................................................. 21

*Jackson v. Abernathy,*
   960 F.3d 94 (2d Cir. 2020) ............................................................................... 29

*Karimi v. Deutsche Bank Aktiengesellschaft,*
   607 F. Supp. 3d 381 (S.D.N.Y. 2022) ............................................................... 24, 28

*KBC Asset Mgmt. NV v. DXC Tech. Co.,*
   19 F.4th 601 (4th Cir. 2021) ............................................................................. 30

*Kusnier v. Virgin Galactic Holdings, Inc.,*
   639 F. Supp. 3d 350 (E.D.N.Y. 2022) ................................................................... 9

*Lematta v. Casper Sleep, Inc.,*
   2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) ................................................. passim

*Lloyd v. CVB Fin. Corp.,*
   811 F.3d 1200 (9th Cir. 2016) ............................................................................ 24

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
   797 F.3d 160 (2d Cir. 2015) ................................................................................ 9

*Meyer v. Concordia Int'l Corp.,*
   2017 WL 4083603 (S.D.N.Y. July 28, 2017) ........................................................ 29

*Meyer v. JinkoSolar Holdings Co., Ltd.,*
   761 F.3d 245 (2d. Cir. 2014) ............................................................................. 16

*Meyer v. Organogenesis Holdings Inc.,*
   727 F. Supp. 3d 368 (E.D.N.Y. 2024) ................................................................. 19

*New England Carpenters Guar. Annuity & Pension Funds v. DeCarlo,*
   80 F.4th 158 (2d Cir. 2023) ........................................................................... 20, 22

*Noto v. 22nd Century Grp., Inc.,*
   35 F.4th 95 (2d. Cir. 2022) ............................................................................... 17

*Novak v. Kasaks*,
   216 F.3d 300 (2nd Cir. 2000) .......................................................................... 26, 27

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008) ................................................................... 17

*Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*,
   2023 WL 5115707 (S.D.N.Y. July 5, 2023) ............................................................ 11

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ................................................................................ 13

*Russo v. Bruce*,
   777 F. Supp. 2d 505 (S.D.N.Y. 2011) ................................................................... 27

*Salzman v. ImmunityBio, Inc.*,
   753 F. Supp. 3d 1050 (S.D. Cal. 2024) ................................................................. 17

*Setzer v. Omega Healthcare Invs., Inc.*,
   968 F.3d 204 (2d Cir. 2020) ................................................................................ 28

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
   2024 WL 456745 (S.D.N.Y. Feb. 5, 2024) ......................................................... 16, 25

*Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*,
   2022 WL 17587853 (2d Cir. Dec. 13, 2022) ........................................................... 11

*Steamfitters Local 449 Pension Fund v. Alter*,
   2011 WL 4528385 (E.D. Pa. Sept. 30, 2011) ..................................................... 20, 21

*TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*,
   2025 WL 416872 (E.D.N.Y. Feb. 6, 2025) ....................................................... passim

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ............................................................................... 22, 29, 30

*Valentini v. Citigroup, Inc.*,
   837 F. Supp. 2d 304 (S.D.N.Y. 2011) ................................................................... 29

*Wang v. Cloopen Grp. Holding Ltd.*,
   661 F. Supp. 3d 208 (S.D.N.Y. 2023) ....................................................... 22, 23, 27, 28

*Weston v. DocuSign, Inc.*,
   669 F. Supp. 3d 849 (N.D. Cal. 2023) .................................................................. 19

*Wilder v. News Corp.*,
   2015 WL 5853763 (S.D.N.Y. Oct. 7, 2015) ............................................................ 30

*Yannes v. SCWorx Corp.*,
  2021 WL 2555437 (S.D.N.Y. June 21, 2021) .......................................................................... 28

**Statutes**

15 U.S.C. § 78j ............................................................................................................................ 9, 30

15 U.S.C. § 78t ............................................................................................................................... 30

**Rules**

Fed. R. Civ. P. 12(b)(6) ...................................................................................................................... 9

Fed. R. Civ. P. 9(b) ............................................................................................................................. 9

**TABLE OF ABBREVIATIONS**

| Term | Definition |
|---|---|
| ¶ | Paragraphs in the Second Amended Class Action Complaint (ECF No. 44) |
| Adee | Jon Adee, Peloton's Chief Supply Chain Officer |
| Bike | Peloton's flagship CFP, a stationary exercise bike originally introduced in 2014 |
| Bike+ | Peloton's premium version of the Bike, introduced in September 2020 |
| Board | Peloton's Board of Directors |
| Carteret Facility | Peloton's Carteret, New Jersey facility |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| CFP | Peloton's Connected Fitness Products, such as the Bike and the Tread |
| Class Period | May 6, 2021 to August 22, 2023, inclusive |
| Coddington | Defendant Elizabeth F. Coddington, Peloton's CFO since June 13, 2022 |
| Company | Peloton Interactive, Inc. |
| COO | Chief Operating Officer |
| Cortese | Defendant Thomas Cortese, Peloton's Chief Operating Officer from before the start of the Class Period until August 2021. Cortese served as Chief Product Officer from August 2021 until November 1, 2023 |
| CPSA | Consumer Product Safety Act codified at 15 U.S.C. §§ 2051-2089 |
| CPSC | The United States Consumer Protection Safety Commission |
| CW(s) | Confidential Witness(es) |
| DB | Defendants' Memorandum of Law in Support of Motion to Dismiss Plaintiffs' Second Amended Complaint |
| Defendants | Peloton, Foley, McCarthy, Woodworth, Coddington, Cortese, and Kushi, collectively |
| DHS | United States Department of Homeland Security |
| DOJ | United States Department of Justice |
| Exchange Act | Securities Exchange Act of 1934 |
| FAC | Plaintiffs' Amended Class Action Complaint for Violations of the Federal Securities Laws filed on November 6, 2023 (ECF No. 23) |
| FAI | First Article Inspection |
| FAT | Factory Acceptance Test |
| Foley | Defendant John Foley, co-founder of Peloton and CEO and Chairman of Peloton's Board of Directors from before the start of the Class Period until February 9, 2022. Defendant John Foley also served as Executive Chairman of the Board from February 9, 2022 until September 12, 2022 |
| Gunipero | James Gunipero, Peloton's Senior Director of Quality, who reported to Senior Vice President Quality, Safety and Product Lifecycle Oliveira who reported to Cortese |
| Individual Defendants | Foley, McCarthy, Woodworth, Coddington, Cortese, and Kushi |
| IPO | Peloton's Initial Public Offering in September 2019 |

viii

| | |
|---|---|
| **Kruger** | Stephan Kruger, Peloton's Senior Director Operations and Supply Chain Management, who reported to Cortese |
| **Kushi** | Defendant Hisao Kushi, Peloton's Secretary and Chief Legal Officer from before the start of the Class Period until October 3, 2022 |
| **McCarthy** | Defendant Barry McCarthy, CEO, President, and Member of the Board of Peloton since February 9, 2022 |
| **Motion** | Defendants' Notice of Motion to Dismiss and Defendants' Memorandum of Law in Support of Motion to Dismiss Plaintiffs' Second Amended Complaint |
| **O'Brien** | Dan O'Brien, VP and Head of Manufacturing Operations |
| **Order** | Memorandum & Order Granting Defendants' Motion to Dismiss the FAC (ECF No. 41) |
| **Peloton** | Peloton Interactive, Inc. |
| **Plaintiffs** | Court-appointed lead plaintiffs Jia Tian and David Feigelman and additional plaintiff Sam Solomon |
| **PPAP** | Pre-production Approval Process |
| **Precor** | A commercial fitness equipment provider that Peloton acquired in December 2020 |
| **Project Tinman    or Tinman** | Peloton's company-wide, covert protocol to conceal corrosion on Bike, including the posts that was orchestrated by Peloton executive officers beginning in September 2021 |
| **Recall** | The May 11, 2023 recall of 2.2 million Peloton Bikes sold from 2018 to 2023 |
| **Rendich** | Andy Rendich, Peloton's Chief Supply Chain Officer/COO |
| **SAC** | Plaintiffs' Second Amended Class Action Complaint filed on April 11, 2025 (ECF No. 44) |
| **SAT** | Site Acceptance Test |
| **SEC** | United States Securities and Exchange Commission |
| **Settlement** | December 8, 2022 settlement between Peloton and the CPSC where Peloton agreed to pay a $19 million civil penalty, roll out an enhanced compliance program with procedures for reviewing reports of safety concerns, and implement corrective and preventative actions, and which charged Peloton's senior management with CPSA compliance |
| **Subscriptions** | Recurring revenue from subscriptions, including subscriptions from both Connected Fitness Products and the Peloton Digital App |
| **Tonic** | Tonic Fitness Technology Inc., one of Peloton's major manufacturers in Taiwan |
| **Tread** | Peloton's second CFP product, a treadmill, which was introduced in late 2018 |
| **Tread+** | Peloton's premium version of the Tread which was introduced in September 2020 |
| **Tread+ recall** | May 5, 2021, recall of all Tread+ machines |
| **Voice of the Member Report** | A report of feedback from Peloton members across all channels compiled and distributed across the Peloton organization |

| | |
|---|---|
| **Ward** | James Ward, Peloton's Director of Manufacturing Engineering |
| **Whitsett Facility** | Peloton's Whitsett, North Carolina, facility |
| **Woodworth** | Defendant Jill Woodworth, Peloton's CFO from before the start of the Class Period until June 13, 2022. Woodworth served as a consultant to Peloton from June 13, 2022 until September 13, 2023 |
| **Wu** | Micco Wu, Peloton's Mechanical Engineering Manager |

x

I.     **PRELIMINARY STATEMENT**[1]

The Court dismissed the FAC finding that it insufficiently alleged that Defendants' statements concerning product safety and quality, churn rates, and subscription growth were material, that the seat post issue would lead to the Recall, or that the loss accrual was understated. Plaintiffs responded with a groundswell of particularized facts. Indeed, the SAC contains factual support from *eighteen* CWs, whose allegations corroborate each other and reveal Peloton: (i) experienced systemic safety and quality defects throughout the Class Period, including pervasive rust and substandard, out-of-specification parts; (ii) knowingly shipped afflicted products; (iii) received countless complaints about rust, post breakage, seat slippage, and related injuries; (iv) scrambled to cover up rust via Project Tinman; and (v) took an after-the-fact-approach to addressing quality defects.

