UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

JIA TIAN and DAVID FEIGELMAN,
*individually and on behalf of all others
similarly situated*,

                Plaintiffs,

          v.

PELOTON INTERACTIVE, INC., JOHN FOLEY,
BARRY MCCARTHY, JILL WOODWORTH,
ELIZABETH F. CODDINGTON, THOMAS
CORTESE, and HISAO KUSHI,

                Defendants.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
23-CV-4279 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff Sam Solomon commenced this securities class action on June 9, 2023, on behalf of himself and other similarly situated investors who purchased or otherwise acquired Peloton Interactive, Inc. ("Peloton") securities between May 10, 2022 and May 10, 2023 against Defendants Peloton, Barry McCarthy, Jill Woodworth, and Elizabeth F. Coddington. (Compl. ¶¶ 1, 13–16, Docket Entry No. 1.) Solomon alleged that Defendants violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). (*Id.* ¶ 1.) On November 6, 2023, Jia Tian and David Feigelman, as lead Plaintiffs,[1] filed an Amended Complaint and added Defendants John Foley, Thomas Cortese, Hisao Kushi, and Tammy Albarrán (collectively with McCarthy, Woodworth, and Coddington, the "Individual Defendants") (the "Amended

---

[1] On August 22, 2023, Tian and Feigelman filed a joint motion for appointment as lead Plaintiffs. (*See* Consent Mot. to Appoint Co-Lead Pls. and Co-Lead Counsel, Docket Entry No. 16.) On September 7, 2023, Magistrate Judge James R. Cho granted the joint motion without objection and directed Tian and Feigelman to file an amended complaint. (Order granting Consent Mot. to Appoint Co-Lead Pls. and Co-Lead Counsel, Docket Entry No. 17.)

Complaint"). (Am. Compl. ¶¶ 19, 23–26, Docket Entry No. 23.) The Amended Complaint also expanded the class period to through May 6, 2021 and August 22, 2023 (the "Class Period"). (*Id.* ¶ 1.) On April 11, 2025, Plaintiffs filed a Second Amended Complaint and removed Tammy Albarrán as a Defendant (the "SAC"). (SAC ¶¶ 20–27, Docket Entry No. 44.)

Defendants move to dismiss the SAC for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, and Plaintiffs oppose the motion.[2] For the reasons explained below, the Court grants Defendants' motion.

## I.   Background

Peloton is a Delaware corporation with principal executive offices in New York, New York.[3] (SAC ¶ 20.) The Individual Defendants were senior officers or board members of Peloton during the Class Period. (*Id.* ¶ 340.) Defendant McCarthy has been the Chief Executive Officer ("CEO") and President of Peloton and a member of the Board of Directors (the "Board") since February 9, 2022. (*Id.* ¶ 22.) Defendant Woodworth was Peloton's Chief Financial Officer ("CFO") from before the Class Period to June 13, 2022, and a consultant to Peloton from June 13, 2022 until September 13, 2023. (*Id.* ¶ 23.) Defendant Coddington has been Peloton's CFO since June 13, 2022. (*Id.* ¶ 24.) Defendant Foley is Peloton's co-founder and was its CEO and Chairman of the Board from before the start of the Class Period until February 9, 2022 and Executive Chairman of the Board from February 9, 2022 to September 12, 2022. (*Id.* ¶ 21.) Defendant Cortese was Peloton's Chief Operating Officer from before the start of the Class

---

[2] (Defs.' Not. of. Mot. to Dismiss ("Defs.' Mot."), Docket Entry No. 50; Defs.' Mem. in Supp. of Defs.' Mot. ("Defs.' Mem."), appended to Defs.' Mot., Docket Entry No. 50-1; Pls.' Opp'n to Defs.' Mot. ("Pls.' Opp'n"), Docket Entry No. 51; Defs.' Reply in Supp. of Defs.' Mot. ("Defs.' Reply"), Docket Entry No. 52.)

[3] The Court assumes the truth of the factual allegations in the Second Amended Complaint for the purpose of deciding Defendants' motion.

Period until August of 2021 and Chief Product Officer from August of 2021 to November 1, 2023.  (*Id.* ¶ 25.)  Defendant Kushi was Peloton's Secretary and Chief Legal Officer from before the start of the Class Period until October 3, 2022.  (*Id.* ¶ 26.)

### a. Peloton's business model

Peloton manufactures personal fitness equipment and sells subscriptions to live and on-demand fitness classes.  (*Id.* ¶¶ 2, 46.)  Peloton's "exercise machines are equipped with a large touchscreen video display which provide[s] direct access to Peloton's course catalog and, as such, are referred to as its 'Connected Fitness Products.'"  (*Id.* ¶ 46.)  During the Class Period, Peloton's Connected Fitness Products included the Bike, which is its flagship stationary spin bike (the "Bike"); the Bike+, a premium version of the Bike; the Tread, a treadmill; and the Tread+, a premium version of the Tread.[4]  (*Id.* ¶¶ 2, 46, 51.)  Peloton's primary revenue sources are its Connected Fitness Products and the "month-to-month subscriptions" of Peloton's "digital library" of its fitness classes.  (*Id.* ¶ 3.)  At the start of the Class Period, the Bike accounted for a "significant majority" of Peloton's annual $4.02 billion in sales, and "almost 75% of Peloton's subscription revenues were associated with Connected Fitness Products."  (*Id.* ¶¶ 3, 52.)  Because "the only source of revenue from a customer after an initial product purchase was often through his or her monthly subscription," Peloton and investors were focused on the "rate of subscription cancellations, referred to as 'churn.'"  (*Id.* ¶ 4.)  "Prior to the Class Period, Peloton boasted an unprecedented churn rate of less than 1%."  (*Id.*)

---

[4]  In September of 2020, Peloton rebranded the Tread as the Tread+.  (SAC ¶ 51.)  In December 2020, Peloton released a "sleeker, more lightweight version branded as the new Tread."  (*Id.*)  For clarity, the Court will refer to the "Tread+" as the treadmill released in 2018 and rebranded in September 2020 and the "New Tread" as the treadmill released in December of 2020.

"As of June 30, 2019, Peloton had more than 500,000 active subscribers, and its annual revenues reached almost $1 billion." (*Id.* ¶ 49.) "On September 26, 2019, Peloton commenced an [Initial Public Offering] in which it issued and sold over 40,000,000 shares of its Class A common stock at $29.00 per share." (*Id.*)

One of Peloton's "fundamental values" is its "Members First" philosophy where Peloton "obsess[es] over every touchpoint of [their] member experience." (*Id.* ¶ 54.) Peloton regularly receives direct feedback from members through several channels. (*Id.* ¶ 73.) "First, Peloton has a dedicated Member Support Team that is responsible for working directly with Peloton members to answer questions and to resolve their issues, including safety issues or product defects." (*Id.* ¶ 74 (emphasis omitted).) "Second, throughout the Class Period, Peloton also maintained the Escalations team within its Members Services group, which was comprised of Executive Escalations Specialists," (*id.* ¶ 75 (emphasis omitted)), who "addressed customer issues that were raised to executive officers," (*id.* ¶ 36). For example, Executive Escalation Specialists handled "complex and sensitive customer issues . . . involving legal, security, and [Public Relations] implication" with "senior management." (*Id.* ¶¶ 75, 253.) Escalations team member Confidential Witness 9 ("CW9") and manager of Member Support Confidential Witness 12 contend that Peloton used a program called Zendesk to collect ticket data and provide reports on "how many instances of a certain topic came, how fast agents were resolving tickets, or how many tickets were being escalated," which would be shared from the Escalation teams executives to the executive suite. (*Id.* ¶ 78.) Confidential Witness 8 ("CW8"), who worked in a director level in customer service, contends that Defendant McCarthy "forwarded emails he received to the Escalations team distribution list." (*Id.* ¶ 79.)

"Third, Peloton receives notice of any safety-related complaints about its products that are filed with the [U.S. Consumer Product Safety Commission (the 'CPSC')]." (*Id.* ¶ 80 (emphasis omitted).)  "Fourth, Peloton engages with members through social media," including through "Community Associates" who are "tasked with monitoring all social media channels for insights by current or prospective members, and addressing support-related posts, comments, and messages." (*Id.* ¶ 81 (emphasis omitted).)  "Fifth, Peloton also receives a wealth of detailed behavioral data from members through their use of Connected Fitness Products and Peloton Digital." (*Id.* ¶ 82 (emphasis omitted).)  In a March of 2018 interview, Brad Olson, the then-head of Peloton's Member Experience division, said that Peloton "capture[s] every single piece of Member feedback across all channels, and read[s] it back to the entire organization on a regular basis to identify emerging trends and areas for improvement." (*Id.* ¶ 83 (emphasis omitted).)  "In 2020, Olson confirmed that Peloton continued to 'pull all that together and share it broadly in the organization.'" (*Id.*)  Confidential Witness 2 ("CW2"), who worked as a "Member Support Supervisor department from July [of] 2021 to October [of] 2022" and as a "Senior Partner Analyst from October [of] 2022 to September [of] 2023," (*id.* ¶ 29), confirmed that reports contained both negative and positive feedback. (*Id.* ¶ 83.)  According to CW8, the monthly report produced by marketing was "generally positive," while the monthly report produced by member support — particularly, the escalations team — were "generally negative" because "you don't call member support unless you have a problem." (*Id.* ¶ 84.)

**b.    Peloton's alleged quality control and manufacturing issues**

Several confidential witnesses stated that because Peloton's manufacturers "could not consistently make the Bikes' and treadmills' parts to specifications," there were "massive assembly problems and other defects prior to and throughout the Class Period." (*Id.* ¶ 86.)  For example, CW8 contends that there were design problems with Peloton products that made

5

"product quality issues even worse," resulting in one out of every fifteen bike installations having a problem within the first thirty days. (*Id.* ¶¶ 87–88.) According to CW8, Defendants were aware of the assembly issues because the pervasiveness of the assembly issues resulted in Defendant Cortese beginning an unsuccessful "initiative to get to zero problems within the first [sixty] days for all of its products." (*Id.* ¶ 89.) In addition, CW8 reported that growing Peloton's base was prioritized over issues related to the poor quality of Peloton's products and its "weak quality control." (*Id.* ¶ 91.) Similarly, Confidential Witness 5 ("CW5") stated that Peloton was "already having 'assembly issues' with the Peloton Bike+" before its release in September of 2020 because pieces that were not made to specifications were nevertheless sold to customers. (*Id.* ¶¶ 93–95.) Plaintiffs, CW5, and CW1 contend that manufacturing problems were pervasive across Peloton manufacturers in Taiwan, Whitsett, and North Carolina. (*Id.* ¶¶ 98, 104, 108.) Senior Director of Quality James Gunipero indicated that executives above him "knew about the issue and did not want to do anything about it." (*Id.* ¶ 96.) In addition, CW5 is "very confident" that Defendant Cortese was aware of these issues, he would nevertheless say "Just ship it." (*Id.* ¶ 109.)

### c. Consumer issues with Peloton's Connected Fitness Products

Beginning in 2018, Peloton received consumer complaints reporting safety concerns about the Tread+ and Bike.[5]

### i. Complaints about the Tread+

Peloton began receiving consumer complaints about the Tread+ shortly after its launch in late 2018. (*Id.* ¶ 56.) Customers reported that "a variety of household objects were getting sucked under and entrapped by the rear of [Tread+'s] unprotected running belt while in use,

---

[5] Despite the allegations regarding the Tread+, Plaintiffs' claims in this action are about the Bike.