The CWs confirm that Defendants received reports, customer complaints (including those received directly by McCarthy and Foley) and data reflecting widespread safety and quality defects. Such data was generated internally from tests, audits, and CWs' analysis, collected by Peloton from complaining consumers, and from the CPSC. The CWs—who recalled inspecting and concealing rust *inside* the Bike post per Peloton's covert Project Tinman operation, and who described Peloton's approaches for escalating rust complaints impacting the structural integrity of the Bike's post—also provide the link between the post's internal rust and its safety defect. The CW allegations are especially damning since they are corroborated by customers' photos of visible rust inside the post *after breakage* and Defendants' admission that rust existed on the *inner frame of the seat*.

Thus, the SAC's new factual detail renders Defendants' statements—affirming "***product safety is a top priority***[,]" assuring Peloton had "***the best equipment***" that was only getting "***better and better***[,]" touting that Peloton's operations were "***designed to keep … churn rate low***" and "***prioritize[d]***

---

[1]  Emphasis is added and citations are omitted unless otherwise indicated.

*subscription growth*[,]" and framing any risks from "***real or perceived defects***" as mere hypotheticals—materially false and misleading when made. The material falsity of Defendants' statements is bolstered by the fact that they were all made on the heels of the Tread+ recall (which sullied Peloton's reputation and cost over $100 million for a recall a fraction of the size of the then-forthcoming one).

But as with the Tread+ scandal, Defendants were motivated to, and did, conceal the Bike defects from the public. Defendants also ignored numerous red flags raised by CWs and other employees, then downplayed the severity and scope of the rust defect in response to the *Financial Times*' February 2022 Project Tinman exposé and continued with a "just ship it" approach. Even after receiving 35 formal reports of post breakage (13 of which involved serious injuries) and instructions from CPSC to recall the seat post, on May 4, 2023, Defendants disclosed a mere $8.4 million loss accrual for the Recall. Given their knowledge of the widespread scope of defects and experience from the Tread+, Defendants knew this figure was wildly understated when issued. Indeed, Defendants shocked investors when they quickly recalled *2.2 million* Peloton Bikes and disclosed the Recall's cost surged to *$48.4 million*.

Defendants insist that the Court should adhere to its prior decision under the premise that statements once deemed puffery or forward-looking can never become actionable. That is legal error. Where an amendment adds new context bearing on a statement's materiality and to the information available to Defendants when their purportedly forward-looking statements were made (as the SAC does here), the dismissal of a stale, earlier complaint should not control. Defendants also characterize the CW allegations as "vague" and urge the Court to examine only on the formal reports and Recall disclosed at the end of the Class Period. The Court, however, cannot turn a blind eye to the SAC's detailed CW accounts, which are corroborated by each other and independent reporting by the *Financial Times*, and provide the Court with the factual context necessary to sustain Plaintiffs' claims. Instead, the CWs must be credited and Defendants' Motion denied in its entirety.

## II.    BACKGROUND

### A.    Peloton's Tread+ Scandal Spurs Investor Concern About CFP Safety, Brand Reputation, and Cooperation with Regulators

Peloton purports to be a premium home-fitness brand that sells connected fitness products, such as its flagship Bike, and digital class subscriptions. ¶¶46, 52. In 2018, Peloton introduced the Tread+ and soon thereafter received reports that people, pets, and objects were being caught in its running belt. ¶56. Peloton was required to immediately report these incidents to the CPSC but did not. ¶¶55-58, 243. On March 3, 2021, Peloton learned that a child was killed by a Tread+ and belatedly reported the incident to the CPSC, whose investigation showed Peloton already received 150 incident reports. ¶¶56-57. Defendants initially refused to recall the Tread+ and accused the CPSC of misleading consumers when it publicly warned to stop using it. ¶¶58-59. After heavy public criticism, Peloton finally recalled all Tread+ machines on May 5, 2021. ¶¶60, 62-63. But its reputation, particularly for safety and regulatory compliance, was tarnished in the eyes of financial analysts and investors. ¶¶62-64. *Bloomberg* said Peloton "blew it," and Foley told an analyst worried about "brand health" that "we have some work to do to get back on the right side of the line with trust and safety[.]" ¶¶62, 64. Defendants also admitted that "design and manufacturing defects, *real or perceived*[,]" could materially impact Peloton and noted the Tread+ recall as an "example" impacting "ability to maintain the value and reputation of the Peloton brand." ¶65. In total, the Tread+ recall cost Peloton over $100 million. ¶61.

It also prompted investigations by the CPSC into Peloton's regulatory reporting, by the DOJ and DHS into Peloton's product-related injury reporting generally, and by the SEC into Peloton's public disclosures on these matters, all of which remained ongoing during the Class Period. ¶271. On December 8, 2022, Peloton settled CPSC charges, agreeing to pay over $19 million, rolled out an "enhanced compliance program[,]" including "procedures for reviewing claims and reports for safety concerns and for implementing corrective and preventative actions[,]" and charged "Peloton's *senior*

*management*" with CPSA compliance. ¶¶275-77. McCarthy signed the Settlement Agreement. ¶275.

### B.    Defendants Knew that Products Were Not Built to Specifications

Prior to and during the Class Period, Peloton knowingly sold products that never passed proper inspections. ¶¶32, 95. During manufacturing, a part must first undergo a FAI (i.e., be measured to ensure it is made to specification). ¶94. Then, it must pass PPAP to ensure the part is fit for production. *Id*. If the part does not exactly match specifications, it does not "match the print" and is "NG" (not good). ¶¶94, 99. As a Peloton manufacturing team member, CW5 uncovered that 400+ of Peloton's Bike parts never passed FAI or PPAP. ¶95. When CW5 reviewed the quality reports, CW5 found the parts did not match the print and had assembly issues in their fixtures. ¶101. CW5 concluded "Peloton had a systemic problem with quality and knowingly released parts without proper FAI or PPAP approvals." ¶95. Others corroborated CW5. CW6 stated Peloton "struggled" "to meet the quality standards" and CW8 said there were "design problems with the product itself that made . . . quality issues even worse." ¶¶87, 105. Per CW8, due to Peloton's weak quality control and poor-quality products, 1 of every 15 Bike installations had a problem within 30 days and "brand-new products were not working." ¶¶87-88, 91.

Other CWs witnessed these defects and problems in the Whitsett and Carteret Facilities. ¶¶104, 106.  In August 2021, CW18 discovered the parts were not "physically in spec" and "were undersized, one relative to the other." ¶106. CW6 reported that Bike parts were incorrectly assembled at the Whitsett Facility due to issues with the components. ¶105. CW18 confirmed that employees assembling the Bikes in the Carteret Facility had to use a rubber mallet to "hit[] the parts until they fit" because the manufacturers' parts did not match the print. ¶106. Because of the out-of-spec parts and assembly issues, the factory and site tests, FAT and SAT, were knowingly bypassed at the Whitsett Facility. ¶104.

Within a month of joining Peloton, CW5 told CW5's supervisor, Ward, in emails and meetings, and O'Brien, the VP and Head of Manufacturing Operations, that Peloton was shipping product that did

not match the print. ¶¶102, 104. CW5 also reported the problems to Cortese's direct report, Kruger, during calls and to Gunipero in August 2021. ¶¶96, 99. Gunipero admitted to CW5 that he knew it was a problem, but did not have time to resolve it and was instead "hoping for the best." ¶96. CW5 is "very confident" that Cortese was aware of these issues. ¶109. CW18's superiors and upper management were all also aware of the issues, including McCarthy, Adee, Jones, O'Brien, and Kruger. ¶¶106-07. CW18 affirmed these executives "absolutely understood" the problems with parts because CW18's team was "screaming that the parts we had didn't work" and O'Brien was reprimanded for not having the assembly line running properly at the Whitsett Facility. ¶107. Ultimately, Peloton shut down the Precor plant in March 2023, laying off all 123 employees, in part, because of the fit problems. ¶108.