6

often lifting the massive device off the ground." (*Id.*) "On March 3, 2021, Peloton received notice that a six year-old died after being swept under the [Tread+'s] slat belt." (*Id.*) On March 4, 2021, Peloton reported the safety concern to the CPSC. (*Id.* ¶ 57.) After investigating, the CPSC asked Peloton to recall the Tread+, but Peloton refused and instead issued a press release stating that "[t]here is no reason to stop using the Tread+, as long as all warnings and safety instructions are followed." (*Id.* ¶¶ 58–59.) Approximately two months later, "on May 5, 2021, CPSC and Peloton issued a joint press release announcing a voluntary recall of all Tread+ machines on the market." (*Id.* ¶ 60.) "At the time of this recall, Peloton had already sold approximately 125,000 Tread+ machines in the United States." (*Id.*) "In total, the Tread+ recall cost Peloton over $100 million in direct recall-related expenses." (*Id.* ¶ 61.) During a May 6, 2021 conference call Peloton executives held to discuss the quarter ending on March 31, 2021, Defendant Foley stated that "Peloton made a mistake in our initial response to the [CSPC]'s request that we recall our Tread+ product." (*Id.* ¶ 64 (alteration in original).) He also stated that Peloton has "some work to do to get back on the right side of the line with trust and safety." (*Id.*) In Peloton's annual Securities and Exchange Commission ("SEC") filing for the period ending June 30, 2021, Peloton identified the Tread+ recall as an "example" of their success depending on their "ability to maintain the value and reputation of the Peloton brand" and noted that their "products and services may be affected from time to time by design and manufacturing defects, real or perceived." (*Id.* ¶ 65.)

By "no later than May 7, 2021, the CPSC notified Peloton that it had opened an investigation into the [c]ompany's compliance with its reporting obligations under the [Consumer Product Safety Act] in connection with the Tread+ safety issue it first reported to the CPSC in March 2021." (*Id.* ¶ 271.) The U.S. Department of Justice and U.S. Department of

7

Homeland Security also "opened investigations into Peloton's reporting of injuries associated with its products generally." (*Id.*)  In August of 2022, "the CPSC informed Peloton that its staff believes that it knowingly failed to satisfy its reporting obligation under the CPSA" and "that by the time Peloton made its first report to the CPSC about the Tread+ safety issue in March [of] 2021, it had already received more than 150 previous reports from as far back as December [of] 2018" about the Tread+'s slat belt.  (*Id.* ¶ 272.)  Defendants McCarthy and Coddington reported the CPSC's findings in the 2022 Form 10-K filed with the SEC on September 7, 2022, and Defendant McCarthy entered a settlement agreement with the CPSC in December of 2022.  (*Id.* ¶¶ 273, 275.)  Peloton agreed to pay a civil penalty of more than $19 million and pledged to maintain an "enhanced compliance program designed to ensure compliance with the CPSA with respect to any consumer product . . . distributed or sold by Peloton."  (*Id.* ¶¶ 276–77 (emphasis omitted).)

### ii.    Complaints about the Bike

Plaintiffs contend that Peloton "was receiving a cascade of complaints that the seat post on the Bike was severely rusting, in addition to detaching *while in use*."  (SAC. ¶ 6.)  "[T]he seat of the Bike is mounted on top of a removable post that has a vertical and horizontal segment, which are connected by a welded joint."  (*Id.* ¶ 69.)  The design allows the user to move the seat up and down and forward and backward, placing "inherent tension on the joint whenever weight is applied on the horizontal shaft."  (*Id.*)  The structural integrity of the joint between the vertical and horizontal segments is "critical to the design of the Bike's seat post."  (*Id.*)  The complaints included reports that a post for the Bike seat had "split along the seam of its joint," (*id.* ¶ 114), that the post for the Bike seat "broke off along the 'weld' of the post joint," (*id.* ¶ 116), and that a user's "seat post snapp[ed] during a ride causing [the user] to fall backwards off the bike," (*id.* ¶ 118).  Plaintiffs contend that "[t]hroughout the Class Period, Peloton received a steady stream of

8

reports about [the Bike] seat posts rusting, breaking, and detaching through its customer service resources, social media pages that the [c]ompany admittedly (and verifiably) monitored, and even directly from the CPSC."  (*Id.* ¶ 8; *see also id.* ¶¶ 111–129 (providing examples of reports).)  "[A]s of April 30, 2023, Peloton admitted it formally received at least [thirty-five] reports of the seat post breaking 'during use,' according to an internal memorandum sent to employees by Peloton's Executive Product Safety Committee on or around May 4, 2023."  (*Id.* ¶ 140.)

### iii. Project Tinman

Plaintiffs allege that, under the code name "Project Tinman," Defendants began covering up visible rust build-up on the Bike seat frames at Peloton's warehouses and selling the Bikes to customers at full price.  (*Id.* ¶ 9.)  In support, Plaintiffs contend that Peloton senior executives issued a series of protocols to direct "staff assembling or inspecting the Bikes in the United States to apply a chemical solution called a 'rust converter,' which concealed the corrosion by reacting with the rust to form a 'black layer' like the color of the frame."  (*Id.* ¶ 144.)  Several former Peloton employees supported Plaintiffs' description of Project Tinman.  (*Id.* ¶ 145.)  Confidential Witness 13 ("CW13"), a "supervisor in the [c]ompany's Hardware and Software Department," (*id.* ¶ 40), recalled that rust-related complaints started approximately in October of 2020.  (*Id.* ¶ 147.)  Confidential Witness 1 ("CW1"), who was a "Product Manager for the Supply Chain," (*id.* ¶ 28), and Confidential Witness 3 ("CW3"), who was a "an Assembly Technician . . . [and later] a Quality Control Inspector," (*id.* ¶ 30), attributed the rust issue, at least in part, to humid conditions during shipping the bike parts from Taiwan to the United States.  (*Id.* ¶ 156.)  CW5, who worked on Peloton's manufacturing team, (*id.* ¶ 32), further attributed the rust issue to supply chain issues with Peloton's manufacturer in Taiwan.  (*Id.* ¶ 146.)  According to CW5, "It was a big deal, and everybody knew about it.  These things were

rusty before they got moved into the next process." (*Id.*) Confidential Witness 4, who was assigned to Project Tinman in late 2021, stated that employees "had to take a heavy-duty flashlight and shine it into the inside of the bike to check the severity of the rust," and if there was a lot of rust, the rust "would get scraped out and then sprayed down on the inside" to cover it up. (*Id.* ¶ 155.) Similarly, Confidential Witness 14, Confidential Witness 15 ("CW15"), and Confidential Witness 16 stated that they stopped building Bikes to, instead, scrape off rust. (*Id.* ¶ 148.) "Prior to Tinman, a Bike frame with *any* rust was automatically disqualified from being sold." (*Id.* ¶ 145 (emphasis in original).)

On February 17, 2022, the *Financial Times* reported on Project Tinman with supporting details from former Peloton employees and internal documentation. (*Id.* ¶¶ 11, 216.) On February 22, 2022, the *Financial Times* published another article "featur[ing] rich detail on Project Tinman sourced from eight current and former employees and internal materials they provided which documented the program . . . and . . . a company-wide national effort to use a chemical solution to change the color of the rust." (*Id.* ¶ 217.) "On this news, Peloton's stock fell approximately 14% in the aggregate." (*Id.* ¶ 11.) CW2 stated that after the *Financial Times* article, Peloton changed its internal guidelines for handling customer complaints about rust. (*Id.* ¶ 264.) Previously, any reports about rust were referred to Peloton's "Escalation Team," but Peloton changed its guidelines so that only reports of rust within "joints or connection points" were sent to the Escalation Team. (*Id.*) CW13 also stated that Peloton was tracking the rust complaints through an internal platform called "Confluence" containing documents, images, and "information about tests that occurred in warehouses investigating the rust." (*Id.* ¶¶ 153, 256.) Although the documents were accessed by engineers and those working in quality assurance, members of the executive suite and above had access to Confluence. (*Id.*)

According to Plaintiffs, Peloton's executives orchestrated Project Tinman, demonstrating "a conscious attempt to *hide* the rust and pass them off to customers at full price." (*Id.* ¶ 259 (emphasis in original).) CW15, for example, received an email that "told us not to disclose any type of information about Project Tinman" because it would "impact people buying the Bike." (*Id.* ¶ 149.) In addition, executives from Peloton's headquarters would visit the warehouse to inspect the Bikes to "see the magnitude of the rust issue and see how to come up with solutions to try to hide the problem." (*Id.* ¶ 159.)

### d. Peloton's alleged misrepresentations and omissions about the Bike and Peloton's business model

Plaintiffs allege that "Defendants concealed [the Bike seat] issues from customers and regulators alike and continued to laud the quality of [Defendants'] products, including the Bike, and [Defendants'] commitment to safety." [6] (*Id.* ¶ 7.)

Plaintiffs allege that Defendants made misleading statements about the quality and safety of the Peloton Bike throughout the Class Period. For example, Defendant Foley stated on a May 6, 2021 earnings call that Peloton is a "members-first organization" and "the safety of our member community comes first." (*Id.* ¶ 170.) He also publicly stated in interviews and on earnings calls in 2021 that Peloton has "an incredible responsibility and obligation to the safety of people who bring Peloton in their home," (*id.* ¶ 174), that Peloton is "100% committed to the

---

[6] Plaintiffs also state that Defendants similarly made false and misleading statements following the Tread+ recall. Plaintiffs contend that "[d]espite the deluge of safety and quality defects reported to or otherwise known by the [c]ompany during the Class Period, Defendants made numerous false and misleading statements in the wake of the Tread recall." (*Id.* ¶ 168.) For example, Plaintiffs state that at an October 21, 2021 industry conference, Defendant Cortese stated, in response to a question about the Tread+ recall, that Peloton "is energized that we can now take . . . this charge and become" the "far, far ahead runner in everything safety-related . . . for innovation in fitness." (*Id.* ¶ 189.) As discussed above, Plaintiffs do not bring any claims regarding the Tread or Tread+ in this action.

safety and well-being" of its members, (*id.*), and that "[e]verything we do at Peloton is designed to keep our members engaged and our churn rate low," (*id.* ¶ 178).

In Peloton's May 7, 2021 Form 10-Q filing, Peloton stated:

> Our products and services may be affected from time to time by design and manufacturing defects, real or perceived, that could adversely affect our business and result in harm to our reputation. We offer complex hardware and software products and services that can be affected by design and manufacturing defects. . . . Defects may also exist in components and products that we source from third parties. Any defects could make our products and services unsafe and create a risk of environmental or property damage and/or personal injury. . . . [T]he occurrence of real or perceived defects in any of our products, now or in the future, could result in additional negative publicity, regulatory investigations, or lawsuits filed against us, particularly if Members or others who use or purchase our Connected Fitness Products are injured.

(*Id.* ¶ 171 (emphasis omitted).) Peloton submitted additional Form 10-Ks and Form 10-Qs to regulators in 2021 and 2022 containing similar language about the company's risks and uncertainties. (*Id.* ¶¶ 187, 194, 198, 202, 204, 210.) Peloton's 2021 Form 10-K, signed by Defendants Foley ad Woodworth, and Schedule 14A proxy statement, signed by Defendant Kushi, also identified "Put[ing] Members First" as one of its core values, elaborating that Peloton "obsess[es] over every touchpoint of our Member experience." (*Id.* ¶¶ 185, 190.) Peloton's website also stated that "the Member experience [is] at the core of everything we do" and "[f]rom product design to manufacturing and from delivery to the entire Member experience — our team continuously evaluates the safety of our products." (*Id.* ¶ 196.)

At a June 8, 2021 industry conference, Defendant Woodworth stated that Peloton is "always continuously working harder to . . . make our products and make our software and content better and better and better." (*Id.* ¶ 176 (emphasis omitted).) In a 2022 letter to stockholders, Defendant McCarthy stated that Peloton was "beating" its own timeline for

12

"sustained growth and scale" by growing its subscriber base and continuing to have low churn rates. (*Id.* ¶ 208.) On a February 1, 2023 earnings call, Defendant Coddington stated that Peloton did not "expect any significant changes to our current churn levels." (*Id.* ¶ 212.)

In Peloton's third quarter 2023 Form 10-Q, Peloton disclosed that it accrued "$8.4 million of estimated contingent loss expense related to a voluntary corrective action plan involving certain seat posts" of the Bike. (*Id.* ¶ 214.) As a result, Peloton stated that it may:

> incur incremental expenses or face other challenges in connection with the implementation of the [corrective action plan] beyond what we have currently estimated to be probable and reasonably estimable, including if the number of reported incidents materially increases, which may adversely impact our operating results, brand reputation, demand for our products, and business, although we do not currently anticipate that the total expenses related to implementation of the [corrective action plan] will be material to our financial position.