Despite these issues, Defendants instructed employees to ship the Bikes anyway. Kruger and Wu told Cortese about the parts not fitting during meetings and his response was to "[j]ust ship it." ¶109. Cortese's goal was to ship product irrespective of its substandard condition. ¶110. Defendant Foley was on monthly calls/meetings where the "just ship it" slogan was repeated. *Id.*

### C.      Defendants Actively Conceal a Dangerous Defect with the Bike Seat Post

Peloton's refusal to address its manufacturing issues and "just ship it" policy resulted in numerous customer complaints of Bike parts not working properly and causing injuries. An Instagram user stated the Bike seat continuously lowered during rides, and "eventually the seat post broke." ¶126. Even after replacement, the seat started lowering again. *Id*. Between 2020 and April 2023, Peloton received reports that Bike posts were detaching at the joint *while in use*, resulting in, *inter alia*: neck and back injuries, torn ligaments, and broken bones. ¶¶111-40. Contrary to Defendants' deliberately misleading characterization that Peloton received a total of *only* 35 customer *complaints* (DB 1, 2, 3, 5, 10, 12, 19), Peloton received countless complaints about the Bike seat which, by April 30, 2023,

culminated into 35 *formal reports* of such incidents that formed the basis of the Recall. ¶140.[2]

CWs further corroborate that Defendants received numerous complaints about post breaking and seat slippage long before they belatedly instituted a recall. For example, around June 2021, CW12's Member Support team received multiple complaints a day about the Bike post from members who said the seat kept dropping while in use. ¶131. CW13, a supervisor who tracked customers' issues, confirmed that "[p]eople would be riding and their seat slipped down[,]" and once someone got injured, "that's when they all started getting monitored." *Id.* Then, "Peloton really started taking a look at it when the post started snapping off." *Id.* Indeed, there was a step-by-step process to track issues with the Bike posts and collect photos in an internal database. ¶132. While on the Escalations team, the biggest issue CW9 dealt with was Bike posts breaking and causing injury. ¶134. CW10's Global Support Team handled complaints about the Bike post and rust "regularly." ¶135. Peloton was plainly aware of these complaints because it often asked customers to mail back defective ones or otherwise responded. ¶¶81, 113-14, 116, 118-19, 122-23, 126, 128. In addition, Peloton was "Admin" in the Facebook group where many users reported incidents. ¶81. One such post in November 2022 generated over 700 replies. ¶¶118-20. Peloton, as Admin, immediately shut down commenting on similar posts afterwards. ¶122.

CW8 confirmed that McCarthy knew about the Bike post issues because customers would email McCarthy directly complaining about the post, and McCarthy would reply, copying CW8 and others. ¶137. Former employees, including the Chief Business Officer, confirm that "every single piece of Member feedback across all [reporting] channels" including Bike post issues, were compiled into the monthly Voice of the Member Report and shared with "the entire organization," including Defendants.

---

[2] These complaints were received via multiple channels across the Company: member complaints addressed by Member Support (¶¶74, 131, 135); customer service (¶116); customer complaints addressed by the Escalations teams (¶¶36, 77, 134); social media posts starting as early as 2019 (¶¶81, 112-129, 133, 140); Voice of the Member reports (¶¶83-85, 138, 165, 250-51); emails sent by customers directly to McCarthy (¶¶8, 76, 79, 85, 111, 137, 240-41); and emails of reports sent to Peloton directly from the CPSC (¶¶247, 249).

6

¶¶83, 138, 250. Defendants also received regular reports from the "Executive Product Safety Committee" formed after the Tread+ recall and tasked with conducting "regular reviews of safety-related data[,]" including Member feedback. ¶254. Further, members who reported post breaks were contacted by Peloton associates *acting on behalf of the Company's executives*. ¶255. At all times, Defendants knew that the Company was required by law to analyze all available information bearing on product safety and, accordingly, had several monitoring systems in place. ¶¶243-44, 267-68, 277.

### D.    Executives Devise "Project Tinman" to Cover Up Bikes with Internal Rust

Around September 2021, Peloton began receiving Bike frames from Taiwan with a build-up of rust on the ***inside of the frame***. ¶144. Prior to Tinman, any rust automatically disqualified a Bike frame from sale. ¶145. Rather than disqualifying these Bike frames from sale to unsuspecting customers, Peloton ordered its assembly lines to paint over the problem. According to internal documents reviewed by the *Financial Times*, Peloton discovered the issue just months after emerging from the Tread+ recall, prompting senior executives to issue procedures code-named "Project Tinman" to conceal the corrosion with a chemical agent and ship the Bikes to customers anyway. ¶144. The nationwide, executive-level cover-up was verified by eight Peloton employees in four different states interviewed by the *Financial Times*. ¶145.

Multiple CWs corroborate Project Tinman. CW5 said that the rust started when the Bikes were left outside exposed to the weather, which "was a big deal, and everybody knew about it." ¶146. According to CW14, rusty Bikes started arriving at the Carteret Facility around October 2021, and thereafter, increasing numbers of rusted Bikes kept arriving. ¶154. CWs 3, 4, 6, 7, 14, 15, and 16 each provided firsthand accounts that, upon the discovery of rust, they stopped assembling Bikes and were directed to scrape off rust. ¶¶148-49, 154-57, 160. At CW14's facility, CW14 estimated that out of about 6,000-7,000 Bikes inspected, about 2,000-3,000 had rust. ¶150. Other CWs confronted Tinman issues during internal meetings and from customer complaints. ¶¶151-53, 161. For instance, CW17 attended

7

weekly Tinman meetings, which included statistics about "how many bikes have been repaired, how deep is the damage" and "root causing it to everything in between." ¶161. CW8 compiled rust reports and gathered complaints from Facebook, which were included in the monthly Voice of the Member Reports. ¶165. As a member support employee, CW13 followed a script with specific procedures for speaking to members about rust and was told to obtain pictures. ¶152.

Defendants' contemporaneous awareness of these reports is inescapable. Aside from McCarthy receiving emails *directly* from customers about rust issues (¶¶76, 162, 166, 241), Peloton's senior "executives" designed the protocol, code-named it Project Tinman, and directed employees to paint over the rust using a chemical "converter." ¶¶144-45, 259. Moreover, CW13 confirmed that Peloton diligently tracked rust complaints through "Confluence[,]" its internal platform accessible by Defendants, where employees compiled images, information, and tests. ¶153. CW15 was told that Project Tinman must be kept confidential because it would negatively impact Bike sales. ¶260. According to CW8, McCarthy and other members of the C-suite knew about Project Tinman because McCarthy's direct reports were on calls, emails, and had conversations about Tinman. ¶166.

### E.    The Truth Is Revealed in a Series of Partial Disclosures

The truth about Peloton's defects was revealed in partial disclosures on: (i) February 17 and 22, 2022 when the *Financial Times* broke the Project Tinman story and subsequently published a full-length exposé (¶¶216-17); (ii) May 11, 2023 when Peloton announced the Recall of the ~2.2 million Bikes sold from January 2018 to May 2023, and the CPSC instructed members to "immediately stop using" affected Bikes (¶¶221-25, 309); (iii) May 24, 2023 when McCarthy revealed Peloton had already received 500,000+ replacement requests and the expenses were now estimated to be $10-20 million (¶¶228-29); and (iv) August 23, 2023 when Peloton revealed a dramatic 64% increase in churn as members awaited replacements and that the loss accrual increased *by $40 million*. ¶¶231-32, 234-36.

8

### III. **PROCEDURAL HISTORY**

On February 14, 2025, the Court dismissed the FAC, finding the Plaintiffs had inadequately alleged (i) any materially false or misleading statement, and (ii) a strong inference of scienter. *See* §I, *supra*. As discussed below, the SAC directly responds to the Court's findings.

### IV. **ARGUMENT**

On a Rule 12(b)(6) motion, courts accept plaintiffs' factual allegations as true and "draw all reasonable inferences in [p]laintiffs' favor." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015). Under Rule 9(b), an "alleged fraud need only be plausible[,]" not "more likely than" alternatives. *Id*. at 174. Section 10(b) claims must allege a material misrepresentation or omission and scienter, among other elements. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 149-50 (2d Cir. 2021). The Motion challenges only these two elements.

#### A.       **The Amended Complaint Alleges Material Misstatements**

#### 1. **Material Misrepresentations Regarding the Bike's Safety**

Throughout the Class Period, in an effort to rebuild investor trust following the Tread+ recall, Defendants misrepresented the Bike's safety and touted safety as Peloton's top priority while simultaneously omitting that Peloton knowingly disregarded safety defects. For instance, when asked to elaborate on why Peloton did not immediately recall the Tread+ after the report of a child's death, Foley assured that Peloton was "***100% committed to the safety and well-being [of members,]***" that "***safety is number one***" and was not "***shirking***" from its "***incredible responsibility and obligation to the safety of people who bring Peloton in their home***[.]" ¶174. Defendants also often reiterated that Peloton, as "***a members-first organization***[,]" made "***the safety of our member community***" its "***first priority***" and "***aim[ed] … to have the safest products on the market***[.]" ¶¶169-70, 173-74, 189, 191, 196, 206; *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 375 (E.D.N.Y. 2022) ("repeated emphasis on safety" supports materiality). Given Peloton's purported "priority" was safety,

the Company also claimed on November 12, 2021 and November 1, 2022, respectively, that "***our team continuously evaluates the safety of our products***" and "***[w]e continually monitor Members safety feedback and experiences with our products and incorporate these learnings … to enhance product safety***[.]" ¶¶196, 206; *In re Vale S.A. Sec. Litig.*, 2020 WL 2610979, at *11 (E.D.N.Y. May 20, 2020) (reasonable to "rely upon" statements about existing monitoring practices "in assessing … risk").