(*Id.* ¶ 214 (emphasis omitted).)

Plaintiffs allege that the above statements made by Defendants were "materially false and misleading when made, or omitted to state material facts necessary to make the statements not misleading" because Defendants actively concealed and failed to disclose that Peloton: (1) was assembling Bikes using parts that were not made to specifications; (2) had a policy of "Just Ship It," which meant that Bikes were "shipped regardless of whether they were made with parts that were not made to specifications"; (3) "in spite of its recent experience with the Tread+ recall" and its report of the issues to the CPSC, "which was mandating that Peloton recall all Bikes,"[7] Peloton continued to sell Bikes to customers for which the seat posts "were prone to rust, break, or [would] otherwise detach during use, rendering them defective or unsafe for users"; (4)

---

[7] Plaintiffs allege that "[b]y early 2023, the CPSC had informed Defendants that they would need to recall Bike seat posts." (SAC ¶ 12.) However, Plaintiffs do not provide any additional facts establishing when in early 2023 the CPSC issued this mandate.

"would need to recall millions of Bikes pending a comprehensive remedy and, as a direct result, experience a large amount of subscription churn"; (5) had a "company-wide effort to cover up visible signs of rust and/or corrosion" on the Bikes, and, accordingly, "the risks posed by design or manufacturing defect . . . were not merely hypothetical and Defendants did not prioritize the safety of Peloton Bike users"; and (6) "understated reserves for future product recall expenses by at least $40 million and the indirect impact a large-scale recall of Bikes would have on its Subscription revenue."  (*See generally id.* ¶¶ 168–215.)

        e.    **Peloton recalls Bikes sold between 2018 and 2023**

On May 11, 2023, Peloton announced a recall of all Bikes sold between January of 2018 and May of 2023.  (*Id.* ¶ 221.)  After announcing the recall, Peloton's stock price fell approximately 9.3%.  (*Id.* ¶ 225.)  Plaintiffs state that "[n]evertheless, the financial community remained upbeat that the impact of the [r]ecall would be short-lived based on [Peloton's] misleading estimate that the [corrective action plan] would cost it $8.4 million."  (*Id.* ¶ 226.)

Plaintiffs allege that Defendant McCarthy "began to reveal the true extent" of the recall at a May 24, 2023 industry conference, where he disclosed that Peloton had already "received more than 500,000 requests for a replacement [seat] post," which was more than Defendants were expecting, and estimated that the seat post replacement cost would total "somewhere in the neighborhood of" $10 million to $20 million.  (*Id.* ¶ 228.)  Peloton's stock price decreased approximately 5.1% over the next three days.  (*Id.* ¶ 229.)  In Peloton's August 23, 2023 quarterly letter to shareholders, Peloton stated that the recall "substantially exceeded" their initial estimate, "leading to an additional accrual of $40 million this quarter for actual costs incurred as well as anticipated future recall-related expenses."  (*Id.* ¶ 231.)  The letter stated that Peloton had (1) received approximately "750,000 requests for replacement [seat] posts," (2) "lost 29,000 subscriptions from the previous quarter," and (3) at least an additional 20,000 Peloton users

paused their subscription that quarter in comparison to the three previous quarters.  (*Id.* ¶¶ 231–32, 235 (emphasis omitted).)  Prior to the recall news, Peloton's subscriptions "consistently grew quarter-over-quarter ever since Peloton went public in 2019."  (*Id.* ¶ 232.)  Peloton's churn rate grew from 1.1% in the three preceding quarters to 1.8%, including subscription losses.  (*Id.*)  Peloton's stock price fell by 22.6% on August 23, 2023.  (*Id.* ¶ 233.)  Plaintiffs allege that Defendants made a series of misleading statements and failed to disclose material facts related to recurring Bike defects, leading to "the precipitous decline in the market value" of Peloton's stock price from $32.05 on February 16, 2022, the date of the first *Financial Times* article on Project Tinman, to $5.41 on August 23, 2023.  (*Id.* ¶¶ 307–12.)

## II.   Discussion

### a.   Standard of review

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must construe [the complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor."  *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)); *see also Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) ("[The Second Circuit] review[s] *de novo* a district court's dismissal of a complaint pursuant to Rule 12(b)(6), construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002))).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *New Yorkers for Religious Liberty, Inc. v. New York*, 125 F.4th 319, 327 (2d Cir. 2024) (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024) (quoting *Matson*, 631 F.3d at 63) (same); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678) (same); *see also Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 544 (2d Cir. 2024) ("[T]he plaintiff's allegations must enable the court to reasonably infer that the defendant is liable for the alleged misconduct"), *cert. denied sub nom.*, *NBA v. Salazar*, 146 S. Ct. 880 (2025); *Emilee Carpenter, LLC v. James*, 107 F.4th 92, 99 (2d Cir. 2024) ("[S]urviv[ing] a motion to dismiss . . . requires 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" (quoting *Iqbal*, 556 U.S. at 678)). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *see Roe*, 91 F.4th at 651 ("Although all factual allegations contained in the complaint are assumed to be true, this rule does not extend 'to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" (quoting *Iqbal*, 556 U.S. at 678)).

### b. Plaintiffs fail to plead that Defendants made an actionable misstatement

Defendants argue that Plaintiffs' claims under the Exchange Act must be dismissed because they fail to plead any materially misleading statements or omissions pursuant to the heightened pleading requirement for a claim of securities fraud. (Defs.' Mem. 11–18.) In support, Defendants contend that Plaintiffs fail to satisfy the heightened pleading requirement because Defendants fail to plead "with particularity" that Defendants made a material misrepresentation or omission that: (1) Peloton's risk disclosures were false or misleading, (*id.* at 11–14); (2) the lost accrual was false or misleading, (*id.* at 14–15); (3) statements regarding product safety and quality were false or misleading, (*id.* at 16–17); (4) statements concerning

16

Project Tinman were false or misleading, (*id.* at 17–18); and (5) statements concerning Peloton's subscriptions were false or misleading, (*id.* at 18–19).[8]  Defendants contend that because the SAC "rehashes claims and allegations the Court previously found insufficient," the Court should find the amended claims insufficient.  (*Id.* at 11.)

Plaintiffs argue that they adequately allege material misrepresentations by Defendants. (Pls.' Opp'n 9–22.)  In support, Plaintiffs contend that Defendants' statements regarding (1) risk disclosures, (*id.* at 15–18), (2) loss accrual, (*id.* at 20–22), (3) product safety and quality, (*id.* at 9–15), (4) Project Tinman, (*id.* at 7–8), and (5) subscriptions, (*id.* at 18–20), were materially false and misleading when made.

Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe."  15 U.S.C. § 78j(b); *see also City of*

---

[8]  Defendants only argue that Plaintiffs failed to plead the first two factors, that a defendant (1) made misstatements or omissions of material fact (2) with scienter.  First, Defendants argue that Plaintiffs failed to plead an actionable misstatement.  (Defs.' Mem. 11–19; Defs.' Reply 1–7; *see* SAC ¶¶ 168–215.)  Second, Defendants argue that Plaintiffs failed to plead a strong inference of scienter.  (Defs.' Mem. 19–30; Defs.' Reply 7–12; SAC ¶¶ 237–303.) Defendants do not address the remaining three factors (*i.e.*, (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury).  Moreover, as discussed below, because Defendants do not move to dismiss based upon these three additional factors, and because Plaintiffs failed to plead that Defendants made (1) misstatements or omissions of material fact (2) with scienter, the Court does not address the remaining factors.  *See Hassan v. Bos. Beer Co., Inc.*, No. 23-8, 2023 WL 8110940, at *3 n.2 (2d Cir. Nov. 22, 2023) (summary order) ("Because the amended complaint fails to sufficiently allege misstatements or omissions of material fact, we need not address the issue of scienter."); *Peneycad v. RTX Corp.*, No. 23-CV-1035, 2025 WL 2636616, at *26 n.6 (D. Conn. Sep. 12, 2025) ("Having decided that [p]laintiffs fail to allege either a material misrepresentation or the requisite scienter, the [c]ourt need not and does not decide whether the other factors have been satisfied."), *appeal docketed*, No. 25-2549 (2d. Cir Oct. 16, 2025); *Burns v. UP Fintechup Fintech Holding Ltd.*, No. 24-CV-1632, 2025 WL 936539, at *5 (S.D.N.Y. Mar. 27, 2025) ("The [c]ourt first addresses [d]efendants' alleged material omissions and finds that [p]laintiff fails to plead an actionable misstatement or omission.  As such, the court declines to consider the parties' scienter arguments.").

*Hialeah Employees' Ret. Sys. v. Peloton Interactive, Inc.*, 153 F.4th 288, 295 (2d Cir. 2025) (quoting 15 U.S.C. § 78j(b)) (same); *VR Glob. Partners, L.P. v. Petroleos de Venezuela, S.A.*, No. 24-1176, 2024 WL 4891271, at *3 (2d. Cir. Nov. 26, 2024) (summary order) (same); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021) (same); *Giunta v. Dingman*, 893 F.3d 73, 79 (2d Cir. 2018) (same).  To state a claim for securities fraud under Section 10(b) or Rule 10b-5 of the Exchange Act, "a plaintiff must allege that the defendant: (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."  *Nandkumar v. AstraZeneca PLC*, No. 22-2704, 2023 WL 3477164, at *1 (2d Cir. May 16, 2023) (summary order) (quoting *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 463 (2d Cir. 2019)); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 167 (quoting *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 100 (2d Cir. 2015), *abrogated by Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257 (2024))) (same); *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007)) (same); *see also Singh v. Cigna Corp.*, 918 F.3d 57, 62 (2d Cir. 2019) ("To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly allege: '(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance . . . ; (5) economic loss; and (6) loss causation.'" (quoting *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013))).  A plaintiff must make a threshold showing that the defendant made the material misrepresentation.  *See* 17 C.F.R. § 240.10b-5 ("It shall be unlawful for any person, directly or indirectly . . . [t]o *make any untrue statement* of a material fact or to omit to state a material fact necessary . . . ." (emphasis added)); *Halliburton Co. v. Erica P. John Fund, Inc.*,

18

573 U.S. 258, 267 (2014) ("Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5 prohibit *making any material misstatement or omission* in connection with the purchase or sale of any security." (emphasis added)); *City of Hialeah Employees' Ret. Sys.*, 153 F.4th at 295 (Rule 10b-5 provides that it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." (alterations in original) (quoting 17 C.F.R. § 240.10b-5)).  In addition, a claim of securities fraud under Section 10(b) is "subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ('PSLRA')." *Wyche v. Adv. Drainage Sys., Inc.*, 710 F. App'x 471, 473 (2d Cir. 2017) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)); *see also Hassan v. Bos. Beer Co.*, No. 23-8, 2023 WL 8110940, at *1 (2d Cir. Nov. 22, 2023) (summary order) (citing *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004)) (same); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) (citing *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir.2012)) (same).

Claims under Section 10(b) require "(1) the existence of either a misstatement or an unlawful omission; and (2) materiality." *Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, No. 21-2698-CV, 2022 WL 17587853, at *3 (2d Cir. Dec. 13, 2022) (summary order) (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010)); *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 170 ("The materiality of an item of information is a mixed question of law and fact." (quoting *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1466 (2d Cir. 1996))); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360 ("However, because the materiality

19

element presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss." (quoting *ECA v. JP Morgan Chase*, 553 F.3d 187, 197 (2d Cir.2009))).  "A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014), *aff'd*, 604 Fed. App'x. 62 (2d Cir. 2015); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 812 (2d Cir. 1996) ("Plaintiffs allege no circumstances to support their allegation that the allegedly false statements, made at least three weeks before the . . . figure was announced, were false at the time made.").  "The test for whether a statement is materially misleading under Section 10(b) . . . is 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *City of Hialeah Employees' Ret. Sys.*, 153 F.4th at 295 (quoting *Rombach*, 355 F.3d at 172 n.7; *Steamfitters Loc. 449 Pension Plan*, 2022 WL 17587853, at *3 (noting that the definition of materiality under Section 10(b) is "whether the defendants' representations, taken together and in context, would have misled a reasonable investor" (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360)); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021) ("A statement is materially misleading when 'the defendants' representations, taken together and in context, would have misled a reasonable investor.'" (quoting *Rombach*, 355 F.3d at 172 n.7; *see also Singh*, 918 F.3d at 63 (explaining that allegedly misleading statements are "evaluated not only by literal truth, but by context and manner of presentation" (internal quotations omitted)).  "A statement or omission is material if 'a reasonable investor would have considered [it] significant in making investment decisions.'" *Altayyar v. Etsy, Inc.*, 731 F. App'x 35, 37 (2d Cir. 2018) (alteration in original) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161–62 (2d Cir. 2000)); *see also Steamfitters Loc. 449*

20

*Pension Plan*, 2022 WL 17587853, at \*2 ("A statement or omission is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act].'" (alteration in original) (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009))); *Singh*, 918 F.3d at 63 ("An alleged misrepresentation is material if 'there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock.'" (quoting *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92–93 (2d Cir. 2010))); *United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) ("A misstatement in a securities transaction is material so long as there is a substantial likelihood that a reasonable investor would find the misrepresentation important in making an investment decision." (alteration and internal quotations omitted)).