These statements were misleading when made because, far from safety being a priority, Peloton continued to sell Bikes despite receiving regular reports throughout the Class Period that escalated dangerous safety issues concerning the seat post's structural integrity. ¶¶111-40. For instance, according to CW9, the Escalation team's biggest issue during CW9's tenure was the post breaking and injuring customers. ¶134. Copious complaints on Peloton's social media accounts also reflected that Peloton frequently received post breakage and seat slipping reports as early as 2020, which continued through the Class Period. ¶¶112-129; *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *8 (S.D.N.Y. Sept. 30, 2020) (pictures of conditions inconsistent with statements support material falsity). Indeed, CW9 confirmed, near the end of 2022, Peloton received 1 to 3 post-break complaints a week. ¶134. Per CWs 8 and 11, post breaks continued in 2023 (¶¶136, 139), which culminated in 35 *formal* CPSC reports (13 with serious injuries) and the Recall of *all* Bikes sold between 2018 and 2023. ¶¶140, 221.

Additionally, CW12, recounted that, beginning around June 2021, CW12's Member Support Team received multiple complaints per day of bike seats dropping while in use. ¶¶39, 131. CW13, a Hardware and Software supervisor during the Class Period, corroborated CW12 stating, before the Class Period, "[p]eople would be riding and their seat slipped down." ¶¶40, 131. CW10, who handled complaints about Bike posts slipping and breaking, confirmed that between June 2021 and January 2023, "[t]he slipping … happened regularly." ¶¶37, 135; ¶126 (complaint that seat slipping led to post breaking). In response, Peloton tried to deter customers from reporting the safety defects to CPSC

(despite the mandate to notify immediately). *See* ¶¶55, 114.

Defendants assert that the Order cements all of the misstatements above as incurable puffery. DB16. Not so. The Court must consider each statement in context, including the additional detail alleged in the SAC. *See, e.g., In re Henry Schein, Inc. Sec. Litig.*, 2019 WL 8638851, at *12 (E.D.N.Y. Sept. 27, 2019) (Brodie, J.) ("puffery depends, in part, on the context in which [the statement] is made"); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 284-85 (E.D.N.Y. 2023) (similar). In light of the SAC's detailed allegations about the scope of the Bike's defects, Defendants' specific statements about safety created a duty to "disclose certain facts contradicting those representations." *Howard v. Arconic Inc.*, 2021 WL 2561895, at *13 (W.D. Pa. June 23, 2021) (the SAC's "new context … gives vitality to claims based on some of the other safety statements, plausibly removing them from the puffery realm."); *see also In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 79 n.4 (S.D.N.Y. 2017) (statements that "[t]he health and safety of our people must come first" and reaffirming "commitment to [customer] safety" deemed material and actionable, "not mere generalities").[3] Defendants also ignore that quality and safety issues—"real or perceived"—were admittedly crucial to investors post-Tread+ scandal, which severely damaged Peloton's reputation and cost millions. ¶¶61-66. Indeed, after that recall, Foley admitted "we have some work to do to get back on the right side of the line with trust and safety[.]" ¶64; *In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482, 504 (E.D.N.Y. 2025) (statements made to "quell a controversy" not puffery); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (repetition suggests "a reasonable investor could rely on them").[4]

---

[3] Unlike those here (*see, e.g.*, ¶¶173-74, 189), the *Steamfitters Loc. 449 Pension Plan v. AT&T Inc.* statements were general ones about ethical behavior and code of conduct, not intended to reassure investors post-scandal. 2022 WL 17587853, at *2 (2d Cir. Dec. 13, 2022) (Order at 19)

[4] Here, the SAC added 14 CWs whose allegations remove the statements from the puffery realm, whereas in *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 5115707, at *2 (S.D.N.Y. July 5, 2023), the new allegations mirrored those already found deficient. *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) is also inapt because, unlike here, the statements were "explicitly aspirational[.]" *See e.g.,* ¶¶170, 174, 184.

## 2. Misrepresentations Regarding Product Quality

Defendants' statements repeatedly touting the Bike's quality and Peloton's focus on Members were materially misleading given that, throughout the Class Period, Peloton's "just ship it" approach plagued the Bikes with manufacturing and assembly issues, including rust that Peloton created an entire covert operation called Project Tinman to cover up. ¶¶176, 180, 184, 186, 190, 193, 200. For instance, on June 8, 2021, Woodworth represented that Peloton was "*always continuously working harder to … make our products … better and better and better*." ¶176. Similarly, during the August 26, 2021 earnings call, Foley touted that "*[b]y always putting members first and obsessing over their experience, we're building the most powerful brand in fitness and potentially … in any category*." ¶180. To that end, in the Company's 2021 Form 10-K, Defendants touted that Peloton had "*the best equipment*" and further represented that the Company "[p]ut [m]embers [f]irst" by "*obsess[ing] over every touchpoint of our Member experience*[,]" "*prioritiz[ing] a positive product and brand experience*." ¶¶184-86; *see also* ¶190 (similar). Moreover, Foley emphasized the Bike's quality during the November 4, 2021 earnings call, stating: "*[o]ur formula for growth that we've been able to hone on the Bike … it starts with the product experience. We deliver the best product experience in Connected Fitness*[.]" ¶193.

Defendants' statements were false and misleading because, as explained below, Peloton had pervasive Bike manufacturing and assembly issues, including widespread rusting and substandard parts. *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 387 (S.D.N.Y. 2012) (touting "high quality" creates duty to disclose product issues); *Lematta v. Casper Sleep, Inc.*, 2022 WL 4637795, at *9 (E.D.N.Y. Sept. 30, 2022) (Brodie, J.) ("*Casper*") (similar). As such, Defendants' argument that their quality statements are inactionable as a matter of law fails for the same reasons in §IV.A.1, *supra*.

***Rust***: Throughout the Class Period, Peloton's Bikes were not the "best" or getting "better and better." ¶¶176, 184. Rather, according to *thirteen* CWs, they were beset with rust. *See e.g.*, ¶146 (CW5:

12

"thousands" of Bikes were rusty before assembly, and "[i]t was a big deal" that "everybody knew about"); ¶150 (CW14: rust was "really bad" and "[w]ay too much"); ¶162 (CW8: 3-month-old Bikes covered in rust); ¶147 (CW13: rust complaints began around October 2020).[5] CWs confirmed that Bikes were "rusting where the seat would install." ¶160; ¶¶149, 155 (CWs described scraping rust from the Post's inside). Several CWs confirmed the rust was so pervasive that Peloton devised a covert "Project Tinman" to remove and conceal it, then sell Bikes as "new." ¶¶41, 155, 157, 160, 163; *see* §IV.A.3, *infra*. Peloton received so many complaints it developed a rust script for customer service. ¶163; *see also* ¶135 (CW10's team handled "a lot" of rusty Bike complaints).

The CWs are corroborated by public reporting. On February 17, 2022, the *Financial Times* exposed the Bike quality issues and Project Tinman. In response, Peloton falsely downplayed the issues, stating the Company "***immediately responded to the 'isolated issue', emphasizing that the 'abnormal' oxidation was limited to non-structural areas of the bikes which had no effect on their quality, durability and reliability***." ¶200. But the Bike's rust issues were not "isolated," "abnormal," or lacking "effect on…quality." Rather, rust impacted thousands of Bikes, including "[]structural areas" like the post, and resulted in "hundreds at least if not thousands" of complaints. ¶162. Instead of "immediately respond[ing,]" Defendants concealed these issues. ¶¶149, 159; *TCP Diversified Tech. Fund v. Gaotu Techedu Inc.*, 2025 WL 416872, at *9 (E.D.N.Y. Feb. 6, 2025) (speaking about an issue creates "a duty to tell the whole truth.") ("*Gaotu*"). Indeed, the *Financial Times* reported that, around September 2021, Peloton senior executives devised Tinman to conceal corrosion on the interior Bike frame.[6] ¶¶143-45; *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 164, 169 (2d Cir. 2021) (facts from investigative report credited where corroborated by CW allegations); *In re Arqit Quantum Inc. Sec. Litig.*, 2025 WL 977995,

---

[5] *See* ¶¶135, 147, 149, 151, 155-56, 160, 264 (CWs 2-4, 6-7, 10, 13, 15-17 describing rust issues).
[6] In *Rombach v. Chang*, 355 F.3d 164, 172–73 (2d Cir. 2004) (Order at 31), the statements notified investors of integration and liquidity issues, unlike those here, which trumpeted safety as a priority, touted products as the "best," while efforts to conceal rust and impact to the post's structure were ongoing. *See Arqit*, 2025 WL 977995, at *16.

13

at *10 (E.D.N.Y. Mar. 28, 2025) (similar); *see also Gaotu*, 2025 WL 416872, at *11-12 (crediting witness in *Financial Times* article where testimony was corroborated).

Defendants' contention that the SAC's allegations suggest the rust was isolated and abnormal because they pinpoint the problem's origin is nonsense, particularly given that the source (Tonic) was one of two major manufacturing partners and the rust impacted thousands of already-defective Bikes. DB17-18; ¶¶141, 146, 149-50. Indeed, consumer reports that describe and depict rust in the Post after the Bike seat broke off confirm that the issues were interrelated, as do CW reports that they had to inspect *inside the Post* for corrosion in thousands of Bikes. *See* ¶¶116, 118, 123, 127, 144-45, 149, 155, 160; *Aphria*, 2020 WL 5819548, at *8. Peloton also admitted that the rust was on the inner frame of the seat. ¶218; *In re Pall Corp.*, 2009 WL 3111777, at *3, 5 (E.D.N.Y. Sept. 21, 2009) (admission supports falsity). Given this rampant scheme to conceal rusted Bikes, Defendants' quality statements were false.