Section 10(b) "do[es] not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *see also Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 353 (2d Cir. 2022) ("Just because a reasonable investor would very much like to know a fact does not create any obligation to speak up.") (internal quotations and citation omitted); *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 101 (2d Cir. 2013) ("Materiality alone does not demand disclosure." (quoting *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 668 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009))). When a company does not have an obligation to speak but does so anyway, it assumes "a duty to be both accurate and complete." *Gimpel v. The Hain Celestial Grp., Inc.*, 156 F.4th 121, 139 (2d Cir. 2025) (quoting *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002)); *see also Setzer*, 968 F.3d at 214 n.15 ("[E]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell

21

the whole truth." (quoting *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014))); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366 (explaining that once a corporation makes "a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate" (internal quotations and citations omitted)). "[L]iterally true statements" are actionable if they "create a materially misleading impression." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021) (quoting *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011)); *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011) ("[L]iterally true statements that create a materially misleading impression [] will support claims for securities fraud."), *rev'd and remanded on other grounds*, 568 U.S. 442 (2013). "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 171 (quoting *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 366). Thus, plaintiffs "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 171.

### i.   Risk disclosures

Defendants argue that Peloton's risk disclosures between May of 2021 and November of 2022 warning investors of risks related to product defects and recalls were not materially misleading because they were "precisely the kinds of risks that later materialized." (Defs.' Mem. 11–12.) First, Defendants argue that Plaintiffs fail to establish that Defendants knew that a "product recall covering millions of Bikes was inevitable" simply because Defendants regularly received reports of the seat post issue at the time of the risk disclosures. (*Id.* at 13.) Second, Defendants argue that the allegation that some Bikes were assembled "using parts that were not

22

made to specifications" and that Peloton used the "Just Ship It" slogan cannot save Plaintiffs' claim because they are "not connect[ed] whatsoever to the seat post recall," (*id.*) and they fail to allege that "Defendant[s] *knew* that these [purported part specification] issue 'would lead to a *recall* of every Bike Peloton sold between 2018 and 2023.'" (*Id.* at 25.)  Third, Defendants contend that even if Plaintiffs suggest that certain Bikes were "at increased risk of experiencing a product problem of some kind *in the future* because of the specification issue," any increase in risk is nevertheless "insufficient to render risk disclosures materially false or misleading." (*Id.* at 13.)

Plaintiffs argue that Defendants' risk disclosures were materially misleading because they misrepresented the known seat post defect.  (Pls.' Opp'n 9–11.)  First, Plaintiffs contend that Defendants' risk disclosures are materially misleading because "they were framed as hypothetical, future risks, but had already materialized." (*Id.* at 15.)  Second, Plaintiffs provide in the SAC the specific statements of several confidential witnesses who allege that Defendants received regular reports distributed by the Escalations team and the Member Support Team that "escalated dangerous safety issues" regarding the seat post sufficient to render the risk disclosure materially false or misleading.  (*Id.* at 10, 18; *see* SAC ¶¶ 73–85.)  Third, Plaintiffs allege that Defendant McCarthy had read "at least some" of such reports because he would forward, and direct Member Support to resolve, customer complaints.  (SAC ¶ 85.)  Finally, Plaintiffs argue that Defendants failed to update the disclosures to "inform investors that the Bike was already experiencing defects and adversely impacting Peloton's operations."  (Pls.' Opp'n 17.)

Peloton's risk disclosures are not materially misleading because they explicitly warned investors that their products "may be affected from time to time by design and manufacturing defects" that could "adversely affect our business and result in harm to our reputation."  (SAC ¶

171.)  When registration statements warning the exact risk later materializes, a securities law fraud claim "will not lie as a matter of law."  *In re ProShares Tr. Sec. Litig.*, 728 F.3d at 102 (quoting *In re ProShares Trust Sec. Litig.*, 889 F. Supp. 2d 644, 653 (S.D.N.Y 2012)); *see also Panther Partners*, 538 F. Supp. 2d at 672 ("An accurate statement coupled with the precise disclosure of a risk later realized cannot adequately form the basis for a securities claim.").

Plaintiffs incorrectly argue that the risk disclosures are materially misleading because "the risk disclosures' plain text identifies product 'defects' as the risk," which they argue had already manifested when the statements were made.  (Pls.' Opp'n 17 (stating that Defendants failed to "inform investors that the Bike was already experiencing defects *and* adversely impacting Peloton's operations" (emphasis added)).)  However, the risk disclosures did not identify the "defects" as the risk.  Instead, the risk disclosures identified the "adverse[] [e]ffect on business" as the risk.  *See Hou Liu v. Intercept Pharm., Inc.*, No. 17-CV-7371, 2020 WL 1489831, at *12 (S.D.N.Y. Mar. 26, 2020) (concluding that a risk disclosure was not materially misleading because the statement that defendant's product "'may result in side effects, adverse reactions or misuse' was made in the context that these events were ones that could affect [the defendant's] income"); *see also Nurlybayev v. ZTO Express (Cayman) Inc.*, No. 17-CV-6130, 2021 WL 1226865, at *7 (S.D.N.Y. Mar. 31, 2021) (concluding that a general warning that sales could be adversely affected upon the occurrence of an event was not misleading even though the event had occurred because the company's sales had not been adversely affected).  Accordingly, Peloton's risk disclosures would be materially misleading only if, when the risk disclosures were made, (1) the "adverse[] [e]ffect" on business had already materialized, or (2) Defendants knew of an impending "adverse[] [e]ffect" on business.

Plaintiffs fail to plead facts supporting either scenario.  First, Plaintiffs do not allege that there was an adverse effect on Peloton's business at the time of the risk disclosures.  While Plaintiffs challenge the risk disclosures issued between May of 2021 and November of 2022, they do not allege facts showing that an adverse effect on business had occurred during this period, which is required to render the risk disclosures materially misleading.  Instead, Plaintiffs allege the first adverse effect on Peloton's business occurred in May of 2023, which was when Peloton's stock price began falling.  (*See* SAC ¶ 12.)  *See Intercept Pharm.*, 2020 WL 1489831, at *12 ("If, when the statements were made, any misuse or adverse events had affected [the defendant's] earnings negatively, then the statement would have been misleading."); *see also Nurlybayev*, 2021 WL 1226865, at *7 (concluding that plaintiffs were not "materially misled by the purported warning about events that had already occurred" because the company had not yet experienced any "adverse effects" and thus no risk had materialized (citation omitted)).

Second, Plaintiffs do not sufficiently allege that Defendants knew of an impending adverse effect on Peloton's business at the time of the risk disclosures.  As discussed above, while Plaintiffs challenge the risk disclosures issued over a period of approximately a year and a half, they do not allege that Defendants knew of and withheld information of an impending adverse effect on business.  Instead, Plaintiffs rely on their argument that Defendants were informed of the issues with the Bike seat post, (*see* Pls.' Opp'n 15–16), to allege a securities law violation.  However, Plaintiffs insufficiently argue that Defendants' knowledge of customer complaints meant that Defendants knew that such customer complaints would later lead to an adverse effect on business, let alone a recall of every Bike Peloton sold between 2018 to 2023. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571 ("A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false

25

*at the time it was made*."); *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 130 (E.D.N.Y. 2020) ("Plaintiffs' failure to plead facts supporting the inference that defendants knew of additional material risks at the time of the [Form] 10-K is an additional reason that the alleged omission is not actionable."); *Bratusov v. Comscore, Inc.*, No. 19-CV-3210, 2020 WL 3447989, at \*14 (S.D.N.Y. June 24, 2020) ("The allegations do not suggest, let alone plead with particularity, that any [d]efendant had knowledge of facts contradicting the [a]lleged [m]isstatements, and therefore the confidential witnesses' statements are insufficient to plead an intent to defraud."). Plaintiffs' addition of testimony from several confidential witnesses in the SAC in further support of this argument is unavailing because the testimony fails to establish Defendants' knowledge of a future adverse impact on business. *See Patel v. Koninklijke Philips N.V.*, No. 21-CV-4606, 2024 WL 4265758, at \*7 n.4 (E.D.N.Y. Sep. 23, 2024), *reconsideration denied*, 2025 WL 3004925 (E.D.N.Y. Oct. 27, 2025) ("[Confidential witness allegations] must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements; conclusory statements that defendants were aware of certain information, and mere allegations that defendants would have or should have had such knowledge is insufficient." (quoting *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 228–29 (S.D.N.Y. 2021))).

Third, Peloton's risk disclosures are not materially misleading because Peloton did not have an "affirmative duty to disclose any and all material information." *See Ark. Tchr. Ret. Sys. v. Goldman Sachs Grp., Inc.*, 77 F.4th 74, 100 (2d Cir. 2023) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016)). Even if Defendants were aware of the issues with the Bike seat post, Plaintiffs cannot target Defendants' risk disclosures by arguing that "had the risk disclosures contained a detailed admission of severe wrongdoing, a price drop would follow." *Id.* at 101; *see In re Allergan PLC Sec. Litig.*, No. 18-CV-12089, 2019 WL 4686445, at \*21

26

(S.D.N.Y. Sep. 20, 2019) ("To the extent [p]laintiff asserts that [defendant] was insufficiently specific in warning that a product recall would materialize, it is black letter law that a company is not obligated to take the gloomiest view of its business.").  Plaintiffs pleading that Defendants' awareness of an increased risk of recall of the Bike is insufficient for a claim of securities fraud because Plaintiffs must show Defendants' knowledge of the certainty or likelihood of a recall when the risk disclosures were made.  *See Peneycad v. RTX Corp.*, 23-CV-1035, 2025 WL 2636616, at *24 (D. Conn. Sep. 12, 2025) (holding that plaintiffs' allegations that defendants were aware of the "magnitude of [a] defect and thus mislead investors until disclosing the need for a large-scale recall . . . are merely conclusory and cannot be sustained on a 12(b)(6) motion to dismiss, let alone the more stringent standard required by the PSLRA" because plaintiffs failed to allege facts to demonstrate that defendants were "aware of the magnitude or 'systemic' nature of the defect before it was disclosed to investors"), *appeal docketed*, No. 25-2549 (2d. Cir Oct. 16, 2025); *In re Chembio Diagnostics, Inc. Sec. Litig.*, 616 F. Supp. 3d 192, 198 (E.D.N.Y. 2022) (holding that plaintiffs had not alleged securities fraud where they only claimed defendants were aware of an increased risk of a future event, not that defendants knew the event "was certain or even likely" to occur); *Okla. L. Enf't Ret. Sys v. Papa John's Int'l, Inc.*, 517 F. Supp. 3d 196, 211 (S.D.N.Y. 2021) (dismissing claims because "[a]n increase in a risk does not mean the risk has already come to pass, such that a[n SEC] disclosure that simply identifies the risk would be misleading" (first alteration in original) (quoting *Constr. Laborers Pension Tr. for S. Cal.  v. CBS Corp.*, 433 F. Supp. 3d 515, 537–38 (S.D.N.Y. 2020))); *Lachman*, 487 F. Supp. 3d at 130 (dismissing claims because plaintiffs did not allege facts "supporting the inference that defendants knew of additional material risks"  that a recall would occur "at the time of the" risk disclosures).  In addition, because Plaintiffs do not allege that Defendants knew a seat post recall

would happen when they made the risk disclosures, Plaintiffs' claims fail because Defendants cannot be held liable for statements that are only false in hindsight. "[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Saraf v. Ebix, Inc.*, No. 23-1182, 2024 WL 1298246, at *3 (2d Cir. Mar. 27, 2024) (summary order) (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)); *see also Diabat v. Credit Suisse Grp. AG*, No. 23-CV-5874, 2024 WL 4252502, at *46 (S.D.N.Y. Sep. 19, 2024) (holding that plaintiff impermissibly pleaded "fraud by hindsight" where plaintiff failed to allege that defendants were aware of a fact that would eventually transpire at the time of their disclosures, "or that disclosing this fact was necessary to render any statements that were made not misleading"); *In re Shanda Games Ltd. Sec. Litig.*, No. 18-CV-2463, 2019 WL 11027710, at *5 (S.D.N.Y. Sep. 30, 2019) (holding that "fraud-by-hindsight cannot support a 10(b) claim"), *adhered to on reconsideration*, 2020 WL 5813769 (S.D.N.Y. Sep. 30, 2020).