***Out-of-Specification Parts***: Defendants' quality statements were also false and misleading because the Bikes were assembled with substandard, out-of-specification parts that caused a myriad of defects. For instance, CW5 stated "over 400 parts" for the Bike and Bike+ "weren't made to specifications" and as such, never passed FAI or PPAP. ¶¶93, 95. CW5 added out-of-spec parts caused assembly issues, resulting in parts being hammered into place and bypassed FAT and SAT tests. ¶¶99, 101, 104; *see* ¶106 (CW18: rubber mallets used to hammer parts into place). Peloton nevertheless sold Bikes with these substandard parts. ¶95. Indeed, CW5 recalled Gunipero admitted Peloton knew about but did not have the bandwidth to address defects, and instead "[j]ust ship[ped]" the Bikes and "hop[ed] for the best." ¶¶96, 109; ¶91 (CW8: Peloton's priority was to grow its base instead of fixing its product).

CW8, a Director-level Operations employee throughout the Class Period, corroborated CW5 and CW18, stating Peloton had "a million assembly issues" and "design problems" with its products, including the Bike, such that 1 of every 15 Bike installations had a problem within 30 days. ¶¶87-88,

14

103. These issues ranged from clicking noises to complete failure and persisted throughout CW8's tenure. ¶¶87-89; ¶105 (CW6: Peloton "struggled" "to meet the quality standards" and described having to "do reworks and scrap parts"). Peloton lost money with each installation, and the issues "never went away" per CW8 despite initiatives aspiring to have zero problems within the first 60 days. ¶¶89-90.

Defendants contend that CWs 5, 6, 8, and 18 are insufficient to render their quality misstatements misleading because these allegations do not concern the Recall or link to the Bike's safety or structural integrity issues. DB7-8. This is a red herring, as the falsity of the above statements does not turn on either. Rather, the statements were false when made because Peloton was making and selling its customers substandard products with myriad issues—not making the best equipment, delivering the best product experience, or continuously improving their products as claimed. *See e.g.*, ¶¶91, 95, 176, 184, 193. Moreover, CW5 *did* link the post's safety and structural integrity issues to quality. *See e.g.*, ¶¶95, 97 (systemic quality problems applied "across all product lines," i.e., including the Bike seat, post, and sleeve). Defendants' attempt to discredit CW5's "just ship it" allegations as "second-hand" (DB8) fails as CW5 recounts first-hand interactions with Gunipero, Wu, Cortese, and Foley. *See e.g.*, ¶¶96, 109-110. Additionally, contrary to Defendants' claims (DB8), CW5 was corroborated by other CWs. ¶¶87-88, 103; *Arqit*, 2025 WL 977995, at *10 n.23 (crediting corroborated CWs).

### 3.  Defendants' Risk Warnings Were Misleading and Offer No Protection

Peloton's risk factors are materially misleading because they were framed as hypothetical, future risks, but had already materialized. *Gaotu*, 2025 WL 416872, at *8. Between May 7, 2021 and November 5, 2021, Peloton warned that the Company's "***products … may be affected from time to time by design and manufacturing defects, real or perceived, that could adversely affect our business and result in harm to our reputation***[,]" and that "***the occurrence of real or perceived defects in any of our products, now or in the future, could result in additional negative***

15

*publicity, regulatory investigations, or lawsuits filed … particularly if Members … are injured*." ¶¶171, 187, 194. However, throughout the Class Period, the Bikes *did* suffer "real" "manufacturing defects"—or certainly issues that the public would have "perceived" as defects given the Tread+ overhang. Defendants' characterization of these issues as mere possibilities staved off (for a time) the very "harm to [Peloton's] reputation," "negative publicity" (*e.g.*, the *Financial Times* report) and "regulatory investigations" (*e.g.*, the Recall) that Defendants knew would inescapably follow.

According to numerous, corroborating CW accounts and as discussed §IV.A.2, *supra*, rust impacted thousands of Bikes and resulted in "hundreds at least if not thousands" of complaints. By October 2021, the rust was so pervasive that Defendants launched Project Tinman—completely pausing Bike assembly at the Whitsett and Carteret Facilities so employees could conceal rust. ¶¶41, 149-50, 154-55, 157, 163. This included inspecting bikes with flashlights to identify corrosion (including peering into the seat posts), then scraping off and covering the rust. *Id*.

Thus, prior to the misleading risk disclosures, rust was already adversely impacting Peloton's business because customers were already receiving rusty Bikes at the time, and instead of assembling new bikes, employees were diverted to covering up the rust defect. ¶¶147-50; *see* ¶164 (rust also resulted in inventory disposals); *see also Meyer v. JinkoSolar Holdings Co., Ltd.*, 761 F.3d 245, 251 (2d. Cir. 2014) ("generic warning[s]" insufficient where "facts on the ground would substantially affect a reasonable investor's calculations of probability"); *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *2 (S.D.N.Y. Feb. 5, 2024) (warning about future "risk" misleading if it "has already happened or is then happening"). Moreover, Defendants knew public awareness of the rust would harm Peloton's reputation given the Tread+ scandal (particularly given analysts' focus on the matter). *See* ¶¶64, 173, 189; ¶144 (proximity to Tread+ prompted Peloton to conceal the rust issue). Indeed, CW15 was told that Project Tinman had to be

kept confidential because it would *definitely impact* people buying the Bike, particularly given it was purportedly a luxury product. ¶149; *see Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 106 (2d. Cir. 2022) (hiding development supports its materiality).[7]

Rather than updating the disclosures to inform investors that the Bike was already experiencing defects and adversely impacting Peloton's operations, on February 8, 2022, Defendants merely added more hypothetically framed risks. *See e.g.*, ¶198 (warning "*[a]ctual or perceived defects may not be identified until after a product is in market*" and that *"[a]ny defects could impact or customer experience, tarnish our brand reputation or make our products and services unsafe and create a risk of ... personal injury*[.]"); *see also* ¶¶204, 210. Defendants' statements were materially misleading given Peloton's ongoing Tinman operations which lasted into October 2022 (¶161) as well as then-occurring defects related to Bike post breakage and seat slippage that were already negatively impacting Peloton's reputation and customer experience, rendering the Bike unsafe, and injuring members. *See e.g.*, ¶¶112-129 (detailing complaints, including injuries related to post breakage and seat slippage); *see also* §IV.A.1, *supra; Virtu Fin.*, 770 F. Supp. 3d at 517-18 (risk disclosures actionable where risk already transpired).

Defendants misconstrue Plaintiffs' risk disclosure arguments again by narrowly focusing on the Recall. DB12. None even mention the word "recall" as a risk. But even if they did, that contention "confuses the risk for its consequence." *Salzman v. ImmunityBio, Inc.*, 753 F. Supp. 3d 1050, 1065 (S.D. Cal. 2024). The risk disclosures' plain text identifies product "defects" as the risk. As alleged, Peloton was already experiencing such quality and safety defects, which rendered

---

[7] Because Defendants hid defects and already occurring impacts, their cases are inapposite. DB12-13 citing *In re ProShares Trust Sec. Litig.*, 728 F.3d 96, 100 (2d. Cir. 2013) (explicitly warning of "potentially dramatic" losses), *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 672 (S.D.N.Y. 2008) (defect did not exist when disclosure made), and *In re Allergan PLS Secs. Litig.*, 2019 WL 4686445, at *21 (S.D.N.Y. Sept. 20, 2019) (disclosing link between implants and cancer, then warning it could result in product withdrawal).

17

the risk warnings misleading when made. *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 161 (E.D.N.Y. 2020) ("To warn that the untoward may occur when the event is contingent is prudent" but to warn they are only "possible . . . when they have already occurred is deceit"). Defendants' protests over the possibility of future risks (DB13-14) are also inapposite. They do not render the risk disclosures here (which misrepresented the *existing* risks) inactionable.[8]

Defendants focus on a narrow subset of the SAC's new allegations and suggest that they are insufficient to disturb the Court's prior ruling. DB12-13. But Plaintiffs' "amplified allegations of the SAC transform the [risk disclosures'] context" such that those previously inactionable statements are now "plausibly allege[d]" as misleading. *Howard*, 2021 WL 2561895, at *5-6 (added allegations showing "regular and systematic practice of such sales" that ran afoul of compliance were sufficient to render risk disclosures materially false or misleading).