### ii. Loss accrual

Defendants argue that Peloton's May of 2023 disclosure of an "estimated contingent loss expense" of $8.4 million following the Bike recall was not false or misleading simply because the loss accrual subsequently increased. (Defs.' Mem. 14.) First, Defendants argue that the warning that (1) "[t]he contingent liability accrual was based on an amount that was deemed probable and estimable" and (2) the possibility that "any additional accruals for contingent losses related to this matter could be material" was sufficient "cautionary language" to show that the accrual remained "forward looking." (*Id.*) In addition, Defendants argue that Peloton's warning that costs "may" increase in the future was sufficient cautionary language to be protected by the bespeaks caution doctrine. (*Id.* at 15.) Second, Defendants argue that their warning was not

28

misleading simply because Peloton reported the seat post issue to the CPSC because Peloton's

discussions with the CPSC were fully disclosed.  (*Id.*)  Third, Defendants argue that Plaintiffs do

not plead facts showing that Peloton "had *already* incurred recall-related costs in excess of its

loss accrual" based on its reliance on various CW testimonies.  (*Id.* at 15.)  Defendants also argue

that Plaintiffs' allegation fails because none of the CWs are alleged to have been in Peloton's

finance organization, analyzed Peloton's actual or anticipated expenses related to the recall, or

been in communication with the Individual Defendants such that the CWs can establish that the

loss accrual was understated at the time it was issued.  (*Id.*)

Plaintiffs argue that Defendants made actionable material misrepresentations in the May

of 2023 disclosure estimating a loss accrual of $8.4 million.  In support, Plaintiffs argue that the

loss accrual was "materially understated" because of (1) Defendants' knowledge of the volume

of complaints received and Bikes sold and (2) the accrual corrections' "magnitude and proximity

to the misstatements."  (Pls.' Opp'n 20–21.)  In support, Plaintiffs argue that the "numerous

allegations evidencing Defendants' knowledge and the defects' scope" shows that Defendants

"lacked a reasonable basis for the lost accrual," and as such, the "risk warning was not

meaningful as the increase in reportable incidents was framed as a mere hypothetical."  (*Id.* at

21.)

Peloton's May of 2023 statements about the loss accrual were not false or misleading

because they were forward-looking statements not actionable under the bespeaks-caution

doctrine.  "[I]t cannot be supposed by a reasonable investor that the future is settled, or

unattended by contingency."  *Iowa Pub. Emps.' Ret. Sys.*, 620 F.3d 137, 141 (2d Cir. 2010).

Therefore, "a defendant is not liable if the forward-looking statement is identified and

accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove

29

that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010); *see In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245–46 ("Because '[t]he safe harbor is written in the disjunctive,' a forward-looking statement is protected under the safe harbor if any of the three prongs [in *Slayton*, 604 F.3d at 766] applies."). "A forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." *Iowa Pub. Emps.' Ret. Sys.*, 620 F.3d at 141; *see United States v. Velissaris*, No. 23-6379, 2024 WL 4502001, at *2 (2d Cir. Oct. 16, 2024) (summary order) (quoting *id.*) (same); *see also Mangrove Partners,* 2025 WL 1420914, at *2 (explaining that a defendant is not liable for a forward-looking statement that "is identified and accompanied by meaningful cautionary language" (quoting *In re Vivendi*, 838 F.3d at 245)).

Peloton's May of 2023 disclosures are also not actionable because the warning that the $8.4 million loss was an "estimated contingent loss" based on "an amount that was deemed probable and estimable," was forward-looking and contained sufficient cautionary language to render it non-actionable.  In addition, Peloton's additional statements warning that, because Peloton was "unable to estimate the amount of such additional losses at this time," it may "incur incremental expenses or face other challenges" if, for example, "the number of reported incidents materially increases," further supports this conclusion.  (Defs.' Mem. 14; *see* Q3 2023 Form 10-Q 18, 44, annexed to Defs.' Mot. as Ex. 1, Docket Entry No. 50-3.)  These statements are non-actionable because they are forward-looking and sufficiently accompanied by cautionary language warning of a potential increase in recall-related expenses.  *See Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 665 F. Supp. 3d 522, 539 (S.D.N.Y. 2023) (finding that Peloton's SEC risk disclosures were "both specific and

realistic about the precise risks [sic] factors faced by Peloton as a company" and thus shielded Peloton "from liability for their forward-looking statements"); *Gluck v. Hecla Mining Co.*, 657 F. Supp. 3d 471, 485 (S.D.N.Y. 2023) (holding that defendants' Form 10-K and 10-Q disclosures were "sufficiently specific to insulate [d]efendants from liability" where their "warnings, when read together, caution[ed] investors of the very risks that [p]laintiffs allege ultimately occurred," namely, that the "cost of operating" a new aspect of their business "would ultimately be higher than expected"); *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 392 (S.D.N.Y. 2020) (holding that defendants' forward-looking statements included sufficient cautionary language where they discussed "company-specific factors that the [c]ompany indicated could cause its results to be either 'materially better or worse'" than the projections).

In addition, as the Court discussed *supra* in this Section, Peloton's May of 2023 disclosures would be materially misleading only if, when the May of 2023 disclosures were made, (1) the total recall-related expenses had already materialized or (2) Defendants knew of the total extent of the recall-related expenses. *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571 ("A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false *at the time it was made*."); *Intercept Pharm.*, 2020 WL 1489831, at *12 ("If, when the statements were made, any misuse or adverse events had affected [defendant's] earnings negatively, then the statement would have been misleading.").

Plaintiffs fail to plead either circumstance. As discussed, Plaintiffs challenge the May of 2023 disclosure of the estimated loss accrual because it underestimated the total loss accrual, reported in August of 2023, by $40 million. First, while Plaintiffs challenge the $40 million difference in the loss accrual between the May of 2023 estimate and August of 2023 revision,

31

they do not allege facts showing that the $40 million difference materialized at the time of the May of 2023 disclosure, which is required to render the disclosure materially misleading.[9]

Second, Plaintiffs do not sufficiently allege that Defendants knew of the total extent of the recall-related expenses at the time of the May of 2023 disclosures.  While Plaintiffs challenge the $40 million difference between the May of 2023 and August of 2023 disclosures, they do not allege that Defendants knew of and withheld the total extent of the recall expenses.  Instead, Plaintiffs rely on their argument that Defendants were informed of the issues with the Bike seat post, (*see* Pls.' Opp'n 21), to allege a securities law violation.  However, as discussed *supra* in this Section, Plaintiffs insufficiently argue that Defendants' knowledge of customer complaints meant that Defendants knew of the extent of the recall-related expenses that would occur in the future.  Accordingly, Plaintiffs' argument fails because — Plaintiffs' reliance on customer complaints and CW testimonies who were not in positions where they could know of the total recall-related expenses of which they allege Defendants had knowledge of — is insufficient to show Defendants' knowledge of the total recall-related expenses.  *See Patel*, 2024 WL 4265758, at *7 n.4 ("[Plaintiffs] must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements.").[10]

---

[9] In addition, the SEC filings contained sufficient forward-looking and cautionary language regarding the possibility of additional accruals by disclosing on May 4, 2023 the $8.4 million of loss accrual related to the seat post issue, (*see* Q3 2023 Form 10-Q at 18, 44), and describing the recall to the SEC on May 11, 2023, (*see* Form 8-K dated May 11, 2023, annexed to Defs.' Mot. as Ex. 6, Docket Entry No. 50-8).  *Cf. City of Hialeah Employees' Ret. Sys. v. Peloton Interactive, Inc.*, 153 F.4th 288, 301 (2d Cir. 2025) (concluding that challenged statements were plausibly false or misleading because the specific financial consequences described were not merely hypothetical but had already materialized).

[10] Furthermore, even if Plaintiffs sufficiently alleged Defendants' knowledge, such that the statements were made with actual knowledge of falsity, the statements would nevertheless be non-actionable because the cautionary language triggers the safe harbor.  *See Golesorkhi v. Green Mountain Coffee Roasters, Inc.*, 569 F. App'x 43, 44 (2d Cir. 2014) ("[A] defendant is not

### iii. Product safety and quality

Defendants argue that Plaintiffs fail to allege that their statements regarding Peloton's corporate values, product safety, and product quality were false or misleading.  First, they argue that generic statements regarding putting its "Members First" and its products being the "best" are not actionable because investors do not rely on generalizations regarding a company's health or the strength of its product.  (Defs.' Mem. 16.)  Second, Defendants argue that Plaintiffs' allegations that Peloton was either assembling or shipping products with parts not made to specifications "cannot render actionable a statement that is inactionable and immaterial as a matter of law."  (*Id.*)  Third, Defendants argue that Plaintiffs fail to allege any facts showing that member safety, product quality, and product experience were not Peloton priorities.  (*Id.* at 16–17.)

Plaintiffs argue that Defendants misrepresented Peloton's commitment to customer safety and their products' quality and performance.  First, Plaintiffs argue that Defendants' statements putting its "Members first" and its products being the "best" were false and misleading because Peloton had "pervasive Bike manufacturing and assembly issues," (Pls.' Opp'n 12), including that the Bikes were assembled and shipped with "substandard, out-of-specification parts that caused a myriad of defects," (*id.* at 14).  In support, Plaintiffs provide statements from several

---

liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010))); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 210 (S.D.N.Y. 2022) (stating that Defendants' statements, "to the extent they are false" are protected by the PSLRA and forward-looking statements because "[a]s long as the plaintiff fails to satisfy one of those elements (*e.g.*, the statement is accompanied by meaningful cautionary language or is immaterial), the presence of one of the other elements (*e.g.*, the statement was known to be false or misleading) will not subject to [sic] the defendant to liability." (quoting *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 385–86 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021))).

confidential witnesses describing Peloton's practice of "just ship[ping]" Bikes despite failing to meet quality standards and its creation of Project Tinman as a "covert operation" to cover up its failure. (*Id.* at 12, 14–15.) Second, Plaintiffs argue that Defendants "misrepresented the Bike's safety and touted safety as Peloton's top priority while simultaneously omitting that Peloton knowingly disregarded safety defects." (*Id.* at 9.) Third, Plaintiffs argue that given Defendants' "specific statements about safety," Defendants had a duty to disclose facts contradicting those representations. (*Id.* at 11.)