### 4. Material Misrepresentations on Churn Rates and Subscription Growth

Throughout the Class Period, Defendants materially misrepresented Peloton's churn rates and subscription growth. For instance, on August 26, 2021, Foley emphasized that "[c]hurn remains a very important metric to us" and stated that "*[e]verything we do at Peloton is designed to keep our members engaged and our churn rate low*." ¶178. That same day, Foley highlighted that Peloton "*will continue to prioritize subscription growth over near-term profitability*[.]" ¶182. To that end, on November 3, 2022, McCarthy touted that the Company was "*beating*" his "*year*" "*timeline*" goal of turning Peloton around (i.e., having "*a growing subscriber base [and] continued low churn*"). ¶208. Then, on February 1, 2023, in response to an analyst question asking if "1.1% churn" was "the new normal," Coddington

---

[8] In *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *19 (S.D.N.Y. Mar. 24, 2023) (DB13-14), the warnings had not materialized because the consent orders had not yet been issued. By contrast, the Bike's defects were already impeding Peloton's assembly line and operations. ¶¶89-90, 105-07, 150-51, 154-55, 157, 159.

stated "*we don't expect any significant changes to our current churn levels*[.]" ¶212; *Weston v. DocuSign, Inc.*, 669 F. Supp. 3d 849, 881 (N.D. Cal. 2023) (reassuring demand not puffery).[9]

These statements were materially false and misleading because they omitted that Peloton's top-selling product was riddled with defects (*see* §IV.A.1, *supra*; ¶52) that required maintenance within the first 30-60 days of customers' ownership (which Defendants knew and tracked) (¶¶76, 79, 81, 83, 85, 88-90), were injuring customers (¶¶117-18, 122-23, 129, 131, 134, 140, 221), and caused them to cancel subscriptions (¶129). ¶¶60-62, 64, 267-70; *Weston*, 669 F. Supp. 3d at 879 (statement actionable where defendants aware of "multiple red flags" indicating "demand was unsustainable"). A recall would (and did) also impact churn by causing subscription pauses and cancellations pending replacements (¶¶221, 231-32, 235-36) and reputational harm (¶224), as Defendants knew from the Tread+ recall. ¶¶267-70.

Defendants contend that their churn and subscription statements are forward-looking statements protected by safe harbor and the bespeaks caution doctrine. DB19 n.6. Not so. Defendants' statements describe present conditions about then-existing practices to keep churn low, continued efforts to prioritize subscription growth, early achievement of churn and subscription goals, and present churn levels. *See* ¶¶178-82, 208, 212; *Vale*, 2020 WL 2610979, at *16 (statement is not entirely forward-looking where it "include[s] representations as to present or historical facts"). Even if the statements were entirely forward-looking (they are not), neither safe harbor nor the bespeaks caution doctrine offer any protection because Peloton's cautionary language was not meaningful. *See* §IV.A.3, *supra*; *Howard*, 2021 WL 2561895, at *10 (risk warnings "no longer sufficient" given SAC's new allegations). These statements are also not protected because Defendants "knew that they had no reasonable basis for making" them as they knew at the time that obscuring defects and deprioritizing quality and safety would harm Peloton's

---

[9] Defendants' churn and subscription statements are objectively verifiable and concerned key metrics to measure Peloton's health (¶53) and as such, they are nothing like the generic statements generally touting strong growth and profitability at issue in *Meyer v. Organogenesis Holdings Inc.*, 727 F. Supp. 3d 368, 379 (E.D.N.Y. 2024) (Order at 30).

reputation, Bike sales, and subscription growth (causing increased churn) if disclosed, particularly given the defects were widespread. ¶¶83-85, 91, 96, 149, 153, 160, 166; *Dentsply Sirona*, 665 F. Supp. 3d at 293-94. Indeed, this is precisely what occurred when the truth was revealed. *See e.g.*, ¶¶228, 230-32, 234-35. Finally, Defendants' contention that the SAC's added context cannot revive statements previously deemed puffery is wrong, particularly given the scope of the defects and complaints (which undoubtedly impacted churn and subscriptions). *See Howard*, 2021 WL 2561895, at *13.

### 5. Materially False and Misleading Loss Accruals

On May 4, 2023, Defendants disclosed that Peloton took an $8.4 million accrual for the Recall and misleadingly stated they did not "***anticipate that the total expenses related to implementation of the CAP will be material to our financial position***."[10] ¶214. This statement had its intended effect of assuaging analysts' concerns. *See e.g.*, ¶226 ("[W]e do not believe it will rise to the tens of millions dollar range"); *id*. (casting $8.4M as "a helpful order of magnitude to keep in mind"); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 303 (S.D.N.Y. 2018) (analyst's report evidenced how the market understood defendants' statements); *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 161-62 (S.D.N.Y. 2008) (similar). But Defendants knew, given the volume of complaints received and Bikes sold, that the accrual was materially understated. *See* ¶¶76, 78, 85 (describing defendants' involvement in addressing and monitoring complaints); §IV.A.1, *supra* (discussing complaint frequency); *see also New England Carpenters Guar. Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 174-76 (2d Cir. 2023) (understated accrual actionable where defendants had no basis to conclude continued payments were not "probable"); *Steamfitters Local 449 Pension Fund v. Alter*, 2011 WL 4528385, at *7 (E.D. Pa. Sept. 30, 2011) (understating losses actionable where management knew

---

[10] Defendants claim additional language related to the Recall provides context. DB14. Not so. None of Defendants' surplusage changes that they assured investors that CAP expenses were not anticipated to be material. ¶214.

contradictory facts undermining losses accuracy).[11] Indeed, only a week later, Defendants revealed that the Recall impacted "all Bikes sold from January 2018 to May 2023"—about 2.2 million units. ¶221.

Ultimately, as disclosed on August 23, 2023, the Recall cost Peloton $40 million more than previously disclosed. ¶231. The accrual corrections' magnitude and proximity to the misstatements also support falsity. ¶¶220-21, 228, 231; *see City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 676 (3d Cir. 2023) (magnitude and temporal proximity support falsity); *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 143 n.13 (2d Cir. 2010) (alleging misconduct in later period "may support an inference that it was present six months earlier").

The SAC contains numerous allegations evidencing Defendants' knowledge of the defects' scope and, as such, their contention that the SAC failed to put forth new allegations that would alter the Court's prior decision is incorrect. *See Howard*, 2021 WL 2561895, at *10; *see also In re NovaGold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 301 (S.D.N.Y. 2009) (duty to speak truthfully about present facts applies to forecasts); *Godinez v. Alere Inc.*, 272 F. Supp. 3d 201, 215-17 (D. Mass. 2017) (receipt of thousands of complaints and actions taken to address the same "all raise an inference that [d]efendants were on notice of consistent and ongoing problems with the product line" such that a recall and large loss accrual was likely).[12] Contrary to their argument (DB15), the risk warning was not meaningful as the increase in reportable incidents was framed as a mere hypothetical though Defendants knew the Company was frequently receiving reports related to the post's defects. ¶¶112-129, 134; *see Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 190-91 (S.D.N.Y. 2010) (loss statements actionable despite warning they were subject to change given risk warnings were themselves misleading). Likewise, because Defendants lacked a reasonable basis for the loss accrual given then

---

[11] Plaintiffs need not show costs already exceeded loss accrual for falsity. DB15; *Alter*, 2011 WL 4528385, at *7.

[12] *Casper*, 2022 WL 4637795, at *12 (DB15) is inapt as the warnings contained nuanced risks, not alleged to be false.

available facts regarding the defects' scope, the statement remains actionable regardless of whether it was an opinion. DB15 n.5; *DeCarlo*, 80 F.4th at 171 (accrual estimates that "contradict[]" the inputs they "purport[] to rest" on are actionable even if opinions).

**B.      The Amended Complaint Alleges a Strong Inference of Scienter**

Scienter is adequately pled by allegations of conscious misbehavior or recklessness, <u>or</u> motive and opportunity to defraud. *Casper*, 2022 WL 4637795 at \*14. Courts must consider "*all* of the facts alleged … collectively" rather than scrutinize "any individual allegation … in isolation," to determine if an inference of scienter is, like here, "cogent and at least as compelling" as the competing inference. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.,* 551 U.S. 308, 322–24 (2007). A "tie … goes to the plaintiff." *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009). The SAC alleges facts supporting each Defendant's scienter. That certain facts support the scienter of multiple Defendants does not alter that despite Defendants' argument to the contrary. DB21; *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 551-52 (S.D.N.Y. 2017) (scienter pled for each defendant based on internal control deficiencies, negative "tone at the top," and defendants' extensive discussions).

**1.  Defendants' Knowledge and Recklessness**

***Actual Knowledge of Defects***: McCarthy's, Foley's, and Cortese's actual knowledge of the defects supports scienter. For instance, CW9 confirmed that, during the Class Period, the Escalations team handled issues that were elevated to Peloton's executives, including Foley and McCarthy, when those executives were too busy. ¶76. Thus, McCarthy and Foley knew that Bike posts were replete with structural defects and rust because they received complaints regarding the same. CW8 also confirmed that McCarthy received customer complaints directly, and responded to them—including by affirming "[w]e've seen this issue before." ¶¶85, 240, 252 *see also* ¶¶162, 261 (McCarthy knew about rust from complaints directed to him); *Wang v. Cloopen Grp. Holding Ltd.*, 661 F. Supp. 3d 208, 236 (S.D.N.Y.

22

2023) (engaging with customers on topic at issue supports scienter). Indeed, CW8 recalled that when McCarthy became CEO in 2022, he began forwarding customer emails with complaints, including those about the Bike post, sleeve, slippage, and rust, to CW8 and others, and continued to do so throughout CW8's tenure (i.e., end of 2023). ¶¶35, 136-37, 166, 252. CW10 likewise stated that McCarthy forwarded complaints about rust and the Bike post to CW10's team at least weekly throughout CW10's tenure, which ended in January 2023. ¶¶37, 241.