Peloton's statements about its corporate values and product safety and quality are not materially misleading. Specifically, Peloton's statements about its products being the "best" on the market, (*id.* at 12), "obsess[ing] over every touchpoint of our member experience," (*id.*), and putting "members first," (*id.*), are inactionable "general promotional language about a product or company, statements of a company's integrity, and positive forward-looking statements," *Steamfitters Loc. 449 Pension Plan*, 2022 WL 17587853, at *2. These "'[g]eneric, indefinite statements of corporate optimism typically are not actionable' because reasonable investors do not place 'substantial reliance on generalizations regarding a company's health or the strength of a company's product.'" *Id.* (quoting *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020)). Defendants' statements about Peloton's corporate values are mere corporate puffery, which do not give rise to securities violations because they are "too general to cause a reasonable investor to rely upon them." *See Sherman v. Abengoa, S.A.*, 156 F.4th 152, 164 (2d Cir. 2025) (affirming a district court's conclusion that statements about "strict financial discipline" and "robust" systems are "[v]ague positive statements and thus "too general" for a reasonable investor to rely upon them.") (alteration in original) (quoting *In re Synchrony Fin. Sec. Litig.*, 988 F.3d at 170)); *City of Hialeah Employees' Ret. Sys.*, 153 F.4th at 299 (affirming a

34

district court's conclusion that Peloton's specific statement its inventories were "healthy" was "the type of expression of corporate optimism that [the Second Circuit] consider[s] non-actionable puffery);[11] *Diabat*, 2024 WL 4252502, at *29 (holding that statements that "touch on [a c]ompany's beliefs and expectations" are "classic examples of puffery" (quoting *In re Sec. Cap. Assur. Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 597 (S.D.N.Y. 2010))); *see also Steamfitters Loc. 449 Pension Plan*, 2022 WL 17587853, at *2 (affirming a district court's conclusion that statements about the integrity of the company's employees, commitments to ethical behavior, and the company's code of conduct are "plainly too generic to have been consequential"); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago.*, 553 F.3d at 206 (stating that plaintiffs' challenged statements are "too general to cause a reasonable investor to rely upon them"); *In re CarLotz, Inc. Sec. Litig.*, No. 21-CV-5906, 2024 WL 1348749, at *11 (S.D.N.Y. Mar. 29, 2024) (holding

---

[11] In *City of Hialeah Employees' Ret. Sys.*, 153 F.4th 288, the Second Circuit evaluated whether Defendant Foley's statement during an August 26, 2021 earnings call was plausibly false or misleading. Defendant Foley was asked whether the Bike price reduction by $400 was "offensive or defensive." *Id.* at 300. In response, Defendant Foley "describe[ed] the company's decision to reduce the price of its bike by $400 as an 'absolutely offensive' business strategy." *Id.* Unlike its conclusion that Defendant Foley's statement about inventory being "healthy" was inactionable, the court concluded that his characterization of the price reduction as "absolutely offensive" was plausibly false or misleading based on plaintiff's allegations that (1) the former senior director of operations and supply-chain management stated that "the August 2021 price reduction on the original Bike was an attempt to increase sales because Peloton had so much excess inventory" and (2) confidential witnesses reported details about the company's inventory build-up. *Id.* In the case before the Court, Plaintiffs' allegations do not "present inconsistencies" in Defendants' statements that would require further inquiry because statements regarding its "Members First" approach and its commitment to quality and safety are generalizable statements of inactionable corporate puffery that are too generic to be rendered inconsistent. *Id.*; *see Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, No. 21-2698-CV, 2022 WL 17587853, at *2 (2d Cir. Dec. 13, 2022) (summary order) ("'Generic, indefinite statements of corporate optimism typically are not actionable' because reasonable investors do not place 'substantial reliance on generalizations regarding a company's health or the strength of a company's product.'" (quoting *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020))).

35

that a company's description of its business model as having "best-in-class unit economics" was corporate puffery).

### iv. Project Tinman

Defendants argue that Plaintiffs do not allege any facts suggesting that the February of 2022 *Financial Times* statement regarding Project Tinman was false or misleading because they fail to show that the cosmetic oxidation issue was not isolated, abnormal, or structural.  (Defs.' Mem. 17–18.)  First, Defendants contend that Plaintiffs' allegations "support the inference that the cosmetic rust issue was . . . isolated and abnormal" because it was "limited to certain Bikes originating from Peloton's Taiwan manufacturer that were 'exposed to humidity and weather.'" (*Id.* at 17–18 (quoting SAC ¶¶ 146, 156).)  Second, Defendants argue that Plaintiffs' factual allegations do not dispute Peloton's conclusion that the rust issue was "non-structural" and would have no effect on a Bike's quality, durability, or reliability, (*id.* at 17; Defs.' Reply 5–6), and Plaintiffs do not allege that the rust or its removal affected "structural safety issues with the Bike or was connected in any way with the recall of the Bike seat post years later," (Defs.' Mem. 18).

Plaintiffs argue that Defendants' February of 2022 *Financial Times* statement regarding Project Tinman was false or misleading because the Bike's rust issues were not isolated, abnormal, or lacking an effect on quality because it impacted thousands of bikes, resulting in "hundreds at least if not thousands of complaints."  (Pls.' Opp'n 13; *see* SAC ¶¶ 200–01.)  In support, Plaintiffs contend that the manufacturer in Taiwan "was one of two major manufacturing partners," (Pls.' Opp'n 14), and that the Bike's rust issues impacted structural areas, requiring several of the confidential witnesses to inspect the Bikes for corrosion, (*id.* at 13).

Peloton's February of 2022 statement in the *Financial Times* was not materially misleading because Plaintiffs fail to allege any facts that the rust was not isolated, abnormal, or "related to any structural problem with the Bike." (*See* Defs.' Reply 5.)

### A.    Plaintiffs fail to allege that the rust was not isolated or abnormal

Plaintiffs fail to allege that Defendants' statement that the rust was isolated or abnormal was materially misleading. Specifically, Plaintiffs fail to meaningfully dispute Defendants' argument that the rust was isolated to Bikes only "originating from Peloton's Taiwan manufacturer that were 'exposed to humidity and weather.'" (*See* Defs.' Mem. 17–18).

First, Plaintiffs fail to allege that the rust issue was not isolated to the Taiwan manufacturer. As discussed *supra* in this Section, Defendants contend that the rust issue was isolated and abnormal because it was "limited to certain Bikes originating from Peloton's Taiwan manufacturer that were 'exposed to humidity and weather.'" (Defs.' Mem. 17–18 (quoting SAC ¶¶ 146, 156).) In challenging Defendants' contention, Plaintiffs state that Defendants' "pinpoint[ing] the problem's origin is nonsense . . .given that the source (Tonic)[12] was one of two major manufacturing partners . . ." for Peloton. (Pls.' Opp'n 14.) In other words, Plaintiffs argue that the rust issue could not be "isolated" because the rust issue originated in one of Peloton's two major manufacturing partners. Plaintiffs' argument fails because they do not plead facts showing that the rust issue was not isolated to bikes "exposed to humidity and weather," (Defs.' Mem. 17–18). Plaintiffs argue that contrary to Defendants' contention that the rust issue was isolated to only Bikes that were "exposed to humidity and weather," from Taiwan, (Defs.' Mem. 17–18), the "rust impacted thousands of already-defective Bikes," (Pls.' Opp'n 14). However, this argument does not meaningfully contradict Defendants' contention that the

---

[12] "Tonic" is the name of Peloton's manufacturer in Taiwan. (SAC ¶ 98.)

37

rust issue was isolated to only Bikes that were "exposed to humidity and weather" from

Taiwanese manufacturer because Plaintiffs do not allege facts about the number of Bikes that

were impacted by the rust issue to render Defendants' statement false.  In addition, Plaintiffs'

allegation that the rust was not isolated because it impacted "thousands" of Bikes fails because

Plaintiffs do not plead facts showing the percentage of rust-impacted Bikes with sufficient

particularity for the Court to conclude that the rust was not isolated.  In addition, Defendants

contend that Plaintiffs failed to allege the pervasiveness of the rust by relying on allegations

made by confidential witnesses.  Plaintiffs fail to show that the confidential witnesses who

inspected the Bike at various warehouses and engaged in getting rid of the rust possessed

sufficient knowledge that the rust issue was "pervasive" in the 2.2 million bikes sold because, on

the whole, the confidential witnesses possessed knowledge only about the warehouse where they

worked.[13]  Similarly, Plaintiffs do not plead facts about the percentage of Bikes that were

impacted by the rust to render Defendants' statement that it was "isolated" to impacted bikes

from the Taiwanese manufacturer false.  *See Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d

283, 305 (S.D.N.Y. 2019) ("In order for a court to credit the allegations of confidential

witnesses, the witnesses must be 'described in the complaint with sufficient particularity to

support the probability that a person in the position occupied by the source would possess the

---

[13]  The Court notes that Plaintiffs' allegation that the rust was pervasive can be supported by the allegations made by confidential witnesses who held more senior roles in Peloton.  (*See, e.g.*, SAC ¶ 35 ("CW8 was a Director-level employee in Operations at Peloton, three levels below the CEO . . ."); *id.* ¶ 37 ("CW10 was Director of Global Member Support Operations and Site Director for Peloton . . . .").)  However, as discussed below, Plaintiffs' allegations still fail because Plaintiffs fail to allege that Defendants had knowledge of facts that contradict the statements such that the statements would be rendered false or misleading.  *See Bratusov v. Comscore, Inc.*, No. 19-CV-3210, 2020 WL 3447989, at *14 (S.D.N.Y. June 24, 2020) ("The allegations do not suggest, let alone plead with particularity, that any [d]efendant had knowledge of facts contradicting the [a]lleged [m]isstatements, and therefore the confidential witnesses' statements are insufficient to plead an intent to defraud.").

information alleged.'" (quoting *Novak*, 216 F.3d at 314)); *Bratusov*, 2020 WL 3447989, at \*14

("The allegations do not suggest, let alone plead with particularity, that any [d]efendant had

knowledge of facts contradicting the [a]lleged [m]isstatements, and therefore the confidential

witnesses' statements are insufficient to plead an intent to defraud."). Instead, Plaintiffs'

argument that Defendants would or should have this knowledge fails because the CWs do not

show that Defendants actually had this knowledge, which would render the statements false or

misleading. *See Patel*, 2024 WL 4265758, at \*7 n.4 ("[C]onfidential source allegations must

show that individual defendants actually possessed the knowledge highlighting the falsity of

public statements; conclusory statements that defendants were aware of certain information, and

mere allegations that defendants would have or should have had such knowledge is insufficient."

(quoting *In re Nielsen Holdings*, 510 F. Supp. 3d at 228–29); *see also Meyer v. Organogenesis

Holdings Inc.*, 727 F. Supp. 3d 368, 393 (E.D.N.Y. 2024) (dismissing claims where plaintiffs did

not allege defendants' actionable statements were objectively false or misleading).

Third, Plaintiffs fail to allege the pervasiveness of the rust by relying on "public

reporting" to corroborate the confidential witness testimony. (Pls.' Opp'n 13). Plaintiffs "must

do more than say that the statements in the press releases were false and misleading; they must

demonstrate with specificity why and how that is so." *See Rombach*, 355 F.3d at 174; *see also

Meyer*, 727 F. Supp. 3d at 393 (dismissing claims where plaintiffs did not allege defendants'

actionable statements were objectively false or misleading).

### B. Plaintiffs fail to allege that the rust impacted the structural areas of the Bike

Plaintiffs fail to allege that Defendants' statement that the rust was not structural was

materially misleading. As discussed *supra* in Section II.b., Plaintiffs must show that, at the time

the statement was made, Defendants made a material misrepresentation or omission. *See Singh*,

918 F.3d at 62 ("To avoid dismissal under Section 10(b) and Rule 10b-5, a complaint must plausibly allege: '(1) a material misrepresentation (or omission) . . . .'").  Importantly, claims under Section 10(b) require that the alleged misstatement was false at the time it was made.  *See In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 571 ("A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false *at the time it was made*.").  Accordingly, Plaintiffs must show that Defendants knew that the rust was structural at the time Defendants made the February of 2022 *Financial Times* statements.