Cortese also knew that the Bikes were built of subpar parts since, per CW8, he spearheaded the (failed) initiative to have zero defects within a product's first 60 days. ¶89; *see Vale*, 2020 WL 2610979, at *17 (direct involvement supports scienter); *see also In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *24 (D. Md. Sept. 1, 2023) ("[T]o try to correct an issue, one must first be aware that it exists"). But the problems "never went away." ¶89. CW18 stated Peloton's executives "absolutely understood" the parts issue because they were "screaming that the parts we had didn't work" and knew the parts had stymied assembly line production ¶107. CW5 confirmed that Wu and Kruger reported the out-of-spec parts directly to Cortese, whose response was "[j]ust ship it." ¶109; *Arqit*, 2025 WL 977995, at *10 (reasonable to infer defendant had knowledge from communications with other employees). This slogan was repeated in meetings and calls led by Cortese led and attended by Foley. ¶110; *Helo v. Sema4 Holdings Corp.*, 2025 WL 1733387, at *9 (D. Conn. June 23, 2025) (reasonable to infer that defendants had adverse information from their participation in calls); *Galestan*, 348 F. Supp. 3d at 300 (similar).

Defendants attempt to undermine these allegations by mischaracterizing the complaints as hypothetical reports and vague "unspecified complaints" made at "unspecified times[.]" DB20-21. This ignores that the allegations detail the types of complaint and that they were received during each CWs' period of employment. *See e.g.*, ¶¶35, 37, 136-37, 240-41, 252 (CWs 8 and 10 described McCarthy's regular practice of responding to complaints about rust and the seat). Defendants also contend CW5's

23

allegations are second-hand and should be disregarded. DB26. Even if CW5 may have learned *some* information from interactions with CW5's superiors, it remains CW5's first-hand experience and there is no reason for the CW to misrepresent those interactions. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) ("hearsay does not automatically disqualify [CW's] statement from consideration" for scienter).[13] The CWs also need not have direct contact with an individual defendant (DB21, 26) to be credited, though CWs 5, 8, and 10 did in any event (¶¶79, 110, 241). *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.,* 2018 WL 2382600, at *10 (S.D.N.Y. May 24, 2018) (lack of contact does not "undermine" credible CW account that data was "made available to senior executives"); *see also In re Axsome Therapeutics, Inc. Sec. Litig.*, 2025 WL 965265, at *9 (S.D.N.Y. Mar. 31, 2025) (similar).[14]

*Internal Reports*: Defendants received internal reports and consumer complaints about injuries, safety and quality defects, and rust, supporting scienter. As alleged:

- Consumers contacted executives, including Foley and McCarthy, directly with their complaints (¶¶76, 79, 85, 136-37, 162, 166, 240-41, 252, 261, 297);

- Complaints were sent via the Escalation teams' distribution list, which included certain executives and leadership, and to which McCarthy forwarded complaints (¶¶76, 79, 134-35, 166, 240-41, 261); *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 398 (S.D.N.Y. 2022) (scienter where employees escalated issues to executive level);

- Olson confirmed that Peloton "capture[d] every single piece of Member feedback across all channels[,]" which would include the complaints alleged in the SAC (¶¶112-29), and ~160,000 monthly social media insights, and 5,000+ social media queries per week. ¶81. This feedback, according to CWs 2 and 8, was assembled into the Voice of the Member report, along with the top escalations and reasons (which necessarily included the post breakage per CW8 (¶138)) and were regularly distributed <u>companywide</u> (¶¶83-85, 250). *Dentsply Sirona*, 665 F. Supp. 3d at 289-91 (monthly reports supported scienter); *Vale*, 2020 WL 2610979, at *17 (same);

- Peloton's C-Suite received reports from Zendesk, a customer service platform, which Peloton used along with Jira, an issue and project tracking tool, to track complaints and which reflected multiple complaints of seat slipping (which began around June 2021 and continued throughout the Class Period) and post breakages (which began in 2020, continued throughout the Class

---

[13] *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 594 (S.D.N.Y. 2011) (DB26) is inapt because the CW had no contact with corporate defendant and the information supporting scienter arose after false statement was made.

[14] *See* DB21-22 citing *In re Am. Express Co. Sec. Litig.*, 2008 WL 4501928, at *8 (S.D.N.Y. Sept. 26, 2008) (no allegations CWs had contact with defendants <u>or</u> how the CW knew "information was communicated to" executives).

24

Period, escalated to 1 to 3 complaints a week around the end of 2022, and culminated in the Recall) (¶¶78, 131-32, 134, 256); *Galestan*, 348 F. Supp. 3d at 300-01 (CW accounts of regular reports supported scienter); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *18 (S.D.N.Y. Mar. 25, 2013) (same);

- Rust complaints, including many documents, images, and test data from the rust investigation, were tracked in Confluence and accessible to the C-suite (¶¶153, 256); *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *16 (S.D.N.Y. Mar. 29, 2024) ("access to information is sufficient" because it would be reckless to discuss "without first looking at the … data"); and

- Safety complaints filed with CSPC were sent to Peloton within five days of receipt where practicable, which would include the 35 formal reports of post breakage received as of April 30, 2023. (¶¶80, 140, 245, 249).

Through the reports above, and given McCarthy, Foley, Cortese, and Woodworth were hands-on managers (¶¶296-300), Defendants received and had to access to information that evidenced mounting quality and safety defects that starkly contrasted with their misstatements.[15] *Stadium Cap.*, 2024 WL 456745 at *5 (access to data contradicting misstatements establishes scienter); *Casper*, 2022 WL4637795, at *14 (same); *see also In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (hands-on managers presumed to have knowledge).

Defendants repeatedly claim the CW allegations are too vague to demonstrate scienter and fail to establish Defendants were on notice of information that contradicted their misstatements. DB21-26. But the SAC includes allegations from numerous CWs evidencing widespread quality and safety defects, which were elevated to Defendants via multiple avenues and directly contradicted their class period statements. *Compare e.g.,* ¶¶196, 206 (affirming safety is top priority) *with* ¶¶78, 131-32, 134, 256 (Defendants received escalating reports of post breaks and seat slipping); *compare e.g.*, ¶193 (touting the Bike and "deliver[ing] the best product experience") *with* ¶¶151, 153, 162, 256 (rust was significant issue and Defendants had access to data collected for the same); *see also* n.8, *supra.*

---

[15] Defendants' mere access to data authorities are inapt. *See In re Vroom, Inc. Sec. Litig.*, 2025 WL 862125, at *36 (S.D.N.Y. Mar. 18, 2025) (DB23) (executives "permitted … to obtain access to" third-party data); *In re SelectQuote, Inc. Sec. Litig.*, 2025 WL 1001247, at *3 (S.D.N.Y. Apr. 3, 2025) (DB21) ("access to tools").

Defendants also repeatedly contend that Peloton's (admitted) receipt of 35 *formal* reports is insufficient to establish that Defendants knew there would be a recall (DB19-20, 25, 29) but Plaintiffs need not show a recall was imminent to show that Defendants knew their misstatements were false when made.

*Duty to Monitor*: Defendants also had a legal duty, pursuant to §15 of the CPSA, to monitor the Bike's safety and quality, to assess whether defects or unreasonable risks of injury existed, and report such risks to CPSC, which Foley, Woodworth, McCarthy, and Coddington acknowledged in Peloton's SEC filings. ¶¶242-44. Defendants also committed to an enhanced compliance system for all Peloton products in connection with the Settlement and as such, had additional monitoring obligations. ¶277. Thus, Defendants here either monitored the extensive reports of safety and quality defects, and injuries related to the same or they were reckless in failing to do so. *See Dentsply Sirona*, 665 F. Supp. 3d at 290 (failure to check information subject to "duty to monitor" supports scienter); *Novak v. Kasaks*, 216 F.3d 300, 311 (2nd Cir. 2000) (same). Defendants also knew what information was required to be reported to CPSC and the expense associated with a full product recall from their roles in Tread+ recall and the investigations thereafter, as well as from recalls of similar products with far less formal reports. ¶¶267-74; *Vale*, 2020 WL 2610979, at *17 (prior incident supported scienter); *In Re Didi Global Inc. Sec. Litig.*, 2024 WL 1119483, at *9-10 (S.D.N.Y. Mar. 14, 2024) (sanctions on other companies for similar offenses support scienter). But Defendants obscured defects and attempted to dissuade consumers from reporting the same. *See e.g.*, ¶¶109-10, 114, 144; *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 308 (2d. Cir. 2015) (efforts to deceive support scienter).

*Project Tinman Coverup*: Defendants' companywide rust coverup supports scienter. ¶¶148, 160, 259; *Dentsply Sirona*, 665 F. Supp. 3d at 291 ("affirmative steps" to further fraud support scienter). Defendants knew the scope of Peloton's quality defects because the Company sent corporate representatives to the facilities to assess it, conducted a full-scale audit of impacted inventory, and

created teams to specifically assess the damage's extent. ¶151. There were weekly meetings—which began under Foley, Woodworth, Cortese, and Kushi's leadership, and lasted at least until October 2022, when McCarthy and Coddington were at the helm—to discuss the issue. ¶¶21-26, 161, 261; *comScore*, 268 F. Supp. 3d at 551 (plausible scheme began under one regime and continued under another); *Wang*, 661 F. Supp. 3d at 235 ("absurd to suggest that management was without knowledge"). Per CWs 8 and 13, Peloton even created a customer service script for rust complaints, which involved asking about injuries (indicating it was not truly "cosmetic" as Defendants claimed). ¶¶152, 163, 218. Peloton also created a process to escalate rust in the Bike's joints, which included legal (*i.e.*, Kushi) and confirms Peloton knew rust was impacting structural integrity. ¶¶26, 264, 266; *Gaotu*, 2025 WL 416872, at *11 ("business changes" "indicative of [d]efendants' knowledge"). This data was amassed in Confluence and available to Defendants, further supporting scienter.[16] *CarLotz,* 2024 WL 1348749, at *16.