Plaintiffs fail to show that Defendants knew of facts that contradicted the February of 2022 *Financial Times* statement false.  First, Plaintiffs' argument fails because they do not allege facts showing that, by February of 2022, Peloton had conducted an internal investigation that concluded that the rust impacted structural areas of the Bike and affected its quality, durability, or reliability.  (*See* Defs.' Reply 5.)  *See Bratusov*, 2020 WL 3447989, at *14 ("The allegations do not suggest, let alone plead with particularity, that any [d]efendant had knowledge of facts contradicting the [a]lleged [m]isstatements . . . .").  Second, Plaintiffs' argument fails because the facts they *do* rely on to allege that Defendants knew that the rust impacted structural areas occurred *after* the February of 2022 *Financial Times* statement.  Specifically, Plaintiffs argue that the "inference" that previous efforts to cover [the] rust . . . was insufficient to ensure the structural integrity of the seat post on the Bike," (SAC ¶ 266), is supported by a series of actions taken by Defendants, including: (1) Peloton drawing a distinction between "rust on the joints of the Bike and rust on all other areas," (*id.* ¶¶ 263–64); (2) CW8 "writ[ing] a script to explain that Peloton did not cover rust damage," (*id.* ¶ 265); and (3) photos posted on the Internet of broken seat posts, including on the forum Reddit, posted in March of 2022, and the Peloton's Member

40

Page on Facebook, posted in November of 2022, (*id.* ¶¶ 116, 118.).[14]  For example, Plaintiffs allege that "[b]y no later than March 29, 2022," Peloton received photographs from customers showing rust, and "soon thereafter," Peloton drew a distinction between the "rust on the joints of the Bike and rust on all other areas," (SAC ¶¶ 263–64), and "wr[ote] a script to explain that Peloton did not cover rust damage," (*id.* ¶ 265).  Even assuming that the above actions supported Plaintiffs' "inference" that the rust impacted structural areas of the Bike, Plaintiffs' argument nevertheless fails because Plaintiffs allege that the above actions were undertaken after the February of 2022 statements.  In other words, for the above-discussed actions to show that Defendants made a false or misleading statement in February of 2022, the above-discussed actions must have occurred before February of 2022 for the Court to conclude that Defendants had knowledge that the rust impacted structural areas of the Bike, took the above-discussed actions to correct the rust issue, and nevertheless reported in February of 2022 that the rust did not impact structural areas of the Bike.  *See Bratusov*, 2020 WL 3447989, at *14 ("The allegations do not suggest, let alone plead with particularity, that any [d]efendant had knowledge of facts contradicting the [a]lleged [m]isstatements . . . .").  Because this is not the case here, Plaintiffs' argument fails.[15]

---

[14]  In further support of its allegation, Plaintiffs include additional reports posted on the Internet between July of 2021 and May of 2023.  (*See generally* SAC ¶¶ 109–30.)  However, only two comments made on or around May 11, 2023 discuss rust in the seat post of the Bike.  (*Id.* ¶ 127.)  As discussed, these two comments made on or around May 11, 2023, do not support Plaintiffs' allegation because they were made after February of 2022, when the *Financial Times* article was published, and the remaining posts do not support Plaintiffs' allegation because they do not mention rust in the seat post of the Bike.

[15]  The Court is not persuaded by Plaintiffs' attempt to support its allegation with social media posts, which were not made by Defendants and are therefore speculative.  The Court notes that social media posts used in similar claims were instructive when made by the defendants, and not the public.  *See SEC v. Coinbase, Inc.*, 726 F. Supp. 3d 260, 292 (S.D.N.Y. 2024), (relying, in part, on defendant's social media posts to conclude that plaintiff plausibly alleged that

Third, Plaintiffs failed to show that the rust was structural because they rely solely on an allegation made by a confidential witness to allege that the rust issue impacted structural areas. (Pls.' Opp'n 13 (citing SAC ¶ 162).)  Plaintiffs rely on CW8's allegation regarding Defendant McCarthy's knowledge of the rust issues from customer complaints, (*id.*), but this allegation does not support Plaintiffs' argument that Defendant McCarthy knew or made statements that the rust issue was structural.  (SAC ¶ 162 ("CW8 'ran key word searches for rust at certain points during the time I was there.[']  According to CW8 'there were hundreds at least if not thousands' of complaints.").)[16]

### v.   Subscriptions

Defendants argue that their statements about Peloton's churn and goal of prioritizing subscription growth are inactionable because they are corporate puffery.  (Defs.' Mem. 18–19.)  First, Defendants argue that Plaintiffs' allegations regarding Bikes that were not made to specifications and the "Just Ship It" slogan do not render "actionable a statement that is otherwise inactionable as a matter of law."  (*Id.* at 18.)  Second, Defendants argue that some statements are immune from liability as forward-looking statements under the PSLRA safe harbor and the bespeaks caution doctrine.  (*Id.* at 19 n.6.)

---

purchasers had a reasonable expectation of profits), *motion to certify appeal granted*, 761 F. Supp. 3d 702 (S.D.N.Y. 2025).

[16]  The Court finds unpersuasive Plaintiffs' argument that the "public reporting" corroborates the confidential witnesses, (*see* Pls.' Opp'n 13), as discussed *supra* in Section II.iv.A, because Plaintiffs "must do more than say that the statements in the press releases were false and misleading; they must demonstrate with specificity why and how that is so."  *See Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004); *see also Meyer v. Organogenesis Holdings Inc.*, 727 F. Supp. 3d 368, 393 (E.D.N.Y 2024) (dismissing claims where plaintiffs did not allege defendants' actionable statements were objectively false or misleading).

Plaintiffs argue first, that Defendants' statements about churn rates and subscription growth were false and misleading because, at the time Defendants made the challenged statements, they knew that "Peloton's top-selling product was riddled with defects" that "required maintenance within the first 30–60 days of customers' ownership," "were injuring customers," and "caused them to cancel subscriptions." (Pls.' Opp'n 18–20.) Second, Plaintiffs argue that Defendants did not make forward-looking statements protected by the safe harbor and bespeaks caution doctrine because they "describe present conditions about then-existing practices to keep churn low, continued efforts to prioritize subscription growth, early achievement of churn and subscription goals, and present churn levels." (*Id.* at 19.) Third, Plaintiffs contend that even if the statements were forward looking, they are nevertheless unprotected by either the safe harbor or the bespeaks caution doctrine because Defendants' (1) "cautionary language was not meaningful" and (2) they "knew that they had no reasonable basis for making them" based on their knowledge that "obscuring defects and deprioritizing quality and safety would harm Peloton's reputation, Bike sales, and subscription growth." (*Id.* at 18–20.)

As discussed *supra* in section II.b.iii, Defendants' statements about its churn rates and subscription growth are inactionable as corporate puffery. *See City of Hialeah Employees' Ret. Sys.*, 153 F.4th at 299 (affirming a district court's conclusion that Peloton's statements about its inventories being "healthy" was "the type of expression of corporate optimism that [the Second Circuit] consider[s] non-actionable puffery); *Meyer*, 727 F. Supp. 3d at 393–94 (holding that statements about a company's "strong execution of our growth and profitability strategy" and ability to "manage through the near-term operating environment challenges and achieve strong, long-term growth" are inactionable puffery); *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago*,

43

553 F.3d at 206 (stating that plaintiffs' challenged statements are "too general to cause a reasonable investor to rely upon them"); *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *11 (holding that a company's description of its business model as having "best-in-class unit economics" was corporate puffery); *Steamfitters Loc. 449 Pension Plan*, 2022 WL 17587853, at *2 (concluding that inactionable statements include "general promotional language about a product or company, statements of a company's integrity, and positive forward-looking statements").

Accordingly, Plaintiffs fail to satisfy the heightened pleading requirement because Defendants fail to plead with particularity that Defendants made a material misrepresentation or omission that: (1) Peloton's risk disclosures were false or misleading; (2) the lost accrual was false or misleading; (3) statements regarding product safety and quality were false or misleading; (4) statements concerning Project Tinman were false or misleading; and (5) statements concerning Peloton's subscriptions were false or misleading.

### c. Plaintiffs fail to plead scienter under Section 10(b) of the Exchange Act

Defendants argue that Plaintiffs fail to (1) allege a strong inference of scienter as required by Section 10(b) and (2) satisfy the "[e]xacting pleading requirements" required by the PSLRA. (Defs.' Mem. 11.)  First, Defendants argue that Plaintiffs fail to allege conscious misbehavior or recklessness.  (*Id.* at 19–28.)  In support, Defendants argue that Plaintiffs fail to allege scienter based on: (1) customer complaints, (*id.* at 20–22); (2) Project Tinman, (*id.* at 22–25); (3) purported quality and assembly issues, (*id.* at 25–26); and (4) its "hands-on manager" allegations, (*id.* at 26).  Second, Defendants argue that Plaintiffs fail to allege motive or opportunity to commit fraud regarding the seat post issue.  (*Id.* at 28.)  Third, Defendants argue that because Plaintiffs fail to allege scienter with respect to any Individual Defendant, their scienter allegations against Peloton necessarily fail.  (*Id.* at 28–30.)

44

Plaintiffs argue that they adequately pleaded scienter.  First, they argue that Defendants had knowledge of the seat post defect because: (1) Defendants McCarthy, Foley, and Cortese had actual knowledge of defects, (Pls.' Opp'n 22–24); (2) Defendants received internal reports and consumer complaints about injuries, safety and quality defects, and rust, (*id.* at 24–26); (3) Defendants had a duty to monitor the Bike's "safety and quality, to assess whether defects or unreasonable risks of injury existed, and report such risks to [the] CPSC," (*id.* at 26); (4) Defendants attempted to cover up the rust through Project Tinman, (*id.* at 26–27); (5) Defendants frequently spoke about the Bike's safety, (*id.* at 27–28); and (6) Defendants made misstatements concerning Peloton's products and its top priorities, (*id.* at 28).  In support, Plaintiffs argue that Defendants were on notice of the likelihood and extent of a Bike recall because of the Tread+ recall and nine voluntary recalls of other companies' stationary bicycles since 1981.  (SAC ¶¶ 267–77).  Second, they argue that the Defendants Foley, Cortese, and Coddington's "personal motivation to obscure Peloton's pervasive defects" to "fend off further reputational and operational damage" "can "bolster or independently satisfy scienter."  (*Id.* at 29–30.)  In addition, Plaintiffs allege that scienter should be imputed to Peloton from the Individual Defendants, Peloton's senior leadership, and the Executive Product Safety Committee because Defendants "knew of and actively concealed [the] Bike post, rust, and assembly issues."  (*Id.* at 28–29.)

When bringing a claim under Section 10(b), a plaintiff must plead facts to support a finding of scienter.  *See* 15 U.S.C. § 78u-4(b)(2)(A); *see also Singh*, 918 F.3d at 62 ("Plaintiffs must allege those facts that give rise to an inference of scienter 'with particularity.'" (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 99)).  To survive a Rule 12(b)(6) motion under the PSLRA, a plaintiff must plead "with particularity facts giving rise to a strong inference that the defendant

45

acted with the required state of mind." *Sherman*, 156 F.4th at 170 (quoting 15 U.S.C. § 78u-4(b)(2)(A)); *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015) (quoting same); *ECA, Loc. 134 IBEW Joint Pension Tr.*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u-4(b)(1)) (same).  When the defendant is a corporate entity, the pleaded facts must create "a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Mangrove Partners,* 2025 WL 1420914, at *5 (quoting *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020)).

Scienter may be established by alleging facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Mangrove* 2025 WL 1420914, at *4 (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 99); *New England Carpenters Guar. Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 48 (2d Cir. 2023) (same), *amended and superseded on reh'g*, 122 F.4th 28 (2d Cir. 2024); *Set Cap. LLC*, 996 F.3d at 78 ("To establish scienter, 'a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud.'" (quoting *Rombach*, 355 F.3d at 176)).  When a plaintiff seeks to establish scienter through evidence of recklessness, she may do so "through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *SEC v. Halitron, Inc.*, No. 24-1052, 2025 WL 678776, at *2 (2d Cir. Mar. 3, 2025) (summary order) (quoting *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012)); *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) (same); *see also City of Pontiac*, 752 F.3d at 184 (noting that, in this context, recklessness is defined as "a state of mind 'approximating actual intent,' which can be established by 'conduct which is highly

46

unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" (quoting *Novak*, 216 F.3d at 308, 312)).  Circumstances comprising evidence of recklessness include allegations that a defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Emps.' Ret. Sys. of Gov. of the V.I.*, 794 F.3d at 306 (quoting *ECA, Loc. 134 IBEW Joint Pension Tr.*, 553 F.3d at 199); *Diaz v. Gap, Inc.*, No. 22-CV-07371, 2025 WL 1293308, at *16 (E.D.N.Y. Mar. 31, 2025) (same).  Scienter "based on conscious misbehavior . . . requires a showing of deliberate illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." *DeCarlo*, 122 F.4th at 49 (quoting *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012)).  When assessing whether scienter has been adequately pled, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc.*, 551 U.S. at 322.  Thus, "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322–23 (emphasis in original).