Project Tinman was an overt effort to hide clear defects in order to prevent sales disruptions. ¶¶149, 260; *Novak*, 216 F.3d at 311 (scheme to disguise issue that would damage the company supports scienter).[17] CW allegations regarding Peloton's systematic coverup were corroborated by the *Financial Times* and directly implicated Peloton's "executives." ¶259.

***Frequent Public Discussion, Denials, and Proximity to Disclosures***: That Defendants frequently spoke about the Bike's safety (¶¶170, 173-74, 189, 191, 196, 206) and quality (¶¶176, 180, 184-86, 190, 193) supports scienter. *Gauquie v. Albany Molecular Rsch., Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("communicating with the public about this issue demonstrates defendants'

---

[16] In *Russo v. Bruce*, 777 F. Supp. 2d 505, 523 (S.D.N.Y. 2011) (DB24), plaintiff did not allege facts showing a permit submission was low quality such that success was unlikely or that defendants knew the same, here the SAC alleges Defendants received numerous reports and complaints that then undermined the veracity of their statements.

[17] Defendants spin their efforts to hide Tinman by claiming it was not meant to mislead investors, only to ward off impacts to consumer perception. DB24. Defendants thus concede they knew rust was a materialized quality issue that if revealed would damage Peloton's reputation, which supports Plaintiffs' arguments. *See* §IV.A.3, *supra*. *Cozzarelli v. Inspire Pharms., Inc.*, 549 F.3d 618, 626 (4th Cir. 2008) (DB24) is inapt as defendants publicized concealing data for competitive reasons whereas here Defendants hid, then downplayed the quality issues.

sensitivity to it"); *Vale*, 2020 WL 2610979, at *17 (similar). Defendants' denial in response to the February 17, 2022 *Financial Times* article also supports scienter, particularly given its proximity to the February 22, 2022 article (which exposed the coverup as companywide rather than isolated). *See Karimi*, 607 F. Supp. 3d at 398 (public denials support scienter); *Wang*, 661 F. Supp. 3d at 235 (short time between misstatement and disclosure support scienter). The one-week gap between Defendants' loss accrual statement (which is itself indicative of scienter) and the revelation that the Recall encompassed 2.2. million Bikes also supports scienter.[18] *Wang*, 661 F. Supp. 3d at 235; *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 216 (2d Cir. 2020) (under-representations indicates recklessness).

*Core Operations:* Scienter is further bolstered here because the misstatements concerned Peloton's flagship product (which comprised the "significant majority" of sales) and its top priorities—member safety and experience. *Wang*, 661 F. Supp. 3d at 237 (core operations supported scienter where statements concerned key initiative); *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *5 (S.D.N.Y. June 21, 2021) (similar); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 481 (S.D.N.Y. 2008) ("single largest component of total revenue" was core operation).

### 2. Corporate Scienter

Scienter should be imputed to Peloton from the Individual Defendants, Peloton's senior leadership, and the Executive Product Safety Committee. *Vale*, 2020 WL 2610979, at *17 (imputing scienter from "senior leadership"). Here, as discussed in §IV.B.1, *supra*, Defendants knew of and actively concealed Bike post, rust, and assembly issues. Several CWs also affirmed that defects were raised repeatedly with Peloton's C-suite, executives, directors, VPs, and department heads. ¶¶79, 84-85, 89, 91, 96-99, 102, 104, 106-07, 109, 136, 140, 161, 166. This is

---

[18] *Diabat v. Credit Suisse Grp. AG*, 2024 WL 4252502, at *164 (S.D.N.Y. Sept. 19, 2024) (Order at 37) is inapt as an auditor's scienter could not be established by another auditor's failure to identify a problem five years earlier.

sufficient for corporate scienter because, contrary to Defendants' position (DB30), officers and directors need only be involved in concealment of the fraud and need not make an alleged misstatement. *See Jackson v. Abernathy*, 960 F.3d 94, 98-99 (2d Cir. 2020); *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 316-17 (S.D.N.Y. 2011) (performing duties "in a consciously wrongful or reckless manner establishes … corporate scienter."); *Howard*, 2021 WL 2561895, at *19-22 (corporate scienter pled where employees knew safety tests unacceptable for products sold).[19]

### 3. Motive and Opportunity to Commit Fraud

Motive can bolster or independently satisfy scienter. *Tellabs*, 551 U.S. at 325; *Gaotu*, 2025 WL 416872, at *10-11. Here, Defendants were motivated to (and did) obscure safety and quality defects to fend off further reputational and operational damage given the Tread+ recall's fallout. *See In re Rsrv. Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 320-21 (S.D.N.Y. 2010) (motive to avoid reputational harm sufficient for scienter); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 56 F. Supp. 3d 549, 555 (S.D.N.Y. 2014) (similar).

Foley's, Cortese's, and Coddington's personal motivation to obscure Peloton's pervasive defects contribute to or establish an inference of scienter here. Defendants contend the Order requires rejection of these allegations. DB28. Not so. Foley and Cortese need not have sold stock to find motive pled; rather, their motivation "to conceal" the defects "to avoid a decline in" Peloton's stock "that could trigger a margin call" is sufficient. *Meyer v. Concordia Int'l Corp.*, 2017 WL 4083603, at *7 (S.D.N.Y. July 28, 2017) (pledged shares for personal loans sufficient motive without voluntary stock sales); *see also In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 416-17 (S.D.N.Y. 2003) (same); ¶284, 286-87, 290. Likewise, that Coddington liquidated

---

[19] *See* DB30 citing *In re Teladoc Health, Inc. Sec. Litig.*, 2025 WL 886934, at *6 n.4 (S.D.N.Y. Mar. 21, 2025) (DB30) (non-defendant individuals were not "involved in the dissemination of the fraud[.]")

*76%* of her Peloton holdings prior to Peloton's August 23, 2023 stock drop supports scienter despite the 10b5-1 plan since it was entered in November 2022 amid Project Tinman and escalating post-breakage reports. ¶¶111-145, 290-92; *see In Re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001) (scienter pled where executive sold ~80% of holdings); *see also In re Gentiva Sec. Litig.*, 971 F. Supp. 2d 305, 328 (E.D.N.Y. 2013) (10b5-1 plan entered in class period no defense); *Blanford*, 794 F.3d at 309.  At the very least, the timing of Coddington's entry into the 10b5-1 trading plan presents an issue of fact that cannot be resolved on a motion to dismiss. *See KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 611 & n.3 (4th Cir. 2021).[20]

### 4. Plaintiffs' Theory of Scienter is More Compelling than Defendants'

Plaintiffs adequately allege, in the wake of a recent recall, Defendants knew or recklessly disregarded safety and quality issues afflicting their flagship product, and actively concealed them. Defendants contend the more reasonable inference is the rust was merely a cosmetic issue that was diligently addressed along with Peloton's other defects. DB22. Defendants' rosy interpretation is undermined by countless complaints and reports escalating those issues.[21] ¶¶130-140. It is also belied by Defendants' concerted effort to conceal defects by taking a "just ship it" approach, devising Project Tinman, "hoping for the best[,]" and the Recall. ¶¶96, 109-110, 141-167. This inference is "cogent and at least as compelling" as Defendants' competing one. *Tellabs, Inc.*, 551 U.S. at 324.

### V. **CONCLUSION**

For the foregoing reasons, Defendants' Motion should be denied in its entirety.[22]

---

[20] *See* Order at 38 citing *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.,* 28 F.4th 343, 355–56 n.4 (2d Cir. 2022) (no allegations trading plan took advantage of the inflated stock, and defendant *purchased* more than sold).

[21] *Compare* DB21 citing *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 581 (S.D.N.Y. 2014) (CWs did not describe contradictory information that defendants had and only provided thoughts about the quality issues) *with* ¶¶130-140.

[22] Because the SAC states a §10(b) claim, it also states a §20(a) claim. *Casper*, 2022 WL 4637795 at *15-16. Plaintiffs' FOIA request to the CPSC is outstanding and thus Plaintiffs request leave to amend if the Motion is granted. *Wilder v. News Corp.*, 2015 WL 5853763, *17 (S.D.N.Y. Oct. 7, 2015) (granting permission to move to file third amended complaint).

Dated: June 30, 2025

Respectfully submitted,

POMERANTZ LLP

*/s/ Justin D. D'Aloia*

Jeremy A. Lieberman
Emma Gilmore
Justin D. D'Aloia
Villi Shteyn
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
egilmore@pomlaw.com
jdaloia@pomlaw.com
vshteyn@pomlaw.com

*Counsel for Co-Lead Plaintiff David Feigelman and Additional Named Plaintiff Sam Solomon and Co-Lead Counsel for the Class*

LEVI & KORSINSKY, LLP

*/s/ Gregory M. Potrepka*

Shannon L. Hopkins
Gregory M. Potrepka
Morgan M. Embleton
Amanda D. Foley
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Fax: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
membleton@zlk.com
afoley@zlk.com

*Counsel for Co-Lead Plaintiff Jia Tian and Co-Lead Counsel for the Class*

31