> **i.    Plaintiffs do not sufficiently allege scienter based on recklessness**

Plaintiffs do not adequately allege scienter based on recklessness.[17]  First, Plaintiffs fail to allege recklessness because they do not persuasively show Defendants' reckless disregard for the truth.  *See Sourlis*, 851 F.3d at 144 ("[S]cienter may be established through a showing of

---

[17] Plaintiffs do not argue that Defendants acted with conscious misbehavior.  (*See* Pls.' Opp'n 22–28.)  Therefore, the Court does not address this factor.

reckless disregard for the truth, that is, conduct which is highly unreasonable and which

represents an extreme departure from the standards of ordinary care." (alteration in original)

(quoting *Obus*, 693 F.3d at 286)).  Second, Plaintiffs do not allege that Defendants' conduct was

"highly unreasonable . . . [or] represents an extreme departure from the standards of ordinary

care," *City of Pontiac*, 752 F.3d at 184 (quoting *Novak*, 216 F.3d at 308, 312), because they do

not persuasively allege that Defendants knew that the Bike would be recalled.  Plaintiffs fail to

show that Defendants "knew facts or had access to information suggesting that their public

statements were not accurate," *Emps.' Ret. Sys. of Gov. of the V.I.*, 794 F.3d at 306 (quoting

*ECA, Loc. 134 IBEW Joint Pension Tr.*, 553 F.3d at 199), because they do not persuasively

allege how Defendants' knowledge of the seat post defect would have made any of the

challenged statements inaccurate.  For example, Plaintiffs do not allege how Defendants'

knowledge of reports of approximately thirty-five seat post issues over multiple years, out of 2.2

million Bikes sold, (*see* SAC ¶¶ 245, 309), would have made any of the challenged statements or

disclosures inaccurate.  Even assuming Plaintiffs are correct that Defendants knew about those

complaints, they do not support Plaintiffs' argument that those reports would lead to a recall of

every Bike Peloton sold between 2018 and 2013.  *See Ret. Bd. of Policemen's Annuity and*

*Benefit Fund of Chicago ex rel. Policemen's Annuity & Benefit Fund v. FXCM Inc.*, 333 F. Supp.

3d 338, 351 (S.D.N.Y. 2018) (dismissing claims for lack of scienter where defendant was aware

of the possible consequences of a risk, but did not perceive it "as a serious possibility at the

time" defendant made disclosures), *aff'd*, 767 F. App'x 139 (2d Cir. 2019); *id.* at 351–52

(concluding that the defendant "did not act with scienter when making statements about the"

company's business risks because he "did not perceive a credible risk").  While providing

additional confidential witnesses testimonies — for example, that Defendant McCarthy had

48

actual knowledge of complaints regarding the Bike post from customer emails, (SAC ¶¶ 240–41), and reports, (*id.* ¶¶ 251–53) — strengthens Plaintiffs' argument that Defendants were aware of the seat post defect, it does not support Plaintiffs' argument that Defendants knew that all the Bikes would be recalled.[18]

In addition, Plaintiffs' argument that Defendants were on notice of the likelihood and extent of a Bike recall because of the Tread+ recall and nine voluntary recalls of other companies' stationary bicycles since 1981, (SAC ¶¶ 267–77), do not support an inference of scienter.  (*See* Defs.' Mem. 27.)  First, Plaintiffs' argument that Defendants were on notice of the likelihood and extent of a Bike recall because they were "intimately familiar with the full spectrum of expenses" associated with the Tread+ recall, (SAC ¶ 270), is insufficient to support an inference of scienter because Plaintiffs must do more than allege that Defendants had or should have had knowledge of the extent of the Bike recall by virtue of their access to inside information about the Tread+.  *See Jun v. 500.com Ltd.*, No. 20-CV-806, 2021 WL 4813192, at *17 (E.D.N.Y. Aug. 13, 2021), ("[P]laintiffs 'must do more than allege that the individual defendants . . . or other officers had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions, their general responsibility for monitoring [their company's] activities, and their access to inside information.'" (alteration in original) (quoting *Johnson v. Siemens AG*, No. 09-CV-5310, 2011 WL 1304267, at *15

---

[18]  Plaintiffs' other scienter allegations that they have established Defendants' knowledge of the seat post issue because (1) Defendants were legally required to review and inform the CPSC about any Bike defects, (SAC ¶¶ 242–49), (2) the Bike and product safety are at the core of Peloton's business, (*id.* ¶¶ 293–95), and (3) the "hands-on" management style of Defendants McCarthy, Foley, Cortese, and Woodworth, (*id.* ¶¶ 296–300), all fail because they depend on Plaintiffs' allegation that Defendants knew of or recklessly disregarded the seat post defect. Even assuming Defendants knew of the seat post issues, Plaintiffs have not adequately alleged scienter because they do not show that Defendants knew that the Bike recall would occur.

(E.D.N.Y. Mar. 31, 2011), *report and recommendation adopted*, 2021 WL 4260644 (E.D.N.Y. Sep. 20, 2021))).  Second, Plaintiffs also argue that Defendants were on notice of the likelihood and extent of a Bike recall because, between 1981 and 2020, nine other bicycle companies had issued recalls.  (SAC ¶ 268.)  This is insufficient to support an inference of scienter because unrelated settlements, investigations, or recalls by other companies do not support an inference of scienter.  *See KBC Asset Mgmt. NV v. MetLife, Inc.*, No. 21-291, 2022 WL 480213, at *2 (2d Cir. Feb. 17, 2022) (summary order) (concluding that defendant's previous settlement concerning a separate issue did not support an inference of scienter); *Diabat*, 2024 WL 4252502, at *159 (holding that an SEC investigation into a separate entity could not support an inference of scienter to another company).

### ii.   Plaintiffs do not sufficiently allege Defendants' motive or opportunity to commit fraud

Plaintiffs do not sufficiently allege that Defendants had a motive or opportunity to fraudulently conceal the seat post defect.  First, Plaintiffs' argument that Defendants were motivated to and subsequently obscured safety and quality defects "to fend off further reputational and operational damage," (Pls.' Opp'n 29), following the recall and fallout of Tread+ are not sufficient to support scienter.  *See Mangrove*, 2025 WL 1420914, at *4 (stating that a desire to "sustain the appearance of corporate profitability" was insufficient to establish scienter (quoting *DeCarlo*, 80 F.4th at 177–78)); *Swanson v. Danimer Sci., Inc.*, No. 23-7674, 2024 WL 4315109, at *3 (2d Cir. Sep. 27, 2024) (summary order) (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (same); *DeCarlo*, 122 F.4th at 49 ("But the desire to sustain 'the appearance of corporate profitability' is not itself the kind of incentive or motivation that raises an inference of scienter." (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996))); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 242

(S.D.N.Y. 2022) ("The desire to maintain the profitability of the investment and to avoid governmental and regulatory scrutiny are neither concrete nor personal to the defendants and are common to all corporate officers."); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d at 582 (holding that "[a]llegations as to the importance of quality and quality control are merely allegations of what could theoretically motivate a company" and not an indicator of scienter). Second, Plaintiffs' allegation that Defendants Foley, Cortese, and Coddington had personal finance motives related to Peloton's stock, (Pls.' Opp'n 29), does not raise a strong inference of scienter. Plaintiffs undermine their argument about Defendants' motives by not alleging that Defendants Foley or Cortese sold Peloton stock during the Class Period. As a result, Plaintiffs' argument that Defendants Foley and Cortese's motivation to conceal the defects to avoid a potential margin call resulting from a decline in Peloton's stock is insufficient to establish scienter. *See Meyer*, 727 F. Supp. 3d at 395 (holding plaintiffs did not sufficiently allege scienter where plaintiffs did not allege any executives sold any shares in the company during the class period); *Russo v. Bruce*, 777 F. Supp. 2d 505, 518 (S.D.N.Y. 2011) (holding that defendants, who were "well-placed to take advantage of the fraud they allegedly committed," but nevertheless "did not engage in any stock sales during the class period fatally undermines [plaintiff's] motive allegations"). Plaintiffs' allegation that Defendants Cortese and Foley pledged Peloton stock as collateral for personal loans, (SAC ¶¶ 282–89), is also insufficient to establish scienter. *See Johnson v. NYFIX, Inc.*, 399 F. Supp. 2d 105, 114 (D. Conn. 2005) (holding that an executive's pledge of company stock for a personal loan is insufficient to establish motive because "loans secured with stock are analogous to stock ownership"). Third, Plaintiffs' argument that Defendant Coddington sold seventy-six percent of her Peloton holdings prior to Peloton's stock drop, (SAC ¶¶ 290–92), does not adequately allege that Defendant Coddington did so "to take

51

advantage of an inflated stock price." *See Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 356 n.4 (concluding that plaintiffs did not "sufficiently allege[] that the purpose of the [10b5-1] plan was to take advantage of an inflated stock price" because they failed to "indicat[e] that the plan was not 'given or entered into in good faith' or was 'part of a plan or scheme to evade the prohibitions' of the regulations" (first alteration in original) (first quoting *Emps.' Ret. Sys. of Gov't of the V.I.*, 794 F.3d at 309; and then quoting 17 C.F.R. § 240.10b5-1(c)(1)(ii))); *Meyer*, 727 F. Supp. 3d at 395 (holding that plaintiffs had not alleged scienter because they failed to allege that the purpose of defendant's 10b5-1 plan was to take advantage of an inflated stock price) (citing *Emps.' Ret. Sys. of Gov't of the V.I.*, 794 F.3d at 309)).

Accordingly, Plaintiffs have not adequately pleaded scienter with respect to Defendants.

### iii.    Plaintiffs do not sufficiently allege control-person claims

Defendants argue that because Plaintiffs have failed to plead a primary violation of Section 10(b), the Court must dismiss the control claim under Section 20(a) against the Individual Defendants.  (Defs.' Mem. 30.)  In addition, Defendants argue that the Section 20(a) claim should be dismissed because Plaintiffs do not allege any of the Individual Defendants culpably participated in the alleged securities fraud.  (*Id.*)

Plaintiffs allege that the Individual Defendants are liable under Section 20(a) "[b]y virtue of their positions of control and authority as senior officers and/or directors" of Peloton, the Individual Defendants "had the power to influence and control, and did influence and control, directly or indirectly . . . the contents of public statements during the Class Period" that "artificially inflated the market price of Peloton securities."  (SAC ¶¶ 337–42.)

To state a claim under Section 20(a), a plaintiff must show: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's

fraud." *In re Shanda Games Ltd. Sec. Litig.*, 128 F.4th 26, 59 (2d Cir. 2025) (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 108); *In re Bernard L. Madoff Inv. Sec. LLC*, 818 F. App'x 48, 55 (2d Cir. 2020) (same); *see also ECA, Loc. 134 IBEW Joint Pension Tr.*, 553 F.3d at 207 ("In order to establish a prima facie case of controlling-person liability [under Section 20(a)], a plaintiff must show a primary violation by the controlled person." (quoting *First Jersey Sec., Inc.*, 101 F.3d at 1472)); *Hawes v. Argo Blockchain PLC*, No. 23-CV-7305, 2024 WL 4451967, at *20 (S.D.N.Y. Oct. 9, 2024) ("To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.") (quoting *ATSI Commc'ns, Inc.*, 493 F.3d at 108)).

As discussed above, Plaintiffs have not pleaded a primary violation of Section 10(b) and have failed to establish a strong inference of scienter as to the Individual Defendants. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's control claims. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When the defendant is a corporate entity," plaintiff must plead facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter. In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant."); *Meyer*, 727 F. Supp. 3d at 398 (dismissing claims against a corporation where plaintiffs failed to plead scienter as to any individual defendant).

## III.   Conclusion

For the foregoing reasons, the Court grants Defendants' motion to dismiss the Second

Amended Complaint.

Dated: March 31, 2026
       Brooklyn, New York

SO ORDERED:


         s/MKB
MARGO K. BRODIE
United States District Judge
